**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NO.:

DALE SNYDER,
MARILYN SNYDER,
MARY ANN GELDREICH,
MARY HARROW, DO,
KENNETH DALE YODER a/k/a KEN YODER,
CATHERINE TAYLOR a/k/a KATE TAYLOR,
MARTHA LEMERT,
GARY LEMERT,
JEFFERY RAY a/k/a/ JEFF RAY,
JENNIFER RAY,
LOUISE CREAGER,
JANET KOCH,
IAN SIEMPLENSKI,
TOMMY MEYER,
NICOLE WRIGHT-MEYER,
SUEHAM KAY HOFFMAN, individually, and as representative for the ESTATE OF
DOROTHY WOOD HAMMER,
LAILA SAEDA URBAN, individually, and as representative for the ESTATE OF DOROTHY
WOOD HAMMER,
ESTATE OF DOROTHY WOOD HAMMER, individually, and on behalf of all others similarly
situated,

      Plaintiffs,
v.

ACORD CORPORATION, a Delaware non-profit corporation,
ACUITY, A MUTUAL INSURANCE COMPANY, a Wisconsin corporation,
ADDISON INSURANCE COMPANY, an Iowa corporation,
ALL AMERICA INSURANCE COMPANY, d/b/a THE CENTRAL INSURANCE
COMPANIES, an Ohio corporation,
ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, a California corporation,
ALLIANZ LIFE INSURANCE CO. OF NORTH AMERICA, a Minnesota corporation,
ALLIANZ OF AMERICA, INC., a Delaware corporation,
ALLSTATE INSURANCE COMPANY, an Illinois corporation,
AMERICAN ASSOCIATION OF INSURANCE SERVICES, INC., a Delaware non-profit
corporation,
AMERICAN AUTOMOBILE INSURANCE COMPANY, a/k/a FIREMAN'S FUND
INSURANCE COMPANY OF MISSOURI, a Missouri corporation,
AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, a Florida corporation,
AMERICAN FAMILY HOME INSURANCE COMPANY, a Florida corporation,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a Wisconsin corporation,
AMERICAN INDEMNITY FINANCIAL CORPORATION, a Delaware corporation,
AMERICAN INTERNATIONAL GROUP, INC., a Delaware corporation,
AMERICAN MODERN INSURANCE GROUP, INC., an Ohio corporation,
AMERICAN MODERN HOME INSURANCE COMPANY, an Ohio corporation,
AMERICAN MODERN SELECT INSURANCE COMPANY, an Ohio corporation,
AMERICAN RELIABLE INSURANCE COMPANY, an Arizona corporation,
AMERICAN STRATEGIC INSURANCE CORP., a Florida corporation,
ASSOCIATED INDEMNITY CORPORATION, a California corporation,
AUTOMOBILE INSURANCE COMPANY OF HARTFORD CONNECTICUT, a
Connecticut corporation,
AUTO-OWNERS INSURANCE COMPANY, d/b/a AUTO-OWNERS INSURANCE, a
Michigan corporation,
CASUALTY ACTUARIAL SOCIETY, an Illinois not for profit corporation,
CENTRAL MUTUAL INSURANCE COMPANY, d/b/a THE CENTRAL INSURANCE
COMPANIES, an Ohio corporation,
THE CHUBB CORPORATION, a New Jersey corporation,
CHUBB NATIONAL INSURANCE COMPANY, an Indiana corporation,
CHUBB SERVICES CORPORATION, an Illinois corporation,
CINCINNATI INSURANCE COMPANY, an Ohio corporation,
COLORADO FARM BUREAU MUTUAL INSURANCE CO., a Colorado corporation,
COUNTRY MUTUAL INSURANCE COMPANY, an Illinois corporation,
ELECTRIC INSURANCE COMPANY, a Massachusetts corporation,
EMPLOYERS MUTUAL CASUALTY COMPANY, d/b/a EMC INSURANCE
COMPANIES, an Iowa corporation,
ENCOMPASS INDEMNITY COMPANY, an Illinois corporation,
ENCOMPASS INSURANCE COMPANY OF AMERICA, d/b/a ENCOMPASS
INSURANCE, an Illinois corporation,
FARMERS ALLIANCE MUTUAL INSURANCE COMPANY, a Kansas corporation,
FARMERS INSURANCE COMPANY, a/k/a FARMERS CASUALTY INSURANCE
COMPANY, d/b/a FARMER'S INSURANCE EXCHANGE, an Iowa corporation,
FEDERAL INSURANCE COMPANY, an Indiana corporation,
FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland corporation,
FIREMAN'S FUND INSURANCE COMPANY, a California corporation,
FIRST AMERICAN PROPERTY & CASUALTY INSURANCE COMPANY, d/b/a FIRST
AMERICAN PROPERTY & CASUALTY GROUP, a California corporation,
FIRST AMERICAN FINANCIAL CORPORATION, a Delaware corporation,
GRANGE INSURANCE ASSOCIATION, d/b/a GRANGE INSURANCE GROUP, a
Washington corporation,
GREAT NORTHERN INSURANCE COMPANY, an Indiana corporation,
GUIDEONE MUTUAL INSURANCE COMPANY, d/b/a GUIDEONE INSURANCE, an
Iowa corporation,
HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Connecticut corporation,
HARTFORD FIRE INSURANCE COMPANY, a Connecticut corporation,
INSURANCE SERVICES OFFICE, INC., a Delaware corporation,

INTERNATIONAL INSURANCE SOCIETY, INC., a Delaware non-profit corporation,
KEMPER CORPORATE SERVICES, INC., an Illinois corporation,
KEMPER CORPORATION, a Delaware corporation,
LAFAYETTE INSURANCE COMPANY, a/k/a UNITED LIFE INSURANCE COMPANY,
INC., a Louisiana corporation,
LIBERTY INSURANCE CORPORATION, an Illinois corporation,
LIBERTY MUTUAL INSURANCE, a Massachusetts corporation,
LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation,
LM INSURANCE CORPORATION, an Illinois corporation,
MARKEL AMERICAN INSURANCE COMPANY, a Virginia corporation,
MARKEL INSURANCE COMPANY, an Illinois corporation,
MCKINSEY & COMPANY, INC., a/k/a MCKINSEY & COMPANY, INC. WASHINGTON
D.C., a Delaware corporation,
MCKINSEY & COMPANY, INC., a New York corporation,
METLIFE AUTO & HOME INSURANCE AGENCY, INC., a Rhode Island corporation,
METROPOLITAN DIRECT PROPERTY & CASUALTY INSURANCE COMPANY, a
Rhode Island corporation,
METROPOLITAN LIFE INSURANCE COMPANY, a Rhode Island corporation,
METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY, a Rhode
Island corporation,
MILBANK INSURANCE COMPANY, an Iowa corporation,
MUNICH-AMERICAN HOLDING CORPORATION, a Delaware corporation,
NATIONAL CASUALTY COMPANY, a Wisconsin corporation,
NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY, a Wisconsin
corporation,
NATIONAL SURETY CORPORATION, an Illinois corporation,
NATIONWIDE AFFINITY INSURANCE COMPANY OF AMERICA, an Ohio corporation,
NATIONWIDE INSURANCE COMPANY OF AMERICA, a Wisconsin corporation,
NATIONWIDE MUTUAL INSURANCE COMPANY, d/b/a NATIONWIDE
INSURANCE, an Ohio corporation,
OWNERS INSURANCE COMPANY, d/b/a AUTO-OWNERS INSURANCE, d/b/a
HOME-OWNERS INSURANCE, an Ohio corporation,
PACIFIC INDEMNITY COMPANY, a Wisconsin corporation,
PHARMACISTS MUTUAL INSURANCE COMPANY, an Iowa corporation,
PRAETORIAN INSURANCE COMPANY, a Pennsylvania corporation,
PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA, a Colorado non-profit
corporation,
QBE HOLDINGS, INC., a Delaware corporation,
QBE INSURANCE COMPANY, a/k/a QBE INSURANCE CORPORATION, a Pennsylvania
corporation,
QBE INSURANCE GROUP, LIMITED, a Sydney, Australia corporation,
SAFECO INSURANCE COMPANY OF AMERICA, a New Hampshire corporation,
SECURA INSURANCE HOLDINGS, INC., a Wisconsin corporation,
SENTRY INSURANCE, A MUTUAL COMPANY, a Wisconsin corporation,
SHELTER MUTUAL INSURANCE COMPANY, a Missouri corporation,

STANDARD FIRE INSURANCE COMPANY, a Connecticut corporation,
STATE AUTOMOBILE INSURANCE COMPANY, an Ohio corporation,
STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation,
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois corporation,
STILLWATER PROPERTY AND CASUALTY INSURANCE COMPANY a/k/a FIDELITY NATIONAL PROPERTY AND CASUALTY INSURANCE COMPANY, d/b/a STILLWATER INSURANCE GROUP, a New York corporation,
TEXAS GENERAL INDEMNITY COMPANY, a Colorado corporation,
THE BUCKEYE STATE MUTUAL INSURANCE COMPANY, d/b/a BUCKEYE INSURANCE GROUP, an Ohio corporation,
THE CALIFORNIA CASUALTY INDEMNITY EXCHANGE, a California corporation,
THE HARTFORD FINANCIAL SERVICES GROUP, a Delaware corporation,
THE TRAVELERS COMPANIES INC., a Minnesota corporation,
THE TRAVELERS INSURANCE COMPANY, a Connecticut corporation,
TRAVELERS INSURANCE GROUP HOLDINGS, INC., a Connecticut corporation,
TRAVELERS HOME AND MARINE INSURANCE COMPANY, a Connecticut corporation,
TRAVELERS INDEMNITY COMPANY OF AMERICA, a Connecticut corporation,
TRAVELERS COMMERCIAL INSURANCE COMPANY, a Connecticut corporation,
UNITED FIRE GROUP, INC., d/b/a UNITED FIRE GROUP, an Iowa corporation,
UNITED FIRE & CASUALTY COMPANY, d/b/a/ UNITED FIRE GROUP, an Iowa corporation,
UNITED FIRE INSURANCE COMPANY, d/b/a UNITED FIRE GROUP, an Illinois corporation,
UNITED FIRE AND INDEMNITY COMPANY, a Texas corporation,
UNITED FIRE LLOYDS, a Texas corporation,
UNITED LIFE INSURANCE COMPANY, an Iowa corporation,
UNITED SERVICES AUTOMOBILE ASSOCIATION, a Texas corporation,
UNITRIN AUTO AND HOME INSURANCE COMPANY, a New York corporation,
UNITRIN DIRECT PROPERTY & CASUALTY COMPANY, an Illinois corporation,
USAA CASUALTY INSURANCE COMPANY, a Texas corporation,
VERISK ANALYTICS, INC., a Delaware corporation,
VIGILANT INSURANCE COMPANY, a New York corporation,
ZURICH AMERICAN INSURANCE COMPANY, a New York corporation,
ZURICH INSURANCE GROUP LTD/FI, a Switzerland corporation,

      Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

## INTRODUCTION

The claims for relief referenced herein are brought by Plaintiffs for themselves and all other members of a class of similarly situated individuals and entities, with included subclasses – which are hereinafter described and established by the different claims for relief and common law causes of action listed in this Complaint, as well as those common law causes of action with overlapping elements in other jurisdictions – in connection with schemes used by Defendants and co-conspirators to defraud Plaintiffs by use of mail, curriers and wires, in violation of 18 U.S.C. §§ 1341 and 1343, along with a complex and intricate conspiracy to use a legitimate enterprise to that effect while also committing Colorado state common law torts and other offenses and violations of law, doing so in other jurisdictions as well (where the alleged acts are actionable on common law or other state law having the same or overlapping elements).  These alleged acts and conspiracy are all in violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968, particularly 18 U.S.C. § 1962 (a), (b), (c) and (d), as well as 15 U.S.C. §§ 1-7, and 15 U.S.C. §§ 12–27, as the acts, omissions and related conspiracy have restrained trade to the detriment of the People of the United States and in foreign trade as well.[1]

---

[1]  Allegations concerning the continuity and relationship of the extremely extensive, intricate, comprehensive and sophisticated conspiracy that is the subject of this Complaint – a conspiracy that has made use of one of the most sophisticated, intricate and extensive enterprises, which spans all reaches of an entire industry – have been stated with particularity to satisfy: (1) the **RICO** pleading requirements; (2) protecting the interests of the millions of putative class members, and

Allegations concerning the conduct in question, the conspiracy and the particular enterprise that Defendants have used to achieve the ends of the schemes and conspiracy – particularly the historical and background allegations and those connecting the nature and features of the conspiracy and scheme to defraud to the enterprise in question – are alleged upon information and belief for all allegations not relating directly to the named Plaintiffs. The Plaintiffs thus allege as follows:

---

subclass members, whose claims for relief are defined by the foreseeable harms that myriad complex features of the conspiracy, which itself makes use of a sophisticated, arcane, and comprehensive enterprise, employing its own level of industry-specific expertise in a complicated framework of business standards and languages that are applied across all levels of the insurance industry, also spanning the entire United States in its operation complexity, and most of the developed and developing markets of the World as well; (3) pleading the many foreseeable and proximate damages of the fraud and conspiracy with particularity; and (4) providing notice through such pleading to the various thousands of participants of the conspiracy.  In so pleading, an additional layer of complexity is added to describing the already complex nature and mechanisms of the enterprise used to the alleged corrupt ends, as the artifices of the conspiracy not only use the complexities of the enterprise by adding deceptive features to it, but also add elements designed to hide those deceptive features within the operations of the enterprise, something that itself must also be plead with particularity.

## PARTIES

1.      Plaintiff DALE SNYDER is a natural person and resident of Colorado, residing in Larimer County, Colorado.

2.      Plaintiff MARILYN SNYDER is a natural person and resident of Colorado, residing in Larimer County, Colorado.

3.      Plaintiff MARY ANN GELDREICH is a natural person and resident of Colorado, residing in Larimer County, Colorado.

4.      Plaintiff MARY HARROW, DO is a natural person and resident of Colorado, residing in El Paso County, Colorado.

5.      Plaintiff KENNETH DALE YODER is a natural person and resident of Colorado, residing in Larimer County, Colorado.

6.      Plaintiff CATHERINE TAYLOR is a natural person and resident of Colorado, residing in Larimer County, Colorado.

7.      Plaintiff MARTHA LEMERT is a natural person and resident of Colorado, residing in Larimer County, Colorado.

8.      Plaintiff GARY LEMERT is a natural person and resident of Colorado, residing in Larimer County, Colorado.

9.      Plaintiff JEFFERY RAY is a natural person and resident of Colorado, residing in Larimer County, Colorado.

10.     Plaintiff JENNIFER RAY is a natural person and resident of Colorado, residing in Larimer County, Colorado.

11.     Plaintiff LOUISE CREAGER is a natural person and resident of Colorado, residing in Larimer County, Colorado.

12.     Plaintiff JANET KOCH is a natural person and resident of Oregon, residing in Curry County, Oregon.

13.     Plaintiff IAN SIEMPLENSKI is a natural person and resident of Colorado, residing in Larimer County, Colorado.

14.     Plaintiff TOMMY MEYER is a natural person and resident of Colorado, residing in Larimer County, Colorado.

15.     Plaintiff NICOLE WRIGHT-MEYER is a natural person and resident of Colorado, residing in Larimer County, Colorado.

16.     Plaintiff SUEHAM KAY HOFFMAN is a natural person and resident of the State of Colorado, residing in the County of Jefferson.

17.     Plaintiff LAILA SAEDA URBAN is a natural person and resident of the State of Colorado, residing in the County of Adams.

18.     Plaintiff the Estate of DOROTHY WOOD HAMMER is a Colorado probate estate, in the County of Grand.

19.     Upon information and belief, Defendant ACORD CORPORATION is a foreign nonprofit corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 1 Blue Hill Plaza 15th Floor, Pearl River, NY 10965, and a registered agent, or service of process, address located at Corporation Service Company, 1560 Broadway, Suite 2090, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

20.     Upon information and belief, Defendant ACUITY, A MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at 2800 South Taylor Drive, Sheboygan,

WI 53081-8474, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

21.     Upon information and belief, Defendant ADDISON INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 118 2nd Avenue Se, Cedar Rapids, IA 52407-3909, and a registered agent, or service of process address located out of state at Neal R Scharmer, 118 2nd Ave Se, Cedar Rapids, IA 52407; and it is engaged in the business of insurance.

22.     Upon information and belief, Defendant ALL AMERICAN INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 800 South Washington Street, Van Wert, OH 45891-2357, and a registered agent, or service of process, address located out of state at Timothy L Rauch, 7301 North State Highway 161, Suite 320, Irving, TX 75039-2820, and is engaged in the business of insurance.

23.     Upon information and belief: Defendant ALLIANZ GLOBAL RISKS US INSURANCE COMPANY is a corporation organized and existing under the laws of the State of California, having its principal office and place of business located at 225 W. Washington Street, Suite 100, Chicago, IL, 60606; it is the parent company of AMERICAN INSURANCE COMPANY, and FIREMAN'S FUND INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Suite Denver, CO. 80202, within the territorial jurisdiction of this Court.

24.     Upon information and belief, Defendant ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, is a corporation organized and existing under the laws of the State of Minnesota, having its principal office and place of business located at 5701 Golden Hills Drive, Minneapolis, MN 55416, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

25.     Upon information and belief: Defendant ALLIANZ OF AMERICA, INC. is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 777 San Marin Dr., Novato, CA, 94998; it has a service of process address out of state at The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, DE 19801; it is the holding company of ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, which is the parent company of FIREMAN'S FUND INSURANCE COMPANY, which is the parent of AMERICAN AUTOMOBILE INSURANCE COMPANY; and it is engaged in the business of insurance.

26.     Upon information and belief: Defendant ALLSTATE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 2775 Sanders Rd, Northbrook, IL 60062; it is the parent company of ENCOMPASS INSURANCE COMPANY OF AMERICA; is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court.

27.     Upon information and belief: Defendant AMERICAN ASSOCIATION OF INSURANCE SERVICES, INC. is a nonprofit corporation organized and existing under the

laws of the State of Delaware, having its principal office and place of business located at 1745 S. Naperville Rd, Wheaton, Illinois 60189; it has a service of process address out of state at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801; and it is engaged in the business of insurance.

28.    Upon information and belief, Defendant AMERICAN AUTOMOBILE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Missouri, having its principal office and place of business located at One Progress Point Parkway, O'Fallon, MO 63368, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

29.    Upon information and belief, Defendant AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA is a corporation organized and existing under the laws of the State of Florida, having its principal office and place of business located at 11222 Quail Roost Drive, Miami, FL 33157, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

30.    Upon information and belief, Defendant AMERICAN FAMILY HOME INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Florida, having its principal office and place of business located at 1301 Riverplace Blvd., Suite 1300, Jacksonville, FL 32207, and a registered agent, or service of process, address located at Registered Agent Solutions, Inc., 36 South 18th Avenue, Suite D, Brighton, CO 80601, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

31.     Upon information and belief, Defendant AMERICAN FAMILY MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at 6000 American Parkway, Madison, WI 53783, United States, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

32.     Upon information and belief, Defendant AMERICAN INDEMNITY FINANCIAL CORPORATION is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 1 American Indemnity Plaza, Galveston, TX 77550; it has a service of process address out of state at LSN/CSC, Inc., 2711 Centerville Road, Wilmington, DE 19808; it is the holding company of TEXAS GENERAL INDEMNITY COMPANY; and it is engaged in the business of insurance.

33.     Upon information and belief: Defendant AMERICAN INTERNATIONAL GROUP, INC. is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 175 Water Street, New York, NY 10038; it has a service of process address out of state at United States Corporation Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808; it is the holding company of AIG PROPERTY CASUALTY COMPANY; and it is engaged in the business of insurance.

34.     Upon information and belief: Defendant AMERICAN MODERN INSURANCE GROUP, INC. is a corporation for profit organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 700 Midland Blvd., Amelia, OH 45102; it has a service of process address out of state at Charles S. Griffith III, 700 Midland Boulevard, Amelia, OH 45102; it is the holding company of AMERICAN FAMILY HOME

INSURANCE COMPANY, AMERICAN MODERN HOME INSURANCE COMPANY, and AMERICAN MODERN SELECT INSURANCE COMPANY; and it is engaged in the business of insurance.

35.    Upon information and belief, Defendant AMERICAN MODERN HOME INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 7000 Midland Boulevard, Amelia, OH 45102, and a registered agent, or service of process, address located at Registered Agent Solutions, Inc., 36 South 18th Avenue, Suite D, Brighton, CO 80601, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

36.    Upon information and belief, Defendant AMERICAN MODERN SELECT INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 7000 Midland Blvd., Amelia, OH 45102-2607; it has a service of process address out of state at Charles S. Griffith III, 7000 Midland Boulevard, Amelia, OH 45102; and it is engaged in the business of insurance.

37.    Upon    information    and    belief,    Defendant    AMERICAN    RELIABLE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Arizona, having its principal office and place of business located at 8655 E Via de Ventura, E200, Scottsdale, AZ 85258, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

38.    Upon    information    and    belief,    Defendant    AMERICAN    STRATEGIC INSURANCE CORP. is a corporation organized and existing under the laws of the State of Florida, having its principal office and place of business located at 1 ASI Way, St. Petersburg,

FL 33702, and a registered agent, or service of process, address located at National Registered Agents, Inc., 1675 Broadway, Suite 1200, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

39.    Upon information and belief, Defendant ASSOCIATED INDEMNITY CORPORATION is a corporation organized and existing under the laws of the State of California, having its principal office and place of business located at 777 San Marin Drive, Novato, CA 94998, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

40.    Upon information and belief, Defendant AUTOMOBILE INSURANCE COMPANY OF HARTFORD CONNECTICUT is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at One Tower Square, Hartford, CT 01683, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

41.    Upon information and belief, Defendant AUTO-OWNERS INSURANCE COMPANY, d/b/a AUTO-OWNERS INSURANCE, is a corporation organized and existing under the laws of the State of Michigan, having its principal office and place of business located at 6101 Anacapri Blvd., Lansing, MI 48909-8160; it is the parent company of OWNERS INSURANCE COMPANY, and is engaged in the business of insurance, with a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court.

42.     Upon information and belief, Defendant CASUALTY ACTUARIAL SOCIETY is a not for profit corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 4350 N. Fairfax Drive, Suite 250, Arlington, VA 22203; it has a service of process address out of state, located at Kathy Pechan, One State Farm Plaza, D-4, Bloomington, IL 61710; and it is engaged in the business of insurance underwriting.

43.     Upon information and belief, Defendant CENTRAL MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 800 South Washington Street, Van Wert, OH 45891-2357, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

44.     Upon information and belief: Defendant THE CHUBB CORPORATION is an Insurance Company organized and existing under the laws of the State of New Jersey, having its principal office and place of business located at 15 Mountain View Road, Warren, NJ 07059; it has a service of process address out of state at:  Henry J. Gulick, 15 Mountain View Road, Warren, NJ 07059; it is the parent company of FEDERAL INSURANCE COMPANY, and GREAT NORTHERN INSURANCE COMPANY; and it is engaged in the business of insurance.

45.     Upon information and belief: Defendant CHUBB NATIONAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Indiana, having its principal office and place of business located at One American Square, Suite 2600, Indianapolis, IN 46282, and a principal office mailing address at 15 Mountain View Road,

Warran, NJ, 07059; it is the parent company of PACIFIC INDEMNITY COMPANY, VIGILANT INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Suite 1200, Denver, CO, 80202, within the territorial jurisdiction of this Court.

46.     Upon information and belief, Defendant CHUBB SERVICES CORPORATION is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 15 Mountain View Road, Warran NJ 07059, and a registered agent, or service of process, address located at The Corporation Company, 1675 Suite 1200, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

47.     Upon information and belief, Defendant CINCINNATI INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 6200 South Gilmore Road, Fairfield, OH, 45014, and a registered agent, or service of process, address located at National Registered Agents, Inc., 1675 Broadway, Suite 1200, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

48.     Upon information and belief, Defendant COLORADO FARM BUREAU MUTUAL INSURANCE CO. is a corporation organized and existing under the laws of the State of Colorado, having its principal office and place of business located at 9177 E. Mineral, Centennial, CO 80112, and a registered agent, or service of process, address located at Cheryl Radke, 9177 E. Mineral, Centennial, CO 80112, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

49.    Upon information and belief, Defendant COUNTRY MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 1711 GE Road, 3rd Floor, Bloomington, IL 61704, and a registered agent, or service of process, address located at The Corporation Company 1675 Broadway, Suite 1200, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

50.    Upon information and belief, Defendant ELECTRIC INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Massachusetts, having its principal office and place of business located at 75 Sam Fonzo Drive, Beverly, MA 01915, and a registered agent, or service of process, address located at CT Corporation, 1675 Broadway, Suite 1200, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

51.    Upon information and belief: Defendant EMPLOYERS MUTUAL CASUALTY COMPANY d/b/a EMC INSURANCE COMPANIES, is a corporation organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 717 Mulberry Street, Des Moines, IA 50309-3872; it is the parent company of EMC INSURANCE GROUP, INC., which is the parent company of EMCASCO INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at: Dennis J Prindiville, 5445 DTC Parkway, Suite 320, Greenwood Village, CO 80111, mailing address:  P.O. Box 3199, Greenwood Village, CO 80155-3199, within the territorial jurisdiction of this Court.

52.    Upon information and belief, Defendant ENCOMPASS INDEMNITY COMPANY is a corporation organized and existing under the laws of the State of Illinois,

having its principal office and place of business located at 2775 Sanders Road, Northbrook, IL 60062-6127; it has a service of process address out of state located at: C T Corporation System, 1999 Bryan St., Ste 900, Dallas TX 75201-3136; and it is engaged in the business of insurance.

53.     Upon information and belief, Defendant ENCOMPASS INSURANCE COMPANY OF AMERICA is an Insurance Company organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 2775 Sanders Road, Northbrook, IL 60062, and a registered agent, or service of process, address located out of state: at Nancy Flores, C/O CT Corporation System, 818 West Seventh Street, Los Angeles, CA 90017, United States, and is engaged in the business of insurance.

54.     Upon information and belief: Defendant FARMERS ALLIANCE MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Kansas, having its principal office and place of business located at 1122 North Main Street, McPherson KS 67460-2846; it is the parent company of ALLIANCE INSURANCE COMPANY, INC., and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court.

55.     Upon information and belief, Defendant FARMERS INSURANCE COMPANY, a/k/a FARMERS CASUALTY INSURANCE COMPANY, d/b/a FARMERS INSURANCE EXCHANGE, is a corporation organized and existing under the laws of the State of Iowa, having a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States; it is a subsidiary of Farmers Insurance Group within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

56.     Upon information and belief, Defendant FEDERAL INSURANCE COMPANY is an insurance company organized and existing under the laws of the Indiana, having its principal office and place of business located at One American Square, Suite 2600, Indianapolis, IN 46282, United States, and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Ste. 1200, Denver, CO 80202, United States within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

57.     Upon information and belief, Defendant FIDELITY AND DEPOSIT COMPANY OF MARYLAND is an insurance company organized and existing under the laws of the State of Maryland, having its principal office and place of business located at 1400 American Lane, Schaumburg, IL 60196, United States, and a registered agent, or service of process, address located at Corporation Service Company 1560 Broadway, Denver, CO 80202, United States within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

58.     Upon information and belief, Defendant FIREMAN'S FUND INSURANCE COMPANY is an insurance company organized and existing under the laws of the State of California, having its principal office and place of business located at 777 San Marin Drive, Novato, CA 94998; it is the parent company of NATIONAL SURETY CORPORATION, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway Ste 1200, Denver, CO 80202, within the territorial jurisdiction of this Court.

59.     Upon information and belief, Defendant FIRST AMERICAN PROPERTY & CASUALTY INSURANCE COMPANY is an insurance company organized and existing under the laws of the State of California, having its principal office and place of business located

at 4 First American Way, Santa Ana, CA 92707, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

60. Upon information and belief, Defendant FIRST AMERICAN FINANCIAL CORPORATION is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 1 First American Way, Santa Ana, CA 92707, and a registered agent, or service of process, address located out of state at Corporation Service Company, 2710 Gateway Oaks Dr, Ste 150N, Sacramento, CA 95833, United States, and is engaged in the business of insurance.

61. Upon information and belief, Defendant GRANGE INSURANCE ASSOCIATION is an insurance company organized and existing under the laws of the State of Washington, having its principal office and place of business located at 200 Cedar St. Seattle, WA 98121, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

62. Upon information and belief, Defendant GREAT NORTHERN INSURANCE COMPANY is an insurance company organized and existing under the laws of the State of Indiana, having its principal office and place of business located at One American Square, Suite 2600, Indianapolis, IN 46282, United States, and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Ste 1200, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

63.     Upon information and belief, Defendant GUIDEONE MUTUAL INSURANCE COMPANY is an Insurance Company organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 1111 Ashworth Road, West Des Moines, IA 50265, United States, and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Ste. 1200, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

64.     Upon information and belief, Defendant HARTFORD ACCIDENT AND INDEMNITY COMPANY is an Insurance Company organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at 7670 S Chester St, Englewood, CO 80112, United States, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

65.     Upon information and belief, Defendant HARTFORD FIRE INSURANCE COMPANY is an insurance company organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at 7670 S Chester St, Englewood, CO 80112, United States, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

66.     Upon information and belief, Defendant INSURANCE SERVICES OFFICE, INC. is a corporation organized and existing under the laws of the state of Delaware, having its principal office and place of business located at 545 Washington Blvd, Jersey City, NJ 07310-1686, and a registered agent, or service of process, address located out of state at 2711

Centerville Rd, Suite 400, Wilmington, DE 19808, United States, and is engaged in the business of insurance.

67.     Upon information and belief, Defendant INTERNATIONAL INSURANCE SOCIETY, INC. is a corporation organized and existing under the laws of the state of Delaware, having its principal office and place of business located at 101 Murray Street, New York, NY 10007, and a registered agent, or service of process, address located out of state at The Corporation Trust Company Corporation Trust Center, 1209 Orange St, Wilmington, DE 19808, United States, and is engaged in the business of insurance.

68.     Upon information and belief, Defendant KEMPER CORPORATE SERVICES, INC. is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at One East Wacker Dr., Chicago, IL 60601 and a registered agent, or service of process, address located at Division of Insurance, 1675 Broadway, Suite 1200, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

69.     Upon information and belief: Defendant KEMPER CORPORATION is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at One East Wacker Drive, Chicago, IL, 60601; it is the holding company of UNITRIN DIRECT PROPERTY & CASUALTY COMPANY and UNITRIN AUTO AND HOME INSURANCE COMPANY, KEMPER CORPORATE SERVICES, INC., and is engaged in the business of insurance; and has a registered agent, or service of process, address located out of state at C T Corporation System, 208 So. LaSalle St., Suite 814, Chicago, IL, 60604.

70.     Upon information and belief, Defendant LAFAYETTE INSURANCE COMPANY is corporation organized and existing under the laws of the State of Louisiana, having its principal office and place of business located at 118 Second Avenue Se, Cedar Rapids, IA 52401; its domiciliary address at 2800 Veterans Blvd, Suite 253, Metairie, Louisiana 70002; and a registered agent, or service of process, address located out of state at 118 Second Avenue Se, Cedar Rapids, IA 52401, United States; and is engaged in the business of insurance.

71.     Upon information and belief, Defendant LIBERTY INSURANCE CORPORATION is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 2815 Forbs Avenue, Hoffman Estates, IL 60192, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

72.     Upon information and belief: Defendant LIBERTY MUTUAL INSURANCE is a corporation organized and existing under the laws of the State of Massachusetts, having its principal office and place of business located at 175 BERKELEY ST, BOSTON, MA 02116, United States; it is the parent company of LM INSURANCE COMPANY AND LIBERTY INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court.

73.     Upon information and belief: Defendant LIBERTY MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Massachusetts, having its principal office and place of business located at 175 Berkeley Street, Boston, MA, 02116; it is the parent company of SAFECO INSURANCE COMPANY OF

AMERICA, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court.

74.     Upon information and belief, Defendant LM INSURANCE CORPORATION is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 2815 Forbs Avenue, Hoffman Estates, IL 60192, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

75.     Upon information and belief, Defendant MARKEL AMERICAN INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Virginia, having its principal office and place of business located at N14 W23800 Stone Ridge Drive, Waukesha, WI 53188, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

76.     Upon information and belief: Defendant MARKEL INSURANCE COMPANY is an Insurance Company organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 4521 Highwoods Parkway, Glen Allen, VA   23060; it  is  the  parent  company  of  MARKEL  AMERICAN  INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court.

77.     Upon information and belief, Defendant MCKINSEY & COMPANY, INC. WASHINGTON D.C.  is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 55 East 52nd Street, New York, NY 10022, and a registered agent, or service of process, address located at Corporation Service Company, 1560 Broadway, Suite 2090, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of managing and consulting.

78.     Upon information and belief: Defendant MCKINSEY & COMPANY, INC. is a corporation organized and existing under the laws of the State of New York, having its principal office and place of business located at 55 E 52nd Street/27th FL, New York, NY 1002; it has a service of process address out of state at Corporation Service Company, 80 State Street, Albany, NY 12207-2543; it is the parent company of MCKINSEY & COMPANY, INC. WASHINGTON D.C.; and it is engaged in the business of managing and consulting.

79.     Upon information and belief: Defendant METLIFE AUTO & HOME INSURANCE AGENCY, INC. is a corporation organized and existing under the laws of the State of Rhode Island, having its principal office and place of business located at 700 Quaker Lane, Warwick, RI 02886-6681; it is the parent company of ECONOMY PREMIER ASSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Suite 1200, Denver CO 80202, within the territorial jurisdiction of this Court.

80.     Upon information and belief, Defendant METROPOLITAN DIRECT PROPERTY AND CASUALTY INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Rhode Island, having its principal office and place of business located at 700 Quaker Lane, Warwick RI 02886-6681, and a registered agent, or

service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

81. Upon information and belief: Defendant METROPOLITAN LIFE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Rhode Island, having its principal office and place of business located at 700 Quaker Lane, Warwick, RI 02886-6681, United States; it is the parent company of METROPOLITAN PROPERTY & CASUALTY INSURANCE COMPANY and METROPOLITAN DIRECT PROPERTY & CASUALTY INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at The Corporation Company 1675 Broadway, Suite 1200, Denver, CO 80202, United States, within the territorial jurisdiction of this Court.

82. Upon information and belief, Defendant METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Rhode Island, having its principal office and place of business located at 700 Quaker Lane, Warwick RI 02886-6681, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

83. Upon information and belief, Defendant MILBANK INSURANCE COMPANY is an Insurance Company organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 1300 Woodland Avenue, West Des Moines, IA 50265, United States, and a registered agent, or service of process, address located at Colorado

Commissioner of Insurance, 1560 Broadway, Ste. 850, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

84.    Upon information and belief: Defendant MUNICH-AMERICAN HOLDING CORPORATION is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 555 College Road E, Princeton, NJ 08543; it has a service of process address out of state at The Corporation Trust Company, Corporation Trust Center 1209 Orange St, Wilmington, DE 19801; it is the holding company of AMERICAN MODERN INSURANCE GROUP, which is the holding company of AMERICAN FAMILY HOME INSURANCE COMPANY, AMERICAN MODERN HOME INSURANCE COMPANY, AND AMERICAN MODERN SELECT INSURANCE COMPANY; and it is engaged in the business of insurance.

85.    Upon information and belief, Defendant NATIONAL CASUALTY COMPANY is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at 8877 North Gainey Center Dr., Scottsdale, AZ 85258, United States, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

86.    Upon information and belief, Defendant NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at One General Drive, Sun Prairie, WI 53596, United States, and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Ste 1200, Denver, CO

80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

87. Upon information and belief, Defendant NATIONAL SURETY CORPORATION is an Insurance Company organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 33 West Monroe Street, Chicago, IL 60603, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

88. Upon information and belief, Defendant NATIONWIDE AFFINITY INSURANCE COMPANY OF AMERICA is an Insurance Company organized and existing under the laws of the State of Ohio, having its principal office and place of business located at One Nationwide Plaza, Columbus, OH 43215, United States, and a registered agent, or service of process, address located at Corporation Service Company, 560 Broadway, Suite 2090, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

89. Upon information and belief, Defendant NATIONWIDE INSURANCE COMPANY OF AMERICA is an Insurance Company organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at 1100 Locust Street, Des Moines, IA 50391-1100, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

90. Upon information and belief: Defendant NATIONWIDE MUTUAL INSURANCE COMPANY d/b/a NATIONWIDE INSURANCE, is a corporation for non-

profit organized and existing under the laws of the State of Ohio, having its principal office and place of business located at One Nationwide Plaza, Columbus, OH 43215; it is the holding company of ALLIED GROUP INC., which is the parent company of DEPOSITORS INSURANCE COMPANY, is also the parent company of NATIONAL CASUALTY CO, NATIONWIDE AFFINITY INSURANCE COMPANY OF AMERICA, and NATIONWIDE INSURANCE COMPANY OF AMERICA; is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court.

91.     Upon information and belief, Defendant OWNERS INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 6101 Anacapri Blvd. Lansing, MI 48917, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

92.     Upon information and belief, Defendant PACIFIC INDEMNITY COMPANY is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at Two Plaza East, Ste. 1450, 330 East Kilbourne Ave., Milwaukee, WI 53202, and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Suite 1200, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

93.     Upon information and belief, Defendant PHARMACISTS MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 808 US Hwy 18 West,

Algona, IA 50511, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

94.    Upon information and belief, Defendant PRAETORIAN INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Pennsylvania, having its principal office and place of business located at 116 Pine Street, Suite 320, Harrisburg, PA 17101, and a registered agent, or service of process, address located at CT Corporation System, 1675 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

95.    Upon information and belief, Defendant PROPERTY CASUALTY INSURERS ASSOCIATION OF AMERICA is a nonprofit corporation organized and existing under the laws of the State of Colorado, having its principal office and place of business located at 8700 W Bryn Mawr Ave, Chicago, IL 60631, and a registered agent, or service of process, address located at Kelly Campbell, 1535 Grant Street, Denver, CO 80203, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

96.    Upon information and belief: QBE HOLDINGS, INC. is a holding company organized and existing under the laws of the State of Delaware, having its principal office and place of business located at Wall Street Plaza, 88 Pine Street, New York, NY  10005; it has a service of process address out of state at C T Corporation System, 1633 Broadway, New York, NY 10019; it is the parent company of NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY; and it is engaged in the business of insurance.

97.    Upon information and belief: Defendant QBE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Pennsylvania, having its

principal office and place of business located at 88 Pine Street, 4th Floor, New York, NY, 10005; it is the holding company of STONINGTON INSURANCE COMPANY, PRAETORIAN INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court.

98.    Upon information and belief: Defendant QBE INSURANCE GROUP, LIMITED is a corporation organized and existing under the laws of Sydney, Australia, having its principal office and place of business located at QBE Insurance Group, Limited, Level 27, 8 Chifley Square, Sydney NSW 200 Australia, and is engaged in the business of insurance.

99.    Upon information and belief, Defendant SAFECO INSURANCE COMPANY OF AMERICA is a corporation organized and existing under the laws of the State of New Hampshire, having its principal office and place of business located at 62 Maple Avenue, Keene, NH, 50511, and a registered agent, or service of process, address located at Colorado Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

100.    Upon information and belief: Defendant SECURA INSURANCE HOLDINGS, INC. is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at 2401 S. Memorial Drive, Appleton, WI, 54915; it has a service of process address out of state at Daniel P. Ferris, 2401 S. Memorial Drive, Appleton, WI, 54915; it is the parent of SECURA, A MUTUAL COMPANY and SECURA, SUPREME INSURANCE COMPANY; and it is engaged in the business of insurance.

101.    Upon information and belief, Defendant SENTRY INSURANCE, A MUTUAL COMPANY is a corporation organized and existing under the laws of the State of Wisconsin, having its principal office and place of business located at 1800 North Point Drive, Stevens Point, WI 54481, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

102.    Upon information and belief, Defendant SHELTER MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Missouri, having its principal office and place of business located at 1817 West Broadway, Columbia, MO, 65218, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

103.    Upon information and belief, STANDARD FIRE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at One Tower Square, Hartford, CT and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

104.    Upon information and belief: Defendant STATE AUTOMOBILE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Ohio, having its principal office and place of business located at 518 East Broad Street, Columbus, OH 43215, United States; it is the parent company of MILBANK INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address

located at Colorado Commission of Insurance, 1560 Broadway, Ste. 850, Denver, CO 80202, United States within the territorial jurisdiction of this Court.

105.   Upon information and belief, Defendant STATE FARM FIRE AND CASUALTY COMPANY is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 1555 Promontory Circle, Greeley, CO 80638, and a registered agent, or service of process, address located at Kathleen Rees, 1555 Promontory Circle, Greeley, CO 80638, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

106.   Upon information and belief: Defendant STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at One State Farm Plaza, Bloomington, IL, 61710; it is the parent company of STATE FARM FIRE AND CASUALTY COMPANY, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Kathleen Rees, 1555 Promontory Circle, Greeley, CO, 80638, within the territorial jurisdiction of this Court.

107.   Upon information and belief, Defendant STILLWATER PROPERTY AND CASUALTY INSURANCE COMPANY, also known as FIDELITY NATIONAL PROPERTY AND CASUALTY INSURANCE COMPANY is a corporation organized and existing under the laws of the State of New York, having its principal office and place of business located at 2 Robbins Lane, Jericho, NY 11753, United States, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

108.    Upon information and belief, Defendant TEXAS GENERAL INDEMNITY COMPANY, is a corporation organized and existing under the laws of the State of Colorado, having its principal office and place of business located at 118 Second Avenue SE, Cedar Rapids, Iowa 52401; a domiciliary address at 7301 North Federal Suite 200, Westminister, Colorado 80030; and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, United States, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

109.    Upon information and belief: Defendant THE BUCKEYE STATE MUTUAL INSURANCE COMPANY d/b/a BUCKEYE INSURANCE GROUP is a corporation for non-profit organized and existing under the laws of the State of Ohio, having its principal office and place of business located at One Heritage Place, Piqua, OH 45356; it has a service of process address out of state at R. Douglas Haines, One Heritage PL , Piqua, OH 45356; and it is engaged in the business of insurance.

110.    Upon information and belief, Defendant THE CALIFORNIA CASUALTY INDEMNITY EXCHANGE is a corporation organized and existing under the laws of the State of California, having its principal office and place of business located at 1900 Alameda de las Pulgas, San Mateo, CA 94403-1298, and a registered agent, or service of process, address located at Registered Agent Solutions, Inc. 36 South 18th Avenue, Suite D, Brighton, CO 80601, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

111.    Upon information and belief: Defendant THE HARTFORD FINANCIAL SERVICES GROUP is an insurance company organized and existing under the laws of the State of Delaware, having its principal office and place of business located at One Hartford

Plaza, Hartford, DT, 06155; it has a service of process address out of state at: CT Corporation System, One Corporate Center, Hartford, CT 06103-3220; it is the parent company of HARTFORD ACCIDENT AND INDEMNITY and HARTFORD FIRE INSURANCE COMPANY; and it is engaged in the business of insurance.

112.   Upon information and belief: Defendant THE TRAVELERS COMPANIES, INC. is a corporation organized and existing under the laws of the State of Minnesota, having its principal office and place of business located at 485 Lexington Avenue, New York, NY, 10017; it has a service of process address out of state at Corporation Service Company, 50 Weston Street, Hartford, CT, 06120; it is the parent of THE TRAVELERS INSURANCE GROUP HOLDINGS, INC., STANDARD FIRE INSURANCE COMPANY, AUTOMOBILE INSURANCE COMPANY OF HARTFORD CONNECTICUT, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY, THE TRAVELERS INDEMNITY COMPANY OF AMERICA, TRAVELERS COMMERCIAL INSURANCE COMPANY; and it is engaged in the business of insurance.

113.   Upon information and belief: Defendant THE TRAVELERS INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at 485 Lexington Avenue, New York, NY, 10017; it is the parent company of STANDARD FIRE INSURANCE COMPANY, AUTOMOBILE INSURANCE COMPANY OF HARTFORD CONNECTICUT, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY, THE TRAVELERS INDEMNITY COMPANY OF AMERICA, TRAVELERS COMMERCIAL INSURANCE COMPANY, and is engaged in the business of insurance; and has a registered agent, or service

of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court.

114.    Upon information and belief: Defendant TRAVELERS INSURANCE GROUP HOLDINGS, INC. is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at One Tower Square, Hartford, CT, 06183; it has a service of process address out of state at Corporation Service Company, 50 Weston St., Hartford, CT, 06120; it is the parent of THE TRAVELERS INSURANCE COMPANY, STANDARD FIRE INSURANCE COMPANY, AUTOMOBILE INSURANCE COMPANY OF HARTFORD CONNECTICUT, THE TRAVELERS HOME AND MARINE INSURANCE COMPANY, THE TRAVELERS INDEMNITY COMPANY OF AMERICA, TRAVELERS COMMERCIAL INSURANCE COMPANY; and it is engaged in the business of insurance.

115.    Upon information and belief, Defendant TRAVELERS HOME AND MARINE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at One Tower Square, Hartford, CT 01683, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

116.    Upon information and belief, Defendant TRAVELERS INDEMNITY COMPANY OF AMERICA is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at One Tower Square, Hartford, CT 01683, and a registered agent, or service of process, address located at Division of

Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

117.    Upon information and belief, Defendant TRAVELERS COMMERCIAL INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Connecticut, having its principal office and place of business located at One Tower Square, Hartford, CT 01683, and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

118.    Upon information and belief, Defendant UNITED FIRE GROUP, INC. is a corporation organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 118 Second Avenue SE, Cedar Rapids, IA, 52407, and a registered agent, or service of process, address located out of state at:  Neal R Scharmer, 118 Second Ave Se, Cedar Rapids, IA, 52401, and is engaged in the business of insurance.

119.    Upon information and belief, Defendant UNITED FIRE & CASUALTY COMPANY is a corporation organized and existing under the laws of the State of Iowa, having its principal office and place of business located at 118 Second Avenue SE, Cedar Rapids, IA, 52407, and a registered agent, or service of process, address located at Division of Insurance: David L. Hellen, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

120.    Upon information and belief, Defendant UNITED FIRE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Illinois, having its principal offices and places of business located at 118 Second Avenue SE, Cedar Rapids, IA, 52407; 2350 East Devon Avenue, Des Plaines, IL 60018; as well as 7301 Federal

Blvd #200, Westminster, CO 80030, and with a registered agent, or service of process, address located at Division of Insurance: 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

121.    Upon information and belief, Defendant UNITED FIRE AND INDEMNITY COMPANY is a corporation organized and existing under the laws of the State of Texas, having its principal offices and places of business located at 118 Second Avenue SE, Cedar Rapids, IA, 52407; 455 East Medical Center Boulevard, Suite 400, Webster, Texas 77598; as well as 2115 Winnie, Galveston, TX 77550; and 7301 Federal Blvd #200, Westminster, CO 80030; and with a registered agent, or service of process, address located at Division of Insurance: David L. Hellen, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

122.    Upon information and belief, Defendant UNITED FIRE LLOYDS is a corporation organized and existing under the laws of the State of Texas, having its principal offices and places of business located at 118 Second Avenue SE, Cedar Rapids, IA, 52407; and 455 East Medical Center, Boulevard, Suite 400, Webster, Texas 77598; and with a registered agent, or service of process, address located at:  Joe Johnson, 2115 Winnie Street, Galveston, TX 77550-2033; and is engaged in the business of insurance.

123.    Upon information and belief, Defendant UNITED LIFE INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Iowa, having its principal offices and places of business located at 118 Second Avenue Se, Cedar Rapids, IA 52401-1212; and with a registered agent, or service of process, address located out of state at: Joe Johnson, 2115 Winnie Street, Galveston, TX 77550-2033; and is engaged in the business of insurance.

124.    Upon information and belief, Defendant UNITED SERVICES AUTOMOBILE ASSOCIATION is a corporation organized and existing under the laws of the State of Texas, having its principal offices and places of business located at 9800 Fredericksburg Road, San Antonio, TX 78288; 9800 Fredericksburg Road, San Antonio, TX 78288; and with a registered agent, or service of process, address located at: C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136; and is engaged in the business of insurance.

125.    Upon information and belief, Defendant UNITRIN AUTO AND HOME INSURANCE COMPANY is a corporation organized and existing under the laws of the State of New York, having its principal office and place of business located at 5784 Widewaters Parkway, Dewitt, NY 13214 and a registered agent, or service of process, address located at Division of Insurance, 1560 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

126.    Upon information and belief, Defendant UNITRIN DIRECT PROPERTY & CASUALTY COMPANY is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at One East Wacker Dr., Chicago, IL 60601 and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

127.    Upon information and belief, Defendant USAA CASUALTY INSURANCE COMPANY is a corporation organized and existing under the laws of the State of Texas, having its principal office and place of business located at 9800 Fredericksburg Road, San Antonio, TX 78288; and a registered agent, or service of process, address located at The

Corporation Company, 1675 Broadway, Suite 1200, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

128.   Upon information and belief, Defendant VERISK ANALYTICS, INC. is a corporation organized and existing under the laws of the State of Delaware, having its principal office and place of business located at 545 Washington Blvd, Jersey City, NJ 07310-1686, and with a registered agent, or service of process, address located out of state at: Corporation Service Company, 2711 Centerville Rd Suite 400, Wilmington, DE 19808.

129.   Upon information and belief, Defendant VIGILANT INSURANCE COMPANY, is a corporation organized and existing under the laws of the State of Illinois, having its principal office and place of business located at 55 Water Street, 28-30th Floors, New York, NY 10041 and a registered agent, or service of process, address located at The Corporation Company, 1675 Broadway, Suite 1200, Denver, CO, 80202, within the territorial jurisdiction of this Court, and is engaged in the business of insurance.

130.   Upon information and belief: Defendant ZURICH AMERICAN INSURANCE COMPANY is an Insurance Company organized and existing under the laws of the State of New York, having its principal office and place of business located at One Liberty Plaza, 165 Broadway, 32nd Floor, New York, NY 10006, United States; it is the parent company of FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and is engaged in the business of insurance; and has a registered agent, or service of process, address located at Corporation Service Company, 1560 Broadway, Suite 2090, Denver, CO 80202, United States, within the territorial jurisdiction of this Court.

131.   Upon information and belief, Defendant ZURICH INSURANCE GROUP LTD/FI is a Foreign Insurance Company organized and existing under the laws of

Switzerland, having its principal office and place of business located at Mythenquai 2, Zurich V8 8022, Switzerland.

## JURISDICTION

132.   This Court has jurisdiction of this action under the Sherman Antitrust Act, 15 U.S.C. § 4, the Clayton Act, 15 U.S.C. §§ 12–27, the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1962(a), (b), (c) and (d), 1964 (a) (Civil RICO "Equity") and (c) (Civil RICO "Damages"); 28 U.S.C. §§ 1331 ("Federal Question"), 1332(d)(2) ("Diversity") and 1337 ("Regulation of Commerce"), the U.S. Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, and 1711–1715, under the principles of supplemental jurisdiction, as stated in 28 U.S.C. § 1367, and through Colorado Long-Arm Statute, § 13-1-124, C.R.S.

133.   Article III, Section 2 of the United States Constitution, providing, in relevant part, that the judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority.

134.   Personal jurisdiction and venue is proper in this District and this Court has personal jurisdiction over the Defendants, pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), as the Defendants are citizens of, residents of, are found within, have agents within, are doing business in, and/or transact their affairs in this District, and the activities of the Defendants which gave rise to the claims for relief occurred in this District.

135.   Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because: (1) a substantial part of the events or omissions giving rise to the claims for insurance coverage occurred in the District of Colorado; (2) the underlying insurance agreements of the individual named plaintiffs, coming on behalf of the class, were purchased and delivered in the State of Colorado;

and (3) the underlying controversies giving rise to the claims for insurance coverage, and showing the nature and predicates of the class claims, occurred in the State of Colorado.

## CO-CONSPIRATORS

136.    Various persons, who are known of and unknown to Plaintiffs, and not named as defendants in this action, including senior executives of the Defendants, have participated as co-conspirators with Defendants in the offenses alleged and have performed acts or made statements in furtherance of the conspiracy.

137.    As a conspiracy is a *de facto* class – being essentially, a group of similarly situated individuals and/or groups similarly situated and connected in an aim, and organized, though for some unlawful purpose – and as similar issues of law and fact apply to all members of a conspiracy in an action on the theories of liability involving conspiracy, the group of Co-Conspirators will also be referred to herein as the "Defendant Class."

## BACKGROUND OF THE CASE

### I. SCOPE

138.    Because a general description of anything as complex and intricate as a scheme that spans the majority of an entire industry enterprise[2] is needed before addressing the significance of a pattern appearing in a set of predicate acts affecting the named Plaintiffs (demonstrating the context of the acts and omissions in question, including the role and factors indicating knowledge on the part of the many involved participants), the allegations themselves are correspondingly complex, intricate and detailed.  In short, describing anything complex

---

[2] With even more inherent complexity than a description of industry enterprise itself, due to the added features of fraud and concealment.

with particularity is a complex endeavor and an involved task. As the allegations also relate to sufficiently addressing and providing notice to a considerable class of Defendants concerning the nature of the liability, the many harms their actions and omissions have caused to an even larger class of putative plaintiffs in what is alleged to be one of the most comprehensive, extensive and sophisticated mail/wire fraud conspiracies in modern history, the allegations strive to provide particular descriptions of the many factors indicating knowledge on the part of enterprise participants within the complex and comprehensive framework of the enterprise. This comprehensive nature of the allegations, included in the BACKGROUND OF THE CASE allegations, *infra*, is also necessary to protect the various interests of the many subclasses of Plaintiffs affected by the various damages caused by the corresponding harms that give rise to their subclass, as each corresponding wrong – in essence – defines the nature of the claims for relief held by the subclasses.

139.    Because racketeering involves deception, which can be demonstrated circumstantially by facts arising through inferences raised in the comparing of different allegations, or compound allegations – particularly as to the inconsistent nature of statements, facts arising from inference will be pled specifically in this Complaint.

## II. HISTORICAL ALLEGATIONS

140.    Prior to the latter half of the twentieth century, and before the creation of what is now termed the "Replacement Cost" policy, the most common kind of insurance protecting property was one that insured the property against fire for the actual value of the property. Such policies would be referred to as "Actual Cash Value" policies by current standards.

141.     It was a common public belief, prior to the latter half of the twentieth century, that a policy insured the property for the amount stated in the policy in the event of a total loss, in that the policyholder was indeed paying for that additional limit.

142.     It was also a common popular belief, prior to the latter half of the twentieth century, that the actual value of the property was agreed to be the limit of insurance in case of total loss, and that it was related to, and indeed was, the limit of insurance, as the premiums on such policies were based on the amount stated in the policy.

143.     In regard to the allegations of the preceding paragraph, because people were therefore paying for their limit of insurance, it was commonly believed that they received something for which they were paying an additional amount.

144.     Being members of the public, insurers, prior to the latter half of the twentieth century, were aware of the aforementioned popular beliefs.

145.     At the time, there was a practice among some insurers of not disclosing the definitions of the material terms: "actual cash value," "actual value," or "depreciation" when a policyholder applied for insurance or entered the insurance contract.  In such instances, policies in question would also not contain definitions of at least one of these terms, and the policyholder was not informed of how the company intended to apply the terms until the time of claim.

146.     Some of the insurers who failed to disclose the aforementioned terms used such undisclosed terms as a method of engineering future disagreement into the contract so that, at the time of a claim, a disagreement on the material terms of payment would be present.  Said insurers would then use the difficulties and costs of legal process that would otherwise determine the "dispute" over the terms "actual cash value," "actual value," or "depreciation" as a

mechanism used to force policyholders into compromises that were lower than the actual value of their property.

147.    In the cases referenced in the preceding paragraph, the policyholders were generally in a weakened economic position, and the referenced insurers took advantage of their weakened position.  Such insurers abused the nature of the legal process by using the burdens of legal enforcement as a negotiating tool to force lower settlement for valid claims.

148.    The process mentioned in the preceding paragraph was done after the insurer intentionally failed to disclose material terms in the contract that were used by the insurer to select value, and the entire process was set up in advance by the insurer in an effort to induce policyholders to enter a contract that contradicted the proper intention of the parties, as imputed by law to insurance contracts.

149.    The insurers who were involved in the aforementioned scheme to defraud policyholders by failing to disclose material terms relating to the actual value of property, or to the value of insurance, incorporated and utilized certain features in the process of how they sold insurance in an effort to take advantage of the public perception of what was being purchased in an insurance contract protecting real property.  Some of the features incorporated were: (1) to not present policyholders with a policy at the time of sale; (2) to not include material terms in the application for insurance; (3) to use a method of distribution and sales that was known to lower the guard of insurance purchasers and which was designed to minimize the disclosure of excluded material terms; (4) the use, in the sales process, of agents who were burdened by a conflict of interest due to obligations to both the policyholder and the insurer, and who were also incentivized to make a sale without disclosing material terms of the policy that would be otherwise communicated by an agent performing the duties of an agent; and (5) to present the

agents as agents of the policyholder, with all the obligations to the policyholder that agency connotes.

150.     Because of the practices of insurers involved in the aforementioned scheme, policyholders that suffered total losses to real property were left without funds they reasonably anticipated in the event of a calamity.  They also did not receive limits of insurance they had paid for.

151.     Insurers involved in the aforementioned scheme used their own definition of the "the principle of indemnity" to bring this about, where instead of the "principle of indemnity" having the commonly understood meaning where the policyholder was to be put in the same financial condition that they were in before the calamity, they applied a meaning where the policyholder would only get the "actual value" of the item lost, and such insurers defined that term in a number of ways that allowed them to supply self-serving calculations of an item's fair market price.

152.     As a pretext for the practices referenced in the preceding paragraph, and despite the fact that the mechanisms of the scheme prevented a meeting of the minds between insurers and policyholders on the issues of what the "principle of indemnity" meant, or what the "actual value" of an item meant, insurers employing the scheme were able to engineer delay into the payment of claims by securing a disagreement in the contract through not providing a definition of the term "principle of indemnity."  (This was possible due to the way insurers controlled the creation of the contract and what was disclosed to the policyholder.)

153.     For insurers involved in this scheme, the term "the principle of indemnity," became associated with features of business, and a justification that would allow an insurer to

achieve unpaid claims, as well as profits gained from unpaid claims.  Profits were also gained in charging premiums for amounts that were, due to the scheme, uncollectible.

154.    Due to the practices referenced in the prior paragraph, such insurers were able to take on an internal meaning of the term "principle of indemnity" and the term "actual cash value," where the terms were seen as dependent.  The "principle of indemnity" was achieved when the insured was given the "actual cash value" or "actual value" of an item, and the "actual cash value" was seen as whatever could be argued in a struggle with the insured as its value.

155.    By means of such uses of "actual cash value" and "actual value," prior to the second half of the twentieth century, some insurers were involved in a racket of coordinating underwriting, policy writing, policy language, and claims practices in a way that capitalized on ambiguities in the policies in question that were created by a failure to disclose material terms relating to valuation.

156.    In cases such as those referenced in the preceding paragraph, policyholders of such insurers were left having to fight for the value of items they had previously insured for a certain limit in the midst of calamity.

157.    Prior to the second half of the twentieth century, and in response to rackets and other abuses regarding the valuation of property in insurance, a number of states passed "valued policy" laws, which gave the policyholder the value of the policy in the event of a total loss.

158.    At the time, the insurance industry combatted the efforts to pass and enact valued policy laws.

159.    In the latter half of the twentieth century, the "Replacement Cost" policy was created.  One reason advanced for the creation of "Replacement Cost" policies was to have an

insurance product that more closely met consumer expectations of what property insurance provided.

160.    In the latter half of the twentieth century, the previously-mentioned common beliefs as to the nature of property or fire insurance and what it provided persisted as a common popular belief, to-wit:  the belief that a policy insured the property for the amount stated in the policy in the event of a total loss, as the policyholder was paying for that limit of insurance; and/or the belief that the actual value of the property was agreed to be the limit of insurance in case of total loss, and that it was related to, and indeed was, the limit of insurance, as the premiums on such policies were based on the amount stated in the policy.  Because people were therefore paying for their limit of insurance, it was commonly believed that they received something for which they were paying an additional amount.

161.    At the time that "Replacement Cost" policies began appearing, many insurers who applied practices in conformity with the schemes previously mentioned in regard to Actual Cash Value policies complained that "Replacement Cost" policies were a threat to the definition of "principle of indemnity" that these insurers wished to apply and decried "Replacement Cost" policies as violative of the "principle of indemnity."

162.    In regard to the allegations of the preceding paragraph, there was a common realization in the industry that the very function and purpose of a Replacement Cost policy was to provide more protection than insurers who used the aforementioned schemes regarding "Actual Cash Value" were willing to pay for at the time of loss on a policy.

163.    The insurers referenced in the preceding two paragraphs raised this protest although the "principle of indemnity," as they defined it, was openly not recognized as the contractual goal of Replacement Cost policies or the marketing surrounding them, where a

stated goal of "Replacement Cost" policies was to provide a contractual means to achieve the replacement of real property after damage, as a means to help restore homeowners to their prior position after a loss.

164.   After the appearance of "Replacement Cost" policies, some insurers discovered ways to engineer the forfeiture of the replacement cost provisions to bring about "Actual Cash Value" payments in the event of loss, along with resulting unpaid claims, and to bring such policies more in line with the "principle of indemnity," as self-servingly defined by such insurers.   Some of the tools that were used to bring this about were "escape clauses," requirements for coinsurance percentages, and requirements against underinsurance. These contractual tools were purportedly meant to function with an amount of insurance commensurate with the amount needed to actually replace a property, but were detrimental to an underinsured homeowner.

165.   At the time Replacement Cost policies appeared, some insurers continued to apply the same practices previously mentioned with regard to Actual Cash Value sales of insurance in addition to the list of previously mentioned omissions in the sales process. It was also common for policyholders not to be notified that: (1) the policy provided only reimbursement of replacement cost and that the policyholder had a limited amount of time to rebuild before there would be a forfeiture of the replacement cost (as opposed to an up-front payment of the amount needed for replacement), which would then leave the policyholder with only an Actual Cash Value payment on the policy; and (2) the amount of insurance needed to adequately protect the property should correspond with an accurate estimate of replacement cost, and not the market value estimate or appraisal of the property.

166.   After the introduction of Replacement Cost policies, some insurers began accounting for what they expected underinsurance to be in their underwriting as a predictor of what they expected to pay on claims and to help calculate what profits would be associated with what they termed "unpaid claims" and the forfeiture of Replacement Cost to the policyholder.

167.   Some of the insurers referenced in the preceding paragraph also took steps to ensure that the amounts of coverage on replacement cost policies did not rise to a level that would preclude the savings such companies expected and/or calculated into their business model to achieve a level of "unpaid claims" due to unpaid replacement cost that resulted from underinsurance.

168.   After the introduction of Replacement Cost policies, some insurers began to incorporate features into their "Replacement Cost" policy products that were calculated to bring about the forfeiture of replacement cost and other unpaid claims. Some underwriters and insurers applying these features, practices, methodologies and calculations, identified such features, practices, methodologies and calculations as ways of bringing about such "efficiencies."

169.   The named Defendants to this action are all knowledgeable of the nature of insurance, the industry of insurance, its history, of schemes that have been applied throughout its history, and of the economic incentives past insurers had in applying such schemes.

### III. The Enterprise

170.   Upon information and belief, ACORD CORPORATION ("ACORD") was founded in 1970 as a not-for-profit organization formed by insurance carriers and agents focused on building efficiencies in the U.S. Property Casualty Insurance Market. Originally termed the Agent Company Operations Research and Development (ACORD) organization, its purported initial focus was in standardizing the many proprietary forms being used by carriers

for new business and claims submission.  As per ACORD, those who started ACORD were volunteers.

171.    Upon information and belief, in the late 1970's ACORD began developing electronic standards to complement the form standards.

172.    All of the allegations made in this Enterprise section, *infra*, are stated as to all relevant times, unless stated otherwise, as they refer to continuing or prevalent matters and states of affairs, or matters happening with frequency during the past ten years. "All relevant times" meaning that they have occurred during the last ten years.

173.    ACORD is part of an enterprise, entailing a cooperative effort among competing insurers and competing vendors of computer hardware, software and Internet products and services.

174.    At its core, ACORD involves people who come from all corners of the industry to unite behind the common goals of "efficiency" and "progress" that are embodied by the ACORD standards.

175.    ACORD envisions an insurance industry that embraces a global and enterprise view of information, in which relevant business solutions all include or provide for ACORD standards.  In this regard, ACORD wishes all trading partners to be able to easily exchange information.

176.    The enterprise that ACORD is a part of includes both members and non-members of ACORD.  In this sense, ACORD facilitates an open standards development process where any interested party - not just ACORD members - may propose a change or enhancement to the ACORD standards. These proposals are known as maintenance requests (MRs) and, if approved, are presented to the appropriate committees for review and vote.

177.    ACORD members vote on the standards, considering their content, nature and effect, and ACORD membership means that the participant organization's interests are represented in the standards.

178.    As an ACORD member, a participant's voice is present in all the work ACORD does. ACORD membership, however, is about more than just the standards; it entails collaboration, networking, and a shared vision. Membership in ACORD demonstrates a participant's commitment to "the future."

179.    All of the named Defendants are involved in an enterprise with ACORD as either members, strategic partners, or as associates.

180.    From a business perspective, ACORD is: a way to describe insurance business data entities; a way to describe insurance operations ("transactions"); and an insurance industry standard used as a common business language by thousands of carriers and agencies.

181.    From an architectural perspective, ACORD is: a data model that specifies insurance business data entities; a transaction model that specifies insurance business operations using the data model as input/output parameters; schema constructs; a data model that provides flexibility; and a stable product, with backwards compatibility as the central design rule for the model.

182.    ACORD members, worldwide, include hundreds of insurance and reinsurance companies, agents and brokers, software providers, financial services organizations and industry associations.  In this regard, those involved in said enterprise also include solutions providers, associations, working groups, trade groups, political action groups, lobbies and volunteers.

183.    ACORD members are highly aware of the wide range of issues facing the industry, and the often-complex ways in which those issues are interrelated, and sense the dual nature of many of the themes that are shaping the market: the ability of a driver to act as either an opportunity or a threat depending on context.

184.    ACORD member organizations encourage and support their employees to serve as volunteers in ACORD because, among other things: the volunteers gain experience and skills; the volunteer's organization gains efficiency and knowledge; and, the entire insurance industry advances.

185.    ACORD volunteers help with the development of "standards," drive change in the industry and are vital to ACORD's success.  In this regard, ACORD volunteers serve on working groups and committees, share their expertise at roundtables and events, and contribute as newsletter guest columnists or webinar hosts.  The time an ACORD volunteer spends in volunteer efforts brings the volunteer personal recognition and networking opportunities while gaining the volunteer skills and insights that benefit the volunteer's organization.

186.    As part of its operations, ACORD provides a Solution Provider Directory, which is a participant's one place to find the potential providers that can answer the participant's strategic and tactical information technology needs using ACORD Standards.

187.    All companies listed in the Solution Provider Directory are ACORD members and the information participants find in the Solution Provider Directory helps participants evaluate and choose the "best" providers, whether they provide a solution, consulting services, outsourcing or other technologies.

188.    Goals, functions and objectives of the enterprise that ACORD is a part of include: (1) standardization programs; (2) the leveraging of standards; (3) the development of a flexible framework that can be applied across state lines in the United States, and internationally as well; (4) the implementation of ACORD framework and standards in the industry; (5) the proliferation of ACORD's standards and framework throughout the industry; (6) use of "best practices" to implement, advance and spread the standards and framework of the ACORD enterprise, where those involved in the enterprise "evangelize" others; (7) the spread of the enterprise, which ACORD is a part of, into emerging markets; (8) to "reach out" to a wide range of reinsurers, cedents, and brokers that are not currently involved, and to provide information and education as to current activities, encouraging implementation; (9) research, development and testing; (10) data gathering; (11) the use and leveraging of data, "Big Data" and analytics for business value and for competitive advantage; (12) educating enterprise participants as to how insurers are acquiring, managing, and enhancing their data, the role standards are playing, and how traditional business intelligence, advanced analytics, and big data are being applied for competitive, strategic and operational advantage; (13) developing opportunities and plans for using "Big Data" to revolutionize the insurance business; (14) to know what people think; (15) the researching of public opinion for enterprise use and advancement; (16) understanding consumers; (17) customer experience management; (18) pragmatic marketing; (19) gaining a clearer understanding of emerging trends; (20) cooperation as to achieving the profitability of its members and participants; (21) impacting regulation and legislation that would have an impact on the profitability of its enterprise participants; (22) impacting and affecting legislation and regulations that would affect enterprise's "best practices" and standards; (23) strategy development; (24) influencing

politicians; (25) influencing regulators; (26) the coordination of the enterprise that ACORD is a part of; (27) plans for the future of the enterprise and future oriented activity; (28) enterprise risk management (ERM); (29) providing a pathway for standards into the future; (30) improving sales of insurance; (31) discovering what makes advertising resonate and achieve results; (32) driving results; (33) bringing together a diverse and progressive cross-section of the industry's leaders and future leaders; (34) developing the industry's next generation; and (35) the creation of a "future view" for the enterprise ACORD is a part of.

189.    Above all, members of the ACORD community show a shared commitment to improving the industry for all its stakeholders, and securing its successful future.

190.    The ACORD Framework is a group of five interrelated models (called facets) that individually present unique perspectives on key aspects of the insurance industry. Collectively, they define the entire industry value chain.

191.    The five facets of the ACORD framework are: (1) a Business Glossary; (2) a Capability Model; (3) an Information Model; (4) a Data Model; and (5) a Component Model.

192.    Taken as a whole, the ACORD Framework forms a basis for standards development that is flexible enough to cross lines of business and geographic borders and provide the industry with a unified approach to understanding insurance data exchange.

193.    ACORD's standards framework is very comprehensive and complex, with a challenging initial learning curve.

194.    The initial implementation times of the ACORD framework take longer for the "first interfaces" of a participant, and "mapping design" initially takes longer due to the longer learning curve associated with the comprehensive and complex framework, though it decreases once more familiarity with ACORD is achieved.

195.   Development time, when adopting the ACORD framework also takes longer initially, but usually decreases once more familiarity with ACORD is achieved.  In this sense, ACORD instructs its participants that it, like any other enterprise-wide standard, works best when it is centrally managed.

196.   The framework, requiring a "learning curve," is also context-specific, and is therefore the key to understanding communications used by the enterprise participants, or initiated outsiders, to understand the communications and data standards communicated between the different participants.

197.   ACORD is, among other things, also an insurance industry standard. The ACORD data model has been in use for close to twenty years, and as such, the base data model is very "mature."  The ACORD transaction model supports over one hundred different types of insurance transactions and is based on the data model.

198.   In this sense, the ACORD standards and framework: reduce time/cost to implement partner interfaces for enterprise participants; reduce data transaction/translation errors reduce human intervention in routine business processing; increase sales and revenue by making it easier for others to do business with an enterprise participant; develop a "single-view" of disparate systems; increase the "richness" of shared information exchanged between participants; and, reduce cycle time between upgrades in data share.

199.   In regard to the above allegations concerning implementation, though ACORD's framework is labor intensive to implement, and slows some internal functions initially, it is the ability of the framework to change the way a company communicates, both internally and externally, that justifies the initial difficulties of change.

200.    ACORD has advanced the proposition that one goal of a data standard is to enable the sharing or exchange of information between multiple parties in a way that guarantees that the interacting parties share the same understanding of what is represented within that information.

201.    ACORD is involved in industry initiatives to establish common names and shared definitions for its commonly used insurance concepts as an industry best practice. In that regard, ACORD is at the forefront of global data standardization.

202.    ACORD data standards form the foundation for communication within the industry and ensure that all participants across all geographies share a common vocabulary or "lingua franca."   From the most basic data element, to messages and business processes, ACORD standards establish a shared understanding, allowing participants to communicate and do business.

203.    Upon information and belief, the enterprise that ACORD takes part in has its own vocabulary and ways of communicating that differ from the way similar terms or ways of communicating in common use operate.

204.    ACORD facilitates the development of open consensus data standards and standard forms, and works with its members and partner organizations to drive implementation of those standards.

205.    ACORD enterprise members tasked with developing communication standards and the framework are experts in language and understand how others perceive what is communicated.

206.    In regard to the allegation in the preceding paragraph, enterprise members tasked with developing communication standards know how to use words to communicate

multiple layers of communication where one communication can be used to send different intended messages to different intended recipients.

207.    The ACORD standards, by design, include multi-layered communication standards intended to communicate different messages to different recipients with a single communication.

208.    A component of the multi-layered communication referenced in the preceding paragraph is the use of words with double meaning.

209.    In regard to the allegation in the preceding paragraph, the use of words with double meaning is also referred to as "doublespeak."

210.    Because of the context-specific nature of the ACORD framework and standards, many of the communications made using the standards are understood differently by those who are aware of the context, or who have been initiated into the framework.

211.    Because of the flexible nature of the ACORD framework, participants can include other context-specific communications – with contexts provided by these participants – which then give different meaning to the items communicated via the framework or standards.

212.    In regard to the allegations of the preceding paragraph, particular contexts determining the meaning of communications sent by means of the ACORD standards and framework can be determined by those centrally managing the framework.

213.    The allegations in the preceding two paragraphs relate to the capacity of the framework to increase the "richness" of communications between enterprise participants.

214.    The enterprise, which ACORD is a part of, recognizes and acknowledges that its standardization programs will not offend the antitrust laws so long as the standards promote efficiency and do not restrain price competition, restrict terms of sale, limit production, result in

boycotts or exclusion of competitors, restrict product innovation or otherwise limit competition unreasonably.

215.   ACORD recognizes that every standards-setting program, including ACORD's, has the potential for being misused towards anti-competitive ends.

216.   In this regard, ACORD recognizes that industry standards can have a significant impact on the product preferences of buyers in the marketplace, and that consequently, the sellers of those products may have an incentive to seek the adoption of standards that would exclude or disadvantage products of their competitors, or otherwise restrain trade.

217.   Because of the aforementioned recognized incentive, ACORD also recognizes that product standards have a serious potential for anti-competitive harm and that private standard-setting associations have, for that reason, traditionally been objects of antitrust scrutiny.

218.   The enterprise in which ACORD takes part, recognizes that it and those involved in the enterprise with it should be careful as to how they communicate in light of antitrust laws and scrutiny.

219.   ACORD has developed standards to facilitate the ability of its members, and other participants of the enterprise ACORD takes part in, to communicate in a way that does not arouse antitrust scrutiny or the scrutiny of different regulators.

220.   ACORD's vision includes implementation of "best practices" for enterprise architecture, including systems made up of interchangeable components based on ACORD standards that provide a "360-degree view" of people, organizations, and risks. As part of ACORD's vision, products and services built upon the aforementioned components will be

highly configurable and will enable a wide range of consistent transactions and processes across the entire insurance value chain.

221.   ACORD "best practices" are, by definition, those practices that will make the ACORD standards implementations of those involved in the enterprise valuable for their business and success. These "best practices" are those strategies, methodologies, and techniques, as determined by major researchers, industry leaders, and experts that make those involved in an enterprise with ACORD and their business more successful.

222.   These "best practices" are based on the direct experience of ACORD members who have learned the "best ways" to implement ACORD standards to improve their businesses. The "best practices" are also designed to make the implementation of ACORD standards by one involved in ACORD'S enterprise faster, to make data communication throughout the insurance value chain more efficient, and to enable those involved in an enterprise with ACORD to more quickly and easily reap the benefits achievable through ACORD standards.

223.   ACORD forms are used by agents, distributors, brokers, and solution providers, and are supported by insurers, reinsurers and regulatory bodies. Standardized ACORD forms are purported by participants in the enterprise of ACORD as useful in streamlining workflows and increasing efficiency.

224.   ACORD data standards and transaction models have been used by enterprise participants in multiple millions of transactions and communications transmitted through wires, mail, and couriers over the past ten years, throughout the entire United States, and internationally as well.

225.   During the past ten years, ACORD forms, standards and communications between enterprise participants have been placed in post office or authorized depositories for

mail matter, to be sent or delivered by the United States Postal Service, and have been also been deposited, or caused to be deposited, and to be sent or delivered, by private or commercial interstate carrier.

226. During the past ten years, participants in the enterprise that ACORD is involved in have also taken and received from the United States Post Office, and from private or commercial interstate carrier, ACORD standard forms and materials promoting its aims. The have also knowingly caused them to be delivered by mail or such carrier, according to their direction thereon, and had their addresses listed as the place to which return mail is directed to be delivered by the person or entity to whom they have mailed it.

227. ACORD has advanced the position that implementing ACORD standards has been shown to "improve data quality and flow," "increase efficiency," and realize billion-dollar savings to the global industry.

228. Upon information and belief, one of the purposes of ACORD standards is to give participants in the enterprise that ACORD is involved in a competitive advantage.

229. ACORD includes: 90% of the top ten and 64% of the top twenty-five AM Best Life and Annuity companies; 80% of top 10 and 72% of the top twenty-five AM Best Property and Casualty (P&C) companies; 70% of top 10 and 64% of the top twenty-five Global Reinsurers; thousands of other member companies, including solutions providers and organizations; the top five brokers, representing 80% of the business; and over 15,000 independent agents.

230. ACORD recognizes three main types of standards, which can be defined, in broad terms, as falling into three categories: (1) Voluntary Consensus Standards/Performance

Standards, (also referred to as Open Standards in certain geographies); Captured/Prescriptive Standards; and (3) *De Facto* Standards.

231.    ACORD recognizes *de facto* standards as those that have emerged in the marketplace.  In regard to *de facto* standards, ACORD recognizes that they can arise from "standardization," which it recognizes as a process where a practice or innovation "catches on" or is otherwise imitated and assimilated by other market participants.  In this regard, ACORD recognizes that standard that doesn't succeed is not a standard.

232.    In regard to the "success" of standards, ACORD has promoted community involvement as the key, where to build a credible standard, the input of the people who will use it is needed.  ACORD has also stated, in this vein, that the criticism of the standard users is needed, as well as their commitment to improving on whatever is produced during the process, and their active participation in deployment.  In this way, ACORD recognizes that the market is unlikely to produce "workable business data standards" without the help of a dedicated community organization.

233.    ACORD also recognizes that *de facto* "standards" can be created by one company or participant in the market or enterprise, and then promoted by that company or participant.

234.    Aside from serving as a forum for *de facto* standards, ACORD develops voluntary consensus standards.

235.    Voluntary consensus standards are created by an industry for use by industry members in an open process.  In this regard, performance standards, which can be a result of the voluntary consensus standard process, are those that state the requirements for the result but do not mandate how that result is to be achieved.

236.    Upon information and belief, there are many standards or "best practices" that participants in the enterprise can choose from and then use to achieve their ends. In this way, many ACORD standards are flexible and voluntary, and ACORD standards, whether data or other, are mechanisms for achieving the ends of enterprise participants and partners.

237.    In this sense referenced in the preceding paragraph, the standards can also be understood as "modular," being applicable and interchangeable across many of the systems employed by the different participants in the enterprise, and allowing participants to form different strategic or working relationships with other enterprise members.

### IV. THE INCORPORATION OF, ACCOMMODATION OF, AND INCLUSION OF MAIL FRAUD, WIRE FRAUD AND ASSOCIATED DECEPTIVE PRACTICES INTO THE ACORD STANDARDS & FRAMEWORK

#### A. THE RACKETEERING MECHANISM

238.    All of the allegations made herein as to the incorporation of deceptive practices into the standards and as to their application, *infra*, are stated as to all relevant times, unless stated otherwise, as they refer to continuing or prevalent matters and states of affairs, or matters happening with frequency during the past ten years.  "All relevant times" meaning that they have occurred, and continue, during the last ten years.

239.    It is alleged that it is precisely because of the nature of the ACORD framework and standard to provide all the things needed for both the schemes and rackets of the conspiracy, as well as the ability those features provide the conspiracy to keep things hidden, that the ACORD framework has both lent itself to the alleged schemes to defraud, and been utilized in those schemes.

240.    The ability of the ACORD standards to conceal all of the aspects of the conspiracy is its most significant, as the conspiracy is of the variety that seek to engender

continual patronage through concealment of the harms caused at the expense of patron victims of the racket.

241.   Because of the nature of ACORD – where participants, members, and associated entities with a shared vision, have access to networking, and to become involved in its governance – ACORD itself has become involved in many degrees, as the standards have developed to meet and accommodate the conspiracy that has permeated it and its participants.

242.   As racketeering includes a service fraudulently offered to solve a problem, wherein the problem will not be affected, or will only deceptively be affected, it is important to look with scrutiny at the communications of enterprise members with those whose problems they have offered to solve.

243.   The nature of communications, known to Defendants, and alleged further, *infra*, demonstrate that the conspiracy in question has been designed to manipulate or circumvent regulators and consumers through multi-layered communications designed so as not to arouse their scrutiny and to thereby keep them ignorant of what the conspiracy aims and is accomplishing.

244.   ACORD data standards allow enterprise participants to communicate information, and other standards, to other enterprise participants or partners so as to understand what is being communicated without the information being readily understood by other parties who may be exposed to the communication.

245.   In the way referenced in the preceding paragraph, data standards, and standard enterprise methods of communication are used so that information is communicated from one enterprise participant to another, communicating the desired message, while minimizing the likelihood that parties outside the enterprise will understand what is communicated.

246.    The method of communication is made possible, in part, because some of the vocabulary used has double meanings, which has the consequence, or potential, of communicating a different message, or messages, to the different parties within the group communicating to, and of keeping some of the things communicated hidden from some of the recipients – particularly those parties not familiar with the standard or framework.

247.    By means of the methods referenced in the preceding paragraph, as well as others, ACORD data standards have been developed to allow enterprise participants to communicate in ways that avoid attracting undesired scrutiny.

248.    In alleging how the ACORD framework and standards support, and allow, an extensive conspiracy to commit mail and wire fraud to flourish and to permeate the enterprise network that ACORD is a part of, it is also alleged that it is the very features of the ACORD framework that lend themselves to the ends of the schemes and conspiracy.

249.    The features of ACORD's framework and standards lend themselves to conspiracy as they allow its communications and operations to: (1) pass scrutiny or suspicion; (2) pass discretely; (3) camouflage communications between involved parties in the conspiracy through particularized methods of speaking and writing that are known to mask the intentions of all but the initiated; (4) hide the relationship between, or the nature of the relationship between, different parties involved in a scheme so as to add legitimacy to the dealings, hiding the fact that they are in an enterprise; (5) conceal the mechanisms of fraud; (6) provide the different, correlated components and mechanisms of achieving the fraud; and (7) hide the fraudulent nature of the harm perpetrated from the victims of the conspiracy and/or mask its full meaning.

250.    By providing a context-specific system of communication where only the initiated participants can know what is being communicated, and by setting up a structure where different initiated parties can handle different aspects of project or matter, or find seemingly independent parties that are privy to the same data standards, the ACORD framework allows for a network or web of modular participants that can be coordinated to aid and assist others in the network with purposes known only to them.

251.    Because racketeering also includes situations where the potential problem is caused by the same party that offers to solve it, although that fact may be concealed with the specific intent to engender continual patronage for this party, the allegations concerning the patterns used by enterprise participants to purposefully underinsure policyholders, alleged herein, and more particularly, *infra*, constitute racketeering activity.

252.    Information that a reasonable policyholder would wish to know, and information that is necessary for informed decision making, is systematically omitted from critical stages of the transactions between consumers and enterprise participants, and if included, is included in a way calculated by enterprise participants to be ineffective due to intentionally deceptive language and data standards designed to hide the true meaning, mechanisms, or import of the material terms and features.

253.    ACORD and enterprise participant standards have incorporated, accommodated, developed around, standardized, and included a number of deceptive features by knowingly omitting, or limiting, material information and contract terms from the products consumers and policyholders are presented with in their transactions with enterprise participants.

B. The Incorporation of Historical Schemes into the Conspiracy Mechanism

254.   Through different forms of standardization, ACORD standards have incorporated and accommodated "best practices" and *de facto* standards recognized historically as features of insurance rackets and abuses related to the valuation of property and the engineering replacement cost forfeiture.

255.   In regard to the preceding paragraph, this has been done through "best practices" that, among other things, encourage: (1) a failure to disclose material terms and hidden mechanisms having a direct impact on the policyholder; (2) practically eliminate the likelihood of replacement cost by calculated and intentional underinsurance; (3) escape clauses that are calculated to be triggered by the intentional underinsurance; (4) introducing practical hindrances that may seem innocuous, but that are calculated into the insurance product to knowingly limit the possibility of rebuilding by causing economic and emotional hardship; (5) practices of forcing the policyholder to fight for recovery of amounts as typically used measured outside the enterprise, while the insurer pretextually relies – in arguing for a lower amount – on enterprise-specific and literally unrealistic standards the insurer knows to be supported with a skewed calculus; (6) practices of ignoring coverage a policyholder has when the policyholder makes a claim, and not mentioning the coverage if not specifically sought out by the policyholder, despite the insurer knowing that the coverage in question applies; and (7) encouraging gamesmanship by using discrete channels to incentivize participants in an adversarial relationship to policyholders with claims.

256.   In regard to the previously-mentioned "practical hindrances," such are items that the enterprise participants know hinder the ability, both practically and financially, of rebuilding, and which also increase emotional hardship after a loss. Such features are triggered

or exacerbated by underinsurance, and are known to exacerbate the underinsurance, which produces more unpaid claims.

257.   Other such historically-recognized deceptive practices, that have become incorporated into the ACORD enterprise standards, relate to the failure to disclose material terms concerning the valuation of covered property and involve coordination between the way enterprise participants write a policy and terms which are known to conspiracy participants to be distinct from the meanings the public understands.

258.   To this end, the ACORD framework provides a new level of innovation—in regard to orchestrating the desired result that undisclosed material terms bring enterprise participants—by allowing for material terms to be to be practically undiscoverable, and discretely implemented, due to the controls, standards, practices or so-called "trade secrets" that enterprise participants at all levels of the policy lifecycle effect.

259.   It is also by such innovations designed to further hide the deceptive nature of the aforementioned legacy schemes and rackets, or to otherwise improve their performance, utilizing the framework and standards of ACORD, that enterprise participants have continued a relationship with prior schemes and rackets, so incorporated, into the enterprise of which ACORD is a part.

260.   Upon information and belief, some of the current enterprise participants include successors in interest, as well as successors in the conspiracy, of parties, individuals, entities, organizations and companies that have been continually running various rackets and deceptive practices since before the second half of the twentieth century, and have included those schemes, and the key elements of the rackets previously-applied in the insurance context, into the ACORD framework and interrelating components supplied by enterprise participants.

261.    The aforementioned incorporation of historically recognized deceptive practices has been motivated by the chief concerns and interests of the enterprise participants and conspirators, as stated more particularly, *infra*.  These have been developed and implemented throughout the insurance value chain, and are operational throughout the enterprise through the use of data standards and other forms of wire transfer that have transmitted these standards through millions of enterprise transactions and enterprise communications furthering the incorporation of these practices into the enterprise standards.

B. The Aims of the Conspiracy as Seen Through its so-called "Best Practices"

262.    ACORD's "best practices" offer a key to the operations of the enterprise ACORD is a part of by demonstrating how the standards and framework are used to achieve the ends of the enterprise, by providing a definition and vision of what "success" means to its participants, by demonstrating the intentional nature of the enterprise's activities, and by showing how the shared vision of the enterprise is implemented throughout the different components and participants depending on the particular aims of the participants.

263.    The allegations of the preceding paragraph are the case because: (1) ACORD's vision includes the implementation of so-called best practices; (2) these "best practices," are the strategies, methodologies, and techniques, as determined by major researcher participants, industry leading participants, and expert participants that make those involved in an enterprise with ACORD and their business more successful, and therefore define what "success" means within ACORD; (3) ACORD "best practices" are those that will make the ACORD standards implementations, of those involved in the enterprise, valuable for their business and a success; (4) the "best practices" in question are for enterprise architecture, including systems made up of interchangeable components based on ACORD standards that provide a "360-degree view" of

people, organizations, and risks, raising the inference of knowledge about what is being affected by the practices;  and (5) the products and services built upon the components that are the "best practices," standards, and framework will be highly configurable and will enable a wide range of consistent transactions and processes across the entire insurance value chain.

264.    Because the "best practices" are also based on the direct experience of ACORD members who have learned the "best ways" to implement ACORD standards to improve their businesses, they are a kind of trade secret and demonstrate that trade secrets of a sort are disseminated freely throughout most of the industry to the advancement of the shared vision of, and benefits to, the enterprise.

265.    In connection with the allegations of the preceding paragraph, "best practices" are also referred to as "trade secrets" in the context of those outside the enterprise who wish to examine certain "best practices" of the enterprise.

266.    In line with the above-stated allegations, ACORD's "best practices" are an additional angle or context that can be added to the context-specific framework and standards, and enhancing them in that way.

267.    A distinction can be made between true trade secrets and enterprise "best practices" because "best practices" are by and large disseminated freely to those in the industry who join the enterprise, an enterprise whose goals include encompassing the entire industry.

268.    As "best practices" are strategies, methodologies, and techniques, they can be distinguished from standards mandating compliance with regulation, and as best practices are communicated to ACORD members and participants in the enterprise so that they may know how to best take advantage of the system provided by the framework and standards, "best

practices" can be understood as secret information and subtext communicated throughout the enterprise.

269.    In the sense described in the previous paragraph, as an insider's understanding of information passed through the framework, "best practices" are also designed to make the implementation of ACORD standards by one involved in ACORD'S enterprise faster, to make data communication throughout the insurance value chain more "efficient," and to enable those involved in an enterprise with ACORD to more quickly and easily reap the benefits achievable through ACORD standards.

270.    The direct experience entailed in discovering and implementing the "best practices" serves as evidence of both personal knowledge conserving the expected results of a "best practice," and also serve to show the deep personal involvement of all enterprise participants related to the implementation of a particular best practice, including those that developed it, those that spread it, and those that learn and apply it.

271.    As "best practices" include valuable information, they demonstrate which goals are valuable to the enterprise and *vis-à-vis*.

272.    ACORD "best practice" also show what the enterprise means when it refers to its standards, framework, and participants receiving a competitive advantage, and what the ends of strategic uses of data are, precisely because they are disseminated through the enterprise in a collaborative and cooperative way, and because the goals of the enterprise are to encompass the entire industry – raising the inference that the "best practices" do not give any advantage to enterprise members against themselves, as the information becomes homogenized and diffused throughout the enterprise, but that the competitive advantage applies to those outside of the enterprise.

273.    This inference is reinforced by ACORD's position that the "right" use of data is strategic data, and that proper targets for those strategies are primarily industry concerns outside of competing with other companies, including: (1) Actuarial & Pricing (*i.e.*, strategies for how insurance products are developed and priced in regard to consumers); (2) Customer Retention; (3) Fraud Detection; (4) Life & Health; and (5) Marketing.

274.    Most of the above-listed topics are typically areas of great competition among industry participants in other industries, and, in light of other facts alleged herein (particularly as to the homogeny the enterprise seeks to add to aspects of the nature of insurance products and against disclosure), the nature of these areas of shared concern is a key to understanding the enterprise's meaning of "competitive advantage" as a joint competitive advantage against the consumer is not an innovation that allows one company to put out a product that is better, from the consumer's perspective, or free of a collaborative effort against the public.

275.    The competitive advantage of a racket is at the expense of the consumer or victim, and it is alleged that the facts and predicate acts alleged, *infra*, demonstrate and otherwise raise an inference that the enterprise ACORD is a part of has included the traditional racketeering feature of seeking a competitive advantage against the consumer into its operations and encouraged it as a "best practice."

276.    Through the enterprise framework and standards, a series of "best practices" seeking a competitive advantage against the consumer have been advanced throughout the enterprise that ACORD is a part of.

277.    Those "best practices," implemented and promoted and aided by ACORD members, strategic partners, and associates have, in fact, changed the nature of insurance products and homogenized them throughout the enterprise.

278.   By adopting deceptive practices from other fields of industry through a conspiracy with major researcher participants, industry leading participants, expert and advisor participants as "best practices," the enterprise that ACORD is a part of, using enterprise standards, served as a conduit and participant in a conspiracy that resulted in the homogenization of insurance products by including deceptive features in insurance products, and ways of both concealing and controlling the application of those features, throughout the enterprise.

279.   From about 1985 to 2000, Defendant MCKINSEY & COMPANY was a chief architect and principal strategist to Enron, and its top partners, one of whom, Jeffery Skilling, had become CEO of Enron.

280.   Defendant MCKINSEY & COMPANY routinely held Enron up to its clients as a corporate innovator worthy of emulation and had advised the giant energy trader for nearly 18 years on basic strategy, even sitting in on boardroom presentations to Enron's directors. had eagerly promoted the underlying principles of Enron's transformation and regularly stamped their imprimatur on many of Enron's strategies and practices in books, articles and essays.

281.   Upon information and belief, Defendant MCKINSEY & COMPANY applied its standard approach to business and advising at Enron.

282.   Many of the underlying principles of Enron's transformation, including its 'asset-light' strategy, its 'loose-tight' culture, and the securitization of debt, were eagerly promoted by MCKINSEY & COMPANY consultants. Defendant MCKINSEY & COMPANY was a key architect of the strategic thinking that Enron employed.

283.   During Enron's "rise," Defendant MCKINSEY & COMPANY's partners regularly stamped their imprimatur on many of Enron's strategies and practices in books,

articles, and essays, helping to position the energy giant as a corporate innovator worthy of emulation. These statements were disseminated, in an effort to promote Defendant MCKINSEY & COMPANY, through mail, courier and wires over interstate lines.

284. Enron implemented Defendant MCKINSEY & COMPANY's principles, and established a culture at Enron around the principles.

285. By use of the MCKINSEY & COMPANY-influenced culture, Enron established a system where predatory behavior on consumers was encouraged in the pursuit of increasing the stock value and associated profits of the company.

286. The predatory culture at Enron was a significant factor in the fraud, which company participants were also involved in, and it allowed them to make use of the company as a vehicle of fraud and other associated harms that injured consumers and the state of California in particular.

287. On or about September 28, 1992, in a meeting with enterprise participants, and through enterprise channels Defendant MCKINSEY & COMPANY proposed a schema for "best practices" that could be applied to the enterprise standards for implementation, and offered it services to do so.

288. The material presented was a proposal to design insurance business around the same principles that Defendant MCKINSEY & COMPANY had applied with such "success" at Enron.

289. The principles in question were that:

a. Business is a Zero-sum Game (as opposed to a model of value in exchange), wherein, for corporations to "win" others must "lose."

b.      Increased profits and/or shareholder value are only valid measures of corporate success; by removing the concern for the customer, the company is free to focus on the stock market, instead of providing customer service.

c.      In regard to manager and employee performance, the ethics of corporate conduct should be redefined and enforced so that the job of corporate management is to be a profit center, which will, in turn, maximize returns to either the company or the shareholders.[3]

d.      That any corporate practice or action that is not "blatantly illegal" is good if it creates increased profits and/or shareholder value.

e.      To heavily use financial incentives to achieve increased shareholder values, aligning interests of corporate management and employees with interests of the shareholders as opposed to the consumer or what would otherwise be considered ethical.

f.      To establish a "best practice" that it is not management's job to determine whether corporate practices or products are harmful to consumers, and stating that if corporate practices or products are harmful then it's government's job to stop them, not the company's.

---

[3] In regard to mutual companies, there may be additional equitable factors that bring liability to those running the enterprise-participant insurer applying these schemes, as there is a fiduciary duty owed to the members of the exchange, as owners, by the management and officers of the company or exchange.

g.    To get participants in a company with the above-stated views to then "think outside the box."

h.    That traditional rules and standards should be ignored where they hamper increases in profits and shareholder value.

290.    The information presented at the meeting referenced in the preceding paragraph was, and has since, been disseminated through enterprise channels to different participants by means of mail, private courier and by means of wires.

291.    At the time of the aforementioned meeting with ALLSTATE and other Defendants, McKinsey had already consulted at Defendant USAA, Defendant STATE FARM, Defendant HARTFORD, Defendant FARMERS, Defendant NATIONWIDE and Defendant LIBERTY MUTUAL.

292.    As a result of the aforementioned meeting, Defendant MCKINSEY & COMPANY hired by Defendant ALLSTATE to create and implement a model of practices based on the practices discussed in the meeting.

293.    It should be noted that the subject matter of the meeting, and the history, tone, and approach of Defendant MCKINSEY & COMPANY, employed before, is indicative of the culture of the enterprise that ACORD is involved in, as the presentation was accepted in the context of the enterprise and was not repudiated, as the practices mentioned became "best practices," and MCKINSEY & COMPANY has continued to provide advancements of its "best practices" to the enterprise.

294.    In regard to the allegations in the previous paragraph, there is symmetry between the approaches, culture and "best practices" of Defendant MCKINSEY & COMPANY and the enterprise that ACORD participates in.

295.    An inference arises from the prior allegations relating to the culture of ACORD in being a venue, where such matters and approaches could be discussed without fear or explosion, that the enterprise created an organizational environment that fosters bad faith.

296.    The fact that the sophisticated Defendant calculated that its proposal would be acceptable in the enterprise context, and that it was indeed accepted, also raises the inference that the culture in the enterprise that ACORD participates in is one of institutionalized bad faith.

297.    "Best practices" implemented by Defendant MCKINSEY & COMPANY have since been applied through the enterprise that ACORD is a part of, and Defendant MCKINSEY & COMPANY is a routine presenter of materials and "best practices" in ACORD-sponsored and promoted meetings for its members and other participants.

298.    Aside from presenting and introducing "best practices," Defendant MCKINSEY & COMPANY has worked for numerous of the named Defendants as a consultant, including those previously-mentioned as Defendant FARM BUREAU, developing "best practices" that are tailored to, and exploit the nature of the standards and framework of the enterprise.

299.    In particular regard to Defendant ALLSTATE, Defendant MCKINSEY & COMPANY developed a system and protocol designed solely to rapidly increase profits and shareholder value, and knowingly at the expense of the consumer.

300.    It did this by introducing a system where a penny saved was a penny earned, although it came at the expense of paying obligations to the policyholder; the principle being similar to selling under-filled containers of product to the consumer, wherein the company profits from the savings.

301.   The model referenced above, with particular application to the insurance context, was to standardize claim values at 20% lower than what the insurer knew the item was worth by conventional means; by introducing measurements that were based on a pre-determined baseline or percentage instead of a conventional method of measurement.

302.   A model that Defendant MCKINSEY & COMPANY developed for the insurance context was to enforce new claim values by: (1) preventing negotiation or compromise; and (2) to have a single performance measurement in the company, being the percent paid in proportion to the evaluated amount – always seeking to pay simply a lower percentage.

303.   In regard to the above-stated claim, bonuses at all lines of the enterprise are based on this model, rewarding those effectuating these principles to profit from their actions in a participant company's interests.

304.   A goal of MCKINSEY & COMPANY's model was also to actively exploit the litigation of cases for the particular purpose of ultimately preventing depriving the public of attorney representation through a Zero-sum Economic Game designed to leave only insurers with a viable field of attorneys in the area of insurance-related litigation.

305.   There were three main features to the insurance enterprise model developed by Defendant MCKINSEY & COMPANY: (1) the "Zero-sum Game," applied to all aspects of the business and its concerns, particularly placing the insurer's interests above policyholders' interests; (2) evaluation procedures where new and skewed calculators were used to produce a percentage of the expected amount, which would produce company savings, by reducing claim values 20-40%, and setting "standardized" values for every claim regardless of individual factors – resulting in converting fiduciary-indemnity coverage into a defined benefit coverage

where the benefit is not defined in the contract, but after the fact; a "new" negotiation strategy, providing take-it-or-leave-it offers with "no real negotiation."

306.    Major Components of this last feature were that "evaluation" of a claim should be redefined to mean that company employees would not re-evaluate what they previously-stated was the "fair value" or "settlement amount," despite it being based on a self-serving calculus. Similarly, "negotiation" and "settlement" were to be redefined to mean that the company would stand firm on final offer with no real negotiation.

307.    In regard to ALLSTATE, Defendant MCKINSEY & COMPANY developed a program tailored to the precise marketing of the insurer; it's motto was "Good Hands *or* Boxing Gloves," and was translated to mean that the company would have a policy of paying either "promptly" at a reduced amount, or "fairly" if it was ultimately forced to pay this in court.

308.    The aforementioned "best practice" is in violation of Colorado law requiring prompt and fair payment.

309.    As for "prompt," under the "Good Hands *or* Boxing Gloves" "best practice," policyholders making a claim would be promptly offered a percentage of what they were owed, such as 65%.

310.    As for "fair," under the "Good Hands *or* Boxing Gloves" "best practice," policyholders making a claim would be forced into "Kill Zone" of civil justice system.

311.    The aforementioned practices also involved the abusing the judicial system to win the Zero-sum Economic Game by forcing frivolous claim litigation, as the basis was known to the participants to be fabricated and intentional.

312.    In regard to the abuse of process alleged, Defendant MCKINSEY & COMPANY pointed to a system with no ethic but the bottom line using "aggressive litigation yields positive results."

313.    Under the MCKINSEY & COMPANY APPROACH, litigation would be controlled by claims adjuster and not by attorneys, and it would be driven by profit goal litigation protocols aligned to achieve profit goals, as opposed to the justice and truth of the position advocated.

314.    In regard to the previously-mentioned Percent to Evaluated Amount Measurement Systems developed by Defendant MCKINSEY & COMPANY, the practice was promoted on the grounds that it would allow: (1) the company to get what we measure they measure, as they get a certain amount of profit in correspondence with the amount that is measured to not be given to the policyholder filing a claim; (2) allow the enterprise applying the practice to develop an internal grounds for repudiation of the Fiduciary-Indemnity Principle of prompt and fair payment, which relates to the ability to motivate and control a work force able to implement these practices; (3) the ability to build a competitive advantage through claims, where the shareholder, or company management, is the true customer and party owed a duty by the participant employees; (4) allows for the charging premiums related uncollectible insurance and unpaid claims, which correlate directly to company profits.

315.    Defendant MCKINSEY & COMPANY's strategy for insurance "profitability" and "efficiency" prioritizes profits above all else, as one slide in the presentation of "best practices" illustrated the known consequences of the zero-sum game by stating that improving Defendant ALLSTATE's casualty economics will have a negative economic impact on some

medical providers, attorneys who represent injured parties, and on policyholders with claims, with the conclusion that ALLSTATE gains – others must lose.

316.   After implementing the "best practices" developed by MCKINSEY & COMPANY, Defendant ALLSTATE implemented them to its own profit, making $4.6 billion in profits in 2007; approximately double the earnings from the 1990s. The stunning increase came through driving down loss values to an average of 30 percent below the actual market cost, and therefore paying dramatically less on claims.

317.   Through the industry framework, participants have also applied a similar "best practice" of interjecting elements that are known to cause hardship into a policy for underwriting purposes, and which are discretely employed and communicated to outside participants through enterprise channels and data standards to ensure their successful forfeiture of a policyholder's claim, or a part thereof.

318.   Through framework channels, participants have received instruction to expect 90% of policyholders to succumb within six months, due to economic hardship after the application of strategies designed to inflict hardship after the covered loss.

319.   One slide prepared by Defendant MCKINSEY & COMPANY for its insurance business model depicts an alligator sitting and waiting for a victim, with a caption instructing the enterprise participant that by postponing payment, insurance companies can hold money longer, causing economic hardship, and thereby wear down policyholders to the point of the policyholder dropping a challenge. (It should be noted that the enterprise often uses slides and PowerPoint in communicating through the framework.)

320.   The aforementioned bizarre association, wherein enterprise participants were encouraged to envision themselves as a dangerous predator in opposition to their customers

reflects the culture that is encouraged by Defendant MCKINSEY & COMPANY in the establishment of its "best practices."

321.   Upon information and belief, on or about September of 2007, ALLSTATE spokesman Michael Siemienas stated that the company would not comment on what role McKinsey played in lowering the insurer's loss ratio and boosting its profits, but did state that "In the early 1990s, ALLSTATE redesigned its claims practices to more efficiently and effectively handle claims and better serve our customers."

322.   Given the fact that MCKINSY & COMPANY did indeed help ALSTATE implement its business model with practices that are considered "best practices" in the enterprise, referenced, *supra*, the characterization of the business model and associated "best practices" illustrates another feature of the enterprise framework, standards and best practices: the use of euphemism to disguise and hide the meaning of what is being said, along with the use of doublespeak – the euphemism being the particular use of "efficiency," which is a standard usage of the term for the enterprise when referring to its business model, and the phrase "better serve our customers" being doublespeak, as it applies to the shareholders, from ALLSTATE's perspective, but is intended to give the hearer the impression that ALLSTATE's policyholders are being referenced.

323.   Another term that is evidenced to have a euphemistic meaning is "fraud detection." In the public sense, fraud detection would seem to mean an insurers resources to detect crime.  Given the zero-sum approach of the enterprise "best practices," and the associated culture of predation where fairness is the result what a policyholder has to fight for, the term "fraud detection" has also taken on an adversarial determined meaning, meaning that it can mean whatever the enterprise participant insurer is able to "push" for it to mean.

324.    The insurer's standard is much less than the legal standard due to this adversarial approach to meaning, where the zero-sum game determines the "winner," what one can get away with, and what is the result.

325.    The meaning of "leveraging data" for a "competitive advantage" also takes on its meaning in the context of the enterprise "best practices" introduced by Defendant MCKINSEY & COMPANY, where data is used to develop insurance products that pay out a specific discounted amount, as determined by measurement data and technology designed to provide an self-serving, discounted, and therefore unjust, measure of valuation.

326.    The aforementioned "best practices," though ruthless and violative of law, are a method of addressing the primary concerns of the industry, and can also be seen reflected in both the practices the enterprise has adopted as standards and the primary concerns of the enterprise and its leaders.

327.    On or about June 17, 2013, top leaders of the enterprise ACORD participates in, from countries around the world, gathered at the 49th annual International Insurance Summit in Seoul, Korea. These global insurance leaders, hoped to facilitate cross-border exchange of ideas and develop global personal networks. ACORD conducted an interactive survey with industry leaders on a variety of questions. According to the survey results, the top area of concern for non-life companies was "risk management / ERM [Enterprise Risk Management]" followed by a tie between "regulatory / reporting requirements" and "upward trend in catastrophe losses."  The top financial concern was "competitive price / adequate profitability," and the top two key risk management issues "applying risk analysis in business decision-making" and "building a strong risk culture."  The top place for key operational issue was a tie between "productivity, efficiency, expense controls" and "organizational talent / retention and

training."

328.    The cost of claims payments and expenses is the single largest expense for property and casualty insurers, accounting for 70% to 85% of total administrative cost.

329.    Jerry Choate, ALLSTATE's chief executive officer from 1995 to 1998, said at a news conference in New York in 1997 that the company's new claims-handling process had reduced payments and increased profit.  Insurers can't make significantly more money just from cutting sales costs, he stated. "The leverage is really on the claims side," Choate said. "If you don't win there, I don't care what you do on the front end. You're not going to win."

330.    The more funds insurers can keep from premiums, the more they can invest. This pool of assets is known in the enterprise as "float."

331.    Enterprise members understand a standard where, in mature insurance markets – such as the United States – enterprise participants spend less on information technology because they seek to focus more on processes and cost reduction, raising the inference that the processes and cost reduction are even more iatrical to the business model of enterprise participants in the mature market of the United State than even information technology.

332.    The processes in question involve mechanisms that are designed to bring about forfeiture of claimed amounts with the associated overpayment of policy amounts on claims that will thus never be paid, and, as seen, *infra*, in the allegations regarding underweighting practices related to Replacement Cost policies and the associated device of "Actual Cash Value," can be even more effective than automatic discounts at achieving wholesale forfeiture of large portions of a policyholder's claim.

333.    One of the chief stated goals of enterprise participants is to use the standards and framework to implement Enterprise Risk Management ("ERM").

334.   Upon information and belief, the payment of claims, claims leakage, and claims exposure are seen as the chief risk and exposure to insurers, and a chief concern to be addressed and minimized in ERM.

335.   Claims Leakage is a key concern of ERM, and is defined as the difference between the actual claim payment made and the amount that would have been paid if "more effective" claim payment controls had been in place. In this sense, claims leakage, which may also be defined simply as "avoidable over-expenditure" in the handling and settlement of claims, is held by the enterprise to be caused by deviations from established industry or company standards and/or leading practices. Leakage is also calculated against the probability that a company utilizing leading practices with the same claim fact pattern would have identified and avoided the result.

336.   In the sense described in the preceding paragraph, there is an enterprise standard where "claims leakage" and "best practices" are opposite functions of one another, and "opposite sides of the same coin," wherein "best practices" in the claims leakage context are simply practices that keep the insurer from paying claims. One of the standards related to ERM for participants in the enterprise ACORD takes part in is to increase savings, minimize risk, and minimize exposure by implementing standards and practices that achieve unpaid claims.

337.   Participants in the enterprise with ACORD have also developed a standard of "mitigating claim development" through predictive modeling, or simply "modeling." This entails using predictive modeling to develop strategies, and procedures that can be used to "mitigate" "claims leakage."

338.   Upon information and belief, all departments within an insurance company including finance, actuarial, strategy, etc., are critical in the implementation of Enterprise Risk

Management ("ERM"), first within their departments, by embedding ERM, into their daily operations, and then by connecting across the organization risk management infrastructure to become part of the overall calculus of decision-making.   A standard is thus present in the enterprise ACORD is involved in of using "leading practices" at all departmental levels of a participant insurer to bring about unpaid claims.

339.   The modular or otherwise configurable nature of the enterprise standards that ACORD participates in allows for these practices to exist in the enterprise and to expand the reach of an insurer participant beyond the confines of employees, as the flexibility of the framework has an end of facilitating the interaction of multiple enterprise participants, as this allows an insurance carrier participant flexibility in working with a selection of participant reinsurers in the future, or of vendors, or of distributors (agents) or of contracted claims handling firms (adjusters).

340.   Reducing payouts is just one way the enterprise ACORD participates in has improved profits, as carriers have also raised premiums and withdrawn from storm-plagued areas such as the Gulf Coast of the U.S. and parts of Long Island, New York, to lower costs and increase income.

341.   In the case of the allegations in the preceding paragraph, the practices referenced have become standard because of elements that help enterprise participants realize secretive profit sources. In the wake of Hurricane Katrina, Allstate and other major insurers have been criticized by numerous state officials and policyholders for underpaying claims for wind damage and shifting these costs to the flood insurance program, which is supported by tax dollars. There is evidence indicating that Defendant ALLSTATE charged the government more for

materials used to repair flood damages paid for by taxpayers than Allstate pays for the same materials to repair wind damages.

342.    The above-stated practices are based on another profit source, however, which is the creation of secondary markets in regard to flood insurance and other areas of insurance abandoned by the enterprise in question.

343.    When coverage is restricted in the admitted market, applicants must turn to surplus lines carriers.

344.    Enterprise members see sublimits and deductibles for personal liability exposures as potential means to depopulate residual market plans and deregulate personal lines, while being able to advance another euphemism: that enterprise members are doing so to avoid creating uninsured exposures for individuals or society.

345.    The euphemistic nature is evident as enterprise participants openly recognize that regulators will be less than enthusiastic about pricing liability hazards unless the insurers can demonstrate that liability sublimits and deductibles can help consumers.

346.    As a "best practice," enterprise participants advance a strategy where the insurer should couch the approach to regulators as an attempts to save consumers money, instead of merely providing the coverage limitation, they seek, as such would be a futile "non-starter."

347.    In addition to euphemism, the above example also shows another method displayed throughout enterprise communications and materials to disguise the aims of the enterprise: that whenever information "useful" in achieving the ends of the enterprise is communicated – information that may seem diametrically opposed to consumer interests – that some pretextual mention of consumer interest should also be mentioned.

348.   The previously mentioned standard is sometimes not disclosed in the most "confidential" of enterprise communications, where it may be assumed that only parties privy to the schemes have access to the information.

349.   The profits that are gained from the aforementioned approach of seeking to replace regulation with secondary markets for supplemental coverage, build upon one another incrementally, as enterprise members – by means of data use and geo-coding, and a realization of how spreading risk, or focusing risk in certain areas, affect both price to the consumer and the savings to the insurer – have discovered: (1) that a significant percentage of the population is at risk of flood damage although not in a federal floodplain designation; (2) that due to a system the enterprise has contributed in developing, such individuals are not likely to be sold or marketed the expensive flood coverage that exists as a variety of surplus coverage; (3) because of a system that the enterprise has contributed to by exiting the market, which is used in step with the creation of surplus markets, enterprise participants have contributed to the increased price of covering for certain hazards, such as flooding; (4) that advancing positions that the introduction of surplus coverage proposals for certain perils (such as flood coverage), as opposed to regulation, will keep the cost down for those with less likelihood of such damage, the surplus coverage will have a greater likelihood of becoming accepted, and a dichotomy will develop between consumers, with only a few paying for coverage at a high price to cover the damage, while the cost to those outside the floodplain is less; (5) that by focusing risk on a few, so that certain coverage is placed only on them, the insurer can still charge the greater population an amount very similar to what it would charge if all policies contained flood coverage, yet with the benefit to the enterprise that those without the expensive coverage , and

outside a federal flood plane, are automatically excludable, and a source of savings and profit in the event of loss.

350.   By applying the practice of seeking these approaches to coverage, enterprise participant can gain on the high premiums of those in floodplains while not significantly lowering the price of insurance for those outside of floodplains, yet still at risk, enterprise participants can use a combination of removing coverage, profiting from a surplus coverage market, and benefiting from the exclusions that result when the coverage is no longer generally available, and where insureds cannot pay for the coverage that has been treated as only being needed by a few.

351.   This can be seen as a divide and conquer strategy, but has been termed by enterprise standards, in the framework, as "Recognizing and Rewarding Correlations Between Sustainable Practices and a Low-Risk Profile" or "Improving Land-Use Planning."

352.   The aforementioned euphemisms are betrayed as such by the fact, recognized by the enterprise, that the cost of insurance for those without the supplemental coverage does not change significantly, and that if the risk was spread uniformly to all insureds, that the increase in premium needed to insure all insureds would be insignificant.

353.   The euphemisms are also betrayed by the fact that flooding is not a peril limited to federal floodplains, a fact recognized by enterprise participants.

354.   The preceding allegations regarding uses of standards and "best practices" for approaching regulators, when taken in connection with the subtle mechanisms of the framework, appear on the surface to simply be accidentally connected, though when combined with the euphemisms and doublespeak components of the context-specific framework, they

demonstrate how the enterprise can disguise its aims and pretextually claim transparency at the same time.

355.   The pretext in the preceding paragraph regarding transparency can be noted from the elements that the standards and framework provide for communications presented with double meaning and context-specificity where those with privity to the framework know the meaning conveyed in a method calculated to not be understood by some, but where regulators have no real means of fully analyzing the presentations of enterprise participants.

356.   When this aforementioned approach is combined with the standard practice in the enterprise of not clearly mentioning exclusions in the sale of policies, or at all, including flood exclusions, the results are both detrimental to insureds, and resulting in savings to the participant insurer.

357.   The abovementioned relationships and interrelationships between the exiting of the market, the introduction of expensive surplus coverage, the failure to adequately inform policy applicants of exclusions, if at all, and the resulting savings to enterprise participants well-known to the enterprise.

358.   Although the exclusions of coverage function much like disclaimers, they are not presented in a fashion meeting the legal standard applicable for the disfavored device of disclaimers.

359.   The lack of features that meet the applicable standards of the law for the presentation of disclaimers, coupled with the practice of withholding policies from the sales process and otherwise controlling the perceived understanding of what is being bargained for, not only prevents a meeting of the minds on the points excluded from coverage, but it also acts to the detriment of insureds.

360.    It is alleged that the enterprise is well aware of this relationship and nurtures it through the ACORD framework and standards.

361.    The enterprise, and particularly those that draft policies within it, realize that the application and restriction of coverage has become increasingly complicated over the past decade – as insurers and advisory organizations have grappled with a growing number of concerns to the industry.

362.    There is an approach, standard or "best practice" within the enterprise that takes these aforementioned factors into account with the euphemism: "From Risk to Opportunity."

363.    Connection, relationship, and sequence all connect the strategies implicit in "From Risk to Opportunity" with practices followed by Defendant MCKINSEY & COMPANY's consultee Enron, when it applied the zero-sum approach in California by removing electricity from the market to drive up the cost.

364.    It is further alleged that in an effort to conceal the functions used by enterprise participants, and to facilitate this method of ensuring savings to themselves at the expense of insureds, that enterprise-created exclusion sheet (essentially disclaimers) of flood coverage were placed conspicuously on the covers or initial pages of policies that were sent to policyholder victims of the 2013 Colorado floods when they asked for their policy. (These "exclusion disclaimers" were completely lacking from any originals previously sent to the policyholder.)

365.    On September 12th and 14th of 2013, President Obama made a presidential emergency disaster declaration for the Colorado flooding in question.

D. THE AIMS OF THE CONSPIRACY AND THE ROLE OF THE STANDARDS, FRAMEWORK AND "BEST PRACTICES" WITH REGARD TO UNDERWRITING REPLACEMENT COST POLICIES

366.    In the event of a disaster, enterprise participants routinely pay less than the replacement cost that the policies promise and the restoration to their prior state that the homeowners expect.  In this regard, enterprise participant insurers often pay 30-60 percent of the cost of rebuilding a damaged home – even when carriers assure homeowners that they are fully covered, as demonstrated by thousands of complaints with state insurance departments and civil court case records.

367.    One standard for both calculating and achieving unpaid claims, recognized by participants of the enterprise that ACORD is involved in, is achieving unpaid replacement cost on a replacement cost policy.

368.    If a home is significantly underinsured, there are a number of factors that come into effect of underinsurance that make it unlikely that the policyholder will be able to rebuild.

369.    As an enterprise standard, underwriters, working for the enterprise participants, account for these factors in their calculations used to write a policy.

370.    In 2012, in the wake of the Waldo Canyon and High Park fires, both of which were declared disasters by the President, there were 1,070 complaints to the division of insurance in regard to homeowners and farmowners policies.

371.    Enterprise standards in underwriting account for anticipated underinsurance.

372.    Underwriters in the enterprise, as an enterprise-accepted standard, calculate to account for 60% to 70% of the homes in the United States being underinsured between 17% and 30% or more of their value.

373.    60% to 70% of the homes in the United States are underinsured between 17% and 30% or more of their value.

374.    By deciding what they amount they will accept on an insurance policy, what it will be covered for, enterprise underwriters have control over the level of coverage that over 70% of the property owners in the United States can achieve, and control a significant feature of the market in that regard.

375.    Although there is some variation in insurance products, enterprise standards are applied in deciding which homeowners those products will be made available to.

376.    In this regard, the vast majority of homes insured in the United States, which are under 25 years old at the time of application and issuance, are insured on a Replacement Cost basis, while the majority of homes that are over 25 years old at the time of issuance are insured on an Actual Cash Value basis.

377.    Enterprise participants know that a certain level of underinsurance calculated, and thereby integrated, into the standard Replacement Cost insurance product will produce less exposure and savings to the insurer, and will produce those benefits at all levels of the insurance value chain for partners and enterprise participants in the event of a total loss.

378.    Enterprise participants have recognized a standard of calculating the relationship between underinsurance and the escape clauses inserted into insurance products.

379.    This aforementioned realization of the relationship between underinsurance and escape clauses has led to a practice were enterprise participants write insurance to: (1) anticipate the amount of savings and cost reduction associated with unpaid replacement cost; (2) use the aforementioned anticipated amount to calculate policies, practices and standards at

all departments and system functions of a participant insurer; (3) calculate the anticipated amount into the business model and ERM of the insurer in question and its strategic partners.

380.    Enterprise participants have standards for estimating the replacement cost of properties that are to be insured – standards that are available to them at the underwriting stage.  In this context, there is also a standard and practice used in underwriting the policy wherein the most accurate estimate of the replacement cost of the policy, as mentioned, is lowered in underweighting to increase the company's efficiency, to lower its risk, and to reduce its exposure.

381.    There are many standards or "best practices" used to lower the amount of replacement cost, and these standards are used in the setting of the policy limits that underweighting will find to assure an acceptable risk and savings of cost.  It should be noted, in this context, that the standard primary point of decision in an insurer participant of the enterprise is its internal actuary and modeling.

382.    These are all features in internal processes and data leveraging of underwriting that are kept hidden from consumers applying for insurance, and they are all under the control of the participating insurers' underwriters who decide whether they will insure a property at a certain amount.

383.    There is a standard among some venders of estimating software to accommodate for the aforementioned interests of the client insurers, by modifying the vendor's calculators to produce estimates of replacement cost that are more in line with the interests of the client insurer's underwriting.  This standard is communicated in many ways using, among other things, tacit agreements.

384.    A consequence of this aforementioned practice is that the standard of lowering the accurate replacement cost estimates to accommodate the underwriting interests of the client insurer is kept hidden by a layer of tacit agreement.  Upon information and belief, this practice is more prevalent in jurisdictions with more exacting replacement cost protections of the consumer, such as California.

385.    There is an enterprise standard where the calculations and standards referenced in the previous paragraph are used to determine a policyholder's coverage amount.  In this standard, if underwriting determines that a policyholder's level of replacement cost coverage exceeds an amount that will produce "acceptable" savings and cost reductions to the insurer or its joint participants, the policyholder is informed that "moral hazard" will not allow them to be insured for that amount.

386.    In this sense used by the enterprise participants in the previous paragraph, the term "moral hazard" has two meanings known to the enterprise participants: (1) A typical meaning akin to the risk that a party to a transaction has not entered into the contract in good faith, or has an incentive to take unusual risks in a desperate attempt to earn a profit before the contract settles to gain a windfall (*i.e.*, the example of someone with a higher limit of insurance than the market value of their home, burning it down to gain a windfall); (2) that the policyholder will be insured in a way that will allow the policyholder to recover replacement cost and all other associated and connected policy coverage's associated with a sufficient limit of insurance to accomplish this, and that such will violate the participant insurer's particular definition of the term "principle of indemnity," by its paying much more than the "actual cash value" (as it defines the term), or an amount it would be willing to pay, in the event of loss.

387.    Enterprise participants recognize that consumers are either aware of, or more likely to understand, the first usage referenced in the preceding paragraph, or to have it explained by the agent, but that they are not aware of the latter.  In this context, there is a standard in the enterprise of promoting a public conception akin to the first usage of "moral hazard," despite the second being the usage almost universally used within the enterprise, and this standard is promoted in part by the standards used to guide agent interaction with the consumer or policyholder in such circumstances.

388.    The standards referenced above also utilize, and reinforce, a common belief on the part of policyholders that a replacement cost policy functions on market value, and that going over market value in one's insurance of a policy is improper – this, itself, is an aim of the enterprise standards, and a standard as well, utilized to advance enterprise ends.

389.    Though enterprise participants know that policyholders understand "moral hazard" in the sense of a fraudster's incentive to burn their house down for a windfall, they also know that due to the nature of a replacement cost policy, which requires rebuilding of the property in question, or of an actual cash value policy, which pays a depreciated value of the property's value (calculated by enterprise participants to be lower than market value), that the corresponding likelihood of one getting a cash payout for burning down one's home or property, or from being reckless with one's home, with an incentive to receive an amount in excess of its market value, is a statistical improbability so high as to be practically impossible.

390.    The aforementioned perception of "moral hazard," providing the image of a "fraudster" seeking a windfall is not corrected by the insurer in its dealings with policyholders, but is instead encouraged in the aforementioned ways, as it both helps promote a marketable view of the protection property insurance supposedly provides (one that is not engineered to

lead a policyholder with ACV), and helps conceal the underwriting standards calculated to produce the loss of claims (which are known to be in conflict with standard marketing by enterprise participants).

391.    The "moral hazard" could also readily be remedied by simply explaining the mechanics of the policy to all policyholders, as anyone knowing how property insurance actually works would not have the incentives that enterprise companies attribute to moral hazard. Nonetheless, the mechanics of the policy, which the enterprise is ready to present clearly and concisely at the time of claims, is not communicated to a policyholder during the sales portion of the insurance lifecycle.

392.    It should be noted in this regard that underwriting departments know a property insured on replacement cost is underinsured in majority of the instances where they state "moral hazard," and that, as such, it will have a likelihood of being relied on.  Such communications have been made by either wires or mail, millions of times over the past ten years, constituting predicate acts of fraud in part of a greater scheme to defraud.

393.    To reach the above-stated ends, to mitigate legal exposure and risk, and to keep the internal processes more discrete, there is another standard used by participants in the enterprise of having the policyholder select an amount of insurance coverage, or to have it facilitated or provided by the agent.

394.    The standard referenced in the preceding paragraph achieves the same goals of minimizing risk and exposure to the insurer, in most cases, as other forms of purposeful underinsurance, as enterprise participants know that a policyholder will typically provide the market value appraisal associated with the property and required by mortgage lenders in connection with the insurance on a mortgaged home.  The standard also serves to mitigate

legal exposure and risk to the insurer, and provides a level of protection from discovery of the standard to underinsure. If the consumer or policyholder does not do what is expected, the standard of stating "moral hazard" can then be employed by the insurer.

395.    In regard to the allegations of the previous paragraph, the standard of having the consumer or policyholder provide the amount is reckless, and implemented with disregard for the policyholder, as the insurer already has the most accurate estimates of replacement cost, and is accepting figures lower than the best known estimates already calculated in a context where it would be a lessened danger to the policyholder or consumer to be given the estimated amount.

396.    In the cases referenced in the previous paragraph, the insurer sees the danger to the policyholder, but proceeds nonetheless with neglect of the policyholder's interests and without adequately disclosing to the policyholder, or warning the policyholder, of the significance.  This is a kind of purposeful "passing the buck," or transfer of risk without the material elements of the typical assumption of risk.

397.    The aforementioned standard is implemented with a purported purpose of limiting the legal risk of the insurer, despite the fact that it involves actions and omissions calculated to exploit the reasonable reliance of the policyholder on the market appraisal in these circumstances, and the reasonable expectation that the policyholder that the insurer is assisting, through its interactions with the agent, to reach a proper amount of coverage in their approval process of the limits (as opposed to calculating policy limits to produce unpaid claims).

398.    The standard and "best practice" referenced in the preceding paragraph is an associated standard practice at all stages of the policy lifecycle in the enterprise; which is to transfer risk to the policyholder, without disclosure as to the fact that risk is being taken on by

the policyholder, or as to what the policyholder is allowing the company to do – at its insistence, or by means of its processes – is anything but standard.

399.    "Post claims underwriting" is another standard used by enterprise participants to bring about the underinsurance necessary to trigger the high likelihood of unpaid claims, as, by having a base of decisions makers that have knowingly not been trained on issues of underinsurance, producing a standard akin to an institutionalized policy of purposeful blindness.

400.    In the aforementioned way, the insurer does not correctly and completely perform the evaluation of the property, and subsequently shifts blame to the policyholder for a failure to obtain appropriate coverage.  In many instances there is a standard where the insurer waits until a claim has been filed to obtain information and make underwriting decisions which should have been made when the application for insurance was made, not after the policy was issued.

401.    The presence of the standard referenced in the preceding paragraph is evidenced in the fact that different processes are used in the claims handling portion of the policy lifecycle than in the application portion.   The tools and standards used during claims, and their importance, is known to the insurer, but nonetheless applied only to post-claims evaluations, and in this way, is akin to a kind of "willful blindness" or recklessness. This practice has been criticized for some time as a "patently unfair" insurer practice, and the criticism is well known and noted to participants in the enterprise in which ACORD participates.

402.    Another standard and practice used by enterprise participants to incorporate underinsurance into the underwriting of a policy involves exploiting the modular nature of the

standards by utilizing another participant's estimation of the replacement cost of a property if it is lower than the estimator used internally.

403. The previously referenced practice usually involves a participant agent contacting different participant insurers to find an estimated replacement cost that is low enough to accomplish the desired ends of both underwriting and the agent. The participant agent will then notify the participating insurer who typically uses a standard estimator that produced a higher amount, that there is another "standard" for an estimate of replacement cost that is lower. As the lower estimate is also a "standard," in a sense, and is then accepted in this modular use of standards.

404. All enterprise parties involved in the aforementioned exchange are aware, due to known "standards" in the enterprise, of what they stand to gain from lowering the replacement cost (both the insurer and the agent), when the policy is written on such a lower amount.

405. What enterprise participants stand to gain from using this "standard" is of key importance to them, and the policyholder's interests are secondary, as, regardless of it being known to the enterprise participants involved that there is indeed a more accurate estimate of replacement cost that has been circumvented by this practice, and regardless of the fact that such is being done without a proper investigation into the accuracy of the estimates by individuals without the necessary expertise or authority to accurately determine replacement cost, the participants proceed because they all understand the benefit to their bottom line.

406. Another standard has also been developed in cases where a participant company's standards, for one reason or another, compel the use of more accurate replacement cost estimators to underwrite the policy. To deal with this "standard," another standard is used where participant company personnel contact the policyholder, usually unsolicited, and under

the pretext of seeking to "assist" the policyholder with determining the "proper" amounts of insurance.

407.    Sometimes, under the aforementioned practice, the insurer will leave a message and ask the policyholder to call back. The participant personnel in this standard then informs the policyholder that the policyholder has too high of an insurance amount, and characterize the interaction as "customer service."  These personnel look at county assessor records, and inform the policyholder that based on those figures, and on representations that insurance is not needed on certain portions of the home, and thereafter encourage the policyholder to lower their policy limit.

408.    This practice helps circumvent the "standard" of an initial accurate estimate of replacement cost, and serves as a method of leaving the apparent liability of the inadequate coverage on the policyholder (minimizing the apparent possibility of claims leakage associated with errors and omissions, and the like).  As part of this standard, the insurance personnel can make a record that they contacted the policyholder about adequate insurance coverage and that the policyholder "requested" a lower limit of coverage.

409.    As part of the practice or "trick of the trade" referenced in the preceding paragraph, enterprise participants are instructed to do the following in regard to the records they keep from interactions with policyholders: (1) omit unflattering features; (2) re-characterize the communication to hide its initial purpose, or the way in which they presented either misinformation or doublespeak to the policyholder; (3) to use flattering or neutral terms for negative items in regard to the company; (4) to use euphemisms.  This is, it should be noted, is part of an enterprise data standard, or way of communicating, where only "favorable"

characterizations and information are included, which are calculated to diminish exposure or liability in the participant's records.

410. In regard to the above-stated standard, some enterprise members simply deny that a conversation ever happened or act as if a voice message was never received, if such would be inconvenient.

411. Training as to the aforementioned data standards is prevalent throughout the enterprise and is considered part of "leveraging customer communications" or "document/content management" to "enhance the customer experience." The standard is applied to, and covers, all major insurance business areas including inbound communications (voice, paper, and computer based), and the process of producing correspondence, as well as document creation and management, including "outbound communications" (paper, records management, and e-delivery). As part of the double meaning common in the enterprise, it is left unsaid for whom the "customer experience" is enhanced, as participant know that it is to enhance their experience.

412. In regard to the practice of underinsurance being produced by calling the policyholder to illicit them to lower their insurance, the fact that lowered limits do not sound the same alarm with underwriting that the raising of limits does is telling. The supposed "moral hazard" used as the reason of disallowing higher limits raises an inference that the primary concern of underwriting is to produce unpaid claims, as it shows the priority of minimizing claims over the maximizing of premiums. The ends of the scheme, or "standard" can be inferred in this light from the result it reaches – an inference that is itself made more likely by ACORD's given position that its standards help the enterprise reach its ends, and that "standards" do not simply arise without planning and intentionality.

413.    In line with the aforementioned standard for lowering policy limits to bring about underinsurance, it is a common "standard" of enterprise participants to use assessor records as a "standard" for a determining the level of replacement cost coverage for a home. Whether simply using the amount listed in the assessor records or by using the description of the property (both of which enterprise participants know to have a substantial probability of underinsuring the home), the "standard" is used, and has been assimilated into the ACORD framework through multiple transactions transmitted through wires, mail and courier during the past ten years.

414.    The material risk referenced in the preceding paragraph, as well as the hidden processes and motives associated with the transfer of that risk to the consumer by these practices, and the associated benefit of the standard to enterprise participants, are all things that, as a standard, are not disclosed to the consumer.

415.    It should also be noted that the aforementioned practice of citing "moral hazard" as a term of double meaning only succeeds because it utilizes the common conception that policies are essentially valued policies or that they function off of the market value – which is generally understood by consumers to be correlated to the policy limit.  Knowing what the insurer knows about how policies function, it would be absurd to think that anyone knowing how policies function would ever have the hope of making a profit from the burning of their home.

E. THE AIMS OF THE CONSPIRACY AND THE ROLE OF THE STANDARDS, FRAMEWORK AND "BEST PRACTICES" WITH REGARD TO UNDERWRITING ACTUAL CASH VALUE POLICIES

416.    When someone loses their replacement cost they are left with "Actual Cash Value" (ACV), and there is a corresponding savings to the insurer based on unpaid claims related to replacement cost.

417.    In line with the allegations of the preceding paragraphs, there has developed an enterprise standard of selling replacement cost policies that are calculated, at their inception, to pay "Actual Cash Value" on the dwelling.

418.    A fact that illustrates both the deceptive nature and the intent of the schemes to underinsure replacement cost is the absence of motivations and efforts on the part enterprise participants to apply the aforementioned schemes used to underinsure replacement cost policies to Actual Cash Value policies.  The standards and associated concern over "moral hazard" are absent, or almost nonexistent, in regard to "Actual Cash Value" policies, as almost all Actual Cash Value (ACV) policies are, in fact, overinsured.

419.    In reference to the allegation in the previous paragraph, a study of ACV policies will demonstrate that they are all chronically overinsured, and that they are, further, becoming more overinsured with each passing year.

420.    As mentioned, there is also an absence of the standard used by underwriters of denying limits to such policies for being overinsured, wherein "moral hazard" is claimed, as, in ACV policies, the policyholder is, due to practices in policy drafting and underwriting associated with ACV policies, practically guaranteed to never receive the policy limits.

421.    The aforementioned allegation underscores the deception used in the claims of "moral hazard," as the insurer is well aware that overinsuring a home does not have the "fraud-

related" risks that they wish to make policyholders think are motivating their desire for low policy limits.  To this end, the inference arises that the goal is to deflect attention away from the scheme to underinsure – simply put, it is a believable excuse.

422.    The key to understanding why enterprise participants treat ACV policies differently is found in another deceptive practice that is used both in the ACV policy and in the Replacement Cost policy context as an added mechanism to bring about forfeiture.  The mechanism concerns the nondisclosure of a definition for the material term "Actual Cash Value" at both the sales process (*i.e.*, application stage) and in the language of the policy where a definition of "Actual Cash Value," the most often referenced valuation term in the policy, is conspicuously absent.

423.    As a standard, the enterprise participants define "Actual Cash Value," internally, and in their operations, as some variant of "replacement cost *minus* depreciation."  As part of this standard, the key feature, which is not defined in the standard policies, is the term "depreciation."

424.    "Depreciation" is usually applied as some form of straight-line depreciation, depreciating the property a given percentage every year over a "useful life" determined for the property (*i.e.*, 2.5% per year, etc.).

425.    As an example of straight-line depreciation, a home would be assigned a useful life of 50 years by the insurer, and would therefore "depreciate" according to this standard at 2% each year, where, after 25 years, it would have an ACV of half the property's replacement cost.  In this example, a property that costs $500,000 to rebuild at the beginning of the policy will only have an ACV of $250,000 after 25 years if insured under an ACV policy.  As an

associated standard, enterprise participants also subtract the pre-fire value of the land from ACV, further lowering the payment to the policyholder on ACV.

426.    What is alleged in the prior paragraph is done despite the fact that the contracts in question do not read "replacement cost *minus* depreciation and *minus* the value of the land." Thus, in the previous example, the market value would be, by all likelihood, quite a bit higher than the $250,000 ACV for the property in question, and a policyholder suffering a total loss, expecting to get the market value of the property in the event of a loss, will be left in a position, after these standards are applied, where they receive significantly less than the market value of the home.

427.    In reference to the preceding example, if the policy was a replacement cost policy that experienced forfeiture of replacement cost due to the previously-mentioned underweighting standards, the policyholder would be left with no means to buy a comparable home elsewhere, or to rebuild anything like the insured property, with an ACV payment.

428.    In contrast to the sales portion of the policy lifecycle, where "actual cash value" is almost uniformly equated to market value, the claims departments have received enterprise standards and "best practices" instructing them to treat the term "Actual Cash Value" as distinct from "market value" or "fair market value," and to treat it at all instances as Replacement Cost *minus* Straight-line Depreciation, or some variant thereof.

429.    By using different meanings for "actual cash value" at both the claims and application stage of a policy, enterprise participants are not only being inconsistent, but have standardized a method of achieving the ends of the scheme to defraud clients through fraudulent omission of material terms that are difficult to track. By doing this, they have also

incorporated features necessary to achieve them and hide their design, as the agents can be given one set of standards and the claims handlers another.

### F. THE RELATIONSHIP BETWEEN ENTERPRISE SALES STANDARDS AND THE DECEPTIVE FEATURES PRESENT IN ACTUAL CASH VALUE & REPLACEMENT COST POLICIES

430.    These underwriting and claims standards of the enterprise participants also run contrary to the sales standards used by the enterprise, particularly concerning ACV, where it is treated, if at all, as a variety market value.

431.    If informed about ACV by an agent when purchasing a policy, applicants are, as a standard, told that the policy insures the cash value or market value of the property.  In the standard, the policyholder is not informed of the "term of art" meaning that the insurer will intend to apply at the time of a claim.  They are not shown depreciation schedules, or anything that will become of key importance in a claim. As the standard, an "agreed value" (which is another standard used by the industry to avoid liability), or the market value, is then included as the policy limit.  "Agreed values" are usually the result of underwriting informing the policyholder through the agent that they will not insure the property for less than a certain amount.  The insured typically sees this as an agreement that the property has a certain value.  However, the insurer sees this as a claim settlement term that will be replaced with another undisclosed "claim settlement term" at a later date.

432.    As a standard, the market value amount provided by the applicant is known by enterprise underwriters, at the time of underwriting, to be higher than the ACV of the property, as calculated by underwriting at its issuance.  It is also known by the insurer to be higher than ACV, if a market value is used as the basis of "agreement."  In this regard it should be noted that insurer in these circumstances does not disclose the ACV they are attributing to

the policy directly at issuance.  Although the policyholder has agreed that the stated amount is the value of the property, the insurer acts as if the ACV is unknown (though they have already calculated it), and instead treats the agreed value as simply the limit of insurance.

433.    It should be noted in regard to the "agreed value" standard, that no disclosures as to the material aspects and purpose of the policy limit, in light of how the insurer plans to apply protection to the property, is disclosed to the policyholder.

434.    In regard to the "agreed value" standard, it should also be noted that the insurer does not treat it as an agreement in the sense that the home depreciates from that "agreed value" every year, as it will nonetheless apply the previously-mentioned mechanisms – producing an ACV, according to the enterprise that, is less than the agreed amount even on the very day the policy is issued.

435.    The sales standard for ACV, wherein an agent presents its benefits as being those of market value, is applied because there is not much of a choice for an agent when forced to sell an ACV policy by the underwriter.  Properties of a certain age, as an enterprise standard, are insured at ACV regardless of what the agent may wish to sell the client.  The agent may wish to sell a replacement cost policy to the policyholder, but according to enterprise standards, properties of around 25 years of age or older will be insured at ACV.

436.    In regard to the allegations in the previously mentioned paragraph, the underwriter has control over what insurance products a certain purchaser will be offered.  It is for this reason that the sales standard involves so little communication, wherein the applicant contacts the agent and is then told that they will be called back.  At such a point, the agent is informed by underwriting what products the consumer can be offered.  The sales presentation is thereafter different depending on what products can be offered to the consumer by the agent

– if an ACV policy is all that can be offered, the representation of ACV coverage will be mush more flattering than the facts would otherwise indicate, as those facts would likely prevent a sale.

437.    Because of the points raised in the previous paragraph, the agents have no incentive to explain the differences between Replacement Cost policies and ACV policies, so a standard has developed for the sale of such policies, which is either not to mention their nature, and simply treat them as "standard" policies, which they are "in a sense," as they fall within an enterprise standard, or to equate ACV in some indefinite way to market value.  (A realistic explanation and disclosure of what ACV indeed provides in the event of loss would have effects similar to what is feared with the standard position of the enterprise to other disclosures: they could be a "distraction" to the sales process, and could prejudice sales.)

438.    In line with the allegations of the preceding paragraph, an additional standard exists for agents where statements that purport to explain the benefits of a particular product or the "product" of a particular insurance are discouraged, as this is seen as a danger that could expose the agent to E&O liability, as the company "could be relied upon" by a consumer in deciding to purchase insurance. This "standard" works to keeps the agent within enterprise-approved script for sale.

439.    The standard referenced in the preceding paragraph demonstrates an example of the negative incentives that can be used to motivate agent participants.

440.    When taken with both the bonuses and increased sales that come from implementing standards that bring about nondisclosure of material information to the policyholder, the two previously-mentioned standards exemplify another recognized standard

of the enterprise: the use of "the carrot and the stick" to bring about implementation of standards.

441.    In regard to the allegations in the preceding three paragraphs, enterprise insurers know the motivations that agents have in selling properties at a low price, and also control the means of both removing a line of business from an agent, or of incentivizing the agent through contingent compensation (which is typically improved by lower prices of insurance resulting from underinsurance).

442.    The enterprise use of the term "ACV" not only violates the common public perception of what the words "actual cash value" means, but it also runs contrary to the requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) that govern every valuation of real property in transactions within Colorado, as well as 35 other states. The USPAP requires a reconciliation of any valuation of real property with the market value of real property, and the USPAP also requires the inclusion of any appreciation in the property, something that is absent in straight-line depreciation.

443.    As mentioned before, and to shift an undisclosed risk to the policyholder, enterprise participants have developed a standard of declaring ACV a "claims settlement term." There is, however, nothing in the practices, the policy, or the standard forms that defines the term as a claims settlement term.

444.    Due to its enterprise-specific use of ACV, an uninitiated member of the public – not privy to the complex enterprise framework known to participant insurers – is, by calculated likelihood, unaware of the complex, undisclosed, and deceptive features that surround the enterprise's use of ACV when selling a policy.

445.    In regard to the allegations of the prior paragraph, as enterprise participants maintain control of all the pertinent information in the sale, their acts and omissions cause the policyholder to enter into a contract premised on deceptive nondisclosure and bad faith, and where there is no meeting of the minds on the material terms.  This fraud is intentional, known and calculated, as it is planned and controlled at every stage, concealed, and for the profit of the enterprise participants and expense of the consumer.

446.    Enterprise participants, particularly those that write the contractual language of the policies in question, are aware that consumers, even after passing through the sales process, only believe that they should have an amount of insurance on their property equal to the amount that the bank requires for the mortgage.

447.    Similarly, and with particular enterprise participants referenced above, it is known that the practices used to sell policies lead to them not being read. The policyholder is reasonably calculated to not anticipate that all of the legal content in a policy would in any way materially different from what they were told by their agent.

448.    This public perception is calculatedly perpetuated by sales and marketing standards which are known to promote the view that a policyholder is purchasing a "standard" or deluxe policy, and to only think of policies in those terms, while the mechanisms that are worked into the policy to produce unpaid claims with regards to Replacement Cost policies, or overpayment with regard to ACV policies, are hidden from the policyholder, and not revealed until the time of claim.

449.    As an enterprise standard, enforced through various methods, agents have a standard of perpetuating the view that most policies are "standard" policies, and that the key difference is the insurer or the level of service an insurer is perceived to provide.

450.   In this regard, agents serve a function in the scheme, as calculated by the other enterprise participants, of aiding and abetting the fraud by omission of material terms in the applications, sales circulars, and policies. By design, these do not have definitions of the key material terms used in the scheme.

451.   What is attempted to be hidden by the above standard is the fact that the features of enterprise "standard" policies are not known to the public, and that the features important to both the insurer and the policyholder at the time of loss (such as: exclusions; the meaning of Actual Cash Value; the particular measure of depreciation that the insurer will seek to apply at the time of a claim; the requirement to rebuild a home within a short period before reimbursement of the amounts needed to rebuild that home will be paid; the role of replacement cost estimates, and how those are categorically different from the market value measurements the applicant, by enterprise calculation, likely sees as the measure of a home's value), are not discussed with the applicant.

452.   In the above way, and in addition to the standards for insurance producers (*i.e.*, agents), terms that are of material significance are not raised in the ACORD standard forms or in the standard presentation to the applicant prior to sale, and are further not defined in the enterprise standard contracts.

453.   Despite that alleged in the previous paragraph, and despite knowing consumers do not understand the contractual terms, the enterprise standards allow for an enterprise-wide failure to disclose material terms by omitting them from applications, for their omission in the sales process, and for their omission from definition in the contract policy.

454.   A reasonable person would have considered these terms, so not disclosed, important in making a decision as to the insurance being sold.

455.    The aforementioned standards are also used to minimize and prevent an applicant from focusing on the material aspects and consequences of the policy language, such as: the nature of policy limits and coverage as affected by the meaning of ACV and Replacement Cost; the exclusions of coverage and their effect; what is required for one to be properly insured; the fact that one must rebuild within a relatively short window to receive the replacement cost as a reimbursement; the effect of escape clauses as related to the amount of coverage; and how the terms in the contract differ from common terms.

456.    By the simple mechanism of not providing a policy at the point of sale, the likelihood of any of the previous questions and issues arising is significantly diminished.

457.    Both the enterprise participant producers and its insurers recognize that these disclosures would lower the likelihood of a sale.

458.    An inference arises from the aforementioned sales practices, that the processes, practices, and standards are designed to manage customer expectations.

459.    In regard to the allegations of the preceding two paragraphs, the participant insurers also recognizes through their underwriting practices, that, in addition to a diminishment in sales, there will be diminished savings to it in the event of a loss if there is disclosure, as the applicant's likelihood of insuring for an amount of coverage adequate to prevent unpaid claims would also likely increase in the event of material disclosures.

460.    As enterprise insurers practice a volume business, they recognize that if the likelihood that an applicant will insure for an amount sufficient to prevent unpaid claims increases, that there will be, as a result, less unpaid claims, and that they will also therefore experience less "savings."

461.    Through the mechanisms of the sale, and the failure to disclose, enterprise participants also expect to hide their role in creating the underinsurance problem by orchestrating a system designed to place a false blame on the policyholder for not "insuring properly."

462.    In the dealings between agents and underwriters as to the policy limits of the insured that the insurer will accept, no disclosure is made to the insured that the insurer is passing the risk of loss to them.  An increased risk of unpaid claims is pimply passed to the insured without telling them.

463.    There is also a standard of enterprise participant agents communicating the likely underinsurance of policyholders to the enterprise participant insurer: surveys conducted by enterprise participant insurers of agents reveled that 83% of agents reported, in 2012, that the client was likely underinsured on the dwelling, and in 2010, 86% of agents had reported the client as likely being underinsured on the dwelling.

464.    From such enterprise communications as those cited in the previous paragraph, enterprise participants have admitted that rebuilding a damaged home remained the most likely underinsured risk.

465.    In enterprise communications of the kind referenced in the preceding paragraph (between insurers and agents), there is an acknowledgement on the part of the insurer of there being overpayment, that additional structures are likely underinsured, and of both agents and underwriters being aware of these likelihoods.

466.    Regardless of the knowledge and control exerted by both agent participants in the enterprise, and underwriting participants of the enterprise, there remains a standard to blame the insured for the resulting underinsurance.

467.    In regard to the aforementioned three paragraphs, no means is given to the insured by which to protect themselves in any negotiation against the bad faith intentions of the insurer to increase the insured's likelihood of forfeiture on the policy.

468.    In regard to the previous allegation, enterprise participants have developed a standard of communicating and placing blame on the consumer for being underinsured, and do so in an effort to hide the mechanisms of the conspiracy.

469.    In regard to the allegation of the prior paragraph, this occurs despite the enterprise participants having control over insurance limits, through both the discretion of the underwriter and the engineering of forfeiture that is worked into the very nature of the product – which is then required for the product to function in the business model developed around the dangerous product.

470.    Over the past ten years, participants in the enterprise ACORD participates in have had a standard of not presenting millions of consumers with insurance policies at the time of the application for insurance.

471.    Over the past ten years, participants in the enterprise ACORD participates in have also had a standard of refusing to provide consumers with a copy of the policy at the time of application or prior.

472.    Participants in the enterprise ACORD participates in have a standard of refusing to provide consumers with a copy of the policy at the time of application because it conflicts with the shared interests of the enterprise.

473.    An inference arises from the standard wherein policies that are asked for at the application stage are not provided for review, where agents do not have one on hand, that the

sales processes is meant to exclude the possibility of the consumer being notified of contract terms.

474.    The previously mentioned inference arises, as it is unreasonable that agents selling insurance not have the most significant features and terms on hand, and that such is a standard practice.

475.    In light of the other features used to limit the discovery of the mechanisms of the scheme, the practice of not having a policy, or of one being kept from agents by the insurer, conforms to being a part of a pattern to conceal the mechanisms of the fraud by omission of material terms.

476.    The standards mentioned in the prior seven paragraphs have been promoted, advanced, aided, abetted, and communicated by enterprise participants through the ACORD framework, and with ACORD standards, through data communications, communications through wires, by mail, and by private courier.

477.    Similarly, policies omitting material terms – which function as part of an insurance product designed to result first in reliance, and then in insurance being paid for which, by design, will not be collected – have been mailed millions of times in the past ten years by means of both United States mail and private courier.

478.    By including terms that are not a part of the sale in the policies sent in a way that one has purchased the policy without the ability to question the agent of the policy's terms, there can be seen a calculated effort that the cumbersome legal document not be read or understood.  By this means, enterprise insurers have also adopted and implemented a standard practice of bait-and-switch sales and advertising.

479.    Due to the previously mentioned underwriting and ERM standards, and dependent internal processes, there is a pattern and standard of selling consumers replacement cost policies that is calculated to result in unpaid replacement cost.

480.    In line with the allegations of the preceding paragraph, and as alleged in more detail, *supra*, there is also a scheme on the part of enterprise participants to hide and camouflage the practices, and to not disclose them, although they are material, as the disclosures are known to impede the mechanisms of deception and their ends (mechanisms that produce economic advantages to all participants in the insurance value chain related to these practices, standards and schemes in question).

481.    In regard to the allegations of the preceding paragraphs, and in light of the nature of ACORD's complex communication framework – which requires dedication and considerable effort on the part of initiated insiders to implement and understand – it is alleged that, it is extremely unrealistic and unreasonable for enterprise participants (who are well aware of the considerable effort it took them to understand the standards and framework) to behave as if policyholders understood the nature and import of communications made to them using a deceptive framework of communication regarding features of the policy that operate as assumptions of risk without the requisite disclosure to appraise the policyholder that any risk is being taken in the supposed agreement.

482.    In light of the context raised in the preceding paragraph, the inference arises that the use of enterprise-specific communications, such as ACV, without a disclosure as to their nature and materiality, and as interpreted within the ACORD framework, are communicated on the part of enterprise participants with knowledge that consumers do not

indeed contract for the hidden material features known, and which, in all statistical probability, run contrary to common perception of such terms.

483.    In regard to the allegations in the prior paragraph, an inference arises that the enterprise participants know policyholders do not understand the terms as the participants plan to apply them, and that they also know what policyholders believe the terms mean.

484.    In the same way as the allegations of the preceding paragraph, enterprise participants have implemented a sales model calculated to exploit what the policyholder believes by using terms that appear to coincide with the policyholder's known understanding of the terms presented.

485.    In the sales model referenced earlier, material terms are hidden, and the sales process is standardized, so as not to present the policyholder with anything but the language that is known to the enterprise participants to have a double meaning, and which will be interpreted according to a common usage by the applicant, producing reliance upon a context that the enterprise has exerted influence over through the removal of disclosures.

486.    When this is combined with the standard of building confidence in the agent, and the cooperation of other enterprise participants to create products that are homogenous on all of the most detrimental or deceptive features, the market choices of the policyholder are severely limited and the power of a consumer to avoid abusive practices is removed by the conspiracy.

487.    In a sale using the sales standards and other enterprise standards referenced in the preceding paragraph, there is no meeting of the minds, and the policy is voidable.

488.    Although enterprise participants and spokespersons recognize that an educated consumer is the best protection against abuses, and although enterprise participants

responsible for drafting policy language recognize that understandability is an important component of protecting consumers, and although the participants also recognize that depreciation is a fluid term not generally understood by the consumer, the enterprise continues to provide insurance products with contracts that homogenously, and as a standard, do not define term "depreciation" or describe is supposedly "fluid" nature.

489.    In regard to the allegations of the preceding paragraph, enterprise participants also know that the omitted and undisclosed terms are significant at the time of claim and highly disputed, particularly due to the zero-sum strategy used in the enterprise to ensure unpaid claims.

490.    In regard to insurance products being largely homogenous on all of the most detrimental or deceptive features, their extensive homogeny throughout the enterprise, and the industry, have reduced competition on this point, and consumers are deprived in almost all cases of a product that meets the minimum consumer expectations.

491.    There would be a market for what the client expects due to supply and demand, however, the nature of the market, due to the proliferation of enterprise standards, has been negatively affected, as has been the ability of an insurance product providing the commonly expected benefits to be available to the public.

492.    In regard to the allegations of the prior paragraph, there has been a restraint on trade by the agreement of enterprise to only offer products with the aforementioned forfeiture clauses and overpayment of premium mechanisms, as such have served to remove true variety, in any significant and openly recognizable form to the consumer, from the market.

493.    As all assumptions of risk that the enterprise intends to lure the policyholder into by means of not disclosing the nature of the danger to the policyholder associated with

assumptions of risk, and by disguising the assumption of risk presented by the insurer as "helpful suggestions" from a trusted professional, enterprise participants bring together all of the of parts of the scheme needed to defraud the policyholder.  In this regard, the policyholder would have to assume that there was a significant possibility that the enterprise was out to engineer their harm to be wary of the efforts used to pass undisclosed risk to them.

494.    ACORD standards and standard forms have not developed to eradicate the possibility of this undisclosed transfer of risk to the policyholder, despite numerous consumer complaints and its own inside knowledge as to the practices and standards facilitate through its data standards. In this way, ACORD provides a venue, forum, marketplace and mechanism for the exchange and proliferation of these so-called "best practices."

495.    Instead of developing forms and standards that primarily seek the good of the consumer, or which at the very least halt the prolific nature of standards that engineer detrimental unpaid replacement cost or inequitable overpayment of policy premiums on ACV, the aforementioned risks to the policyholder are instead accommodated by the forms and standards.

496.    The accommodation of these practices and features in the forms: (1) persists despite what the enterprise reasonably knows a policyholder is calculated to believe after passing through all of the enterprise "standard" processes prior to sale; and (2) is intricately linked with approaches that participant insurers apply to both ACV and replacement cost policies to a practice of taking advantage of the long held public perception that insurance functions on market value.

497.    In regard to the allegations of the preceding paragraph, and in regard to all the previously alleged instances of failing to disclose material terms of features of material

significance on the part of Defendants, there is an obligation to disclose, and such withholding

of a material facts establish the requisite element of causation in fact for the resulting damages.

498.    In regard to the preceding allegation, the obligation to disclose is even more

particular in regard to Defendant insurers who are mutual companies or exchanges where an

interest in the company is being sold.

### G. The Use of the Standards and Framework to Ensure that all Departments and Points of Contact with the Consumer Achieve the Aims of the Conspiracy

499.    Aside from the "flexibility" of standards as modular, the level of control

implemented in all departments of an enterprise participant insurer, or at every level of the

insurance value chain in relation to an enterprise participant insurer, are, as a standard,

coordinated through ACORD and enterprise standards to the end of "increasing profitability,"

"reducing costs," and "minimizing exposure," by detailing each task and set of standards that a

department or particular element of the system is to accomplish.  To this end, each department

has a standard of training and a standard of instructions provided to them that are coordinated

to achieve company ends and the greatest possible control over the functions of each

department in the system.

500.    The ACORD standards allow enterprise participants to achieve a greater level of

control over all departments of an insurance company, and at all levels of the insurance value

chain, to achieve the ends of the enterprise participants.

501.    To facilitate control a standard has developed in the enterprise of using

identifying different functions for participants, limiting their authority, and managing all of the

departments or functions to the ends of enterprise participants. Each participant is given a goal

and minimal information in what they are to do.

502.    By means of the aforementioned segmentation and division of responsibilities among employees and departments, enterprise participants are able to coordinate each stage of the policy lifecycle and control the approach that is applied to the consumer at the various points of contact with the consumer.

503.    By means of the aforementioned segmentation, enterprise participants are also able to ensure that the different uses of material terms not disclosed to consumers can be applied with the different intended understanding by the insured to both disguise the coordinated effort and ensure the aims of the conspiracy.

504.    An example of the standards and framework, as applied to control of all operations throughout the enterprise, can be seen in regard to the implementations of standards regarding "project management" and project managers in the development and implementation of insurance products within the enterprise.

505.    Product management is the effective management of all product planning and development phases, from product idea through product monitoring.

506.    In its purest form, product management is a role that enables one person to focus all of his or her energy on the total business performance of a given state or product lines.

507.    Contrasting the product management approach with a more traditional approaches illustrates the nature of the developing standard: whereas a sales vice president will often be evaluated and compensated for top-line growth, and while an underwriting vice president's responsibilities may emphasize underwriting profitability; a product manager's goal is to find the optimum balance between top-line growth and bottom line profitability.

508.    There are two key functions in the standard traditional insurance business model of the enterprise: underwriting and marketing.

509.    Everything in a traditional organization, or insurance business model, funnels through those two functions.  The flaw recognized by enterprise participants in the traditional approach is that those functions are in conflict.

510.    There is a known disparity and conflict in the enterprise between what is marketed and what is achieved by underwriting. "Good underwriting," as determined by enterprise participants, has a tendency to proceed at the expense of marketing, but leads to unnecessary limitations and restrictions on business; on the other hand, aggressive marketing with relaxed underwriting erodes the quality of a book of business, from an enterprise participant's perspective.

511.    In the context of the preceding paragraph, there are six standards, "best practices" and competencies associated with the role of a product manager: the ability to think strategically and act tactically; project management skills; data analysis skills; working knowledge of insurance functions; effective interpersonal skills; and a strong "sense of accountability." Of these, a standard has developed where the ability to work to with numbers is paramount, as, in many companies, product management is a more analytical role, emphasizing the quantitative aspects of pricing and ratemaking, and balancing price-competitiveness with profitability.

512.    A standard is recognized in the enterprise wherein "diplomacy" and "accountability" are seen as essential to the function of a product manager because the position carries a significant amount of responsibility without much authority.

513.    Responsibility without authority is consistently identified as one of the defining characteristics of product management because product managers must work across the

functional lines that still define most insurance organizations – marketing, underwriting, and claims – and therefore challenging traditional lines of authority.

514.    In the sense described in the preceding paragraph, a product manager's functions will "bump up" against vertical team interests where someone is always responsible for marketing, underwriting, claims, and so forth.

515.    In the sense described in the preceding paragraph, product managers are potentially seen as a threat and are therefore, as a standard, managed through "the dotted line accountability."

516.    As an example of the "dotted line of accountability," a project manager may be individually responsible for actuarial determinations and underwriting results, but only have shared access to, and authority over, the actuarial and underwriting specialists needed to do the job.

517.    As ACORD standards become more prevalent in the insurance industry, the enterprise participants have determined that it is important to do everything possible to make sure the standards are implemented "properly," as defined by the aims of the enterprise participants, and to that end have offered "trainings" that are designed to help organizations realize the full benefits of time and "cost savings" ACORD standards bring.

518.    As part of the goals referenced in the preceding paragraph, educational, training and enterprise communications are video transmitted for such purposes over ACORD's website and via youtube.com.

519.    This education is a method of limiting human error, which is seen in the enterprise as a cause of "claims leakage."

520.    As a standard, enterprise participants are educated and trained in the "principle of indemnity," as defined in the light of enterprise "best practices."

521.    Employees at all levels of the insurance value chain are instructed to seek the enterprise-specific vision of indemnity through mitigating "claims leakage," which is seen, in a standard, as any claims that could have been minimized or not paid.

522.    Procedures and accompanying educational standards are set in the enterprise to minimize the possibility of claims payment in the event of loss, and this standard of training places the policyholder and the insurer's personnel in an adversarial relationship as to claims through all departments from underwriting to claims handling, as minimizing claims leakage is governed by the zero-sum principles.

523.    Because of the human toll that such an adversarial relationship can place on enterprise personnel and employees, and to ensure that the aims of the enterprise are achieved, enterprise participants are constantly seeking new protocols, standards, functions, "best practices" and mechanisms for ensuring that the aims of the designed insurance products and the aims of underwriting are achieved.

524.    There is a standard to educate insurance personnel to seek application of "the principle of indemnity," as understood in the enterprise, even in regard to replacement cost policies and guaranteed replacement cost policies.

525.    By indoctrination on "principles" such as the principle of indemnity, teaching interpretations of the terms that are geared to achieve the aims of enterprise participants, the standards and framework can be implemented in a way that is affected by such education (and associated context), a perspective that enterprise employees have been given by upper management and the ultimate decision-making calculus of the insurer(s) involved.

526.    To further eliminate "human error" in the implementation of standards, participants in the enterprise that ACORD is involved in are developing and implementing new standards for the automation, digitization and electronic standards for every part of the insurance value chain and for all departments within enterprise participants as well.

527.    To the end of eliminating "human error," leadership in the enterprise that ACORD participates in has informed participants that digitization should not be seen simply as something concerning the streamlining of customer acquisition and "service," but emphasizes the points that digitization is also about "leveraging the power of data" and "transforming internal processes," which the enterprise recognizes as the ultimate engines that drive organizational performance (as opposed to customer service and acquisition).

528.    It should be noted, in regard to the previous paragraph, that there is a standard in the enterprise where "customer service" has nothing to do with seeking to give the policyholder the full amount of their claim, or to assist the policyholder in that regard. Instead, it is used as either a euphemism for simply dealing with clients using the zero-sum approaches or standards, or similar, or of seeking the best interests of the shareholders – the true "customer" of the corporation.

529.    To make the most of data, enterprise participants have been instructed by other enterprise participants that though insurers are in the business of gathering and analyzing data to appraise risk, they should focus on how they are positioning themselves to embrace and exploit all the "new" data that exists, in order to make better decisions about what customers "need," and about how risky those needs are to insure.

530.    In promoting automation, the enterprise that ACORD takes part in has educated the participants that over and above the more practical collection of insurance risk data, the

members of the enterprise ACORD should keep in mind that "strategic" risks, rather than financial risks, were responsible for 68% of severe market capitalization declines between 1998 and 2009.

531.    In the sense reference in the preceding paragraph, the enterprise has acknowledged that the focus on minimizing risk has demanded multiple layers of practical data management, not merely of "Insurance Risk, such as actuarial, underwriting and pricing, but also of financial, operational, strategic, HR and "customer risk."  Recognizing that such is an immense amount of data to gather in furthering enterprise aims, and to both analyze and exploit while still excelling at a participant's core insurance business, the importance of automation is encouraged.

532.    Despite the realization of the other uses of data referenced in the preceding paragraph, leadership in the enterprise that ACORD participates has instructed enterprise participants that though such benefits of automation are encouraged, enterprise participants are also directed to focus on the use where automation "should" also serve the purpose of enabling companies to refocus their personnel on more "strategic tasks," such as the product management, for example referenced, *supra*.

533.    Enterprise participants are instructed by enterprise leadership to consider how much of a product underwriter's daily time is spent either manually underwriting or manually designing (via complex internal product design and configuration processes) new products or just simple product extensions.  In this sense, enterprise participants are instructed to consider how much time they would prefer they invest in "real" research and development (R&D), "innovation" and "creativity," and seeking out new pools of profit through such innovation.

534.    As insurance products research and development currently involves the standards of producing "cost savings" and associated unpaid claims through engineering and R&D, the allegations of the previous paragraph serve to show how the level of control and personal involvement of enterprise participants and personnel, without the authority to change enterprise ends, is developing due to the comprehensive and complex nature of the standards, are gaining power in the enterprise and industry through technological advancement.

535.    The allegations of the preceding two paragraphs also serve to demonstrate how the institutionalization of the standards, "best practices" and means to achieve them through both the personal involvement of innovators who have no authority to change the aims of the enterprise, and automation, which also has no choice but to seek enterprise ends, are related to the exploitation of "profit pools," which the enterprise currently sees as ways to charge the consumer for something they will never be given.

536.    In the ways described above, said allegations show the threat of continued and increasing perpetuity, projecting into the future, of the schemes to deceive that have become integrated into the enterprise standards.

## H. THE SHARED AIMS AND BENEFITS TO ENTERPRISE PARTICIPANTS IN APPLYING THE "BEST PRACTICES" USED TO EFFECTUATE THE AIMS OF THE CONSPIRACY

537.    The participants of the enterprise ACORD is involved in, at all levels of the insurance value chain, benefit from standards and controls mitigating "claims leakage" by implementing "best practices" engineered to bring about unpaid claims in the form of unpaid replacement cost. In this regard, a standard has developed to bring about the non-payment of replacement cost.

538.    Reinsurers who are members of the enterprise benefit from minimized risk in the implementation of the aforementioned "best practices," while insurers experience saving that can then be used in investments, and which then also lower the perceived cost of the insurance products sold, as the exposure is minimized to levels that have nothing to do with what it would cost to meet the expectations of an insured, facilitating less expensive sales for insurance products (though they are, in actuality, overpriced, as they do not provide for the minimum expectation of the consumer, and are engineered to cause economic harm in the event of loss).

539.    The aforementioned artificially lowered prices help agents sell more, which benefits them with contingent compensation, also known as bonuses, and also helps the insurers sell more product, while keeping loss ratios at levels they could not be kept at without "best practices" calculated to produce unpaid replacement cost claims.

540.    The diminished exposure resulting from the aforementioned "best practices" allows all participants of the insurance value chain, including reinsurers, to experience efficiency, savings and "productivity" at the expense of the consumer and insured, who has had the risk and exposure transferred to them through hidden and deceptive features including the failure to disclose material aspects and features of the policy – or, otherwise, deceptive nondisclosure.

541.    The shared objectives and enterprise partnership aspects of the many parts of the insurance value chain can be seen illustrated in contingent compensation and bonuses, which serve to achieve the ends of the enterprise, its participants, and to ensure the personal investment of employees as participants.

542.    Total premium volume, "growth," and loss ratio all of which are affected by the "best practices previously mentioned, are standardized criteria for contingent compensation in the enterprise.

543.    In regard to the allegations of the previous paragraph, enterprise participants have standards of contingent compensation where it is paid at all levels of an enterprise participant's operations for "beating" the loss ratio.

544.    The aforementioned compensation is contingent on performance, and thus aims to alter the behavior of participants in regard to factors that would be out of their control, if the loss ratio were indeed calculated fairly and accurately.

545.    As alleged earlier, such contingent compensation also correlates to the "proper" application of standards to achieve a diminished loss ratio – standards that include unpaid claims, claims mitigation and an adversarial approach to the policyholder receiving their claim as predicted in the loss ratio.

546.    It is alleged that this practice is, due to the nature of the loss ration, unfair, and in the claims setting defined by the aforementioned best practices of the zero-sum approach to the policyholder, ties bonuses directly to the denial of claims.

### I. THE USE OF LANGUAGE IN THE ENTERPRISE STANDARDS AND FRAMEWORK TO DISGUISE ITS EFFORTS TO KEEP THE MECHANISMS OF THE CONSPIRACY FUNCTIONING THROUGH FURTHER CONCEALMENT

547.    At all relevant times, standards have been developed to hide the relationship between beating the loss ratio and bonuses, and also to conceal other aspects of the scheme that could be revealed by disclosure.

548.    On or about March 17, 2011, ACORD announced the implementation of new standard forms to be used in New York and developed in response to the State of New York

Insurance Department Regulation 194, requiring producer compensation transparency. The final version of the regulation was published February 10, 2011 in the New York State Register. It should be noted that ACORD has not made these disclosures a standard in other jurisdictions where insurance is sold.

549. In regard to the preceding paragraph, on or about October of 2004, the New York attorney general had, in an investigation that ultimately led to the aforementioned regulation, put enterprise participants, insurers and their trade associations in an awkward situation, as it became difficult for enterprise participants to resist growing demands for disclosure of producer compensation without appearing to resist the idea of disclosure itself – something that appeared a natural inference of their resistance.

550. Enterprise-associated trade associations representing agents, brokers, and carriers of the enterprise responded in turn that the aforementioned proposed disclosure requirements were too broad and would prove to be unwieldy.

551. The enterprise participants opposing the regulation expressed fear that producer compensation disclosure requirements would be extended to all insurance purchases, while the investigations leading to the regulation had already found problems in the area of commercial transactions, where the producer is receiving compensation from two different sources, thus creating potential conflicts of interest.

552. At the time of the aforementioned proposed regulations, enterprise participants insisted that a blanket disclosure requirement would not "necessarily" be helpful to insurance buyers seeking to determine if they are getting the best available coverage for what they are spending.

553.   A common refrain of enterprise participants in regard to the allegations of the preceding paragraph was that disclosures must disclose information that is "meaningful" to customers, as defined by the enterprise, and not by disclosure for disclosure's sake, a sentiment that sidestepped the very meaningful nature of what was ultimately determined to be required in disclosures by the regulation.

554.   Enterprise participants opposed the proposed disclosures as "sounding good conceptually," but providing absolutely no value to the consumer in "obtaining a good product and a good price."

555.   The enterprise position in the previous paragraph sidestepped the issue of disclosures allowing consumers to determine for themselves what a good product and what a good price is.

556.   Enterprise participants also opposed the aforementioned proposed general disclosure requirement as adding "burden without value," advocating that "it could almost be a distraction" in the sales process.

557.   As the allegation of the preceding paragraph suggests, enterprise participants, carriers and agents, were apprehensive that disclosure requirements would make it harder to sell insurance.

558.   A proposed reason for the aforementioned enterprise opposition to the proposed regulation was that, regardless of whether a disclosure contributes to making an informed choice or not, a disclosure interjected into a transaction has the power to change the dynamics of a marketing encounter.

559.    At the aforementioned time, enterprise participants also expressed a concern that if commission disclosures became common, deals with consumers would become more focused on price.

560.    The enterprise position referenced in the preceding paragraph was advanced despite the fact that sales of commodities, in general, typically deal with issues of price and quality (terms understood readily by consumers, and which have long been the province of salespersons and agents to deal with in selling items of various quality), while the proposed disclosures were aimed at hidden information regarding the entire transaction that a consumer would not be privy to or understand without disclosure.

561.    In reference to the allegations of the above three paragraphs, an inference arises as to a standard in the enterprise where agents make decisions for the insured without disclosure.

562.    Enterprise participants also opposed a general requirement to disclose the amount and sources of commissions, as something that "gets close to divulging trade secrets."

563.    The enterprise position referenced in the preceding paragraph is an argument that diverts attention away from the disadvantaged consumers, who were not in on the secret, would have in evaluating the transactions in question, and which reveals the nature of the use of the term "trade secret," where, among other things, it also means information that the enterprise does not wish consumers to know.

564.    At the aforementioned time, enterprise spokespersons expressed worry that disclosing commission amounts would create suspicions of an agent's recommendations.

565.    The worry in question was related to the natural inferences consumers may likely note when offered an insurance product and seeing a disclosure of agent compensation equal to enterprise standards of either 40% to 70% of the total premium.

566.    Enterprise participants knew, at the time of opposition to disclosure requirements in New York, that there would be resulting "awkward moments" if producers were, in essence, forced to disclose how much money they made on a particular transaction.

567.    In regard to the allegations provided in the preceding paragraph, it is alleged that the industry knew consumers would reasonably question the value of the benefits in relation to the cost, as well as the interests of the agent, or possible conflicts of interest between industry participants and consumers, and that the standard of not disclosing relevant and material information to consumers is thus intentional, and for the furtherance of enterprise ends.

568.    As an uninformed consumer cannot make a determination as to hidden practices or hidden pricing factors (such as sales practices and standards, along with other marketing, and the trust in the agent that the enterprise sought to perpetuate through a lack of disclosure), and will be forced to rely only on information at their disposal, an inference arises that the undisclosed information and standards are treated as a secret trade practice by the enterprise, despite the fact that such standards are primarily open and discoverable to enterprise participants in the enterprise, and indeed known to them – who additionally make up the majority of the industry – that the primary point of the secrecy is aimed at the consumer, and to prevent an informed decision.

569.    In regard to the allegations in the preceding three paragraphs, the fact that the enterprise, as a whole, opposed the proposed regulation also raises the inference that the "trade

secrets" in question were not information that gave one participant a competitive advantage against other enterprise members, as, if that were the case, it would be expected that some enterprise participants would want to know the information.

570.    In regard to disclosures, enterprise participants see, recognize and know why the idea of disclosure is appealing to both consumers and regulators, and hence so hard for them to effectively resist, as they also recognize that it is often presented as an agreeable alternative to prohibitions on certain practices.

571.    Enterprise-participant carriers have been warned by other enterprise participants, and leaders, that they can anticipate the new disclosure requirements to drive expectations and demands for even more disclosure requirements.

572.    In regard to the effect of required disclosures, enterprise participants have expressed a concern that the entire tone of industry marketing may have to change, as, if participants were to develop a standard in response to discloser requirements wherein they opted to emphasize the role of agents as representatives of the carrier, instead of the consumer, and in effort to avoid disclosure, it would have a negative impact or conflict with the use of "good hands," "good neighbor," "trusted choice," and "we're on your side," "we have you covered" marketing campaigns that have been associated with the enterprise and their participants, as well as other marketing messages designed to give consumers confidence that sales representatives have their interests at heart.

573.    Enterprise participants know and recognize that generalized disclosure requirements can have as profound an impact on insurance carriers as a direct prohibition on methods for marketing or pricing coverage.

574.     Given the aforementioned "best practices," focuses, business models and aims of enterprise participants, wherein disclosure would impede the ability to profit secretly from unpaid claims, as well as the recognized conflict between marketing and underwriting, an inference arises from the aforementioned allegations that this is the chief reason for opposition to disclosure, and that such reason overshadows the reasons advanced by the enterprise, which can, in turn, be inferred to be pretextual.

575.     Because the reasons the enterprise gives to prevent disclosure are pretextual, and because the aims of the enterprise are to further fraud through nondisclosure of material terms and defects worked into the insurance product to effectuate loss and economic damage to policyholders, an inference arises that the mechanisms and efforts made to advance the pretext are in furtherance of the conspiracy as efforts to conceal, classifying the particular parties involved in those efforts as accessories to the conspiracy.

576.     The aforementioned harm that failures to disclose causes the consumer is incorporated in both the determination of standards and the decision-making calculus of enterprise participants, and, through the enterprise-wide efforts to conceal the conspiracy, involves the leadership of the enterprise that ACORD participates in, as well as its spokespersons.

577.     Participants in the enterprise that ACORD is involved in have developed advertising standards used over the past ten years, which have been implemented in regard to the standard messages that the enterprise sees as useful to accomplishing its ends.

578.     The standard messages of enterprise advertisement, encouraged by enterprise leadership, and ACORD, are that insurers provide representatives on the side of the insured, and who act in their best interest.

579.    Because the "best practices" of the enterprise knowingly contradict the advertised message that its insurers are on the side of the policyholder, and because enterprise is aware of this contradiction, the advertisements in question are patently false, and cannot be classified as mere puffery, as they actually communicate a message opposite to the truth.

580.    The aforementioned advertising has been disseminated through wires in mass marketing campaigns via television and radio, and via mail and courier in regards to printed media in millions of instances over the past ten years and prior.

581.    The aforementioned advertising is an important component in the calculations or schemes of participants engineering the frauds and deceptive practices referenced in this Complaint, as the standards developed for marketing – from agent distribution to the television messages advertising that the insurer will act in a policyholder's best interest and put things right or back to normal in policyholder's the time of need – assists, and makes possible, the deception by concealing it and, providing an alternative false message (as the underwriting, which serves as the primary decision-calculus, has calculated and implemented exposure to the insured with the goal of unpaid claims, while the underwriting company has also incentivized and standardized the claims personnel to achieve unpaid claims in the event of loss).

582.    Enterprise participants recognize that just as the controversy over disclosure spread quickly from commercial brokerage into personal lines in reference to the aforementioned New York disclosure regulations, its impact also extends to the reinsurance market, long considered the province of insurance and risk management professionals who understood each other's language and did not require consumer protections.

583.    The "trade secrets" referenced above are termed so by enterprise participants despite "standards" development being an open and shared within the ACORD framework, and

despite the fact that many of these supposed "trade secrets" are modular in many respects, and therefore largely known by almost all of the participants of the industry.

584.    In the ways noted previously (*i.e.*, the unlikelihood of shared standards and enterprise "best practices" being largely unknown to other enterprise participants) and as also inferred from the admitted conflicts that enterprise participants recognize as existing between the messages their marketing and sales departments communicate to the public, and the conflict those also have with the messages embodied in their actual and internally-recognized aims (which are communicated internally between the underwriting departments, product development departments, project management departments, claims departments, and coming down from the ultimate decision-making calculus – usually through discrete data standards), an inference arises that there is a material disparity between what enterprise participants share among themselves and what they communicate to the public.

585.    The nomenclature "trade secret" is, by its nature, a concealment tool, and the inference raised by the very fact that misinformation is needed to achieve the unpaid claims the enterprise seeks, and has built its business model on, points to the true nature of the enterprise's concern to avoid disclosure, and to use the concealment tool of "trade secret" to hide the nature of information pertinent to the consumer.

586.    In regard to the allegations of the preceding paragraph, the enterprise's standard of keeping practices, "best practices" and so-called  "trade secrets" from public disclosure, or hidden within industry-specific language that allows enterprise participants to conceal their practices and intentions, has an even more significant relationship to the importance and impact that disclosure would have on the enterprise's ability to "effectively" use the "best practices" in question against consumers, as can be seen from the standard use of the term "trade secret"

when employed by enterprise participants in the context of disclosure requirements, and when compared to its use of the term "competitive advantage," wherein it means a competitive advantage against consumers and the public.

587.   Reference to "trade secrets" is also raised as a pretext in connection with the nondisclosure of policy language at the sale of insurance and the failure to provide insurance applicants with a copy of the policy at the point of sale.

588.   The standard approach to disclosures advanced by the enterprise, and the ready use of pretext, demonstrate knowledge on the part of those seeking to conceal the hidden feature of underwriting and purposeful underinsurance, and other prohibited practices, the disclosures would bring to light, and thereby raise an inference of why the information is not disclosed to policyholders at the issuance of a policy.

589.   As almost all of the policies have essentially the same functional language in regard to the mechanism used in the aforementioned "best practices" to produce unpaid claims, and because two companies, Defendant INSURANCE SERVICES OFFICE, INC. (ISO) and Defendant AMERICAN ASSOCIATION OF INSURANCE SERVICES, INC. (AAIS) – who have other access to the policy language used by the other and vis-à-vis – produce almost all of the policies used in the enterprise or assist other companies in drafting their own, an inference arises that the failure to disclose policy language as a "trade secret" giving enterprise participants a competitive advantage against other insurers is pretextual and related more to the function such policies serve in effectuating the frauds of omission and deceptive nondisclosure.

590.   In this same regard, when it is noted that it would be quite inexpensive for an enterprising and "underhanded" competing insurer to acquire a copy of a policy from either

friends or family, or from other associates who may simply change their insurance to that of the targeted competitor for a while, at no real added expense to either the associates of the "underhanded" competing insurer or its associates – a pittance of investment to the enterprising competing insurer – the circumstances surrounding the strong reaction insurers raise to the prospect of providing consumers with a copy of policy for some measure of informed decision-making as to the insurance product, is such an unrealistic reaction that it raises inferences of pretext by the very futility that the mechanism of continued concealment from consumers  at the point of sale can offer to alleviate professed "great fear" of enterprise participants in this regard.

591.    In regard to the preceding paragraph, the inference that the efforts enterprise participants acting to conceal policy language from consumers at the point of sale is pretextual, increases in light of the genuine consumer benefits associated with disclosure of such legally significant documents, which increases in import when consideration of the corresponding and significant harms that are common due to lack of disclosure are also considered– and particularly in light of the fact that the enterprise "best practices" interpreting, permeating, influencing and utilizing ACORD's standards and framework are directed at bringing about harm to the consumer as a mechanism for enterprise participant profit.

592.    The aforementioned inferences are also bolstered by the fact that insurers across the enterprise have access to the policies of other insurers through other means, and already possess copies of competing policies.

593.    In many states, insurers are required to post their policies publicly with the state's insurance regulator.

594.    In regard to the previous paragraph, despite public posting of policies, where competitors have access, there is still a standard of not providing policies to consumers at the point of sale.

595.    The position of enterprise members in not giving policies to consumers on the basis that they could be a competing insurer seeking a "trade secret" is so incongruous, given the facts, that it raises the inferences of: (1) pretext; (2) that the enterprise members simply do not want consumers to ask questions about the policy language at the point of sale; and (3) that the practice of not giving consumers policies is due to the fact that it would put inquisitive consumers on notice of the features of the policy that are harmful, hindering their effectiveness in achieving the goals of the conspiracy to defraud my means of nondisclosure of material terms that is coupled with mechanisms designed to bring about unpaid claims based on the fraudulent concealment of material terms.

### J. OTHER EFFECTS OF THE CONSPIRACY

596.    The aforementioned standards that have been incorporated deceptive practices can all be understood, as such as independent schemes advanced on behalf of the entire enterprise by the enterprise participants.

597.    The aforementioned standards that have incorporated deceptive practices have been, as part of the ACORD standards and framework, have been transmitted by wires, mail and courier, across state lines in the United States and internationally, as well, millions of times during the past ten years, all of which, when used in connection with practices and standards that have left over 60% of the United States detrimentally underinsured, constitute predicate acts of the conspiracy.  The number of predicate acts is alleged to be in the millions.

598.    ACORD and the enterprise that it is a part of have applied the same standards, framework and "best practices" in Australia as they have applied in the United States, with similar devastating effects to the public, wherein wildfires, there called "brush fires," demonstrate the nature of the insurance being sold by allowing a pattern, that would be undiscoverable otherwise, to come to light, as the pattern would not be readily apparent to one outside the enterprise in isolated instances of loss where blame for underinsurance is placed on the insured by enterprise participants in an effort to conceal their conspiracy.

599.    Australia has also suffered from floods, and its victims, in great numbers, have demonstrated being unaware that the insurance they have been paying for includes and exclusion for flood coverage that was not disclosed to them at the point of sale, but is applied to their loss by enterprise participant insurers at the time of claim.

600.    The failure to disclose material terms, and the conspiracy to apply this fraudulent feature, has caused loss of expected claims to policyholders along with associated overpayment of premiums, as the product offered is designed and engineered to produce forfeiture of expected, and paid for, claims amounts.

601.    In addition to inflating the price of a defective product that, through designed defect, fails to perform its intended purpose, the effects of the conspiracy have lowered the cost of legitimate insurance products while simultaneously removing them from the market, as the defective products – which are much less expensive to provide in the marketplace, and which masquerade as the products consumers expect, have displaced legitimate insurance products.

602.    The effect on the market of insurance that the conspiracy has is also seen by the fact that a large majority of the industry is a part of the enterprise that ACORD participates in,

and are, to varying degrees, involved in the conspiracy to profit at the expense of consumers by use of said enterprise.

603.    By the effects that the mechanisms of the conspiracy have exerted on the market, and by means of fraud and deception on policyholders, leading them to believe that they are "fully covered," those involved in the conspiracy have also deprived property owners of the opportunity to purchase legitimate insurance.

604.    In an effort to conceal the conspiracy in question, the enterprise in question has exerted undue influence on regulators by means of false transparency, through deceptive uses of language and misinformation, and has resulted in an effect on regulation that has weakened its ability to detect and prevent the conspiracy, its associated fraud, its restraint on commerce, and the intentional tortious acts the conspiracy has both conspired to commit and effectuated.

605.    On January 30, 2013, Colorado Gov. John Hickenlooper, an honorable citizen of the State of Colorado who signed the Colorado Insurance Reform Act of 2013 into law on May 10, 2013 to improve insurance practices in the State, signed and issued Executive Order B 2013-002 creating the Task Force on Wildfire Insurance and Forest Health to examine how to best protect property and those within and adjacent to the wildland-urban interface and Colorado's landscape, which is critical to the state's economic health, and the Task Force was also to investigate the issue of underinsurance and its causes.

606.    More than 25 percent of Colorado's population lives in the wildland-urban interface, and the Governor issued the Executive Order to investigate how to reduce the loss resulting from wildland fires and increase protection for communities, first responders and property investments.

607.    The Task Force had 18 members, and took eight months to produce its report to the public, where the Task Force membership cited the effort as one of the steepest learning curves those involved in the Task Force had to endure, describing what was seen as a monumental task before its members to come back with recommendations.

608.    In citing their limitations, the Task Force noted that they stated that they could not "reinvent the wheel."

609.    During the time of its investigation, the Task Force was provided information by lobbies representing enterprise members, on which it relied heavily, citing materials from lobbies representing the enterprise and enterprise trade groups as its primary written sources on insurance.

610.    In its report, the Task Force noted that it encountered what it described as "legal constraints" when it attempted to investigate certain approaches to underwriting that could improve the underinsurance problem, as insurers cannot share individual methodologies for risk assessment because of state and federal antitrust laws – noting that the legal constraints potentially limited the reach of state government in applying a standardized approach to underwriting policies in high-risk areas.

611.    In regard to the allegations of the prior paragraph, it is alleged that as part of its conspiracy, enterprise underwriters share underwriting strategies and approaches designed to engineer unpaid claims, including replacement cost, and that they communicate through the ACORD framework and standards in furtherance of the conspiracy.

612.    Of the eighty-page report it produced, only six paged dealt specifically with the issue of insurance and homeowners.

613.    In those six pages, the there were two key principles that the Task Force came away with as a conclusion: (1) Colorado needs a competitive market with multiple insurers and products, where to ensure such exists, insurance companies must maintain their own individual underwriting and inspection processes with minimal interference from the legislative branch; and (2) Changing homeowners' behavior is essential, as insurance companies are united in their desire to motivate homeowners in risk zones to mitigate.

614.    Although implied in the above-stated second point, the conclusion of the Task Force was that homeowners were to blame for the underinsurance problems, a notion based primarily on enterprise lobby materials cited in the report and from dealings with enterprise spokespersons.  This conclusion was more specifically chronicled in notes from a February 28, 2013 meeting of the Task Force where it was listed that homeowners were responsible for underinsurance by choice.

615.    Because the Task Force relied on enterprise produced information, and because it did not receive access to underwriting, it was not given information by the enterprise, or its participants, that would have cast an accurate light on the enterprise's involvement in producing underinsurance.

616.    It follows from the allegation of the prior paragraph that the Task Force was knowingly and deliberately misled by the enterprise and its members, and that the enterprise used the "legal constraints" of the Task Force and associated regulators, as well as by operation of the ACORD data standards and framework for communication employing strategies to protect the enterprise's "best practices."

617.    The Task Force also recommended a comparison between flood coverage and wildfire coverage, and the possible implementation of a system similar to the "From Risk to

Opportunity" model advanced by enterprise participants, and concluded that many homeowners of the 25% of Colorado homeowners who would be affected by such a proposal would possibly not be able to afford insurance and have other associated hardships.

618.    It is alleged that enterprise participants mailed materials and other information to the Task Force and the government of Colorado in their efforts to mislead and deceive the government in its aforementioned investigations.

619.    The example of enterprise influence on government, listed, *supra*, demonstrates the danger to consumers that arises from the misinformation provided by enterprise participants in the advancement of the enterprise, wherein, because the most significant features leading to underinsurance were kept from government officials, they were misled in their efforts to seek the public good by conspiratorial deception – the threatening result being that policy may become skewed by enterprise deception in a way that could negatively affect a quarter of Colorado's homeowners.

620.    Another point of connection between the enterprise's acts and omissions in regard to the Task Force, which relate to the conspiracy, can be seen from how this strategy was employed by the Defendant MCKINSEY & COMPANY counseled Enron in its business strategy against the loosened regulation, and then having a platform in which to artificially affect the market of electricity.

621.    In regard to the allegations of the preceding paragraph, it should be noted that the deregulation did not make Enron's actions legal, it simply meant that the ability of government to observe Enron's actions was diminished significantly by the Defendant MCKINSEY & COMPANY guided Enron's efforts to create an environment in which it could more easily act without regulatory scrutiny.

622.    In regard to the allegations of the prior paragraph, the leaders of the enterprise that ACORD participates in have also openly declared that they see regulation as a threat to the industry enterprise.

623.    The opposition to the New York regulations requiring disclosure, referenced, *supra*, also demonstrate the pattern of opposing regulation that would facilitate the discovery of prohibited practices and inform the consumer.

624.    Instances of government being misled by enterprise members acting in furtherance of the conspiracy and its aims are not uncommon.

625.    Another predicate example of the above-referenced deception of government officials by enterprise members occurred in 1997, when Jennie Hampton's 1990 Toyota Four Runner, valued at $10,300 and insured by Defendant STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (STATE FARM), was stolen from her residence on the night of December 21, 1997.

626.    Five days later Jennie Hampton's vehicle was found burned and a total loss on a rural road in Miami County, Kansas.

627.    Subsequently, both the Olathe Police Department and the Miami County Sheriff's Department investigated the theft and arson and determined that plaintiffs were not involved.

628.    Despite two separate law enforcement agencies finding no evidence to implicate the plaintiffs, STATE FARM, through its Special Investigative Unit, conducted its own independent investigation and denied Jennie Hampton's claim by stating that she and Marvin Vail, her half-brother with whom she lived, were guilty of insurance fraud.

629.     Specifically, STATE FARM asserted that Marvin, who was employed at a towing company, towed the Four-Runner to the rural area and conspired with Jennie Hampton to burn the vehicle in an attempt at falsely collecting insurance proceeds.

630.     Through their mechanical experts, whom they paid over $400,000 in the previous ten years, STATE FARM concluded that the engine was inoperable before the fire, and that Jennie Hampton and Marvin Vail were responsible for both the inoperability and the arson.

631.     Simultaneous with the aforementioned independent investigation, Jennie Hampton filed a Breach of Contract claim against STATE FARM in Johnson County, Kansas.

632.     Shortly after the filing of her Breach of Contract claim, STATE FARM, through its attorney, overtly threatened the criminal prosecution of Jennie Hampton if she didn't "back off" from her claim.  Regardless of this threat, Jennie Hampton continued to pursue her claim.

633.     Two years from the date of the theft, Marvin Vail and Jennie Hampton were charged with felony insurance fraud in Johnson County, Kansas.

634.     The bases for the State's charges derived entirely from information provided by STATE FARM and the National Insurance Crime Bureau (NICB), another enterprise-associated group.

635.     It was later uncovered that during their independent investigation, STATE FARM's Special Investigative Unit threatened an independent witness to solicit perjury, concealed and disregarded clear exculpatory evidence, reported what information they did collect in a false manner, and directed the conclusions of their mechanical expert.

636.     STATE FARM, knowing that it did not have access to the Johnson County District Attorney's Office, then provided this self-serving and erroneous information to NICB,

requesting instead that they refer the case to the Johnson County District Attorney for charging.

637.     NICB followed State Farm's instruction and, through an employee with Kansas Bureau of Investigation experience, presented the file to the Johnson District Attorney.

638.     Prior to the actions alleged in the prior paragraph, the NICB had not conducted an independent investigation to either confirm or deny the facts presented by STATE FARM, further demonstrating the enterprise nature of their relationship. Rather, while presenting this information to the Johnson County District Attorney's Office, NICB admittedly "watered down" exculpatory evidence in an attempt to instigate charging. Additionally, while meeting with the Johnson County District Attorney, NICB withheld critical evidence by not informing the prosecutor that it was STATE FARM, and not NICB, which was behind the investigation and referral.

639.     After reviewing the aforementioned information provided by NICB and STATE FARM, felony insurance fraud charges were filed against both Jennie Hampton and Marvin Vail.

640.     Prior to the aforementioned charges, neither Jennie Hampton nor Marvin Vail had any criminal history, and as a result of the charges they were arrested, faced the extreme humiliation, anxiety and expense that is tied with being criminal defendants.

641.     Following the criminal charges, STATE FARM continued to work behind the scenes preparing the State's witnesses for the preliminary hearing testimony, claiming privilege on documents sought by the prosecutor, attempting to keep crucial evidence from being inspected by Jennie Hampton and Marvin Vail's criminal attorneys, closely monitoring the criminal trial and providing well-prepared witnesses to testify at trial.

642.    Eventually, on May 10, 2001, after a ten-day criminal trial, both Jennie and Marvin were acquitted of all charges. Rather than showing remorse for instigating the wrongful prosecution, State Farm continued to not only proclaim Hampton and Vail's guilt, but to deny Jennie Hampton's insurance claim as well.

643.    After the acquittals, Jennie Hampton's Breach of Contract in Johnson County, Kansas against State Farm re-filled with her and Marvin Vail's claims for malicious prosecution and the tort of outrage against STATE FARM and the NICB.

644.    After a three-week trial in Jackson County, Missouri, the jury returned a verdict for Jennie Hampton and Marvin Vail on all counts.

645.    It is alleged that Defendant STATE FARM, and other enterprise participants, placed material in the mail or courier, and used wires to commit the acts and omissions referenced, *supra*, in regard to Jennie Hampton and Marvin Vail.

646.    The preceding allegations regarding the case of Jennie Hampton provide another predicate act demonstrating the lengths that enterprise members will take to mislead the government and harm consumers, and demonstrate the culture of the conspiracy within the enterprise in question, and there are numerous other examples such as this.

647.    An inference is raised from all of the previously-mentioned allegations of enterprise deception of government that the enterprise is not only a threat to the property of homeowners, but is also a direct threat to the policy of the state of Colorado and to the un-tampered rule of law and justice, as well.

## V. PREDICATE ACTS RELATED TO THE NAMED PLAINTIFFS

648.    The aforementioned allegations concerning the incorporation of, and accommodation of, mail fraud, wire fraud and associated deceptive practices into the ACORD

standards, and the associated conspiracy to secure the perpetuity of those mechanisms by influence on the market of insurance by means of many acts, including deceptive "transparency," and other schemes of misinformation used to manipulate regulators and government officials, are alleged herein and included as predicate acts, as they have been implemented, occurred repeatedly, and on large scale, over the past ten years.

649.    In addition to that stated, *supra*, the following predicate acts committed against the Plaintiffs by participants in an enterprise with ACORD further reveal the nature and pattern of the scheme to defraud, and are stated in detail in the following sections of the BACKGROUND OF THE CASE section, *infra*.

PREDICATE ACTS RELATING TO PLAINTIFFS
DALE & MARILYN SNYDER

650.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

651.    Plaintiffs DALE SNYDER & MARILYN SNYDER first purchased policy on or about October 1996 from Defendant SHELTER MUTUAL INSURANCE COMPANY (SHELTER).

652.    Upon information and belief, and at all relevant times herein, Defendant SHELTER, and its employees, acted in conformity with enterprise standards, "best practices," and with ACORD standards and best practices.

653.    The agency selling the policy was the Bruce Johnson Agency, located at 4020 S. College Ave., Ft. Collins, Co 80525, and the agent selling policy was Bruce Johnson.

654.    At the time of purchase, DALE SNYDER stated that he wanted to make sure it would cover what was needed for rebuilding for dwelling and replacement cost of the contents.

655.    The policy had two endorsements: one for "Expanded Restoration Cost Coverage" which was explained to the SNYDERS by the agent as total replacement cost, and the second endorsement stated " Inflation Protection Endorsement" which was explained as replacement cost protection against inflation.

656.    After the loss of the SNYDERS' home on June 11, 2012, the adjustor, Dan Rogers, told DALE SNYDER that both endorsements in the policy only related to the contents as long as those losses were under the contents limit stated in the policy.

657.    The SNYDERS were not shown or given any explanation of the difference between ACV and replacement cost, and nothing was mentioned about having to rebuild the home to get replacement cost.  It was implied the SNYDERS sustained a loss, they would we get their limits or Shelter would likely pay to replace what they had lost.

658.    A policy was not offered at any time. DALE SNYDER had to request a copy of his policy after the loss.

659.    The SNYDERS had paid for their policy from Oct. of 1996 to date of loss on June 11, 2012, a period of 15 years.

660.    In the year 2003, DALE SNYDER built a guesthouse and requested insurance coverage on the guesthouse. Their agent, Bruce Johnson, visited the property, taking pictures of both the guesthouse and main dwelling. At that time, DALE SNYDER stated he wanted to be sure they were covered with replacement cost coverage limits and was assured that they were.

661.    In the year 2006, Bruce Johnson once more visited the property, again taking pictures for purported purposes of adequate coverage.

662.    The High Park fire started on June 9, 2012 and the SNYDERS were evacuated on the first day, June 9, 2012, and they were notified on or about June 11, 2012, at around noon of their loss. The date of loss was June 11, 2012.

663.    Shortly thereafter, DALE SNYDER contacted Bruce Johnson, their agent, to make sure he received information about the SNYDERS' loss.  Their agent informed the SNYDERS that he would notify Shelter's claims department and that an adjustor would be contacting the SNYDERS shortly. The SNYDERS were contacted in approximately three hours by adjustor Dan Rogers.

664.    The adjuster scheduled a meeting and told the SNYDERS that someone from "housing" would be contacting them with respect to temporary housing and furniture. THE SNYDERS met with adjustor about 4 days later, and at that time the adjuster presented the SNYDERS with a check for $10,000 for urgent needs, which would be part of their contents payment.

665.    The SNYDERS were unable to visit site for approximately three weeks due to the fact that the fire was still burning. They were never informed of any amount they would be receiving for their loss until they received first communication from SHELTER to that effect, by letter, on July 26, 2012. In said communication, it stated that the SNYDERS needed to repair or replace within two years to get above the Actual Cash Value of the property.

666.    On or about July 19, 2012, the SNYDERS sent SHELTER a sworn statement for proof of loss on the dwelling/structure.

667.    On or about August 7, 2012, the SNYDERS received checks for dwelling and outbuildings in the amount of $238,550.73, and for trees, in the amount of $11,550.00.

668.    DALE SNYDER telephoned and questioned the adjustor, Dan Rogers, about the company only including a payment for fencing within 200 feet of dwelling, when the policy stated that all fencing was included.  The adjuster stated that he would call the following day, but did not. There was still no answer as of August 13, 2012, so DALE SNYDER sent e-mail requesting the status. On or about August 16, 2012, DALE SNYDER took approximately 39 photographs of the total length of fence and e-mailed them to Dan Rogers.  DALE SNYDER then received conformation later that day stating that it would take a few days to process the information.

669.    Thereafter, the SNYDER received check on August 17, 201208/17/12 for $12,762.54. The amount paid was not offered by the insurer, despite the fact that insurer knew these monies were owed, but was instead paid because the SNYDERS discovered that it was owed to them.  (This shows the standard practice, under the zero-sum approach, of not treating a policyholder's claim as one claim, the way that it is understood by the public, but, under the zero-sum approach, enterprise participants treat the whole claims process as an adversarial one where the insured must advocate for each item known to be owed, and if not achieved though adversity, then said insurers treat the claim as not having been made, and retain the unpaid claims associated.)

670.    On or about August 10, 2012, the SNYDERS met with their agent, Bruce Johnson, requesting information on how there could be underinsurance when one year prior to the month of loss two Shelter underwriters were on their property taking pictures and measuring all of the buildings.   Bruce Johnson gave the SNYDERS the underwriters' names, Charles Jackson and Adam Smith, and DALE SNYDER thereafter called Charles Jackson, leaving a message.

671.    DALE SNYDER also talked to underwriter Adam Smith about the issue of SHELTER paying the replacement cost of $302,661.00 that it would take to rebuild the home. In reply, Mr. Smith stated that Shelter could not pay any more than policy limits.   DALE SNYDER also asked about ask about the Actual Cash Value, and received the same response: that SHELTER could not pay more than the policy limits – something different from the explanation the SNYDERS were given before, and DALE SNYDER questioned him about the endorsement offering "Expanded Restoration Cost Coverage," listed in the policy.   DALE SNYDER was told that the endorsement only applies to contents that do not go over limit.

672.    Charles Jackson returned the SNYDERS' call the same day and stated essentially the same things Mr. Smith had.  He admitted that he was one of the underwriters on the SNYDERS' property previously taking pictures, and DALE SNYDER questioned Mr. Jackson about how there could be underinsurance when the adjusters visited the site.  Both Mr. Jackson and Mr. Smith put the entirety of the blame on the agent, Bruce Johnson, for the SNYDERS being underinsured.

673.    On or about August 31, 2012, the SNYDERS had meeting with the adjustor, Dan Rogers, about DALE SNYDER's finding in the policy a clause stating Shelter would pay to haul away all damaged trees within 200 feet of the dwelling. Mr. Rogers verbally denied DALE SNYDER's contention and said that no one had ever pointed that out before but he would have to take it to his superiors and they approved. On 10/24/12 I received a check for $36,300.00 for tree removal. Another nondisclosure.

674.    On or about October 12, 2012, DALE SNYDER discovered Shelter had hired a management firm to pay the temporary housing payment and furniture rental payment, and that the management firm was charging a $500 per month fee and up-charging the furniture

rental $300 per month, all of which was being deducted from the Additional Living Expense (ALE) account, which has a time limit and a dollar amount limit. DALE SNYDER contacted Doug Wilson, who is adjustor Dan Rogers supervisor, and had no results. Getting no results, DALE SNYDER e-mailed a letter to Shelter CEO Rick Means on or about October 23, 2012 requesting that the nearly $3,500 spent for management fees be returned to the ALE account. On 10/26/12 or about October 26, 2012, DALE SNYDER received a call from Joe Mosley, VP Public Affairs, and discussed the management fees. Mr. Mosley stated that he was certain Shelter would not do that.  DALE SNYDER received an e-mail later that day denying reimbursement to ALE account.

675.    On or about November 6, 2012, the SNYDERS filed a complaint with the Colorado Department of Regulatory Agencies, Division of Insurance (DORA) requesting the ALE be reimbursed.

676.    On or about November 8, 2012, the SNYDERS received a call from Bruce Glaser of DORA acknowledging the complaint, and he contacted Shelter requesting additional information.

677.    On or about November 30, 2012, Bruce Glaser called stating Shelter would reimburse ALE account at end of the claim period, if needed.

678.    Per Shelter's Claim Summary, the SNYDER's total replacement cost of the Dwelling, Other Structures, and Contents was $810,117.03, with an Actual Cash Value of $706,613.18, and a Net Claim Payment of $502,916.55. The total underinsurance was $307,200.48.

679.    The SNYDERS applied for a waiver for listing contents on or about August 18, 2012 because of Marilyn Snyder's emotional state, but were denied. On 11/12/12 or about

November 12, 2012, the SNYDERS applied again for a waiver, and though this request was accompanied with a letter from their psychotherapist, it too was denied again.  The adjustor, Dan Rogers, checked with his supervisors and they stated that they do not give waivers for any reason.

680.    When the SNYDERS visited the fire site for the first time with the adjustor, Dan Rogers, he stated they were trained to frustrate and give as much paper work as possible to their claimants.

681.    DALE SNYDER asked the adjusted why the insurer makes people go through the pain of putting a list together and thinking about every last thing that they lost, reliving the loss again. He was told that it was because the insurer knew it would make more by having people do so.

PREDICATE ACTS RELATING TO PLAINTIFF
MARY ANN GELDREICH

682.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

683.    Plaintiff MARY ANN GELDREICH (GELDREICH) first purchased a policy of insurance with American Family Mutual Insurance Company d/b/a American Family Insurance Company (AMERICAN FAMILY) in about 1988, when she and moved into her family cabin, shortly after October of 1987.  The agent signed her up for the policy, and recalls no questions from the Agent about the policy, or information about Actual Cash Value or Replacement coverage, or even any value for property or contents being mentioned or raised by the agent.

684.     Upon information and belief, and at all relevant times herein, Defendant AMERICAN FAMILY, and its employees, acted in conformity with enterprise standards, "best practices," and with ACORD standards and best practices.

685.     Ms. GELDREICH was given no choice regarding different premium prices or the nature of the different coverages at the time of her application, other than the statement that she was purchasing a "basic" plan.  The agent provided no information about the personal property covered, and what MARY ANN GELDREICH has subsequently come to learn, after her loss, is referred to as "Contents."

686.     Plaintiff MARY ANN GELDREICH was not shown a policy when she applied for insurance, only the policy bill.

687.     MARY ANN GELDREICH's agent is the Danielle D. Arnold Agency, 1140 Manford Ave, Unit C, Estes Park, CO 80517-7741; American Family Insurance Company (6000 American Pkwy, Madison, WI 53783), but does not recall the name of the agent from whom the original policy was purchased.  Plaintiff MARY ANN GELDREICH has dealt with the current agent for ten years.

688.     MARY ANN GELDREICH paid on the insurance policy for 25 years.

689.     In 2004, Ms. GELDREICH spoke with her agent and was advised that the value of her property was increasing and coverage should be increased as well.  In the next few years, Plaintiff MARY ANN GELDREICH's house/property value increased and the insurance premiums increased, as well. She recalls communications during that time to the effect of being told that she had enough insurance and was not "underinsured."

690.    MARY ANN GELDREICH also recalls that the response from the agent over the years was that should be fully insured for any losses and should not economize on coverage premiums, and she spoke to her agent on roughly an annual basis about the issue.

691.    Plaintiff MARY ANN GELDREICH first found out about the loss of her cabin on June 23, 2012, and the loss was confirmed same day in the evening.

692.    Ms. GELDREICH left message with Agent on June 24, 2012 (a Sunday). Thegent returned the call on Monday, June 25, 2012.  Thereafter, the adjuster, Craig Faile, took the estimate of loss and pictures June 26, 2012.

693.    Plaintiff MARY ANN GELDREICH was informed about the requirement to rebuild within one year to recover the limits in Coverage A, for her dwelling, from an estimate sent to by electronic mail.  Ms. GELDREICH's builder was with her at the estimate viewing on June 26, 2012 and asked about the limits for the Dwelling (Coverage A) amount.

694.    Plaintiff MARY ANN GELDREICH was overwhelmed even by the electronic mail about the estimate being near the $143,500 limits the adjuster provided on June 26, 2012. Ms. GELDREICH did not comprehend whether she could rebuild her lost home for this amount, and understood it would be a difficult process.  Plaintiff's builder helped to give her confidence of keeping the cost as low as possible for rebuilding within those low limits.

695.    After receiving the funds for ACV of the dwelling (fence ACV & trees) and an advance against contents totaling $103,824.83, Plaintiff personally worried that she could not rebuild in time and therefore get reimbursed, but could not handle the idea of whether she would receive all the coverage due her, as it was overwhelming, so she instead resolved to hope in her builder, and that he could achieve something with the lesser amount.  If not for his kindness, she would have been even worse off.

696.    The response of Defendant American Family was only to assure Plaintiff MARY ANN GELDREICH's builder that the final amount of funds would be released upon 98% building completion. This information was confirmed by MARY ANN GELDREICH's builder on September 4, 2013, and Ms. GELDREICH's builder spoke and corresponded by electronic mail on her behalf to get this response in July of 2012.

697.    The contents limits on the policy were $72,432.60, as listed on the last estimate from May 3, 2013, and the amount received to date, as justified by the Defendant's straight-line depreciation of her personal property, has been $35,719.95, leaving an underpaid claim amount of $36,712.65. (On many of her contents, Ms. GELDREIGH received $0, even though the items were in good working order, and after complaining that the items were being unrealistically depreciated, because they were nowhere near the value that used items sell for on eBay, AMERICAN FAMILY raised their value a percentage, but still not what her items would be in their market value.) As for the dwelling policy limits, they were $144,764.32 on the last estimate from May 3, 2013, and the cost of rebuilding had totaled $186,914.07 – an underinsurance amount of $42,149.75.

698.    In July of 2012, Ms. GELDREICH was told to give her contents list to Enservio, a company that Ms. GELDREICH had been told would work for her to help her get her contents lists together, and scheduled an appointment by telephone to list her contents. Plaintiff MARY ANN GELDREICH had been working on a handwritten list from memory for a couple of weeks and had very few things on it, mostly furniture, as it was a difficult and painstaking process. When speaking with Enservio, Ms. GELDREICH was asked the age of each item and in what room the item was located; there was a total of 87 items. Plaintiff MARY ANN GELDREICH thereafter received a check for reimbursement

minus depreciation for all value of ACV "final contents" less $15,000, $2500 and deposit of $2000 recoverable deposit on housing, equaling $5,750.21.

699.   Ms. GELDREICH did not cash the check because she did not believe this was a final content amount.  When the itemization from Enservio came to only $25,250.21 Actual Cash Value, Plaintiff MARY ANN GELDREICH had to contest this low amount. Plaintiff MARY ANN GELDREICH's adjuster, Craig Faile told her for the first time on August 1, 2012, that she did not have a "replacement" policy and to "save receipts."

700.   Plaintiff worked for a couple of weeks to add to this list and spoke to Enservio's Jamie Walker on August 29, 2012, and then with a certain Ryan Frye, on September 26, 2012, to complete her e-mailed list of contents.  Enservio's items numbered 416 additional items of contents.  Lastly, Plaintiff MARY ANN GELDREICH added three additional items, providing them via electronic mail to a new adjuster on January 31, 2013.  Plaintiff MARY ANN GELDREICH finally received a final property itemization in July 2013, a total of 406 line items.

701.   Plaintiff MARY ANN GELDREICH received $35,719.95 (ACV) on her list of 406 items of personal property, and on a policy with Contents Limits of $72,432.60.

702.   In regard to this, Ms. GELDREICH wrote e-mails to both Enservio and Defendant AMERICAN FAMILY about the problems she saw with how they valued items and depreciated them.  She mentioned that the Market Value on her cabin, was much higher than the roughly $70,000 that Defendant had paid. She also explained how the process of rebuilding would be made much easier if they would simply give her the actual value of her cabin on the front end.  She wrote numerous e-mails about how the she was not getting the market value for

her items and home, and asked the insurer to provide a reason for why their measurement system did not match up with the way everyone else determines the value of property.

703.    In response to her inquiries, no reason could be given other than that the system of valuation used was what "the industry" used.  Ms. GELDREICH wrote Enservio and asked them to provide information on the system they used to determine value.  She received some information on a kind of list used, but when she asked further, AMERICAN FAMILY and Enservio both pointed to the other company as the one that should be approached.  In the end, AMERICAN FAMILY found a copy of a military depreciation chart, and it had taken them considerable time to find it.  She questioned how they could act as if this was a normal way of determining value that someone applying for insurance would ever think of, as its depreciation was nothing like what happens in market value, and had the absurd result of producing $0 values for items that still had value used, and sold for much more on eBay.

704.    Plaintiff MARY ANN GELDREICH was handed off to the next adjuster, a certain Terry L. Wisdom, by letter and by telephone on April 3, 2013,.  She wrote Mr. Wisdom many times about her issues, and received the same response, which was, that such is how AMERICAN FAMILY and "the industry" handle things.  No rationale could be given that satisfied the discrepancy between market value and how AMERICAN FAMILY treated "Actual Cash Value."

705.    In addition, there were coverage limits that Ms. GELDREICH was not able to reach because Defendant lost invoices she sent, an number of times, and because of apparently deducting additional coverage items early, from the main dwelling limits, so that when her home was completed, the available funds, which should have been additional coverage, had already been depleted.

706.    Issues of this kind, and in regard to the compensation for additional coverage amounts, were not reconciled.  The additional "demolition and removal" coverage of remaining structure was not reconciled along with the complete list of building invoices, and the recoverable depreciation on her ACV fence payment, which was also not reconciled or reasonably answered. As a result, her fence was not rebuilt with insurance funds due to a "lack of funds" within the time limit. Also, in this letter, the issue of "plumbing replacement – we can approve this additional amount with your contractors bid" was never resolved.

707.    The unpaid value of Plaintiff MARY ANN GELDREICH's claim and policy limits, which were not reached because of such actions and omissions, is $36,712.65.

<u>PREDICATE ACTS RELATING TO PLAINTIFF</u>
<u>MARY HARROW</u>

708.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

709.    Plaintiff MARY HARROW, DO (Doctor HARROW) purchased her first home with Defendant United Services Automobile Insurance (USAA) as insurer in the year1997, a property located at 4610 South Sleepy Hollow Circle, Colorado Springs, CO 80917.

710.    Upon information and belief, and at all relevant times herein, Defendant AMERICAN FAMILY, and its employees, acted in conformity with enterprise standards, "best practices," and with ACORD standards and best practices.

711.    When she first purchased insurance in 1997, Doctor HARROW had an agent, and had the agent walk the home and property to establish the limits of coverage.

712.    Plaintiff stayed with USAA thereafter, and continued patronage of the insurer when she purchased her home that was ultimately lost in the Waldo Canyon Fire, a property

located at 2545 Brogans Bluff Dr., Colorado Springs, CO 80919.  It was purchased in December of 2007, with a closing on February 4, 2008.

713.    When she insured the home that burned in the wildfire, USAA Doctor HARROW technically had no agent sell the policy for the home.  As stated in a letter dated January 11, 2012, from Yvette Morales, Regulatory Complaint Analyst, DOI Complaint Handling with USAA, "…we do use licensed agents, although we refer to them as Member Service Representatives (MSR). Any MSR who may issue a quote or policy to a Colorado resident is required to maintain a Colorado Casualty and Property Insurance Producer License. We don't refer to our MSR's as agents, as they are compensated on a salary basis as opposed to commission."  At no time was Actual Cash Value discussed. Doctor HARROW was mailed a copy of the policy, but not shown a policy at the time of purchase.

714.    All communications with USAA were completed by telephone.

715.    On or about December 12, 2007, limits of dwelling were $581,000, with 3244 square feet, which was based on the appraisal prior to purchase.

716.    On or about January 7, 2008, the limits of dwelling were reduced to $344,000, with 2019 square feet. (The square footage of walk out 90 percent finished basement was removed, excluding 1225 square feet).

717.    On or about July, 1, 2011, Doctor HARROW contacted USAA with concern for the coverage limit and still questioning the square footage discrepancy.  She had had the property re-measured by the El Paso County Assessor, as the Plaintiff knew that USAA was using the Assessor site to calculate the square footage of the property with their software system.

718.     Despite the fact that she and her then husband requested USAA send someone to measure, photograph and correctly insure the property, their request was denied. USAA Colorado Springs office was seven miles from Doctor HARROW's home, and she felt that this was the "old fashioned" way of eliminating any potential error in coverage. As Yvette Morales, stated in a letter dated January 25, 2013, "We (USAA) did not order an inspection report of the property." (The suggestion being made that it was the clients' fault that the property was not insured properly.)

719.     On or about August 5, 2011, an MSR and Doctor HARROW's spouse at the time, Joel Palmer, conducted a telephone re-evaluation survey of the property characteristics and USAA calculated a rebuild cost from a "mainframe tool supported by Marshall & Swift/Boeckh, an industry leader in rebuilding cost software", and confirmed that the rebuild cost was $322,000. Since the limits for Dwelling were $358,000, and that no changes were necessary.

720.     Doctor HARROW paid on the policy for approximately 4.5 years.

721.     Doctor HARROW also asked USAA if they had enough insurance by telephone on January 7, 2008, July 1, 2011, August 1, 2011 and via letter on November 11, 2011.

722.     USAA responded to Doctor HARROW's questions regarding the square footage discrepancy by decreasing the dwelling coverage as explained in a letter, dated January 25, 2013, from Yvette Morales, stating: "Construction factors allocated for the replacement value of basement construction are different from that of above ground living space. Therefore, when the square footage of the dwelling was revised by Mr. Palmer, our tool recalculated the actual replacement cost with consideration of the revised square footage above ground and the finished basement, adjusting the dwelling replacement value by $237,000.00." The problem, for

Doctor HARROW, however, was that the basement was above ground, as it was built into the hill, but USAA insisted all was fine. (As it became apparent later, when Doctor HARROW saw USAA's records, USAA was attempting to make it seem as though the policyholders were the ones providing the square footage.)

723.    Doctor HARROW found herself battling the software and people on the telephone who insisted everything was in order, as the company that had eliminated field agents.  On or about July 1, 2011, when she re-visited this discrepancy with USAA, and after the Assessor had confirmed measurements, the totality of the numbers for coverage were still in range of the $581,000 appraisal she had previously had and use (however, what Doctor Harrow failed to understand in the context of what she was being told was that adding up all the coverage was the total limit on her insurance, as opposed to the coverage applicable to the dwelling itself (Coverage A), and with the confusion over being told that "basements" are treated differently by insurance than a lower level built into the side of a hill, while at the same time being told that all was in order, was extremely confusing, and she found herself trying to find how things could possibly make sense). Doctor HARROW again requested a site visit to determine the correct coverage, and was denied.

724.    Doctor HARROW lost her home in the Waldo Canyon Fire on June 26, 2012. She was notified of total loss on June 28, 2012, and was permitted to inspect the property on June 29, 2012.

725.    Doctor Harrow first spoke with USAA on June 27, 2012, to request a copy of their policy.  She had an appointment with an attorney to review the contract on June 28, 2012, because USAA had told her that the home was only insured for $358,000. Plaintiff had told USAA this must be a mistake, because she had just signed a loan for $360,000, and didn't

understand how the insurance could be less than the mortgage. (She was also confused about Coverage B, the "other structures" and $89,000). USAA faxed a copy of the policy to Attorney Pat Salt, who disclosed to Doctor HARROW, after their meeting, that Attorney had defended USAA in past litigation, and felt Plaintiff was grossly underinsured, and that there was not much she could do about it.

726.   On or about Saturday, June 30, 2012, Michael Groody, a USAA representative, met with Doctor HARROW at her office. It was at this time that Michael Groody presented the "streamlined" documents of personal property, in which USAA would pay 75%, without requiring a content list. Doctor HARROW was informed that USAA would not forced her to rebuild for that amount, and that the insurance covered the structure and personal property. She was instructed to keep all receipts, find reasonable housing, and that if she chose to itemize, however, that she would need to depreciate all of her personal property.

727.   Doctor HARROW and Michael Groody met again on July 1, 2012, at the property site, where he took detailed measurements, declared that Plaintiff had a substantial home, and that she was grossly underinsured. Michael Groody took recorded statements from her then spouse, Joel Palmer, and her regarding the policyholders' concerning over their predicament, and how Doctor HARROW had attempted previously to correct the coverage limits. Michael Groody agreed to take Doctor HARROW's verbal statement to the USAA's "Underwriting Appeals Board" and request that they grant Plaintiff the 25% paid when a homeowner rebuilds without requiring the Doctor to rebuild, since she and her then husband had been so drastically underinsured. A week later the Doctor received a call that underwriting had refused to increase the limits.

728.    It had been on July 1, 2012 that Plaintiff was informed that she could get the 25% increase if she chose to rebuild.

729.    Multiple telephone calls were made by Doctor HARROW, as stated earlier, *supra*, and after the fire, Doctor HARROW contacted an attorney on June 28, 2012.

730.    Doctor HARROW thereafter hired public adjuster on July 14, 2012 to handle her claim. Doctor HARROW attended numerous meetings, with DORA, the Mayor Bach Town Hall meeting, United Policyholders, and other neighbors at the Colorado Springs Together location.

731.    Doctor HARROW supported and testified on HB - 13-1225, both in the House and Senate, and wrote a letter of complaint on December 3, 2012, to Commissioner of Insurance, (carbon copied to the Governor, the Attorney General, U.S. House and Senate representatives, the Denver Post, and USAA).

732.    On April 5, 2013, DORA opened an investigation of USAA. Doctor HARROW wrote a letter on April 24, 2013, to the Attorney General, and a letter on March 15, 2013 to President Robles, of USAA, again carbon copied to newspapers, and all listed, *supra*.

733.    The first response from the USAA was on June 27, 2012, when policy limits were discussed. On June 30, 2012, was the USAA adjuster meeting to "streamline" the process for "filing a claim". On July 1, 2012, USAA adjuster measured property and informed Doctor HARROW that they would try to get Doctor HARROW's limits increased. On July 12, 2012, Doctor HARROW was informed that she and her then husband had been "grossly underinsured," and to not make a request to increase coverage limits. Payments were issued for mortgage, shrubs, trees, living expense, and demolition, (dates on print out that has been submitted). Doctor HARROW received DORA letter responses from Yvette Morales, on

January 11, 2012 and January 25, 2013, outlined telephone conversations with Joel Palmer regarding square footage discrepancies and USAA reasoning that the software used to determine replacement cost was accurate to decrease the value by $237,000. USAA also contend that since Doctor HARROW never completed a "written estimate" and Doctor HARROW continued to pay the premium, Doctor HARROW was accepting of the current limits. Doctor HARROW also has a letter November 11, 2011, stating that the home was estimated to rebuild for $322,000 (minimum).

734.    Doctor HARROW's underinsurance on contents was $228,052, whereas underinsurance on dwelling was $159,000, and underinsurance on bushes/shrubs was $82,100, for a total underinsurance amount of $469,152

735.    The contents listing required Doctor HARROW to take two weeks off work, and work every evening through the summer to complete. Two weeks of work is approximately $7,900. It is difficult to calculate all lost summer evenings both financially and emotionally, but Doctor HARROW's public adjuster recommended she go through the house, and visualize every corner. Then, by looking up on the Internet for replacement items, and to then try to depreciating them, adding tax, only to then have her adjuster hire someone else to put it into graph form. The adjuster hired Gary Morris, another public adjuster. The process was grueling, but thankfully, when it was completed, she received the additional $67,500 over the additional $201,000 of the 75% "streamlined" payment originally offered.

736.    Doctor HARROW's unpaid claims amounts were of $228,052 and $159,000 for contents and dwelling, respectively, totaling $387,052 of underinsurance. Doctor HARROW's letter to USAA from Public Adjuster, a certain Donald Fymbo, was written on September 27,

2012 requesting $388,500, and a letter from Doctor HARROW, dated December 3, 2012 requesting $400,000.

737.    Eighteen days after the initial policy was issued, the reduction was put in place and the debate began over the proper square footage. The dwelling, with a $581,000 Appraisal replacement value had been reduced to $344,000, as the square footage was reduced by 1225, and the re-classifying a lower level to basement.  In this context, the mortgage was $390,000.

738.    On or about, November 1, 2011, Doctor HARROW received a letter from USAA stating that they had performed a periodic review to help provide adequate coverage limits, and they were pleased to announce that their calculations to minimally rebuild her home was $322,000.

739.    On or about, July 1, 2012, Doctor HARROW felt deceptive practices were in force, as the USAA adjuster finally measured Doctor HARROW's debris, and informed her that she was "grossly underinsured." Then, when the adjuster stated that he was going to take Doctor HARROW's sworn, verbal recording back to underwriting appeal board, and that he was going request to an increase of Doctor HARROW's limit paid 25%, raised her hopes, only to receive the call July 12, 2012, notifying her of the board's decision to deny. There were things that simply seemed disingenuous about the, and she wondered what criteria USAA used if its own lowering of the limits, and insistence on lowering the limits, was not grounds for granting someone the 25% they would receive if they rebuilt their home.

740.    She began to think about the way USAA had interacted with her: there was the issue of all the telephone calls made debating the square footage of her property, and the was also the issue of a question they asked over the telephone on December 20, 2007, about whether she lived in the "Brush Fire" area, a call that had a similar tone and angle.  At the time it

seemed like a company that was simply very involved, but putting everything together, a different picture began to emerge that answered seeming inconsistencies and strange ways the company had behaved. She could see that the two calls had been related.  She lived in a "Brush Fire" area, as far as USAA was concerned, and she was seen as a risk to rebuild, whereas there would be unpaid claims if she did not rebuild. This explained why the company was so insistent on lowering her limits, and why it, a sophisticated risk calculating company with extensive technology, would have such a perceived poor understanding of property values.  One would suppose that an insurer would try to increase the premium by selling a higher limit of coverage, but as she dealt further with the company, it was apparent that its personnel were simply playing dumb.

741.    The "streamlined" documents were deceptive in retrospect as well, as well. There was an element of a hard sell to it that she noted, and it was being presented with a certain insistence that was unsettling, as though there was something to be gained by the adjuster. She was a distressed person, having just lost all she had, and she was getting a pitch: "just fill out these forms, and we'll give you 75% of contents, and pay you the minimum of your policy."  Left out had been any discussion of 25% increase afforded to those who rebuild.

742.    USAA delayed payment of living expenses, until 10/5/12 October 5, 2012. Doctor HARROW and her then husband had had to remind USAA and request that the payment be made, and supply then supply a copy of the lease before payment.

743.    It became evident to the doctor that "like kind and quality" was being used as a pretextual limitation, where USAA personnel would think up any excuse for why a replacement was not of "like kind and quality," an almost impossible standard of identity.

744.     She lived only seven miles from the USAA office, and called routinely to have someone visit the property to properly take a quote.  The failure to visit her site to measure, when a policyholder was rightfully concerned about having adequate coverage seemed odd while it happened, but she had no reason to know why USAA personnel had been so keenly interested in lowering her amounts of coverage, and stating justification for it, as it would seem that a company so intent on finding her the right amount of insurance would simply then drive seven miles, comply with the wishes of the policyholder and measure the square footage for a proper quote. In retrospect, she could see they were employing willful blindness, and seeking out a pretext to lower her coverage. At the time, however, it was simply confusing – she never would have suspected her insurer would wish to purposefully underinsure her.

### PREDICATE ACTS RELATING TO PLAINTIFFS
### KENNETH DALE YODER & CATHERINE TAYLOR

745.     Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

746.     Plaintiffs KEN YODER (KEN YODER) and CATHERINE TAYLOR (KATE TAYLOR) were insured with State Farm Fire and Casualty Company (State Farm).

747.     Upon information and belief, and at all relevant times herein, Defendant STATE FARM, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

748.     KEN YODER and KATE TAYLOR had visited with their agent, Barry Bailey, about six months before the fire to make sure their home was not underinsured. One of their concerns was that their solar power system had grown over the years. As their sole source of power, it had grown over the years to include 16 solar panels, a Trace inverter, 12 L16

batteries, a transformer for 220 power, a specially designed SunFrost refrigerator, various other electrical parts, and a Kohler generator for backup battery charging power. In addition they had added a wind power generator and chargers to charge the house batteries on cloudy, windy days.  PLAINTIFFS valued the solar/wind system at between $25,000-30,000 (not including the $3000 refrigerator).  The Couple wanted to be sure it was covered in case of a disaster, and that is why they consulted the agent.

749.    At that time, Plaintiffs were told by said agent that all solar systems were covered as possessions, not as part of the structure of the home.  KENNETH YODER and KATE TAYLOR were told this was so because most people with solar had it as supplemental power and could choose to take their solar components with them when moving.  Plaintiffs argued that this did not make sense for a home like theirs, whose power was dependent on the solar. Nonetheless, they were told not to raise the value of their structures as this would in no way any loss of the solar. Because of this clear statement from the company, Plaintiffs did not increase their replacement value numbers, being told it was futile.

750.    After the loss of everything they owned in the High Park Fire, Plaintiffs were told that the solar system was indeed a structural loss, and could not therefore be included in their list of possessions.  After receiving such news, they were then informed that they were underinsured. To add insult to injury, their agent denied the previous underinsurance consultation, which had occurred only a few months before, had even taken place – something they found shocking.

751.    KEN YODER and KATE TAYLOR had insured with State Farm, and agent Barry Bailey, since the year 1992.

752.    The couple has since changed agents to and is trying to insure for full coverage, as they rebuild. Presently, STATE FARM is requiring extra proof of the replacement value of their structure, and it is obvious that the process of getting adequately insured is a battle with the insurer.   They are currently in the middle of sending STATE FARM their building contractors estimates.

753.    KEN YODER and KATE TAYLOR's chief complaint with State Farm is that they feel they were deliberately underinsured.   They received bad advice from their Agent only months before the fire, when they had in fact attempted to make sure they were adequately insured.   After the fire, the Agent denied giving them the advice, and taken as a whole, the circumstances were confusing.   It did not appear to make sense that a company would be turning down a higher premium. That action on the part of STATE FARM was the chief factor in their ending up being over $120,000 under insured.

754.    State Farm also began harassing Plaintiffs about not wanting to pay their living expenses while they were rebuilding, despite the fact that the policy said STATE FARM would pay up to two years. After one year, STATE FARM began complaining, every month, that Plaintiffs were taking too long to rebuild, and forcing them to justify their "delay." It was readily apparent that STATE FARM had ulterior motives in this, and they characterized the results of underinsurance as if they were choices the aforementioned Plaintiffs were making in the great difficulty of rebuilding with insufficient funds.

755.    KEN YODER and KATE TAYLOR also noticed an arbitrary nature to the depreciation determinations State Farm made as to their belongings; with no recourse open to the policyholder regarding their value. Unless KEN YODER and KATE TAYLOR replaced an item, they received only a small portion of the value of the items lost, but by replacing the item,

they could not use the money to help pay for the rebuilding of their home, and they could see that there was no real intent to get them back to the position they were in before the fire, as everything was a struggle.

756.    The approach of STATE FARM to use any excuse to not pay was routinely evident, with the result usually being unfair or senseless.  An example of this was that almost $50,000 more, above their limit, and as a form of supplemental coverage would be paid towards permits changes and inflation costs was only apparently available if they rebuilt the exact same house, or so they were told by STATE FARM.  This seemed arbitrary and unfair, as they had made an effort to insure the home properly, but had been misinformed by STATE FARM's own personnel.  Furthermore, they were actually rebuilding, with every last dime made available to them.  As the Plaintiffs were underinsured, they had to build a much smaller house, and so the apparent contractual feature was not made available to them.

757.    They also noticed something in the way that the adjusters acted, which indicated total disregard and a related level of dishonesty, wherein the adjuster could be seen to have no intentions of listening to them, but would go simply through the motions in a pretextual fashion.

758.    Related to this approach – and what they saw as a final insult – while Plaintiffs simply wanted to be paid what they were insured for, and never tried to cheat anyone, the adjusters continually treated them as if they were dishonest lowlifes – something Plaintiffs could note in the same adversarial pretext that was applied to them in STATE FARM's general dealings with them.  They could tell that there was a sense of automatic opposition from the adjuster, and that neither reason nor basis had any bearing with regard to company policy.

PREDICATE ACTS RELATING TO PLAINTIFFS
MARTHA & GARY LEMERT

759.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

760.    Plaintiffs MARTHA and GARY LEMERT felt a certain loyalty, and had multiple forms of coverage with Defendant Liberty Mutual Insurance (LIBERY MUTUAL) prior to the High Park Fire, including their primary residence, their residence in Cokedale, Colorado, two automobiles, a camper, an ATV, a tractor and a trailer.

761.    Upon information and belief, and at all relevant times herein, Defendant LIBERTY MUTUAL, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

762.    The tractor, camper, and ATV were separate from the residence and Plaintiffs MARTHA LEMERT and GARY LEMERT were paid for them at their current value at the time of the fire, and the LEMERTS did not replace them, except for the tractor as the money went toward the house.   Plaintiffs MARTHA LEMERT and GARY LEMERT paid the builder $252,901. This does not include funds paid by the LEMERTs directly for repair of the driveway, which exceeded $10,000, $2100 for well repair, nor $5,000 for a deck.

763.    After the High Park Firs, the money paid for contents was so short of replacing the LEMERT's items, that they were not required to provide an inventory.  Plaintiffs had to use some of the money paid by LIBERY MUTUAL on the contents claim to replace the driveway and dig a new foundation for the house.  In order to complete the house, Plaintiffs were forced to withdraw money from their retirement accounts, thereby reducing their monthly income, and taking on additional debt.

764.    Due to this lack of funds, the LEMERTS could not replace the garage, the guest cabin, an outdoor sauna, a hot tub with separate deck, or a corral with tack room.  These items would cost close to $100,000 to replace, as the Plaintiffs simply could not afford to do so after their loss.  Plaintiffs state that it is particularly a burden not to have a garage and they were also forced to get rid of their horse for lack of facilities for her.  Items under separate policies, the ATV and the pop-up camper, were not replaced, as the funds paid for them by Defendant LIBERY MUTUAL were used to rebuild the house.

765.    All of this has been a devastating experience for Plaintiffs MARTHA LEMERT and GARY LEMERT, both financially and emotionally, which has not passed even as Plaintiffs MARTHA LEMERT and GARY LEMERT are in their new home, which is simply lacking of what Plaintiffs MARTHA LEMERT and GARY LEMERT had previously, and what they thought they were paying for with regard to the insurance.  The stress has affected both Plaintiffs MARTHA LEMERT and GARY LEMERT, which is detrimental to Plaintiff MARTHA LEMERT's cancer treatment.

766.    At least twice, Plaintiff MARTHA LEMERT questioned Defendant LIBERY MUTUAL's staff in Denver about the sufficiency of the policy limits, and both times she was assured that the coverage was adequate.  In support of the position LIBERTY MUTUAL's staff even offered justification, and one comment recalled by Ms. LEMERT was: "your land won't burn."

767.    Plaintiffs MARTHA LEMERT and GARY LEMERT state that service by Defendant LIBERY MUTUAL after the fire was efficient and timely, and handled with consideration; however, Plaintiffs MARTHA LEMERT and GARY LEMERT feel the

shortfall could have been avoided had Defendant LIBERY MUTUAL simply raised the limits as requested.

768.    Plaintiffs MARTHA and GARY LEMERT received correspondence from Defendant LIBERY MUTUAL outlining what was paid, as well as the adjuster's estimates showing about a $90,000 deficit.

769.    The LEMERTs received policy declarations, but never received an actual policy.

770.    Defendant LIBERY MUTUAL paid the policy limits on the claim of Plaintiffs MARTHA LEMERT and GARY LEMERT for property and contents.

771.    Plaintiffs remain inundated with damaged trees that need to be felled and removed.  Plaintiffs MARTHA and GARY LEMERT's only option is to do this work a few trees at a time, which is a hardship, at ages 72 and 73.

772.    MARTHA and GARY LEMERT funded $282,000 to the builder and other subcontractors, while receiving $238,500 from LIBERY MUTUAL for buildings and structures. The shortfall of $43,500 was funded from the contents check of $114,195. The $70,695 left did not put a dent in replacing Plaintiffs MARTHA LEMERT and GARY LEMERT's furniture, household goods, personal belongings, tools, and other items. Many items could not be replaced due to lack of funds.

773.    Plaintiffs MARTHA LEMERT and GARY LEMERT purchased a policy for their primary residence and vehicles in or around the spring of 2006, although it could have been a little earlier. The vacation home was added in the fall of 2006.

774.    Plaintiffs MARTHA LEMERT and GARY LEMERT purchased the policies from the Barney Jones Agency: 10901 12OTH Ave., Broomfield, Co 80021 (303) 420-3222.  In all the years of carrying the policies, Plaintiffs MARTHA LEMERT and GARY LEMERT

have never spoken to Barney Jones and have always spoken with women who say they are authorized to speak for Agent Jones. Since the fire, Plaintiffs MARTHA LEMERT and GARY LEMERT added earthquake coverage for both homes; they believe this was done through LIBERY MUTUAL's national call center.

775.    MARTHA and GARY LEMERT do not recall the name of the agent who sold them the policies originally. He was a male representative of LIBERY MUTUAL , who called on Mrs. LEMERT at her place of work in Fort Collins, Colorado (Norlarco Credit Union) seeking an endorsement for the insurance company to be published to the credit union members.  The credit union was not willing to do that, as it already had a business tie to Cuna Mutual Insurance, but Mrs. LEMERT did agree to let the representative give her a personal quote. At the time, the Plaintiffs held policies with Farmers Insurance.  The quote was about $800 less annually and on the assurances given, the LEMERTS switched to LIBERY MUTUAL. With perhaps the first call to the Denver Agency, MARTHA LEMERT learned the representative with whom she had met was no longer with the company and everything would be handled through the Denver office.

776.    Mrs. LEMERT specifically recalls the representative addressing the policy as a premium policy and that in the event of having to be off-premise after a loss, that all expenses would be covered (ALE). What Plaintiff MARTHA LEMERT seems to recall is that the ALE was the biggest difference in coverage from the Farmers policy.

777.    The LEMERTS do not recall seeing a policy when purchasing their insurance, but know for certain that they never given a complete copy until one was requested for the loss in question and could then see what a full policy looked like.

778.   Plaintiffs have paid premiums for coverage from LIBERY MUTUAL, consistently, since 2006, or eight years.

779.   MARTHA LEMERT also recalls discussing the amount of coverage in approximately 2006 and about 2009 she called the Barney Jones Agency in Westminster, CO, and reviewed the issue.  MARTHA LEMERT spoke with a woman who assured her that they had adequate coverage. Several years later, Mrs. LEMERT remained a bit uncomfortable and contacted LIBERY MUTUAL's customer service department at their 1-800 number, and the result was the same. She specifically asked if they should raise the coverage amounts. Both times Plaintiff MARTHA LEMERT specifically recalls being told the phrase "your land won't burn." However, even in that regard the STATE FARM representatives were wrong, when the home burned, the LEMERTS had numerous expenses related to repairs to the well, septic, foundation, driveway, etc., that were costly.

780.   MARTHA and GARY LEMERT estimate their underinsured amounts as:

a.   Garage (not rebuilt):              $25,000

b.   Guesthouse (not rebuilt):          $35,000

c.   Corral & Horse Barn (not rebuilt): $30,000

d.   Driveway repairs:                  $3,000

e.   Debris removal to date & ongoing:  $5,000

f.   Contents estimate:                 $75,000

g.   Sauna & Hot Tub:                   $12,000

781.   The LEMERTS were approximately $100,000 underinsured on their dwelling, which is what they would need to finish rebuilding and to replace the garage, guesthouse and sauna/hot tub (used for therapeutics). The funds for Plaintiffs MARTHA LEMERT and

GARY LEMERT's camper and ATV (insured separately) were used for the general rebuild so those items were also not replaced, and therefore underinsured. Tools alone have become a major replacement expense and the LEMERTS continue to find all categories of items that need to be replaced, a continued expenditure and measurement of what they lost, which would not be the case if they had not been underinsured.

PREDICATE ACTS RELATING TO PLAINTIFFS
JEFFERY RAY & JENNIFER RAY

782. Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

783. JEFFERY RAY and JENNIFER RAY were originally insured with COUNTRY Mutual Insurance Company (COUNTRY INSURANCE), and Steve Armfield, located at 1625 Foxtail Drive Bld. B, Ste. 200, Loveland CO 80537, was their agent.

784. Upon information and belief, and at all relevant times herein, Defendant COUNTRY INSURANCE, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

785. During purchase of home the RAYS called Steve Armfield and requested a homeowner policy on their property located at 580 La Escena Dr., Bellvue CO 80512, and asked him to please submit necessary paperwork to their mortgage broker. The agent went to property, and took outside photographs, and thereafter put the policy together, and never physically met to go over policy. All values assigned to the policy were assigned solely by Steve Armfield per Country Insurance criteria. Few months later the RAYS replaced Steve Armfield with Brian Lints as their agent, and met with him to review coverage's due to concern of underinsurance of their structures. Dwelling amounts could not be raised per Country

Insurance's assigned value, due to probable over-insurance of what the company called a small log cabin, citing to lack of utilities, and despite the fact that the home was completely finished, bout outside and in.  COUNTRY INSURANCE stated that it was uninsurable for anything more than an outbuilding. At no time during this meeting was the reality of coverage, as it would be applied after the fire, explained to the RAYS.

786.    This being the RAY's second home insured through Country Insurance, they had total confidence that the coverage was adequate if the company went to such steps to assure them of that fact.

787.    Both in 2002, with their first home policy, and in 2010 with the second policy, they never received an accurate explanation of coverage associated with the policy were purchasing: there was no explanation of ACV, with depreciation values assigned, or the percentages of coverage allocated for personal contents, cleanup and tree damage. The RAYS were also uninformed that the policy had no personal content coverage for the outbuildings, leaving all items in their small cabin and outbuilding to be covered under the dwelling personal contents.

788.    In 2012, the RAYS turned to another agent, Luke Stromquist, and met with him to review coverage.  They received the same answer concerning the lack of coverage on dwelling, as Brian Lints had given. No increase in value was apparently possible, due to possibly over insuring the property, which the insurance company would not do. Again, there was no explanation of the coverage they had in place, though the agent assured them they were properly insured.

789.    The RAYS were not shown the policy when they applied for insurance.  Instead, the policy was mailed to us after policy had been paid in full and put in place.

790.    On June 9, 2012 JEFF and JENNIFER RAY, suffered a total loss of all structures and personal property they owned due to the High Park Fire, in Bellvue, Colorado. They were insured by Defendant COUNTRY INSURANCE.

791.    Upon information and belief, and at all relevant times herein, COUNTRY INSURANCE, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

792.    Several days after the evacuation, JEFF and JENNIFER RAY met with the adjuster to go over the procedures for moving forward. The adjuster did not have a copy of their homeowner policy with him, but assured JEFF and JENNIFER RAY that they would receive a copy as soon as possible.

793.    COUNTRY INSURANCE thereafter assigned a new adjuster, and the Plaintiffs met the adjuster at the property to view the damage. The new adjuster also did not have a copy of JEFF and JENNIFER RAY's Home Policy.

794.    Plaintiffs were presented with a preloaded Excel Spreadsheet upon first meeting with initial adjuster, and prompted to begin their list of home contents immediately.

795.    After initial meeting with the second adjuster, the Plaintiffs were quickly sent payouts for cleanup and tree damage. However, the payouts were sent to the burned property address instead of the rental at which they were living. This practice set the tone for the next many months of their trying to receive funds, which became a pattern of outright frustration, and countless calls to rectify the mail situation fell on deaf ears.

796.    The payouts received for cleanup and tree damage were deposited immediately, as they were thought to be the correct amounts, as per the policy.  However, as per the policy, cleanup was to be paid at the rate of 5% of the dwelling, outbuildings and personal property

coverage, for a total of $36,487.50. Plaintiffs were paid only 5% of their dwelling amount, $25,000, leaving $11,487.50 that COUNTRY INSURANCE neglected to pay.

797.    For the next twelve months, the adjuster accosted the Couple via email, multiple times per week, about the contents spreadsheet. The spreadsheet itself required eight columns of information to be completed for each and every item they were listing.  Confronted with the many hours ahead to heed these "requests," the RAYS asked for a copy of guidelines to follow and to assist their moving forward with the lists. No guidelines were ever sent, however, to help them with the process. With every list Plaintiffs submitted, the standards seemed to change, leading to countless hours, weeks and months spent on "corrections." The last list was submitted only days before the RAY's one-year deadline to submit, and the list, though incomplete, was enough to reach final payout.

798.    The emotional toll placed on Plaintiffs in fulfilling the requirement of preparing the content lists in this way, with "evolving" standards, and after the devastation of a total loss, was noticeably cruel.

799.    During the aforementioned time, countless requests were made for a copy of Plaintiffs homeowner policy, with no results. JEFF and JENNIFER RAY finally filed two complaints with DORA to finally receive a copy of the policy nearly three months after evacuation.  The RAYS found the aforementioned intense interest of the adjuster in the lists peculiar in light of all the adjuster had neglected, such as providing the lists guidelines, for reference, or even simply providing a policy.

800.    In this context, the adjuster requested an estimate to rebuild the Couple's log home from a reputable log homebuilder, which they did.  As determined, to rebuild with a like log structure was going to cost them approximately $508,000, and the Plaintiffs, replacement

policy was only $250,000, leaving them $258,000 underinsured on the dwelling. The adjuster immediately dismissed the Plaintiffs' estimate and refused to use the actual rebuild cost moving forward.

801.    Plaintiffs then received their Actual Cash Value (ACV) payout check totaling approximately $206,000, the adjuster assigned a depreciation value of 30% to the whole house, 10% for every year standing.

802.    Although daunting, rebuilding was JEFF and JENNIFER RAY's only option. In this context, the adjuster informed them that COUNTRY INSURANCE would not distribute the remaining $44,000 of the "policy maximum" until the home was completed.

803.    There were great disparities between what the insurer estimated things would cost to replace, and what they actually cost, both before claim and after.  The RAYS brought this to the attention of the insurer, but were roundly ignored, and it was evident that the insurer preferred to stand by estimates, than bids, and had no intention of deviating from the estimates which seemed more and more self-serving as the process wore on.

804.    The payouts on the policy were, as mentioned, $250,000 to replace the home, while the actual cost to replace was approximately $500,000, nearly twice the amount. Including the other factored amounts, such as tree damage, personal property, and demolition/cleanup, the underinsurance amount, minus the difference between what was paid and not paid on the policy, came out $565,700. The amount illustrates the savings to COUNTRY INSURANCE achieved by assigning a low property value to the homeowner.

805.    Had the RAYS obtained an accurate replacement coverage for their property and personal items it would have allowed them to replace the log home and guest cabin, to "turnkey" for the an exact copy of their previous home, as well as allowing them to replace all

of their personal items. With the underinsurance, however, none of this was an option.  Instead, Plaintiffs had to settle for a "stick built" home and were not able to replace their guest cabin or storage shed, while only barely touching the surface of replacing personal property. The funds received were completely unrealistic to replace what they had and were not even sufficient to "turnkey" a "stick built" home with similar square footage.

806.     JEFF and JENNIFER RAY's main wish is to evoke change within the Insurance Industry's practices, which they see as fair and proper insurance limits for structures and personal property, based on accurate estimates, and not reckless estimates or practices.

807.     The RAYS experienced unfairness in the continual emotional trauma of battling for every penny due to them per their policies. They could see that the COUNTRY INSURANCE personnel could recognize the pain they caused with their actions, and the delay that they caused with their omissions, but simply didn't care.

### PREDICATE ACTS RELATED TO PLAINTIFF<br>LOUISE CREAGER

808.     Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

809.     Plaintiff LOUISE CREAGER (CREAGER) is insured with ALLSTATE INSURANCE COMPANY (ALLSTATE), and has been with agent Mike Lanteri of Allstate, who sold her the policy, as of the year 2000.  The address for her agent is 1002 W Drake, Ste. 101, Fort Collins, CO 80526, and LOUISE CREAGER has paid on the policy for the house at 105 Stratton Park Rd., Bellvue, CO 80512, since the year she started construction, in1999.

810.   Upon information and belief, and at all relevant times herein, Defendant ALLSTATE, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

811.   At the time of purchase, LOUISE CREAGER remembers discussing what the premiums were and coverage, but that the only information given at that time was basic information, and the agent discussed what the house should be insured for; contents amounts. LOUISE CREAGER remembers discussing her husband's gun collection and tools, and that the agent informed her she did not need a rider.   LOUISE CREAGER and the agent discussed liability coverage, as to whether someone would get injured at her property, but the agent never came to the house, and they discussed discounts, as it was stated that she lived within five miles of the fire department and had an E9 rating.   The agent also told her to purchase full replacement value for her contents, which would better protect her in case of the home burning.

812.   Plaintiff does not believe she was ever gave her a full policy, something apparently in line with ALLSTATE standards of simply sending a summary, which is only known to be a summary after a loss.   She had removed all of her files with insurance information when she was evacuated, and, as a habit, would have kept a copy of her policy if it had ever been sent.

813.   LOUISE CREAGER remembers discussing with the agent, two years before the fire, that she felt she needed to have higher coverage.   Ms. CREAGER, who is a realtor, knows something of the cost of construction and materials, especially custom homes.   She also knew that building in the foothills was an additional expense to building elsewhere.   Ms. CREAGER, however, did not understand her coverage, and discussed her concerns with the

agent at length.  The agent explained that an increase in limits was not warranted, as the particular policy she had was a "full replacement value," and explained that her home would be rebuilt in the event of a loss. Ms. CREAGER told the agent that it would cost at least $450,000 to replace her home, and the agent explained that the way the policy worked, the building would be replaced, and was thus covered. As stated to her by said agent: "Why would you pay more when you don't need to."  Plaintiff was also not told about depreciation, or that she would have to supply receipts within 180 days from the day she received the check in order to received additional replacement funds.

814.    LOUISE CREAGER's date of loss was June 11, 2012.  She was called by one of the firefighters at 9:03 a.m. on June 12, 2012 and notified.  She was at The Ranch in Loveland on June 12, 2012, when she got the call from the firefighter. (The Ranch is where all the meetings were held to update individuals on the status of the fire and learn if their home was lost.) There was a motor home with Allstate representatives there and Ms. CREAGER went over to them discuss her loss.  During this meeting, she was never told about Actual Cash Value, or its significance.

815.    Ms. CREAGER was confused by the interactions she had been having with her adjusters, and in an effort to determine the details and rights of her coverage, and get some bearing, she asked ALLSTATE repeatedly for her complete policy – beginning in about August of 2012. ALLSTATE personnel told her twice that they sent it but she did not receive a copy and continued to ask and wait.  Originally, when Ms. CREAGER asked for a certified copy of the policy, Barry Gruis, an agent in Lanteri Office, said he never before heard of a certified copy of a policy.  Ms. CREAGER told him she had been informed by DORA to ask her insurance company for one.  Mr. Gruis sent Ms. CREAGER a very brief summary of coverage, in May of

2013, a 28-page document, but no details were in it, as it was not actually a policy – although it had been sent to her as if it were the policy.  Ms. CREAGER continued to make her requests, and finally, she was able to receive the one from Terry Havens the adjuster.  Finally ALLSTATE sent the policy via FedEx to LOUISE CREAGER's office and it was received.  This was in February of 2014.

816.    Every time Ms. CREAGER spoke with Terry Havens, or to the other adjusters, they would finish the conversation by asking - "is there anything else I can do for you?" and she would ask them: "I don't know what I should be asking, do you know of anything on my policy I should be asking for?" "No" was always the reply.  At least once a month, LOUISE CREAGER spoke with her adjuster, Terry Havens.

817.    Additionally, Ms. CREAGER asked Terry Havens, repeatedly, about compensation for her family's lost trees, and the adjuster kept saying there was no coverage for trees.  Ms. CREAGER responded that so many others were getting money for trees, even those insured by Allstate, and didn't understand how that could be the case just for her.  Finally, in August of 2013, the adjuster stated: "I'm so sorry, I forgot to pay you for your trees." This left Ms. CREAGER wondering what else the ALLSTATE adjusters had "forgotten."

818.    As to Actual Cash Value and issues of value the value of her property, LOUISE CREAGER asked the next adjusters that she dealt with about her property value numerous times. The adjuster who determined what the value of the house was, said Ms. CREAGER would have to discuss this with her next adjuster or her agent.  The two adjusters she had dealings with on the telephone thereafter, kept saying there was none, and this was what Ms. CREAGER had to go on until adjuster Terry Havens looked into the situation, and informed her that she had what is called a "Bezel." In regard to this, ALLSTATE informed her that she

would need a list of County requirements that had changed to a higher cost, plus receipts to prove that the County requirements were more expensive before her "amounts" could go up.

819.    When LOUISE CREAGER went to the County and spoke with a Chief Building Official, on or about April 10, 2013.   The Official said that it was essentially an impossible task she was given by ALLSTATE because there are volumes of changes. He added that it appeared the insurance companies require this because they know they won't receive the information and can say the additional changes were unnecessary, even though it is obvious to the County, and to everyone involved, that the requirements are indeed more expensive, and significantly so – something patently obvious.    The Official wrote a letter to say it would indeed cost substantially more to build the CREAGER home in a way "meeting updated wind loading, wall bracing, insulation, energy efficiency, thermal envelope, heating and venting, fireplace, electrical, roofing and wildfire mitigation requirements." Terry Havens, the adjuster, however, said the letter wouldn't help because ALLSTATE "needed" to know all of the changes in the County, not simply that the requirements were indeed more expensive.  An explanation Ms. Creager saw as unreasonable.

820.    Depreciation was a shocking factor.  In November of 2012, her family gave a list for over $175,000 worth of contents to ALLSTATE and received a check for $62,000 thereafter, depreciated significantly.   Another list was later sent for an additional $157,000 of home contents, and the CREAGER Family received $119,000.  They received another check for their appliances, for around $5,200.  The CREAGER Family take very good care of their contents and felt their depreciation percentages were arbitrary, given they have no measure of the condition of the items submitted.   In one instance, Ms. Creager gave ALLSTATE specific item numbers for Silpada jewelry and was "informed" by the ALLSTATE representatives that

the items could not be found on the Internet, and could not therefore be reimbursed without further information. In response, Ms. CREAGER contacted a friend who sells Silpada, but because the friend did not have the antiquated catalogues, which only show what the item used to cost, ALLSTATE said that there was insufficient information, and could not pay for the pieces.   The apparent dishonesty of ALLSTATE's claims of inability were troubling, frustrating and tiring.

821.   Ms. CEAGER also had a Whurlitzer piano that she paid $6,000 for at a closeout half-price sale.  At first, the adjusters simply wouldn't pay her but compared it to a Baldwin piano, which is not at all the same quality. Ms. CREAGER's piano was solid oak, wood construction – nonetheless, ALLSTATE only paid $2,300.

822.   With regard to their home, the CREAGER Family received $324,000 as a total. ALLSTATE informed the Ms. CREAGER that it had depreciated her property by $118,000 in 12 years. The home in question was an insulated concrete form (ICF) 10" walls on the main floor, and 8" walls on second floor, with a metal roof and metal siding.  The inside of the home was all higher quality finishes with slate and travertine floors as well as on the fireplace, window base, around the fireplace/furnace (this is not a typical fireplace but a fireplace/furnace ducted throughout the house), and custom travertine counter tops; windows were also higher quality, one level down from argon, and with high energy-rating.

823.   Ms. CREAGER found that having to take the extra time to make this list of contents basically has forced her to take what little time she could muster to do this extra chore.  Personally, Ms. CREAGER spent countless evenings, at least 200 hours, working on the lists, in addition to time reviewing them with a friend and with her daughter to assure that nothing was duplicated.  Finally, when the checks were received, and the lists reviewed, the

CREAGER Family would see where ALLSATE had placed a $0 value for the item because the adjusters "couldn't figure it out" or find or find the item on the Internet.  The depreciation often had this absurd effect of zero-dollar values, and was obviously a flawed methodology.  This "contents" process took away from the time needed to arrange and clear the property, have septic, well and leach field inspected.  Then, the time needed to get the trades in line, and to prepare the property just to get started – soils inspector, perk test. Working with the mortgage company and their own list – to get reimbursed for the work done. Additional efforts to have trees cut down and get the ground ready to rejuvenate the land, arrange for trees, folks to help plant trees – get the right mix of grasses, find spreaders for the grass and wildflowers and forbs to prevent erosion.  The apparent conflict that the lists created with the time needed to place one's life in order was evident in the strain and interference it created. None of this had been communicated at the purchase of the insurance.  And it all appeared calculated to keep one from getting their life back after the fire, instead of allowing one to, and facilitating that.

824.    Ms. CREAGER's husband has post-traumatic stress, and she has had to help him a great deal with the house and the rebuilding process by either making phone calls, picking up materials, interviewing trade workers, or anything else that needs to be done.  The process leaves one working 12 to 14 hours a day, 6-7 days a week most of the time, something that interferes with the work one must do to make a living.

825.    The CREAGER Family never had an opportunity to get recoverable depreciation on their home, as far as the guidance they had received from the adjusters.  This is all quite different from the description of the property and assurances received at the issuance of the policy and before the fire. They have yet to finish their home, and although they are currently close to finishing, were flatly denied an extension.

826.    In regard to being underinsured, the rebuilding is costing the CREAGER Family at least $450,000, and they have had to use their savings, credit cards and most of their contents money to make what they have made possible up to this point.

827.    On or about June 14, 2013, the CREAGER Family received a letter that they could not have an extension to rebuild, and that they had had 180 days to ask for the recoverable depreciation on the house from the time they received the original check.  None of this was communicated in the many calls for to the adjusters where Ms. CREAGER asked to be told what she needed to know on her claim, and where they responded that there was nothing else she needed to know.  These denials also came approximately six months before Defendant ALLSTATE finally sent her a copy of her policy.

PREDICATE ACTS RELATED TO PLAINTIFF
JANET KOCH

828.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

829.    Plaintiff JANET KOCH (KOCH) was insured with COLORADO FARM BUREAU (FARM BUREAU) while still in Florida.  She was purchasing a property in Colorado, and had contacted an agent, Rich Davis, long-distance about getting insurance on the home she was purchasing.  Because of closing issues, two policies were issued, on in June of 2011, and another in July of 2011.

830.    Upon information and belief, and at all relevant times herein, Defendant FARM BUREAU, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

831.    Ms. KOCH spoke with her agent prior to the High Park fire. (This was after she had submitted a wind damage claim.) Celeste Ramos, the adjuster, had come to measure the property and look at damages from the wind claim, which was later denied because of the fire.

832.    Thereafter Ms. KOCH's agent talked with her about the coverage and he said it needed to be reviewed and changed. This was on or about May of 2012 in a telephone conversation. The agent had entered the wrong information of square footage into the policy, but Ms. KOCH was not told all the details of why the change was necessary.

833.    Before the change to her policy was effectuated, the High Park Fire started, and when Ms. KOCK called the agent, but he said that he could not change her policy because of the fire danger. It did not matter that he had entered the wrong figures concerning her square footage, and not recognizing that the property. Ms. KOCH realized after the fact that the adjuster and the agent knew that the home was not accurately insured after the wind claim, but aside from telling her that she should make an appointment, and admit the incorrect square footage, she had simply been told that to set up an appointment.

834.    Ms. KOCH's home burned on or about June 22, 2012. She was told with along with another group of people who were all called into a special room to hear the news at a place called "The Ranch" in Loveland, Colorado, which had opened its facilities to the fire victims. It was a horrible experience for each of the victims as they read off the addresses affected. Farm Bureau, however, used June 14, 2012, the date of evacuation, as the loss date.

835.    At first, Ms. KOCH would stop by the adjuster's office to drop off her "claims," as the adjusters called her receipts, but stopped going because of the way the adjuster treated her with regard to my head pains (Ms. KOCH suffers from post-traumatic stress and other ailments), and one occasion in particular where the adjuster smiled viciously while Ms. KOCH

had an extremely bad spell of head pains.  Instead, Ms. KOCH would make copies of all of her living costs and mail them to the adjuster.  The adjuster also made insensitive remarks and gestures about Ms. KOCH's condition.  Those comments from her adjuster only added to Ms. KOCH's stress and stress-related issues, and did not return to the office.  Nonetheless, Scott Martin and the adjuster continually tried to get Ms. KOCH meet with them regarding the questions MS. KOCH submitted by e-mail concerning her coverage, and JANET KOCH could sense that the insistence on getting her into the office was not out of a desire to answer her questions, but to instead apply pressure instead of answering questions – Ms. KOCH could sense the difference between actually answering the content of someone's questions and telling them "no" behind closed doors, so she elected to have letters sent to her questions instead.

836.    As mentioned, Ms. KOCH applied for insurance while still in Florida.  She was not shown or told anything regarding "actual cash value" or "replacement cost" requiring a home to be rebuilt at the time of application.  She was not informed of any of this in the application process, but was told, after the fire and total loss of her home by her adjuster, Celeste Ramos, that she would have to "rebuild a 'log' home exactly like the one you had" to get the 25 percent additional amount paid to one that "replaced" their home.  Nothing was explained concerning this at time of application.  No policy was ever shown to JANET KOCH when she applied for the insurance.  She could see instantly that FARM BUREAU intended to use statements such as "like kind and quality" into relative limitations pushed as far against the policyholder as possible.

837.    There were many items of disagreement between Ms. KOCH and the adjusters, and even though incorrect law, and illogical reasons were given for their actions, FARM BUREAU refused to change their position on a number of items.

838.    Ms. KOCH also noticed that if she did not mention a point of coverage, which she would either be told information that was contrary to the language of the policy she had received after the fire, or she would not be told that something was covered.  It was evident that the adjusters spent their time either inventing reasons why payment should not be given according to what Ms. KOCH could see in the contract, or where simply hoping that she would not notice what she was owed – it was evident they knew the nature of the policy, but would not volunteer any assistance in finding all of the coverage one was owed.

839.    Ms. KOCH was about $120,000 underinsured.  As she read her policy contract, it became evident that the policy did not say she had to rebuild her home, but that she merely needed to replace it.  She contacted the adjuster and Scott Martin about this, and asked them to provide reasons why she could not do so under the contract.   In response, Scott Martin supplied circular reasons, and even sent her a case of law that he thought would work.   The case, however didn't appear to support what he was saying. Ms. KOCH asked him further about the case, and he backed off of his approach.   Nonetheless, when this was all pointed out to him, he still refused to acknowledge that she could have the 25% increase associated with simply replacing a home.

840.    Even though Ms. KOCH could tell that she was right, this limited her options when looking for a new home, as she had to use the funds she was given to purchase a home, and had FARM BUREAU's assurances that she would not get the 25 percent increase if she simply replaced her home without rebuilding.

841.    Of more lasting impact for Ms. KOCH was the fact that her physical condition, and post-traumatic stress disorder (which she had from before the fire), were exacerbated by the stresses associated with compiling the lists.  She had her treating professionals write their

concerns to FARM BUREAU, asking that Ms. KOCH receive a waiver from the list requirement.  FARM BUREAU denied her requests, and gave no medical reason why they would not allow her to have a waiver, and JANET KOCH found herself in the position of having to deal with her stress-related conditions while wadding through the multi-layered stresses of the lists.

842.    When she finally finished her lists, she did receive her whole amount, but the stresses of the event had exacerbated her conditions, and she was informed afterword that she had both nerve damage and diabetes as a result of her ordeal.

PREDICATE ACTS RELATED TO PLAINTIFF<br>IAN SIEMPLENSKI

843.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

844.    IAN SIEMPLENSKI purchased insurance for his property that burned in the High Park Fire, 1456 Saddle Ridge Rd., Bellvue, Colorado, in or around the last week of May of 2009.  Mr. SIEMPLENSKI did not purchase the property until June 4, 2009, but was conducting repairs to the property, as he had purchased the house in a short sale and the owner who was selling it had stripped a lot of the fixtures. Repairs had to be made in order to bring it up to appraisal condition.

845.    Upon information and belief, and at all relevant times herein, Defendant State Farm Fire and Casualty Company (STATE FARM), and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

846.    When Mr. SIEMPLENSKI applied for insurance for the Saddle Ridge property, the process was over the telephone, and Plaintiff explained to STATE FARM's personnel that

the house was a short sale and was worth a lot more than the $400,000 purchase price. Defendant STATE FARM, however, did not allow Mr. SIEMPLENSKI to insure the house for any more than the mortgage, and was told that due to insurance fraud, Defendant STATE FARM was "not allowed" to insure the house for any more than $386,000, which represented the mortgage amount, after the down payment.

847.   At the time Mr. SIEMPLENSKI purchased the Saddle Ridge property insurance, his agent was Linda Horton; the agent, however, soon became Chip Beake.  His address is 106 E Olive St., Fort Collins, CO 80524.

848.   Plaintiff IAN SIEMPLENSKI did not speak to an agent, but always dealt with Barb, an assistant, both when it was LINDA HORTON STATE FARM and when it became CHIP BEAKE STATE FARM.

849.   Mr. SIEMPLENSKI was told he had a replacement cost policy. He explained to the agent that the house was worth almost double the purchase price, and that he would like more insurance placed on the home.   Plaintiff IAN SIEMPLENSKI did not receive the policy until after purchase of the insurance.

850.   Plaintiff went in to Agent's office with an appraisal in April of 2012 to attempt raising the limits. (It should be noted that after the fire, the appraisal was conspicuously missing from Mr. SIEMPLENSKI's folder.)  The agent told Mr. SIEMPLENSKI that coverage should be fine, when he saw Mr. SIEMPLENSKI just after the house burned in the High Park Fire, as Plaintiff IAN SIEMPLENSKI had just reviewed the coverage with the agent in April of 2012.

851.   When IAN SIEMPLENSKI went to his agent's office in April of 2012, he was told that the policy limit would be raised.  He went to the agent's office in April of 2012 with an

appraisal and asked to have the limits raised.  He was told that Barb, the assistant, would contact him with the updated policy. (IAN SIEMPLENSKI's policy renewed each year at the end of May.)

852.   IAN SIEMPLENSKI watched his house explode in about six minutes on June 11, 2012 in the fire.   Plaintiff IAN SIEMPLENSKI did not get to visit the property until the end of June – June 29th or 30th – when he was allowed to go up to the property.

853.   When Mr. SIEMPLENSKI saw the agent a day after the house burned, he was told he had plenty of coverage because the Agent and Plaintiff IAN SIEMPLENSKI had just reviewed my policy.  Plaintiff IAN SIEMPLENSKI was even told at that time by Agent that he had some $750,000 worth of coverage on the house.  It turns out that Agent was adding the dwelling and personal property coverage together to get that number.

854.   Plaintiff IAN SIEMPLENSKI told Defendant STATE FARM that he wanted to rebuild the house, and even provided blue prints.  It was about the beginning of July when he found out how heavily underinsured the property was, almost $600,000 underinsured.  He was quite shocked to find that the limits were still at the original $386,000 set by STATE FARM previously, despite the submitted update request and accompanying appraisal.

855.   Mr. SIEMPLENSKI filed a complaint with the State because of the coverage issues associated with his request for higher limits simply being ignored, and without basis, the agent stated that he had no recollection of IAN SIEMPLENSKI's ever bringing in the appraisal – a complete lie.  He pleaded with Defendant STATE FARM for over a year, appealing to its better nature, but to no avail.  When Plaintiff finally spoke directly to his agent again, and not through an adjuster, he was able to admit who was working the day Mr.

SIEMPLENSKI came into the agent's office with the appraisal and also the content of what they had discussed during the meeting.

856.    Confronted with the truth, the agent told Mr. SIEMPLENSKI to come into the office and that STATE FARM would increase the policy limits to the level requested previously. (This was just after the Colorado Homeowners Insurance Reform Act of 2013 passed, and insurers were then required to honor other proofs of a property's value besides their estimates.) This was when Defendant STATE FARM raised Plaintiff's current policy limits to $875,000 from $368,000. In regard to retroactively dealing with the issues of his limits before the fire, however, which he had requested raised in April of 2012, STATE FARM sent a letter about a week after the other letter had arrived, stating that the limits before the fire would only be raised to $420,000. (It was explained that this was being done because Mr. SIEMPLENSKI had notified it within 90 days finishing upgrades, of the upgrades to the house.) STATE FARM, however, would still not honor or acknowledge the true value of those upgrades or of the request to have his insurance raised, which was accompanied by an appraisal.

857.    Mr. SIEMPLENSKI was given a check for the maxed out underinsured policy immediately. He spent almost two years providing the exact same proof of prices that were originally provided to Defendant STATE FARM in January of 2013. It was about a week ago when Defendant STATE FARM finally released the funds for the actual cash value of the personal property, giving him just over two weeks to replace his personal property before losing the replacement cost benefit. Through depreciation, STATE FARM took $376,000 worth of personal property and reduced it to approximately $150,000. By its delay, STATE FARM forced Plaintiff to live without needed funds. Fortunately, he lived in a trailer that he bought in December 2012, which allows him to have an office from which to work while

attempting to rebuild his house.  Mr. SIEMPLENSKI will have to remain in the trailer now until he can finish the rebuild himself, as he has spent all of the money that STATE FARM had insured the house for, which is the original mortgage amount.

858.  From desperate first-hand experience, Mr. SIEMPLENSKI has come to learn that it is practically impossible to find a contractor to rebuild a house that cost almost a million dollars when less than half of the funds needed for the home are available.

859.  Defendant STATE FARM denied almost all of Plaintiff's requests over the last two years.  Plaintiff has made many attempts to communicate with STATE FARM, and has e-mails reflecting those communications.  For example, Mr. SIEMPLENSKI had asked Defendant STATE FARM to investigate why he was underinsured and was told in September 2012 that nothing was found.  Plaintiff SIEMPLENSKI was advised in July of 2013, that Defendant STATE FARM had decided to raise his policy limits by $50,000.  That was at the same time STATE FARM allowed him to increase his policy to $875,000. Mr. SIEMPLENSKI requested an extension of his replacement cost benefits, at that time, which was denied by Defendant STATE FARM on or about April of 2014.  Plaintiff also asked the Defendant to extend his Additional Living Expenses (ALE) benefits, since his house reconstruction was not finished, due to a delay caused by a flood that took out the road for almost three months.  Defendant STATE FARM denied the request at that time as well, despite the clear interference of the flood, and Defendant's knowledge that the condition had been rendered impracticable by this intervening act, as well as its previous decision to not "overinsure" him.

860.  IAN SIEMPLENSKI reached his policy limits instantly.  Defendant STATE FARM then classified as many items as it could as part of the dwelling, as those limits had been reached.  The gamesmanship was apparent to Mr. SIEMPLENSKI in the way it approached the

issue – another thing he saw as disingenuous. Plaintiff calculates that he lost about a million dollars with his dwelling and personal property combined, not to mention the two years of agony and stress in fighting with STATE FARM simply to get them to cover what he requested they cover before the fire, or what he later saw in the policy. Mr. SIEMPLENSKI was told by his agent that his snowmobile and many of other items would be covered, so long as they were on his property, nevertheless, STATE FARM has covered none of those items.

861. IAN SIEMPLENSKI provided a contents listing to Defendant STATE FARM in January of 2013. Defendant kept returning different items from the list for price verification, and has delayed to the end of the two-year limit, and as of the filing, Plaintiff is still being asked to verify prices that were submitted to Defendant STATE FARM in January 2013. Mr. SIEMPLENSKI will not be able to replace much of his personal property, and is running out of money for reconstruction of the dwelling. He believes STATE FARM's adjuster wasted about ten months claiming he did not know that one could put "sticky notes" into a PDF that the adjuster told Plaintiff to use. The constant dragging of feet and making of excuses was beyond pretextual, and it was apparent that the adjusters seek or think up any reason to delay what would be readily apparent to the ordinary person.

862. Defendant STATE FARM has refused to pay most of Plaintiff IAN SIEMPLENSKI's additional living expenses, which the policy says is out of pocket. The additional mileage has been classified as the rebuild process but yet nowhere in the claim or their statement of loss does Plaintiff IAN SIEMPLENSKI find where Defendant STATE FARM covers the additional mileage that put on a vehicle due to a loss. The bills that Plaintiff IAN SIEMPLENSKI has submitted to Defendant STATE FARM have been rejected because he did not "have a historical record," something due to his files burning in the fire – and a

standard that appeared as an unreasonable standard of automatic disbelief, particularly in regard to a fire policy where all that one has is lost.

863.   The standard was so self-serving, that it was apparent STATE FARM would do anything it could, as an adversary constantly playing devil's advocate, unless Mr. SIEMPLENSKI had enough "proof" to make it almost impossible for its adjusters to persist.

PREDICATE ACTS RELATED TO PLAINTIFFS
TOMMY MEYER & NICOLE WRIGHT-MEYER

864.   Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

865.   Plaintiffs TOMMY MEYER and NICOLE WRIGHT-MEYER (the MEYERS) first purchased their farmowners policy of insurance with Defendant Nationwide Mutual Insurance Company (NATIONWIDE) on or about August 3, 2009. Their agent was Eric Ehrlich, of Renaissance Insurance Group, 101 East Main St., Windsor, Colorado 80550.

866.   Upon information and belief, and at all relevant times herein, Defendant NATIONWIDE, and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

867.   The MEYERS remember that their agent came to their house and compared their American Family Insurance policy with that of Nationwide Agribusiness, as far as what the two offered for a similar price. The MEYERS and their agent discussed coverage if the livestock got out on the highway, the cost of insuring the outbuildings, the coverage of household items and home coverage. They also talked about general liability insurance and umbrella policies. Plaintiffs also remember something to the effect of the agent trying to sell them life insurance. There was no mention, however, that the policy in question didn't cover

against flood and water-related damages, or of flood insurance, either.  It was never offered, mentioned or discussed. The MEYERS had used the agent before, and as the agent was previously with them at American Family Insurance, they trusted his knowledge and judgment. The exclusions in the policy were also not covered.

868.    The MEYERS do not have any memory of being presented a policy, seriously doubting that it was ever presented in the sale. The MEYERS do know that they never had a full policy to review before their purchase, and only received the policy after payment, though Mr. Ehrlich showed them a notebook with laminated coverage options containing vague descriptions of some of features.

869.    The MEYERS recall asking their agent to review insurance coverages with them at the initial purchase of policy in 2009, and they renewed annually thereafter.  Their agent came back for an update in or around June of 2011, and for a review of the insurance coverage.

870.    Plaintiffs receive a letter every year to make an appointment to review the policy each year, and the most current letter appears to have come from Nationwide directly, and not a specific agent.  There was no mention of flood insurance on the most recent update.

871.    The MEYERS suffered their loss on September 13, 2013, sometime during the night, and became aware of the damage on the morning of September 14, 2013.  It was obvious from looking at the property that the water had weakened the land underneath the house, and the land had disappeared below it, leaving no foundation. Five buildings were destroyed that day.

872.    On or about September 14, 2013, the MEYERS left a message on their agent's cellular telephone about the damage to their home, after TOMMY MEYER was able to get to

the property and see the damage. Their agent called back on or about Monday, September 16, 2013, and was informed of the damage. The agent submitted the claim but stated that things would probably not be covered due to the flood, and stated that they did not have flood insurance. The agent put together a packet for the Plaintiffs to pick up relating to the policy, but it was just the declarations page and did not provide a reprint of the policy, nor did it provide resources for flood victims.

873. The week after the flood, the adjuster, Melissa Stidd, contacted TOMMY MEYER to set up an appointment to visit the property. When she arrived, she spent about two hours looking over the damaged property.

874. When the adjuster arrived on the site for inspection, TOMMY MEYER spent time with the Nationwide on the property for over two hours looking at the damaged property.

875. Two to three weeks later Plaintiffs received the initial denial of flood damage. The property adjustor for Defendant Nationwide had made statements that the company does not cover floods. After her visit, the MEYERs continued to communicate via electronic mail with Melissa Stidd. The initial response from Nationwide was a flat denial, stating the home was damaged in a flood, and that there would not be any coverage except for wind damage to the garage that was left standing, with a check value of $298.96 on October 6, 2013. The response was conclusory, and it did not seem that any thought had been put into the fact that the land had simply disappeared from under the home. The damage to the home had happened during the floods, and even though it wasn't flooding that directly harmed the home, in that there was no flood damage to it, NATIONWIDE used that as their reason for denying coverage.

876.    The MEYERS called their agent again to ask about coverage for the subsidence of the land a few weeks post-flood. TOMMY MEYER and NICOLE WRIGHT-MEYER have not heard from the agent since.

877.    At the beginning of November of 2013, the MEYERS called Nationwide to get a certified copy of their policy.  When they called, those at NATIONWIDE acted as if they did not know what a certified copy was, which seemed strange.  The MEYERS called back and tried again.  The MEYERS did talk to the adjuster, however, and she admitted that the only full room left of the house did not get wet.

878.    At the end of December, the MEYERS sent a letter the adjustor, Melissa Stidd, stating that the house had not flooded, and indicating that room that was not destroyed in the subsistence of the land did not have any water damage or water in the room, as the house was destroyed by the land subsisting out from under it.  The response from Nationwide was that the land was damaged by flood, and that no coverage was therefore available for the loss.

879.    Thereafter, the adjustor would not return any of the MEYERS' telephone calls.

880.    They received a copy of their policy around the first week of December of 2013. On the very front of the policy sent to them, a large bold-printed page stated that the policy did not cover any flood damage. They found this strange, and knew that that disclaimer had not been on the front of their original policy.

881.    The MEYERS requested a second review in January of 2014, as they had not received any reasons for why NATIONWIDE stood by the conclusion that flooding was the damage to their loosing their home. In the letter, the MEYERS asked for NATIONWIDE's reasons that it was flooding, and not the land giving way below the house that caused the damage. Nationwide responded in February of 2014.

882.    In that response, NATIONWIDE admitted that at the inspection of the property, it was evident that part of the ground beneath the house and the milk barn had moved. There were large sections of the ground that were missing from beneath these two buildings as well as the entire area between your house and the road, which was also gone.

883.    Nationwide, however, stated that the floodwater had eroded at the soil and carried it away. The letter contained a large portion of the policy, and ended with an exclusion concerning Earth Movement.  The letter said that the policy exclusion for Earth Movement would exclude coverage for any damage caused by the movement of the soil under their dwelling.

884.    When they purchased the policy, this exclusion had not been mentioned. Nonetheless, the exclusion stated that sinkholes were covered.  When they turned to that portion of the policy, it seemed that what happened to their property had more in common with the sinkhole description than with the exclusion the adjuster mentioned.  They could tell, however, that the adjuster had no plans of listening, as she had previously been avoiding them, as did the agent.  It was obvious to them, however, that there was nothing they could say to convince their insurer to cover their losses, as the insurer had sown an attitude and disposition to look for any reason to deny.  The process seemed hopeless and unfair, as there was obviously not anyone neutral to appeal to in NATIONWIDE's in-house claims department.

885.    In regard to the aforementioned Earth Movement exclusion and Sinkhole Collapse provision, they are included for reference:

a.    The Earth Movement exclusion stated: "Any earth movement (other than sinkhole collapse), such as earthquake, landslide, mine subsidence or earth sinking, rising or

shifting. This exclusion applies whether the earth movement is caused by human or animal forces or any act of nature."

b.    "Sinkhole Collapse, meaning loss or damage caused by the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include: 1) The cost of filling sinkholes; or 2) Sinking or collapse of land into manmade underground cavities."

886.    The MEYERS were not in a flood plain, nor on riverfront.  Their property of Plaintiffs is located one mile east of the river and on a hill.  What remains is a cliff where there house used to be, with nothing underneath it where there house used to be.

887.    Plaintiff TOMMY MEYER and NICOLE WRIGHT-MEYER allege that there is both dolomite and limestone in the land below their home, and that it was the effect of the water that caused the sudden subsistence, sinking and disappearance of their foundation into an empty space below where there home used to be.

PREDICATE ACTS RELATING TO PLAINTIFFS
SUEHAM KAY HOFFMAN, LAILA SAEDA URBAN,
AND THE ESTATE OF DOROTHY WOOD HAMMER

888.    Plaintiffs incorporate by reference the allegations contained in the Complaint, *supra*, as if repeated here.

889.    Upon information and belief, and at all relevant times herein, Defendant United Fire & Casualty Company (UNITED FIRE), and its employees, acted in conformity with enterprise standards, "best practices," and with the ACORD standards and best practices.

890.    On or about August 21, 2008, the now decedent Testator of the ESTATE, DOROTHY WOOD HAMMER, then living, and UNITED FIRE entered into a contract to

provide insurance by the acceptance of the application for insurance (the "Application") by UNITED FIRE.

891.    Upon information and belief, UNITED FIRE considers the Application on offer.

892.    UNITED FIRE accepted an offer from DOROTHY WOOD HAMMER containing the terms expressed in the Application.

893.    By its acceptance of the Application, UNITED FIRE formed an agreement with the insured.

894.    By its acceptance of the Application, UNITED FIRE formed an agreement that included all the necessary terms to form a valid insurance contract.

895.    Upon information and belief, and at all pertinent times herein, UNITED FIRE has a practice of creating contracts with its insureds by the acceptance of insurance applications submitted by its insureds.

896.    The contract formed between UNITED FIRE and DOROTHY WOOD HAMMER at the time of the acceptance of the Application (the "Agreement") included, as part of its terms, an agreement that the insured's "building" would be insured against losses at the stated amount.

897.    Upon information and belief, Defendants' applications serve as a memorialization of agreements reached between agents and insureds as to the rates to be charged, the value of property and the policy limits.

898.    The terms of the Agreement reached by the agent and DOROTHY WOOD HAMMER were included in the Application and accepted by UNITED FIRE.

899.     The insurance policy issued after the acceptance of the Application (the "Policy") was not provided to the insured, DOROTHY WOOD HAMMER, until after an agreement was entered with UNITED FIRE.

900.     UNITED FIRE had informed DOROTHY WOOD HAMMER that it would not insure her for less than $240,000.

901.     Upon information and belief, it is the standard practice of UNITED FIRE to not present a policy to an insured until after an agreement has been entered.

902.     The terms of the Agreement and the Application were thereafter included and incorporated into the Policy.

903.     Upon information and belief, the procedures that an agent must follow in preparing an application were developed in part by UNITED FIRE.

904.     Upon information and belief, UNITED FIRE assisted in the preparation of the procedures, policies and other requirements that an agent must follow in preparing an application for insurance to UNITED FIRE.

905.     Upon information and belief, according to standards to which UNITED FIRE subscribes, its form of the Application requires training, instruction and expertise to be properly used by an agent.

906.     Upon information and belief, the aforementioned required training and instruction is not provided to insureds in UNITED FIRE's usual practice of selling insurance.

907.     It is not a usual business practice of UNITED FIRE to present the instructions to the application forms it uses to an insured at the time an insured applies for insurance.

908.    As a usual business practice, UNITED FIRE does not disclose to insureds, at the time of an application, a list of the meaning(s) that it gives the terms "Actual Cash Value" and "Depreciation" at the time of a claim.

909.    As part of their training, the agents that UNITED FIRE uses to sell insurance are given a script for what should be communicated in the sale of insurance.

910.    As part of their training, the agents that UNITED FIRE uses to sell insurance are given model examples of what should be communicated in the sale of insurance.

911.    With regard to the terms stated in the "Property Section" of the Application, by means of columns and rows, the Application associates an amount of insurance of $240,000.00 with a "valuation" of Actual Cash Value ("ACV").

912.    There is no term listed in the "Property Section" of the Application that would preclude equating the amount of insurance of $240,000 with the ACV of the building.

913.    The decedent, DOROTHY WOOD HAMMER, passed away on May 3, 2011.

914.    The Estate of DOROTHY WOOD HAMMER (hereinafter "the ESTATE") was opened on or about May 13, 2011, in the County of Grand, State of Colorado. Her daughters Plaintiff LAILA SAEDA URBAN and Plaintiff SUEHAM KAY HOFFMAN were appointed personal representatives of the ESTATE on or about June 3, 2011.

915.    After the appointment of the personal representatives, the Policy was amended to recognize the ESTATE as the insured, with the mailing address amended to that of SUEHAM KAY HOFFMAN in the State of Colorado, County of Jefferson.

916.    In light of the amendments to the Policy referenced in the preceding paragraph, pertinent correspondence and claims-related dealings were mailed by UNITED FIRE to the

appointed representative, Plaintiff SUEHAM KAY HOFFMAN, in the State of Colorado, County of Jefferson.

917.    On or about February 12, 2012, the property insured under the Policy and Agreement was destroyed by a fire.

918.    Under the terms of the Policy, fire is a covered loss.

919.    The property was subsequently deemed a total loss due to the damage it suffered on February 12, 2012.

920.    The Policy does not contain a definition of the term "Actual Cash Value" or "Depreciation."

921.    On or about February 12, 2012, Plaintiffs notified UNITED FIRE that they were making a claim against the Policy.

922.    On or about February 23, 2012, Tim Thibault, a claim representative of UNITED FIRE sent the ESTATE a blank Property Loss Inventory List.

923.    On or about March 22, 2012, UNITED FIRE sent Plaintiff SUEHAM KAY HOFFMAN a letter explaining that they had hired an appraisal firm that should be out within a week of the letter's writing to complete an appraisal of the property, and therefore requested that Plaintiffs not demolish the building until the appraiser completed the inspection of the property and building.  In the letter, UNITED FIRE stated that they were enclosing a check in the amount of $72.730.00 representing the "undisputed amount of property damage," and that stating that they recognized that they may owe additional dollars once the appraisal was completed.

924.    On or about March 26, 2012, in a letter Plaintiff SUEHAM KAY HOFFMAN sent to UNITED FIRE, the ESTATE asked UNITED FIRE to clarify whether UNITED FIRE was asserting a dispute as to the value of the real property.

925.    On or about April 9, 2012, Plaintiff SUEHAM KAY HOFFMAN sent Tim Thibault the Property Loss Inventory List, advising him to notice the tabs at the bottom, which divided the property into the categories of: (1) Dry Run Liquor; (2) Parshall Store; and (3) DOROTHY WOOD HAMMER'S residence.

926.    On or about April 11, 2012, Tim Thibault e-mailed Plaintiff SUEHAM KAY HOFFMAN a blank Proof of Loss.

927.    The aforementioned blank Proof of Loss form equated Actual Cash Value to "The Full Cost of Repair or Replacement" minus "Applicable Depreciation."

928.    It was only after the ESTATE made the insurance claim that is the subject of this case that the ESTATE was presented with materials equating "Actual Cash Value" to "The Full Cost of Repair or Replacement" minus "Applicable Depreciation."

929.    Upon information and belief, and at all times herein pertinent, it was a standard practice of UNITED FIRE to define "Actual Cash Value" as "The Full Cost of Repair or Replacement" minus "Applicable Depreciation."

930.    At all times herein pertinent, it was a standard practice of UNITED FIRE to present "Actual Cash Value" as "The Full Cost of Repair or Replacement" minus "Applicable Depreciation" only after a claim has been made on the insurance policy.

931.    On or about April 11, 2012, Tim Thibault also sent an e-mail to the ESTATE, stating that he had not yet had a chance to review the Property Inventory Lists, but that he would do so in the next couple of days.

932.    On or about April 11, 2012, Tim Thibault wrote a letter stating that UNITED FIRE would determine the value of "Covered Property" in the event of loss or damage at actual cash value as of the time of loss or damage.  The letter stated that during the course of the claim UNITED FIRE had realized the building was written on an Actual Cash Value basis and that in order for it to determine what the Actual Cash Value was that it would take additional time. Tim Thibault stated that UNITED FIRE was having its appraiser, Realty Advisors, provide an Appraisal Report to help determine the value of the building that was destroyed by the fire, and hoped to have the report by the April 13, 2012. UNITED FIRE brought to the attention of the ESTATE certain vacancy provisions of the Policy, and that it would be reducing the amount it would otherwise pay for the loss or damage by 15%. Tim Thibault wrote that if the ESTATE disagreed with any value determination of the property after appraisal was received, that the ESTATE could seek appraisal. Tim Thibault also stated that if there was an appraisal, that UNITED FIRE would retain its right to deny the claim. UNITED FIRE advised the ESTATE that the amount paid or charged for the insurance premium was an issue that needed to be discussed with the insurance agent. The letter also stated that the claims department of UNITED FIRE does not set premiums and does not get involved with how an agent sets the rates that are charged. UNITED FIRE also stated that the claims department merely follows what the policy provides as it is written by the agent and that the claims department has no control over any agreements the insured reached with the agent.

933.    Upon information and belief, it is the position of UNITED FIRE that its claims department could not provide the ESTATE with the original application, quote, and declarations page of an insured's policy.

934.     Upon information and belief, it is the position of UNITED FIRE that its agents reach agreements as to policy limits and the value of property with its insureds in the application process.

935.     In the same letter, dated April 11, 2012, UNITED FIRE stated that they recognized having a claim to be "a trying issue for anyone."

936.     On or about April 25, 2012, Tim Thibault wrote a letter to the ESTATE stating that the appraisal from Realty Advisors (the "Appraisal") came in with a value for the property of $181,000.00, and that such was a valuation that included the value of the land, which was appraised at $46,000.00.  He informed the ESTATE that the land is not covered by the Policy and is therefore to be subtracted from the appraised value.  In the same April 25, 2012 letter, Tim Thibault informed the ESTATE that the deductible of $1,000.00 would also be subtracted from the appraised value and that the previously–mentioned Vacancy Penalty of 15% would be applied, subtracting $20,100.00 as well from the amount of the appraised value.  He also informed the ESTATE that the UNITED FIRE'S "final" actual cash value determination for the real property in question as $113,900.00. UNITED FIRE figured that the aforementioned $72,730.00 that was previously paid as an advance would lower the previously-referenced $113,900.00 to a total amount due on the real property in question of $41,170.00. UNITED FIRE determined the final payment as follows: Actual Cash Value of the building as $41,170.00; a debris removal payment of $23,200.00; a temporary fence payment of $3.403.00, for a total final payment proposed by UNITED FIRE of $67,773.00.

937.     On or about April 25, 2012, in the aforementioned letter of UNITED FIRE to the ESTATE, UNITED FIRE presented the ESTATE with a document purported to be a Proof of Loss.

938. Neither of the UNITED FIRE Defendants had previously communicated to the insureds, to DOROTHY WOOD HAMMER or to the ESTATE, or to any of the Plaintiffs, that the value of the land would be subtracted from "Actual Cash Value."

939. The Policy does not state that the value of land will be subtracted in a determination of Actual Cash Value.

940. The purported Proof of Loss was also a settlement and subrogation agreement based on the values listed in the Appraisal.

941. The Appraisal did not reference or account for documents and information that were provided to UNITED FIRE concerning repairs, renovations, and information regarding the square footage of the covered property.

942. The aforementioned settlement and subrogation agreement did not include a valuation based on the correct square footage of the covered real property.

943. Information regarding square footage was also included in the Application.

944. UNITED FIRE did not provide realty Advisors with the aforementioned documents and information concerning recent repairs, renovations, and information regarding the square footage for the covered property.

945. The aforementioned appraisal of Realty Advisors did not reference or account for the documents and information that were provided to UNITED FIRE concerning recent repairs, renovations, and information regarding the square footage for the covered property. It also did not include the correct square footage of the covered real property, and Realty Advisors did not contact the ESTATE, or any of its representatives, to gather information in the process of conducting the aforementioned appraisal.

946.    At all times herein pertinent, and upon information and belief, UNITED FIRE provided Realty Advisors with information and parameters for conducting the Appraisal.

947.    The previously referenced settlement and subrogation agreement, and its accompanying letter, contained no reference to the ESTATE'S contents claim.

948.    The previously referenced settlement and subrogation agreement is a standard form used by UNITED FIRE.

949.    UNITED FIRE also has a different standard form "Proof of Loss" that is not a settlement and subrogation agreement.

950.    By submitting the settlement and subrogation agreement to the ESTATE, UNITED FIRE took a course of action seeking to have the ESTATE settle.

951.    If the ESTATE would have signed the aforementioned settlement and subrogation agreement, provided as a Proof of Loss, the ESTATE would have settled its claim for less than the full amount it was rightfully due.

952.    On or about May 17, 2012, the ESTATE contacted Becky Beeson of Town & Country Insurance, the agency, asking for any original appraisal that would have accompanied the Application and asking for the contents of the insured's entire file on record at the agency.

953.    Thereafter, on Friday, May 18, 2012, Beaky Beeson notified the ESTATE that there was no cost estimator on file and that her conclusion as to there being no cost estimator was that the property was written on an actual cash value basis, as opposed to a replacement cost basis.  She also informed the ESTATE and that the limit of coverage was discussed and agreed upon by the DOROTHY WOOD HAMMER and the writing agent.

954.    On or about May 21, 2012, Becky Beeson wrote the ESTATE stating that an applicant's information, including building information such as year built, updates, and square

footage are gathered in the underwriting process. Becky Beeson also stated that DOROTHY WOOD HAMMER and Duane Scholl, the writing agent, discussed and mutually agreed that the building property would be written on an Actual Cash Value/Market Value basis and that Dorothy Hammer and Duane Scholl mutually agreed to place the property values at $240,000.00 on the building and $35,000.00 on the contents. She also stated that the aforementioned discussion and mutual agreement was evidenced on the policy application.

955.   Upon information and belief, the definitions, procedures and practices of UNITED FIRE relayed by Becky Beeson to the ESTATE in the aforementioned communications were part of the standards and business practices used by UNITED FIRE at the time of the Application.

956.   On or about May 25, 2012, the ESTATE sent an e-mail Becky Beeson stating that her last e-mail was the first time that the Plaintiffs had heard from her office of actual cash value being equated with market value, and that the Policy appeared to define actual cash value as "full replacement cost" minus "applicable depreciation." The ESTATE stated that the reason it had asked about actual cash value and replacement cost was because those acting on its behalf found it irregular that she had interjected those terms after the ESTATE had simply requested the original appraisal and file.  The ESTATE also stated that it appeared UNITED FIRE had been in communication with Becky Beeson, and asked her to let them know, if that were the case. In this regard, the ESTATE asked that if Becky Beeson was indeed acting as the ESTATE'S agent, that she please let the ESTATE know the dates of all communications she had with UNITED FIRE from February 12, 2012 until the time of the request, and that she also let it know everything that had been discussed with UNITED FIRE in those communications, as she was apparently the ESTATE'S agent.  The ESTATE also asked that

Becky Beeson approve all future communications relating to its file, the property, or those acting on its behalf, before communicating anything with UNITED FIRE, as it found it necessary to take steps to avoid UNITED FIRE invading the agency relationship or pressuring the agent. The ESTATE concluded the e-mail of May 25, 2012 with a request that the Becky Beeson let it know if UNITED FIRE had been pressuring her in any way.

957.    On or about May 25, 2012, the ESTATE sent UNITED FIRE a letter in which it informed UNITED FIRE of the incorrect square footage. The ESTATE also asked that UNITED FIRE indicate if it would be standing by the figures in the appraisal despite the noted problem or if it would instead instruct the appraiser to enter the correct figure for square footage.  The ESTATE also noted that there was no inclusion of the fact that many features of the property had been upgraded and renovated. The ESTATE noted that the omission affected the calculation significantly.  The ESTATE asked that UNITED FIRE to explain why no effort was made on its part to include the renovations and that UNITED FIRE state if it would be standing by the figures in the appraisal now that was made knowledgeable of the problem. The ESTATE noted that the Proof of Loss that UNITED FIRE had asked it to sign used the wrong definition of "actual cash value" because the forms it had been provided after the claim indicated that the Policy stated "actual cash value" to be "full replacement cost" minus "applicable depreciation."  The ESTATE noted that it was improper to use an appraiser to define terms a contract. The letter noted that UNITED FIRE'S appraisal never looked into the "full replacement cost" but instead used only an estimate, as opposed to a bid in the region.  The ESTATE also requested that UNITED FIRE provide a more realistic basis for construction costs than an estimate.

958. Upon information and belief, UNITED FIRE is aware that in a significant number of cases of total loss, insureds are unable to fully rebuild on the estimates they seek through appraisers.

959. Upon information and belief, UNITED FIRE is privy to actuarial calculations indicating that more homes will be rebuilt if full bids are used instead of estimators.

960. In the May 25, 2012 letter, the ESTATE pointed out that the Policy specifically defines the term "vacancy," and that according to the either of the two meanings listed, the property was not vacant. (the ESTATE referenced Section 6.a. of the Policy). The ESTATE stated also that Tim Thibault's April 11, 2012 letter contained an unreasonable answer to the ESTATE'S question of how UNITED FIRE could use one valuation of the property for setting the Policy and a different appraisal or method for determining how much UNITED FIRE will pay on the Policy. The ESTATE asked UNITED FIRE to explain to why UNITED FIRE it was using different "avenues" from those employed in setting the agreement to determine how much it was obliged to pay at the claim stage. The letter pointed out that UNITED FIRE apparently had no steps in place to "subtract" the value of the land from the property at its initial valuation, at the writing of the policy, but that it made a significant effort to ensure that the land was subtracted the value of land in the claims process. The ESTATE asked that UNITED FIRE inform it of what procedures it had in place to make sure that the value of the land is subtracted at the initial valuation in the application process.

961. Upon information and belief, UNITED FIRE knowingly uses forms, practices and procedures that include the value of land in the writing of a policy, but that subtract it at the claims stage.

962.    Upon information and belief, prior to insuring DOROTHY WOOD HAMMER, UNITED FIRE had been notified by insureds that they were surprised by the subtraction of land from the value determinations of their real property in a claim.

963.    A provision subtracting the value of land from a valuation of real estate is a material term.

964.    On or about May 30, 2012, Becky Beeson wrote an e-mail to the ESTATE in which she expressed respect for their position in being faced with working through the hardship and frustration of the February 12, 2012 fire loss. In her e-mail, Becky Beeson stated that she had earnestly answered the ESTATE'S questions and provided the requested information in order to provide an overview of how the property came to be written on an Actual Cash Value basis, and also giving a general explanation of Actual Cash Value. Becky Beeson stated that she was forwarding a copy of the Loss Notice, Acknowledgement of Claim, and agency copies of the UNITED FIRE correspondence dated March 22, 2012 and April 11, 2012.  She concluded by stating that it was not involved in any of the specific claim process, which she identified as participating or guiding UNITED FIRE'S "coverage interpretation and/or claim settlement," and that she respected the ESTATE'S request that any future discussion of the claim situation remain between UNITED FIRE and the ESTATE.

965.    In her May 30, 2012 e-mail, Becky Beeson never answered the question of whether UNITED FIRE had pressured her in any way or attempted to contact her.

966.    Plaintiff SUEHAM KAY HOFFMAN and her husband both sensed that the silence in response to the ESTATE'S questions regarding to pressure and questioning as odd.

967.    Upon information and belief, UNITED FIRE has had taken part in a framework of using incentives, restrictions, standards and/or penalties to bring agents into conformity with a course of conduct that serves its ends the formation stage of a policy.

968.    Upon information and belief, UNITED FIRE is aware that the incentives, restrictions, standards, and penalties that it uses to bring agents into conformity with a course of conduct that serve its ends at both the formation stage of a policy prejudice the duties an agent owes the insured as a principal.

969.    At all pertinent times herein, and upon information and belief, UNITED FIRE has been aware that conflicts and potential conflicts in the agency relationship between its agents and insureds arise due to requirements that it places on its agents through involvement in a shared enterprise and/or by means of contracts.

970.    The aforementioned conflicts of interest between UNITED FIRE and its insureds regarding the agency relationship are not disclosed to insureds in the framework it uses to sell insurance.

971.    Upon information and belief, UNITED FIRE has adopted a framework of business that contractually obliges agents to an enterprise it takes part in while still requiring them to hold themselves out in commerce as agents of the insured.


972.    On or about June 8, 2012, the ESTATE submitted its Proof of Loss to UNITED FIRE along with a letter describing some of the calculations used in the Proof of Loss. The ESTATE stated that the Application included a 4% inflation guard associated with the building.  The ESTATE noted that a certain Section G of the Policy provides that the amount associated with that percentage will increase automatically each year by that percentage and

pointed out that after 3 years, the amount of insurance coverage after the application of the inflation guard would be about $269,967.00, and after 4 years, would be about $280,765.00. It also noted that added to that amount of coverage would be an amount of coverage for "debris removal," which it noted as an additional $10,000.00 of coverage, distinguished from "pollutant clean up and removal," which added another $10,000.00 of coverage. The ESTATE also noted that the actual cash value of the property would exceed the aforementioned $280,765.00 figure for dwelling coverage as modified by the 4% inflation guard, the ESTATE expressed that all costs to it that could be treated as debris removal or pollutant removal should be covered by those parts of the policy, noting a likelihood that the costs associated with clean up, fencing, etc., would likely come out to $25,000.00 by the end of the process. The ESTATE also noted the "extra expense coverage," and added that such coverage should apply to any cleanup and removal not covered by the other provisions. The ESTATE estimated that by the time it was done, it would devote about 320 hours or so to dealing with the aftermath of the fire, and listed half that number on the Proof of Loss form at the minimum wage of $7.64, for a total $1,222.00. The ESTATE also noted business personal property coverage at $39,500.00.

973.    Taking the above-listed figures into account, the ESTATE'S Proof of Loss, accompanying the aforementioned June 8, 2012 letter, included the following information: Full amount of insurance, at $360,265.00; Full Replacement Cost of the building at the time of loss, at $616, 216.00; the Full Cost of Repair or Replacement (including all things lost), at $687, 438.00; Applicable Depreciation as $59,000.00 (at the most); The Actual Cash Value loss of $628,438.00 (cited as "Full Cost of Repair or Replacement" *minus* "Applicable Depreciation"); less the Deductible, at $1,000.00; for an Actual Cash Value Claim amount of $627,438.00.

974.    On or about June 18, 2012, and in response to the ESTATE'S letters dated May 25, 2012 and June 8, 2012, Tim Thibault wrote a letter to the ESTATE asking it to provide information of square footage and expressing that UNITED FIRE was unaware of any renovations or upgrades. Tim Thibault asked that the ESTATE provide any documentation it had in that regarding upgrades so that UNITED FIRE could make a decision about whether the renovations would affect the value of the property.  In regard to Actual Cash Value, the June 18, 2012 letter stated that the appraiser was not defining any of the terms, but that it was instead UNITED FIRE'S contention that the appraised value of the property would be the "Actual Cash Value" of the property. In regard to the vacancy issue, the June 18, 2012 letter stated that UNITED FIRE would be standing by its application of the Vacancy Provision in applying the 15% reduction and stated that "it was not aware" the ESTATE was conducting customary for the 60 days prior to the loss. The letter also stated that the policy value was determined by the agent and the insured at the time that the policy was written. It stated that UNITED FIRE looks at the value of the building at the time of the loss to and has no control over the amount of the policy limits that were selected by the agent and the insured. The aforementioned letter of June 18, 2012 also stated that the value of the building does not include the value of the land and that the value of the land should not have been included in the policy limits at the time that the policy was written. (This was stated despite the fact the UNITED FIRE had stated that it would not insure the property for less than $240,000) UNITED FIRE'S response as to the "inflation guard" was that the ESTATE did not have "Inflation Guard" as part of its coverage, despite it appearing in both the Application and Declarations.  The letter stated "inflation guard" coverage was "optional," and that it is never part of an Actual Cash Value policy. UNITED FIRE also stated that the Extra Expense

Coverage addressed by the ESTATE only applies to lost business income. The letter also stated that UNITED FIRE was in possession of the ESTATE'S Property Inventory Lists.

975.    In response to UNITED FIRE'S June 18, 2012 letter, the ESTATE sent Tim Thibault a July 9, 2012 letter stating that there were important issues that should be addressed and corrected before proceeding. The ESTATE asked to be notified of when the appraiser would be done with addressing the issue of square footage. The ESTATE pointed out that it discussed the upgrades with UNITED FIRE before the appraisal and had also sent a McMillan Claim Service document dealing with updates the property experienced in 2008.  The ESTATE also pointed out that the portion of the Policy cited in Tim Thibault's letter states that UNITED FIRE must make its determination in accordance with "the Valuation Condition in the coverage form." And noted that Actual Cash Value was typically defined by UNITED FIRE as "Full Replacement Cost minus Applicable Depreciation" and that the appraiser should have conducted an appraisal calculated to determine "Full Replacement Cost" minus "Applicable Depreciation." In its July 9, 2012 letter, the ESTATE also noted that the interpretation of the policy language provided, where UNITED FIRE could substitute a number of options for the meaning of the term "actual cash value," simply made no sense in the English language.

976.    By standing by the appraisal in the circumstances referenced above, UNITED FIRE'S actions raised an inference of tampering with the appraisal process by not addressing shortcomings requiring attention.

977.    In response to Plaintiffs' aforementioned July 9, 2012 letter, UNITED FIRE responded with a letter on or about July 26, 2012. UNITED FIRE'S July 26, 2012 letter did not address the issues raised in Plaintiffs' July 9, 2012 letter, but instead, simply ignored some

points, stated that it would continue its course, and asked for "more documentation," even on maters that were not of the kind where documentation would solve the disagreement. The letter also provided no guidance as to what kind of "documentation" UNITED FIRE would accept.

978.    UNITED FIRE was asked pertinent questions as to coverage, and questions that, if answered, would have addressed the reasonableness of UNITED FIRE'S refusal.

979.    By not answering those questions, and by otherwise avoiding issues of coverage, UNITED FIRE acted unreasonably.

980.    In correspondence that followed between the Plaintiffs and UNITED FIRE, UNITED FIRE stood by the positions it had previously taken in the claims process and in it July 9 letter.

981.    Despite being notified, as referenced in the preceding paragraph, UNITED FIRE refused to honor the reasonable requests of the Plaintiffs as to coverage, wherein UNITED FIRE unreasonably refused to cooperate on the claim.

982.    During the course of the claim, UNITED FIRE was also presented with lists of Plaintiffs' personal property claim items and although it knew of the existence of certain contents presented, it failed to compensate Plaintiffs for said contents despite being notified, and remained silent when asked pertinent questions on the matters complained of.

983.    On April 14, 2014, the Plaintiffs brought suit in the Denver District Court on related claims of bad faith, violation of the Colorado Consumer Protection Act, and breach of contract. Case No.: 2014CV31527.

984.    It was while working on that case that Plaintiffs counsel discovered the relationship between Defendant UNITED FIRE and Defendant Insurance Services Office, Inc.

(ISO), which led to discovering the relationship with Defendant ACORD CORPORATION (ACORD) leading to this conspiracy action.

### VI. THE PREDICATE ACTS AMOUNT TO, OR OTHERWISE CONSTITUTE, A THREAT OF CONTINUING RACKETEERING ACTIVITY

985.    In regard to all of the previously referenced standards for the enterprise that ACORD participates in, all such practices, standards, "best practices" approaches or mechanisms occur with such frequency to be a standard practice of the participants.  Their nature, expanse, severity, repetition and the fact that they have become institutionalized across an entire segment of the market, demonstrates that the treat of  racketeering activity stated, supra, is continuing and serious.

## CLASS ACTION ALLEGATIONS

### I. AS TO THE CLASS OF PLAINTIFFS

986.    This action is brought by Plaintiffs as a class action, on their own behalf and on behalf of all others similarly situated, under the provisions of Rules 23(a) and subdivisions (1)(A), (1)(B), (2) and (3) of Rule 23(b) of the Federal Rules of Civil Procedure, for relief sought in connection with schemes used by Defendants and co-conspirators to defraud Plaintiffs by use of mail, curriers and wires, in violation of 18 U.S.C. §§ 1341 and 1343, along with all foreseeable harms caused by a complex and intricate conspiracy to use a legitimate enterprise to that effect while also committing Colorado state common law torts and other offenses and violations of law, listed with more particularity in the different claims for relief stated below, each of which constitutes a corresponding subclass, and doing so in other jurisdictions as well (where the alleged acts are actionable on common law or other state law having the same or overlapping elements).  These alleged acts and conspiracy are all in violation of 18 U.S.C. §

1962 (a),(b),(c) and (d), as well as 15 U.S.C. §§ 1-7, as the acts, omissions and related conspiracy have restrained trade to the detriment of the People of the United States and also restrain foreign trade.

## II. CHARACTERISTICS OF THE CLASS AND ASSOCIATED SUBCLASSES

987.     The class so represented by Plaintiffs in this action, and of which Plaintiffs are themselves members, consists of a class of all other similarly situated individuals, corporations, partnerships, associations and other entities who otherwise fit within the class definition, set forth more fully in the following paragraph of this Complaint, *infra*, who are and/or were during the Class Period defined in paragraphs 991 and 992, *infra*, insured under a property and casualty policy of insurance, or otherwise a homeowners insurance policy, underwritten by one of the Defendants or a member of the Defendant Class, and who were caused foreseeable and proximate damages by the aforementioned conspiracy to defraud Plaintiffs by use of mail, curriers and wires, or by the frauds themselves, with subclasses also arising under Colorado state common law, in both tort and contract, and under statute – all of which are described more particularly in the Claims for Relief included, *infra* – and under other violations and offenses of the law of all jurisdictions where the acts and omissions alleged herein have taken place and where elements and facts, causing damage, are actionable under theories corresponding to those stated in the body of this Complaint, giving notice to the Defendants in the facts pled. (In this regard, it is prayed of the Court that it take judicial notice – and Defendants are thus given corresponding notice – in this pleading, of the law of all other state, commonwealth and territorial jurisdictions that can be applied to the facts and elements stated herein, and under corresponding or analogous theories of law satisfied by the words used in

this Complaint but as applied in those jurisdictions, by the power of this Court as a court of the United States under the jurisdictional grounds asserted with particularity, *supra*.)

988.    Said Plaintiff Class represented by the putative class representatives and nominal Plaintiffs bringing this action is hereby defined as follows:

a.    All individual persons, corporations, partnerships, associations and other entities insured during the Class Period under a property and casualty policy of insurance and/or a homeowners insurance policy underwritten by an insurer who is a member Defendant Class, as aforesaid in paragraph 987, *supra*, who by means of the acts and omissions alleged above and stated with particularity, *supra*, were caused any foreseeable and proximate damage to their property, or who have been harmed in a way entitling them to bring any cause of action stated with more particularity in the Claims for Relief, *infra*, in any jurisdiction where such putative class member was injured by any of the acts and omissions alleged in this Complaint, and where corresponding claims for relief are afforded to them by the courts of that jurisdiction, including, but not limited to any such persons, corporations, partnerships, associations and other entities that: (1) insured one or more properties on an Actual Cash Value basis with a "Stated Amount" that was higher than the underwritten calculation of ACV; (2) insured one or more properties on a Replacement Cost policy where the replacement cost of the policy during the relevant times was greater than the amounts of insurance because of the application of an enterprise standard or "best practice" known to bring about the non-payment of replacement cost by the insurer; (3) were overcharged on their insurance by operation of any act in furtherance of the aforementioned conspiracy, or by means of any of the acts and omissions complained of herein; (4) lost the opportunity to acquire

adequate insurance to return them to the complete economic position they were in before a loss by operation of any act in furtherance of the aforementioned conspiracy, or by means of any of the acts and omissions complained of herein; had an exclusion applied to their insurance claim that by any of the means, acts or omissions listed in this Complaint were denied the opportunity to make an informed choice as to coverage; (6) were insurance exchange or mutual company policyholders who purchased a policy and were injured by the breach of any duty owed to them by the management of a company through the commission of any of the acts and omissions stated herein; or (7) had any prosecution brought against them for insurance fraud by means of any of the acts and omissions stated in this Complaint, or in furtherance of the conspiracy complained of herein. Excluded from the Class are those persons who have lawsuits pending against, or who have settled their claims against, the Defendant Class for the same or similar claims as set forth herein, Members of the state and federal judiciary, Defendants, Defendants' employees, any entities in which Defendants have a controlling interest, and the parents, subsidiaries, affiliates, and their officers and directors of the Defendants and the members of their immediate families.

989.     Greater than two-thirds of the members of the proposed Plaintiff Class and subclasses relating to RICO, federal antitrust, and common law causes of action in other jurisdictions are outside of the State of Colorado and are not citizens of the state of Colorado.

990.     Greater than two-thirds of the members of the proposed Plaintiff subclasses stemming from application of Colorado law are citizens of the state of Colorado.

991.     The Class Period for all the RICO-related and Antitrust-related causes of action is that period of time between when the applicable statutes of limitations would have run if not

plead by June 21, 2014, with applicable tolling for concealment, and the date the Court certifies this Class Action under Rule 23(c)(1).  If the Court is not able to make such a determination, that period of time between June 21, 2010 and the date the Court certifies this Class Action under Rule 23(c)(1).

992.    The Class Period for all common law and state-related causes of action is that period of time between when the applicable statutes of limitations for each jurisdiction would have run if not plead by June 21, 2014 and the date the Court certifies this Class Action under Rule 23(c)(1). To this effect, Plaintiffs request of the Court that it take judicial notice of the law in both Colorado and all of the jurisdictions in the United States, state and federal.

### III. NUMEROSITY

993.    The exact number of members of the Plaintiff Class, as hereinabove identified and described, is not known, but it is estimated that there are not less than seventy thousand (70,000) who have damages stemming from a total loss and that there are not less than eighty million (80,000,000) members with damages related to overcharging and with an alternative claim in equity.  The class is so numerous that joinder of individual members herein is impracticable.

994.    The exact number of members of the Colorado Subclass included in the Plaintiff Class, as hereinabove identified and described, is not known, but it is estimated that there are not less than two thousand (2,000) who have damages stemming from a total loss.  It is estimated that there are not less than three million (3,000,000) members with damages related to overcharging and with claims in equity.  The class is so numerous that joinder of individual members herein is impracticable.

995.    Although the exact number of putative Plaintiff Class members and their

addresses are presently unknown to Plaintiff, they are readily ascertainable from Defendants' records. Class members may readily be notified of the pendency of this action by mail, supplemented (if deemed necessary by the Court) by published or electronic notice, or by any efficient means calculated to provide notice by the law.

### IV. COMMONALITY

996.   There are common questions of law and fact in the action that relate to and affect the rights of each member of the Plaintiff Class and included subclass, as well as to the relief sought, which is common to the entire class, including, without limitation:

a.   Whether the allegations of the Complaint, on their face, state a claim that the network and enterprise that ACORD participates is an "enterprise" as per the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968, particularly 18 U.S.C. § 1962 (a), (b), (c) and (d);

b.   Whether the term Actual Cash Value is a material term of an insurance contract;

c.   Whether the term Actual Cash Value, as used by the enterprise, violates the Uniform Standards of Professional Appraisal Practice (USPAP);

d.   Whether the nondisclosure of material terms constitutes proof of causation for the harms associated with the nondisclosure of material terms;

e.   The meaning, as a matter of law, of the vague and/or indefinite terms in the form insuring contracts and ACORD standard forms used by the enterprise in question;

f.   Whether the form insuring contracts omitted terms necessary to make the meaning of the contracts' stated terms definite and certain;

g. Whether the insuring agreements of enterprise participants are a contracts of adhesion;

h. Whether the standards of the enterprise in question as to the sale of insurance, wherein a policyholder does not receive a policy, until after an agreement is entered creates a stated policy contract in the case of Actual Cash Value policies;

i. The meaning and application as a matter of law of the duty of good faith and fair dealing in the context of interpretation and implementation of the terms and conditions of the standard forms and insuring contracts of the enterprise;

j. Whether Defendants and the Defendant class acted in violation of 18 U.S.C. §§ 1341 and 1343 by commission of the acts or omissions referenced with more particularity, *supra*, or in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968, particularly 18 U.S.C. § 1962 (a), (b), (c) and (d) by same acts and omissions;

k. Whether Defendants and the Defendant Class acted in violation of the Sherman Antitrust Act, 15 U.S.C. § 4 by commission of the acts or omissions referenced with more particularity, *supra*;

l. Whether exclusions, when used in accordance with the standards, procedures and "best practices" of the enterprise, are function as disclaimers, deserving the same legal disfavor;

m. Whether the Defendants and Defendant Class acted in violation of all other laws or duties alleged in the Claims for Relief, *infra*, setting forth subclasses.

997. Common questions of fact exist as to all members of the Plaintiff Class and included subclasses, including without limitation:

a.      Whether the Defendants were involved in a conspiracy to commit the acts and omission complained of in the Complaint;

b.      Whether the acts and omissions of the Defendants and Defendant Class restrained trade;

c.      Whether the Defendants had a scheme to intentionally underinsure Plaintiffs and Plaintiff Class to bring about unpaid claims and forfeiture;

d.      Whether Defendants based the premiums for its coverage upon the "Stated Amount" in regard to Actual Cash Value policies;

e.      Whether Defendants and Defendant Class employed a scheme to defraud the public, and used the mail, curriers or wires to employ said scheme to do so;

f.      Whether the Defendants and Defendant Class used the ACORD framework and standards as a clandestine method of communicating to further a conspiracy;

g.      Whether the Defendants conspired to fraudulently accuse innocent insureds of fraud;

h.      Whether the underwriting and claims adjustment methods implemented by the Defendants resulted in the Plaintiff Class members paying for insurance which was neither provided nor ever intended by Defendant to be provided nor possible to be provided by Defendant under the aforesaid insuring contracts.

i.      Whether the amounts actually paid by or on behalf of the Defendants under the aforesaid insuring contracts for "total loss" were known and intended by the Defendants at the time of underwriting and issuance of the policies to be defined and computed in such a way as to be less than the "Stated Amount," resulting in Defendant

knowingly providing less actual insurance coverage at the time of underwriting and issuance of the policies, and at all times thereafter, than the Plaintiff Class members paid for in their premiums;

j.      Whether those who have been paying for insurance products containing the defects alleged in this Complaint have been overcharged;

k.      Whether the alleged acts and omissions of the Defendants have occurred with such frequency as to be a business practice of the Defendants and the enterprise in question;

l.      Whether Defendants and the Defendant class acted in violation of 18 U.S.C. §§ 1341 and 1343 by commission of the acts or omissions referenced with more particularity, *supra*, or in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968, particularly 18 U.S.C. § 1962 (a), (b), (c) and (d) by same acts and omissions;

m.      Whether Defendants and the Defendant Class acted in violation of the Sherman Antitrust Act, 15 U.S.C. § 4 by commission of the acts or omissions referenced with more particularity, *supra*;

n.      Whether the Defendants and Defendant Class acted in violation of all other laws or duties alleged in the Claims for Relief, *infra*, setting forth subclasses.

## V. TYPICALITY

998.    The claims of Plaintiffs, who are representatives of the Plaintiff Class herein are typical of the claims of the Plaintiff Class and included subclasses, in that the claims of all members of the class, including the named Plaintiffs, depend on a showing of the acts and omissions of the Defendants giving rise to the right of Plaintiffs to the relief sought herein.

There is no conflict as between any individual named Plaintiff and other members of the class with respect to this action, as, among other things, the facts in question are supportive of the claims of the entire Plaintiff class and associated subclasses, or with respect to the claims for relief herein set forth.

999.   Plaintiffs' claims are typical of the claims of the Plaintiff Class because, among other things, Plaintiffs theories of action as hereinafter set forth are the same as the theories of action would be for the Class Members were they to individually pursue their rights and remedies as against the Defendant Class in regard to the claims for relief stated herein. Furthermore, the claims related to the violation of 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 1962 (a),(b),(c) and (d), and 15 U.S.C. §§ 1-7, provide a factual issue and context necessary for determining the reasonableness, duty, foreseeability, proximate cause and equity of the associated state and common law claims for relief, and therefore affect all subclasses arising on Colorado state grounds, causes of action and claims for relief, and the subclasses arising on analogous or corresponding causes of action or claims for relief in other jurisdictions.

## VI. ADEQUACY

1000.  The named Plaintiffs are representative of the Plaintiff Class, and are representative parties for said Plaintiff Class who are dedicated, able to, willing, and will, fairly and adequately protect the interests of the Plaintiff Class. Named Plaintiffs have been active over the past two years in addressing the harms alleged herein through administrative and legislative channels, and were also involved in the discovery of the harms and violations of law alleged herein. Plaintiffs DALE & MARILYN SNYDER, organized meetings between wildfire survivors and government official, legislative and administrative – meetings that ultimately led to the passing of the Colorado Homeowners Insurance Reform Act of 2013, wherein DALE &

MARILYN SNYDER testified numerous times, along with others of the named Plaintiffs. DALE & MARILYN SNYDER have also been active in groups supporting the rebuilding efforts.  Certain counsel from Plaintiffs' Attorney's Office was also invited by the legislators to testify in the hearings on HB 13-1225, which became the Colorado Homeowners Insurance Reform Act of 2013, and has participated in flood mitigation following the fires, assisting with groups involved in the rebuilding efforts, and speaking on the matters of insurance and claims. The attorneys working for Plaintiffs are experienced and capable in the litigation of insurance coverage, have counsel with complex litigation experience in class action litigation, have investigated and discovered the RICO violations alleged herein over the past two years, have successfully represented claimants in other insurance-related and bad faith litigation, have had experience prosecuting criminal acts, and have also had success in class action litigation. Plaintiffs' attorneys also have a network of attorneys providing *of counsel* assistance, well versed, experienced, and successful in complex litigation, particularly class actions.  Said *of counsel* attorneys are assisting Plaintiffs' counsel, and have stated a desire to assist in a greater capacity should the Plaintiffs Class reach certification.  Furthermore, Plaintiffs and Plaintiffs' attorneys are willing to diligently work with any attorneys that the Court may appoint as class counsel to the end that all discovered over the past two years would be put to the use and help of the putative Plaintiff Class in a way that would best serve efficiency and justice.

1001.   Plaintiffs are adequate representatives of the Plaintiff Class, as their interests do not conflict with the interests of the members of the Plaintiff Class they seeks to represent. Furthermore, Plaintiffs have worked diligently to address these harms and wrongs by multiple means and have also retained legal counsel to this end – seeking remedy through the judicial branch of the Government – competent and experienced in insurance-related law, commercial

litigation, bad faith, fraud and the particular facts of the case. Plaintiffs and their attorneys have already put forth significant efforts, work and research, and intend to prosecute this action vigorously for the interests of all of the members of the Plaintiff Class, seeking to fairly and adequately protect those rights as much as possible.  To this end, Plaintiffs have brought an action, tolling the statute of limitations for as many similarly situated individuals and entities as there may be.

## VI. Risk of Inconsistent and/or Varying Adjudications
## Rule 23(b)(1)(A)

1002.   This action is properly maintained as a class action in that the prosecution of separate actions by individual members of the class would create a risk of varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the Defendants herein in regard to the conspiracy in question, which is interstate in nature and violative of federal law.  All such Defendants, upon information are believed to oppose the certification of a Plaintiff Class.

1003.   The prosecution of separate actions by one or more individual members of the Class would create a risk of incompatible standards of conduct for the Defendants in that the interpretation of the meaning and effect of the aforesaid form contract, as affected by any latent ambiguities, or other fact related ambiguities specific to all of the facts affecting the behavior of the conspiracy in question, might vary from one action to another, denying plaintiffs in such cases the whole truth in regard to their claims.

## VII. Practical Impairment of the Interests of Class Members not Present
## Without the Class Action Mechanism
## Rule 23(b)(1)(B)

1004.   The prosecution of separate actions by one or more individual members of the

Plaintiff Class, addressing a multinational and interstate conspiracy against multiple Defendants requiring the interpretation of the vague, ambiguous, and/or indefinite terms of the form insuring contracts would create a risk of adjudications by individual members of the class which would as a practical matter be dispositive of the interests of the other members of the Class who are not parties to those separate adjudications, particularly as the Sherman Act and RICO provide penalties for divestiture and fines that could deplete the ability of Defendants to compensate all harmed if not in a class.

1005.   The Defendants have an adaptable scheme, modular in nature and flexible in the sense that it is alleged to evolve in ways meant to circumvent the laws of the various state jurisdictions.   To be able to treat each of its harms consistently, and in the light of its whole nature, which will assist in uncovering its true qualities, requires looking at the conspiracy and associated enterprise as a whole, and consistently.

1006.   The prosecution of separate actions by one or more individual members of the Plaintiffs Class, requiring interpretation of the vague, ambiguous, and/or indefinite insuring contracts would create a risk of adjudications by individual members of the class which would as a practical matter impair or impede the ability of the absent Class Members to protect their interests, particularly as the classes are so large, of both Defendants and Plaintiffs, that consistent application, without the class mechanism would be highly unlikely.   Furthermore, any failure to account for the facts relating to 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 1962 (a), (b), (c) and (d), and 15 U.S.C. §§ 1-7,would present an inaccurate and unrealistic circumstantial context for any meaning to be given the ambiguous terms.

1007.   The amounts in controversy on individual claims of overcharging are so small as to disable individual Class Members from proceeding with their claims on their own, as the

costs of such individual lawsuits, including the retention of expert witnesses, the conduct of written discovery, the receipt and review of documents, along with the taking of depositions in other jurisdictions, are likely to exceed the amounts of individual recoveries and therefore be prohibitive. Furthermore, any failure to account for the facts brought to light in the total loss cases would deprive such individual claims for overcharging in relation to 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 1962 (a), (b), (c) and (d), and 15 U.S.C. §§ 1-7, of key evidence needed to determine the basis for a claim of overbilling, and would present an inaccurate and unrealistic circumstantial context for such claims for relief.

1008.  Also, evidence needed in the litigation for determining the overcharged class, under federal equity, would be absent without the presence of the plaintiffs experiencing a total loss, whose cases reveal the pattern, and the facts of their cases.

## VIII. THE NEED FOR FINAL INJUNCTIVE AND/OR DECLARATORY RELIEF RULE 23(B)(2)

1009.  The Defendants have acted and/or refused to act, as alleged with more particularity, *supra*, in the aforesaid conspiracy and violations of federal statute, the nondisclosure of material terms in contracts, the fraudulent use of form contract provisions in interlocking standardized systems, and the intentional inclusion of defects and devices in insurance products engineered to deprive the purchaser of the expected benefit, all of which constitute grounds for their acts and inactions being generally applicable to the Plaintiff Class.

1010.  Plaintiff seeks final injunctive relief in the form of a prohibition upon the following of Defendants' continuing actions:

a.   All violations of RICO and the Sherman Act, as alleged with more particularity, *supra*, and in the associated Claims for Relief, *infra*.

b.      All violations of state antitrust and organized crime laws, as alleged with more particularity, *supra*, and in the associated Claims for Relief, *infra*.

c.      Defendants' omissions to disclose material information in the sales and processes of their insurance products;

d.      Defendants' intentional creation of defects in the insurance products they sell through the underwriting practices they employ;

e.      Defendants' omissions in the form insurance contracts and standards that premiums are computed based upon the "Stated Amount" in circumstances where the "Stated Amount" is known to exceed, at the time of underwriting, the "actual cash value" amount and/or the amount of insurance that will be provided in the event of a "total loss;"

f.      Defendants' omissions to adopt and disclose a specific method, including disclosure of reference materials to be used, by which the "actual cash value" of the insured property will be determined for purposes of paying a "total loss;" and

g.      Defendants' omissions to adopt and disclose a specific method, including disclosure of reference materials to be used, by which the "depreciation" of the insured property will be determined for purposes of paying a "total loss;" and

h.      Defendants' mechanisms, policies and practices for creating a system encouraging the calculated, reckless, and therefore frivolous litigation of fraud for purposes of economic gain.

## IX. COMMON QUESTIONS OF LAW AND/OR FACT PREDOMINATE
### RULE 23(B)(3)

1011.   The common questions of law and fact set forth in paragraphs, *supra*,

predominate over any questions affecting only individual members of the Plaintiff Class, as, among other things, they provide the background and factual context for all harms related to the individual acts and omission committed in furtherance of the conspiracy, and the resolution of those common questions is central to this litigation and would be central to any adjudication of a separate action by an individual Class Member.

## X. SUPERIORITY
## RULE 23(B)(3)

1012.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Not only does the class action device present far fewer management difficulties than innumerable individual actions against innumerable Defendants in regard to an enterprise-wide conspiracy for definable state and federal violations of law, which would be pending in multiple state and federal forums across the Country and in the state of Colorado, but it also provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single court.

1013.   The violations of federal law alleged herein affect commerce, the public interest and have been instituted, wholesale, against a class of citizens of the United States, raising a need for a concerted approach to the problem.

1014.   Considerable research and effort has gone into researching this matter, and it should be applied to the benefits of all affected in the most efficient way to provide justice against the scope of the acts and omissions complained of against the Defendants and Defendant Class.

1015.   It is desirable to concentrate the litigation in the forum as the acts and omissions

of defendants in regard to the conspiracy were discoverable due to many features of facts that pertain to the actions and omissions of the interstate conspiracy with regard to the named Plaintiffs, all of whom reside in the State of Colorado.

1016.   The difficulties of innumerable other private causes of action, with the possibly conflicting outcomes and inconsistent evidence as to a nationwide and international network, and without the benefit of comprehensive factual analysis of the wrongs alleged herein, provides the class method as the only viable method of arriving at the comprehensive truth, efficiently, and of providing civil justice remedies for all Plaintiff Class members suffering harm to their persons and property as a result of all of violations of law alleged herein.

## GENERAL ALLEGATIONS

1017.   As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in the previously-stated paragraphs of this Complaint, *supra*, as set forth herein.

1018.   The Plaintiffs and Plaintiff Class members each entered into an insurance contract with the Defendants to insure real property, buildings and/or dwellings from loss. These contracts were each drafted by and/or for the Defendants following standard forms, most of which were prepared by ACORD, and all of which contained certain features.

1019.   The contracts purported to provide property loss and comprehensive insurance coverage.

1020.   In the process of obtaining such coverage, Plaintiffs and each Plaintiff Class member were required to complete an application for insurance coverage in which they were assisted by an agent who had received ACORD and enterprise instructions on how to fill out the form for the consumer applicant, wherein the form required to state an amount of coverage

which they desired for each property being insured, referred to in the policies as the "Stated Amount."

1021.   The policyholder applicants relied on agents to fill out the forms, as special knowledge of the forms is required to properly fill them out, and the agents filled the forms out for the policyholder.

1022.   In the vast majority of cases, and per an enterprise standard, itself establishing a subclass, agents determined, and assisted in determining with their special knowledge, what amount of insurance coverage would be appropriate to achieve the promised coverage, and what coverage the enterprise, through its standards, would allow to be made available to the applicant, either: Actual Cash Value coverage; Replacement Cost Coverage; Guaranteed Replacement Cost Coverage, etc.

1023.   For each such form of coverage, the enterprise had certain standards that would apply to determine those who were eligible for certain coverage, and the choice of the consumer was limited.

1024.   Agents could make many enterprise-standard maneuvers, and recognized tricks of the trade to fit applicants within certain ranges that would allow them to receive coverage with different companies in the modular system of the enterprise.

1025.   On information and belief, enterprise participants treat the prospective insured's statement of the amount of coverage – although provided by the agent – as the insured's amount of coverage desired upon the real property, buildings and/or dwellings, which is then used by Defendants in their underwriting process to determine the amount of the premiums to be paid by the insured for the coverage. By doing this, the Defendant established an apparent relationship between the amount of coverage provided and the "Stated Amount" listed in the

policies, particularly as to Actual Cash Value properties, where consistency in this standard would require the stated amount to be an equal measure of Actual Cash Value across the board in all policies using the term without differentiation of its meaning.

1026.   In some cases, the "Stated Amount," or policy limit, might be less than the actual value of the property. In those cases, according to the terms of the standard forms and policies, the Defendants paid the Stated Amount and provided the amount of insurance directly related to the premiums that the policyholder had paid.

1027.   However, on information and belief, in many cases, the "Stated Amount" exceeded the actual value of the insured property, using the valuation methods used by Defendants to adjust losses, which excess was known to the Defendants at the time of underwriting and issuance of the policies. Nevertheless, and despite the fact that the Defendants knew that it would not provide an amount of insurance equal to the "Stated Amount," and or policy limit, Defendants charged a premium based upon the "Stated Amount" without disclosing either the "actual cash value" at the time of underwriting or issuance of the policies or the method and source material by which the actual cash value would be determined by Defendants should there be a "total loss."

1028.   As a direct and proximate result of the methodology by which the Defendants computed premiums as aforesaid, and the omission by the Defendants to disclose that methodology, as well as the omission by Defendants to disclose the methodology and source by which "actual value" would be determined in the event of a "total loss," Plaintiffs and the other members of the Plaintiff Class paid for insurance which was not provided and/or which Defendants do not intend to provide.

**FIRST CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**(Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. §§1961-1968)**

1029.   As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in paragraphs of this Complaint, stated, *supra*, as set forth herein.

1030.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961-1968, prohibits conduct involving a "pattern of racketeering activity."

1031.   RICO provides for a private right of action to "[a]ny person injured in his business or property by reason of a violation of Section 1962". 11 U.S.C. §1964(c). "Racketeering activity" is defined in Section 1961(1)(B) to include various predicate acts indictable under provisions of the United States Code. Predicate acts that constitute racketeering activity include mail and wire fraud, indictable under 18 U.S.C. §§ 1341 and 1343 respectively. §1961(1)(B).

1032.   RICO Section 1962(c) makes it unlawful for any person employed by or associated with an enterprise affecting interstate or foreign commerce to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering.

1033.   Defendants are "persons" within the meaning of 18 U.S.C. §1961(3) and associated to form an "enterprise" within the meaning of §1961(4) for the purpose of making profit, money and other economic gain.

1034.   The enterprise ACORD participated in is a network consisting of insurers, reinsurers, agencies, brokers, businesses, consulting firms, *de facto* partnerships, contractual partnerships, trade groups, associations, associations-in-fact, lobbies, solution providers and others who have derivative business dealings with those connected to said network through

either membership, strategic partnership, association, association-in-fact or as volunteers seeking collateral benefit for themselves and enterprise participants.

1035.   Upon information and belief, the enterprise found its nucleus, venue for shared aims, method of orchestration, and center in Defendant ACORD, to which members paid dues, participated in by voting, held positions of leadership and sat on committees – investing therein in multiple direct and indirect ways.

1036.   The enterprise and its participants engaged in, and its activities affected, interstate commerce.

1037.   By application of the acts and omissions alleged with more particularity, *supra*, enterprise participants sought to make gain by unlawful means which include: (1) an intentional, standardized system of not presenting consumers or policyholders with material terms of contracts prior to execution; (2) doing so with an intent to induce reliance on the omitted information; (3) engineering hidden traps and defects into the nature of insurance products while orchestrating features designed to bring about the operation of those secret traps; (4) orchestrating the affairs of the enterprise and the businesses of the enterprise network participants to facilitate the commission of these acts by aiding and abetting them; (5) setting up methods of communication and ideologies designed to recruit conspirators; (6) the use of said network to conceal, and so aid and abet the fraud; and (7) the undue influence, concealment and spread of deceitful information to government in an effort to advance the aims of the conspiracy to defraud by means of mail and wires.

1038.   Beginning at some point prior to September 28, 1992, and continuing through the present, Defendants devised and executed the aforementioned scheme and conspiracy to defraud Plaintiffs in order to profit from actions intentionally done, omissions knowingly made,

and with knowledge that such steps would cause harm to an entire class of persons, entities, businesses and associations.

1039.   Defendants have thereafter colluded to dictate, withhold, delay and/or deny the ability of policyholders to be paid monies that through artifice, calculated to produce reliance, and orchestrated by Defendants to induce the Plaintiffs, and others similarly situated, to enter contracts with Defendants and to pay monies to Defendants in expectation that they would receive those things the Defendants knowingly led them to believe – schemes designed to unlawfully dictate, withhold, delay and/or deny payment of obligations enterprise participants intended to be illusory and communicated through artifice, and by deceitful means calculated to deceive and conceal the orchestrated mechanisms of the artifice.

1040.   Upon information and belief, ACORD organized the enterprise and communicated the terms, standards, ideology, devices and "best practices" of the aforementioned schemes to the other Defendants.

1041.   The Defendants, as enterprise participants, and in violation of 18 U.S.C. § 162 (a), unlawfully received income derived, directly or indirectly, from a pattern of racketeering activity they participated in as principals within the meaning of Section 2, title 18, United States Code, and used or invested, directly or indirectly, portions of that income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of, the enterprise in question, which is engaged in interstate and foreign commerce, and the activities of which affect interstate and foreign commerce.

1042.   In order to bring Defendants' plan and scheme to fruition, Defendants conducted the enterprise's affairs through a "pattern of racketeering activity" within the meaning of §1961(5) and in violation of Section 1962(c), as stated with more particularity in the

BACKGROUND ALLEGATIONS Section of this Complaint, *supra*.

1043.   Defendants have executed this scheme and artifice with the intent to defraud Plaintiffs and the Plaintiff Class members through, among other thing, false pretenses, representations, traps and promises to the end of permanently depriving Plaintiffs of monies and property by overcharging for illusory goods and services, and by selling insurance products containing traps and other features artfully designed to bring about forfeiture when used for their intended purpose – thereby depriving Plaintiffs and the Plaintiff Class members of property. Defendants used the mails, wires and computers to advance and execute this scheme, and did so by mailing materials relating to the various aspects and components of the scheme in millions of instances over the past ten years, and by using wires to advertise and communicate in furtherance of the fraud.

1044.   Defendants willfully and/or with actual knowledge of their illegal activities committed indictable predicate acts of mail and wire fraud, alleged with particularity in the BACKGROUND ALLEGATIONS Section of this Complaint, *supra*, each of which constitute "racketeering activity", and all of which collectively demonstrate a "pattern of racketeering activity" for purposes of Section 1962.

1045.   Defendants willfully and/or with actual knowledge of their illegal activities have formulated and embarked on an extensive plan of related acts in order to defraud Plaintiffs and the Plaintiff Class members. Defendants' acts are related because the acts have the same results, participants, victims, and methods of commission, and are designed to promote continued patronage through concealment of the fraud.

1046.   Defendants have, unlawfully, and through a pattern of racketeering activity, acquired or maintained, directly and/or indirectly, an interest in, and/or control of, by multiple

ways, including vote, the enterprise, which itself is engaged in interstate and foreign commerce, and the activities of which affect, interstate and foreign commerce.

1047.   Defendants' pattern of racketeering activity has been continuous over a period of more than ten years with a clear threat of future racketeering activity, as described with particularity in the BACKGROUND ALLEGATIONS Section of this Complaint, *supra*, including continued influence on government to conceal its efforts and technological advancements made to both conceal its acts and make them more efficient, and which will therefore continue to affect Plaintiffs and the Plaintiff Class members, the marketplace and the public at large.

1048.   As a direct result of Defendants' conduct in violation of Section 1962(c), Plaintiffs and the Plaintiff Class members have suffered and will continue to suffer damages.

1049.   Further and extensive particulars regarding Defendants' false and misleading representations can be obtained with discovery.

1050.   In addition to an award of actual damages, Plaintiffs and the Plaintiff Class members are entitled to treble damages, costs, and reasonable attorney's fees, along with the equitable remedies necessary to prevent such harm, including, but not limited to: (1) ordering Defendants to divest of any interest, direct or indirect, in the enterprise; (2) imposing reasonable restrictions on the future activities or investments of the Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; (3) ordering dissolution or reorganization of the enterprise, making due provision for the rights of innocent persons to prevent and divest only those committing the wrongdoing alleged herein from committing further wrong, pursuant to Sections 1964(a),(b) and (c) of the Act.

## SECOND CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Racketeer Influenced and Corrupt Organizations Act,18 U.S.C. §1962(d))

1051.  As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in the paragraphs of this Complaint, stated, *supra*, as set forth herein.

1052.  Defendants conspired amongst each other to violate 18 U.S.C. §1962(a), (b) and (c), as described with more particularity, *supra*, and violated 18 U.S.C. §1962(d), in the process, which makes it unlawful for any person to conspire to violate §1962(a), (b), or (c).

1053.  Defendants associated to form an enterprise, and did so within the meaning of §1961(4), thereafter using said enterprise for the purposes of defrauding Plaintiffs and Plaintiff Class through an elaborate system and network of participants in an effort to both conceal the fraud and ensure its continuance through concealment, for purposes of securing the continued patronage of its victims.

1054.  As discussed in greater detail, *supra*, beginning at sometime prior to ten years before the filing of this Complaint and continuing through to the present, Defendants have devised a scheme to defraud Plaintiffs and the Plaintiff Class members by the mechanisms of fraud, and by means of the instrumentalities of the empire, and by the violations of 18 U.S.C. § 162(a), (b) and (c), described in more particularity in the allegations of predicate acts, *supra*.

1055.  Defendants have therefore planned and conspired, through their words and conduct, through organization, and by means of wires and mail, to engage in a pattern of racketeering activity as described above, wherein ACORD would organize the participants so as to conduct the affairs of the enterprise through the pattern of racketeering activity.

1056.  Plaintiffs and the Plaintiff Class members have suffered, and continue to suffer, injury to their property as a direct result of Defendants' conspiracy affecting trade and

interstate commerce, entitling Plaintiffs and the Plaintiff Class members to an award of treble damages, costs and reasonable attorney's fees pursuant to §1964(c), along with the equitable remedies necessary to prevent such harm, including, but not limited to: (1) ordering Defendants to divest of any interest, direct or indirect, in the enterprise; (2) imposing reasonable restrictions on the future activities or investments of the Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; (3) ordering dissolution or reorganization of the enterprise, making due provision for the rights of innocent persons to prevent and divest only those committing the wrongdoing alleged herein from committing further wrong, pursuant to Sections 1964(a),(b) and (c) of the Act.

### THIRD CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Colorado Organized Crime Control Act (COCCA), § 18-17-101, et seq., C.R.S.)

1057.   As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in paragraphs stated, *supra*, as set forth herein.

1058.   The Colorado Organized Crime Control Act ("COCCA") §18-17-101, *et seq.*, prohibits conduct involving a "pattern of racketeering activity" and provides for civil remedies for persons injured by such activities.

1059.   Racketeering activity is defined in §18-17-103(5), C.R.S. to include various predicate acts indictable under the United States Code and/or Colorado statutes. Defendants' predicate acts that constitute racketeering activity include mail and wire fraud, indictable under 18 U.S.C. §§1341 and 1343 respectively, as well as theft and computer crimes, indictable under §§18-4-401, C.R.S. and 18-5.5-102, C.R.S., respectively.

1060.   COCCA Section 18-17-104(3) makes it unlawful for any person employed by or

associated with an enterprise to conduct the affairs of an enterprise through a pattern of racketeering, and as alleged with more particularity in the FIRST CLAIM FOR RELIEF, and in the BACKGROUND ALLEGATIONS Section, *supra*, Defendants have done so.

1061.   COCCA Section 18-17-104(4) makes it unlawful for any person to conspire or endeavor to violate §18-17-104(3), and by the acts alleged in more particularity in the SECOND CLAIM FOR RELIEF, and in the BACKGROUND ALLEGATIONS section, *supra*, Defendants have done so.

1062.   Defendants are "person[s]" within the meaning of §18-17-103(4), and have associated to form an "enterprise" within the meaning of §18-17-103(2) for the purpose of profiting from a "scheme" consisting of the establishment of policies, practices, and procedures designed to unlawfully and improperly dictate, delay, deny, withhold monies fraudulently obtained, and to fraudulently engineer the forfeiture of payments owed.

1063.   In carrying out their aforementioned schemes, Defendants have injured Plaintiffs, as well as all other similarly situated policyholders.

1064.   In order to bring Defendants' plan and scheme to fruition, Defendants conducted the enterprise's affairs through a pattern of racketeering activity in violation of §18-17-104, C.R.S.

1065.   As alleged with more particularity in the FIRST CLAIM FOR RELIEF, and in the BACKGROUND ALLEGATIONS section, *supra*, and in violation of § 18-17-104(1)(a), C.R.S., Defendants also unlawfully and knowingly received proceeds derived, directly or indirectly, from a pattern of racketeering activity and used or invested same, directly and indirectly, both parts of such proceeds or the proceeds derived from the investment or use thereof in the acquisition of titles to, rights, interests, or equity in, the establishment or operation of the

enterprise in question.

1066.   As alleged with more particularity in the FIRST CLAIM FOR RELIEF, and in the BACKGROUND ALLEGATIONS section, *supra*, and in violation of § 18-17-104(2), C.R.S., Defendants unlawfully, and through a pattern of racketeering activity, knowingly acquired or maintained, directly or indirectly, an interest in and/or control of the enterprise in question, or a portion thereof.

1067.   As alleged with more particularity in the FIRST CLAIM FOR RELIEF, and in the BACKGROUND ALLEGATIONS section, *supra*, and in violation of § 18-17-104(3), C.R.S., Defendants knowingly and unlawfully were employed by, or associated with, the enterprise in question, to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity.

1068.   In addition to the ways described with more particularity, *supra*, Defendants willfully and/or with actual knowledge of their illegal activities, have executed this scheme and artifice with the intent to defraud Plaintiffs and the Plaintiff Class members through false pretenses, representations, and promise to permanently deprive Plaintiffs and the Class members of their right to receive contractual recoveries made illusory by Defendants' fraudulent and deceitful schemes using mail and wires and computers, among other methods and devices, to advance and execute their scheme.

1069.   Defendants committed the previously-mentioned indictable predicate acts of mail and/or wire fraud, computer crimes, and/or theft, each of which constitute "racketeering activity," and all of which collectively demonstrate a "pattern of racketeering activity" under COCCA.

1070.   Further and extensive particulars regarding Defendants' false and misleading

representations can be obtained with discovery.

1071. As a direct result of Defendants' violations of COCCA, Plaintiffs and the Class members have been damaged and are, therefore, entitled to treble damages, costs, and reasonable attorney's fees pursuant to §18-17-106(7), C.R.S., as well as: (1) ordering any defendant to be divested of any interest in any sub-enterprise that itself is part of the enterprise and involved in the conspiracy complained of herein, including all real property in which the proceeds of racketeering have been invested, pursuant to §18-17-106(1)(a) and (6), C.R.S.; (2) imposing reasonable restrictions upon the future activities or investments of any Defendant herein, including, but not limited to, prohibiting any Defendant herein from engaging in the same type of endeavor as the enterprise in which he was engaged while in violation of the provisions of Section 18-17-104, pursuant to §18-17-106(1)(b) and (6), C.R.S.; (3) ordering the dissolution or reorganization of the enterprise in question and any sub-enterprise §18-17-106(1)(c) and (6), C.R.S.; (4) ordering the suspension or revocation of a license, permit, or prior approval granted to the enterprise and any sub-enterprise by any agency of the state; (5) ordering the forfeiture of the charter of any Defendant corporation organized under the laws of this state or the revocation of a certificate authorizing a Defendant foreign corporation to conduct business within the state, upon finding that the board of directors or a managerial agent acting on behalf of the corporation, in conducting the affairs of the corporation, has authorized or engaged in conduct in violation of Section 18-17-104 and that, for the prevention of future criminal activity, the public interest requires the charter of the corporation forfeited and the corporation dissolved or the certificate revoked, pursuant to §18-17-106(1)(d) and (6), C.R.S.

**FOURTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**(Antitrust - Sherman Antitrust Act, 15 U.S.C. §§ 1-7,**
**and the Clayton Act, 15 U.S.C. §§ 12–27)**

1072.   As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in paragraphs of this Complaint stated, *supra*, as set forth herein.

1073.   The Defendants are "persons" as defined by 15 U.S.C. § 7.

1074.   The evidence showing conspiracy is substantial and includes:

a.      Practices facilitating a horizontal conspiracy. The Defendants regularly communicated with each other in private conversations, both in person and through means of the enterprise framework and channels, and in private websites exchanged sensitive information and assurances of solidarity to advance the ends of the conspiracy;

b.      Direct evidence of a conspiracy. The Defendants directly discussed, agreed to, and encouraged each other to collective action to force certain deceptive standards, and to use purposefully incorrect measurements of replacement cost, and the nondisclosure of material terms and information, to raise the probability of unpaid replacement cost claims and to increase sales of insurance by providing a product that was less expensive to sustain, as it provided only a fraction of the anticipated benefit of both the insurer and the policyholder;

c.      Recognition of the illicit nature of communications. Defendants took steps to conceal their communications with one another, including instructions on secret and deceptive ways to communicate and other measures to avoid leaving a paper trail;

d.     Acts contrary to economic interests. It would have been contrary to the economic interests of any Defendant acting alone to attempt to impose agency on all of its producers and then to implement the outrageous measures employed against the Plaintiffs and Plaintiff Class. For example, the industry has developed a common strategy, and has had meetings to the effect, to address the "threat" of disclosures to consumers and regulators who would attempt to find a more accurate way to determine the true replacement cost of homes. Simply put, it would not be possible for any individual insurer to mount an "effective" anti-consumer campaign, and surviving, without the bulk of the enterprise working in concert, as it would have been economically disadvantaged if it was the only insurer dealing under the new business model;

e.     Motive to enter the conspiracy, including knowledge or assurances that competitors also will enter. The Defendants were motivated by a desire to maintain both the perceived value of their insurance and their own position in the industry. They received assurances from each that they all would move together to limit information to consumers, to enact the "best practices" referenced above, and to conceal their conspiracy through the ACORD framework and standards; and

f.     Abrupt, contemporaneous shift from past behavior.  After Defendant ALLSTATE implemented its pilot project engineered by Defendant MCKINSEY & COMPANY, the rest of the industry followed suit – something that would not have been possible if ALLSTATE guarded that "secret" information against the industry with the same zeal that it does in regard to regulators and consumers (stated *reductio ad*

*absurdum*, as competitors were actually at the meeting with Defendant MCKINSEY & COMPANY).

1174.  Defendants' ongoing conspiracy and agreements have worked to the ends proposed by Defendant MCKINSEY & COMPANY, and have caused:

a.      Consumers to pay tens of millions of dollars more for insurance providing ineffective coverage than they otherwise would have if material terms and features, and issues of key importance, had been disclosed. This nondisclosure made the product unsafe for its intended use in the absence of such knowledge, as such nondisclosure passed unreasonable, unconscionable and reckless risk to the consumer known to the enterprise;

b.      Consumers to pay millions of dollars more for insurance in supplemental coverage than they otherwise would have paid if the "From Risk to Opportunity" model had not been employed against them;

c.      Consumers to lose millions of dollars in unpaid claims that they could have avoided without the enterprise's conspiracy, and such losses being directly related to profit of the enterprise participants; and

d.      Removed variety from the industry of insurance with features that consumers actually demand, as the conspiracy of the enterprise is continually making new products engineered to produce unpaid claims.

1175.  Defendants and their coconspirators have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1 and 3. For the reasons previously stated

in the BACKGROUND OF THE CASE section, *supra*, this offense is likely to continue and recur unless the relief requested is granted.

1176.   The conspiracy and agreement consists of an understanding and concert of action among Defendants and their co-conspirators to raise, fix, and stabilize an amount of underinsurance, with an associated and causal effect on retail prices, to end competition among retailers on issues that would allow them to, as a group, aggressively pursue unpaid claims and fraudulent nondisclosure of material terms to that effect, and to limit retail price competition associated with the deceptive features among the Defendants, ultimately effectuated by collectively adopting and adhering to functionally identical methods of selling insurance, constituting a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1 and 3, in its restraint of trade.

1177.   Where, as here, defendants have engaged in a *per se* violation of Section I of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required. To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is property insurance. The anticompetitive acts at issue in this case directly affect the sale of property insurance to consumers.

1178.   No reasonable substitute exists for property insurance. There are no technological alternatives to property insurance, which can be placed on a property, while other kinds of insurance, by definition, cannot – something that is essentially a tautology.

1179.   Industry firms also view property insurance as a separate market segment from other forms of insurance, and the Defendants were able to impose and sustain a significant loss of value to consumers – and associated profits to the enterprise participants – by increasing

unpaid claims through a calculated conspiracy to defraud consumers and conceal a zero-sum business model.

1180.   By the conspiracy to commit the above acts, and as consumers in the market directly affected by the conspiracy to violate the Antitrust Acts of the United States, the Defendants harmed the Plaintiffs and Plaintiff class.

1181.   Plaintiffs are, as alleged with more particularity in the BACKGROUND OF THE CASE section of this Complaint, *supra*, persons injured in their property within the meaning of 15 U.S.C. 15(a), and Defendants violated the Antitrust laws of the United States, restraining important aspects of trade, and conspiring to do so.

1182.   To remedy these illegal acts, Plaintiffs request that the Court:

   a.   Adjudge and decree that Defendants entered into an unlawful contract, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1 and 3;

   b.   Enjoin the Defendants, their officers, agents, servants, employees and attorneys and their successors and all other persons acting or claiming to act in active concert or participation with one or more of them, from continuing, maintaining, or renewing in any manner, directly or indirectly, the conduct alleged herein or from engaging in any other conduct, combination, conspiracy, agreement, understanding, plan, program, or other arrangement having the same effect as the alleged violation or that otherwise violates Sections 1 of the Sherman Act, 15 U.S.C. § 1 and 3, through fixing the method and manner in which they sell insurance, or otherwise agree to set the standards for the enterprise and the industry, or the collective negotiation of

insurance forms, or otherwise collectively restraining retail price competition for property insurance;

  c. Prohibit the collusive setting of underwriting practices that can work as *de facto* price fixing, raising the price on all insurance by providing an inferior form of insurance, which is perceived to be legitimate or standard, but which is, in fact, defective and fraudulently so;

  d. Declare null and void the bylaws and agreements parties have with ACORD and any agreement between Defendant that restricts, limits, or impedes trade, or which has been a repeated instrumentality of the conspiracy.  This is asked for to ensure that the Defendants truly compete on features important to the consumer, and such is asked in the alternative if it be not more equitable to divest a Defendant by means of other relief requested herein due to the extent of their corruption;

  e. Reform the agreements between Defendants and consumers to strike all clauses rendered deceptive and fraudulent by traps and hidden, institutionalized mechanisms of the conspiracy that would likely still be at work, or automated, and using such latently-deceptive features in furtherance of the restraint of trade, if these weren't stricken down as void and unenforceable; and

  f. Award to Plaintiffs treble damages under Section (a) of the Clayton Act as codified at 15 U.S.C. §15(a), the costs of this action, reasonable attorneys fees, and such other and further relief as may be appropriate and as the Court may deem just and proper under any Section of 15 U.S.C. 1-7, including that if it shall appear to the Court that the ends of justice require that other parties should be brought before the Court, that the Court cause them to be summoned, whether they reside in the district in which

the Court is held or not; and that subpoenas to that end may be served in any district by the marshal thereof upon such Defendants, pursuant to 15 U.S.C. 4.

### FIFTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Colorado Antitrust Act of 1992 §§ 6-4-101, *et seq.*, C.R.S.)

1183.   As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in paragraphs of this Complaint stated, *supra*, as set forth herein.

1184.   As per § 6-4-104, C.R.S., every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal.

1185.   As stated in with more particularity in the BACKGROUND OF THE CASE section, and in the previous Claims for Relief, Defendants have compacted and conspired in the restraint of trade to the injury of Plaintiffs and Plaintiff Class.

1186.   As seen in the BACKGROUND OF THE CASE section of this Complaint, *supra*: (1) the nature of the violation of the Act is predatory, reckless, unconscionable, criminal and depraved, while its extent, by every measure, is monumental (in geography, time, market effect, and damage caused); (2) the number of consumers affected by the violation ranges in the tens to hundreds of millions, for those overcharged or deprived of a product free of defect, while those affected in direct loss are in the hundreds of thousands; (3) the violation was a continuous pattern and practice of behavior, well-orchestrated and clandestine; the violation was the result of willful conduct, greed and pure disregard for humanity; (4) the Defendants took affirmative steps to conceal such violations, and victimized others in the process, while taking steps to further conceal their acts through undue influence on the government officials; and (5) the size and wealth of the Defendants is vast, and they have used that power to prolong wrongdoing, and to take steps that not only would ensure wrongdoing if not drastically remedied, but which

would increase its strength, scope, power and devastating influence on the market and society.

1187. Plaintiffs meet the definition of persons injured provided in § 6-4-114, C.R.S.

1188. Defendants' actions constitute a *per se* violation of the Colorado Antitrust Act, as demonstrated in the previously-referenced section of the Act.

1189. Wherefore, Plaintiffs request of the Court that it grant them treble damages, and that if Plaintiffs succeed at trial, that the Court would grant them all of the discretionary relief afforded under § 6-4-114(2), C.R.S., and that the Court declare that all contracts or agreements made by any Defendant, while a member of any combination, conspiracy, trust, or pool prohibited under the Article, which are founded upon, or are the result of, or grow out of, or are connected with the violation of the Article complained of herein, either directly or indirectly, be declared void, and that no recovery thereon, or benefit therefrom, shall be had by or for any Defendant, pursuant to § 6-4-121, C.R.S. Furthermore, it is requested of the Court that it recognize any payments made upon, under, or pursuant to such contract or agreement to or for the benefit of Defendants, so that such may be recovered in an action by the Plaintiffs and the Plaintiff Class or that payment to their heirs, personal representatives, or assigns be made for any so situated members of the Plaintiff Class.

**SIXTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**(Bad faith pursuant to the holding of *Showpiece Homes Corp. v. Assurance Co. of***
***America*, 38 P.3d 47(Colo. 2001), in**
**Violation of the Colorado Consumer Protection Act,**
**§ 6-1-101 *et seq.*, C.R.S. and by violations of**
**Colorado Unfair Claims-Deceptive Practices Act,**
**§ 10-3-1101 *et seq.*, C.R.S., against all Defendants)**

1190. As supporting factual allegations, Plaintiffs once more incorporate the allegations included in the Complaint, *supra*, by reference, as though alleged herein.

1191.  It is alleged that Defendants violated the provisions of both the Colorado Consumer Protection Act, § 6-1-101 *et seq.*, C.R.S. and the Colorado Unfair Claims-Deceptive Practices Act, § 10-3-1101 *et seq.*, C.R.S., with bad faith in regard to both, and as specified therein, and in interrelated ways, in bad faith, and by committing bad faith as defined by the acts, applicable by law to every aspect of insurance related to consumers, as to the facts alleged herein, *infra*:

    a.  In that Defendants misrepresented the benefits, advantages, conditions, or terms of an insurance policy:

        i.  Defendants did this by using a term, "Actual Cash Value," that they knew, or had reason to know, was generally understood by the public at large to have a meaning distinct from the meaning(s) that the Defendants applied, or intended to apply, at the time of a claim. Said term, "Actual Cash Value," was used by Defendants as a term of art not known to the general public, and which was then also was not defined by Defendants in their contracts, and/or was inadequately defined by Defendants in their contracts. This was – among other ways – due to the absence of the particular definition(s) of "depreciation" that Defendants use(d) at the time of a claim and/or as part of their meaning for "Actual Cash Value," or the definition(s) of a material aspect of the term "depreciation" that Defendants used at the time of a claim, from the Defendants contracts. Defendants knew, or should have known, that this absence would be deceptive and/or misleading.

        ii.  Defendants used "straight-line" and/or depreciation schedules to provide their definitions of the term "depreciation." These schedules were not

included in the contracts in question. These schedules were material to the meaning that the Defendants sought to apply to the contracts in question.

iii.   The Defendants took active steps to keep these schedules hidden from the general public and/or consumers and/or insureds.

iv.   Defendants used the aforementioned term of art, "Actual Cash Value," in the ways alleged in this Complaint, although in plain English, and in other contexts, the term had a general meaning of "Fair Market Value."

v.   Defendants also misrepresented the benefits, advantages, conditions, or terms of an insurance policy because the Defendants knew, or should have know, that there are features of the insurance they sell that impede and/or prevent the rebuilding of homes; nonetheless, Defendants still marketed, advertised, and sold the insurance to consumers who had the reasonable expectation and/or understanding, based on Defendants' communications, that the insurance did not contain features that impede and/or prevent the rebuilding of homes.

vi.   One such feature and/or practice of the Defendants, in this regard, has been to calculate the value of the total loss possible to an insured's property, but to divide the risk to the insured of that value in a way that protected the Defendants against not having a total value for all property accounted for, but in a way which was known, or should have been known, to the Defendants to prevent and/or thwart the insureds'/claimants' ability of having the loss properly allocated to each individual part of their property.

vii. Defendants misrepresented the benefits, advantages, conditions, or terms of an insurance policy because the Defendants knew, or should have known, that there are features of the insurance they sell which were calculated to impede and/or prevent the rebuilding of homes; nonetheless, Defendants still marketed, advertised, and sold the insurance to consumers who had the reasonable expectation and/or understanding, based on Defendants' communications, that the insurance sold did not indeed contain features that impede and/or prevent the rebuilding of homes.

viii. Defendants misrepresented the benefits, advantages, conditions, or terms of an insurance policy by advertising that they would handle claims, matters and/or concerns for the insureds in a quasi-fiduciary way and/or a fiduciary way and/or as an advocate and/or in a friendly way and/or with a handshake and/or at beck-and-call, when the Defendants knew, or should have known, that they took and/or intended to take an adversarial approach and/or a non-friendly approach and/or with methods antithetical to the manner that things would be handled in their advertisements and/or that Defendants would delay when it suited them economically, particularly, but not limited to, by use of the above-listed, and below-listed, policies and/or actions and/or omissions.

b. Defendants used at least one name or title of any insurance policy or class of insurance policies misrepresenting the true nature thereof:

i. By using the term "Actual Cash Value," as described above, and as otherwise described herein, and with the knowledge and/or notice alleged

herein, Defendants misrepresented to the public at large and/or to consumers generally all policies titled and/or named "Actual Cash Value" policies, or their equivalent.

ii.   By using the term "Actual Cash Value" and/or  the term "Depreciation" as described above, Defendants misrepresented policies titled and/or named "Replacement Cost" policies, or their equivalent, as said policies misrepresented the likelihood that one would be able to rebuild by use of the insurance's assistance, and as this unlikelihood was caused by the consumers receiving considerably less to rebuild by virtue of the Defendants' use of the terms "Actual Cash Value" and "Depreciation," which led to a tender of less funds for the purpose of rebuilding a home.

iii. Defendants misrepresented their policies titled and/or named "Replacement Cost" policies, or their equivalent, as said policies bore that name despite the fact that Defendants knew, or should have known, that the public in general held the belief, in part based on omissions by the Defendants or calculated efforts to keep information hidden and/or unknown by the insureds and/or the general public, that the insurance in question would bring about and/or reasonably enable the replacement of the home, when Defendants knew, or should have known, that there were many features worked into the insurance that were made to prevent and/or thwart the replacement of the claimants'/insureds' homes.

iv. Defendants misrepresented their policies titled and/or named "Replacement Cost" policies, or their equivalent, as said policies bore that

name despite the fact that Defendants knew, or should have known, that the public in general, and policyholders in general, held the belief, in part based on omissions by the Defendants or calculated efforts to keep information hidden and/or unknown by the insureds and/or the general public, that the insurance in question would bring about and/or reasonably enable the full replacement of the property at the time of loss, as opposed to the reimbursement of the costs, after the fact, for the rebuilding of the property.

c.   Defendants' aforementioned, and subsequently mentioned, misrepresentations, along with other misrepresentations that will come forth through discovery, were for the purpose of inducing or tending to induce the lapse, forfeiture, exchange, conversion, or surrender of an insurance policy by:

  i.   By including features in the insurance that would prevent the recovery;

  ii.   By using materially different appraisals, estimates, approaches or terms to initiate or write the policy, in order to set a price thereon, while using different appraisals at the claims stage of the insurance process;

  iii.   This was also done by means of using appraisals or estimates that included the land at issuance, and on which Plaintiffs paid premiums, but using methods calculated to exclude the land at the time of claim.

d.   The misrepresentations referenced in this Complaint were made without a written comparison of policies, factually disclosing relevant features and benefits for which the policy or policies were issued, and by which an informed decision could be made, despite the fact that Defendants were put on notice that such steps would

prevent deception or misunderstanding, and that consumers were in fact misunderstanding the policy or policies.

e.    As stated in more particularity, *supra*, Defendants made, issued, circulated, or caused to be made, issued, or circulated, an estimate, circular, statement, sales presentation, omission, or comparison which:

>    i.    Misrepresented the benefits, advantages, conditions, or terms of an insurance policy;

>    ii.    Used a name or title of any insurance policy or class of insurance policies misrepresenting the true nature thereof;

>    iii.    Misrepresented for the purpose of inducing or tending to induce the lapse, forfeiture, exchange, conversion, or surrender of any insurance policy;

>    iv.    Misrepresentation by not providing a written comparison of policies, factually disclosing relevant features and benefits for which the policy is issued, and by taking steps to prevent informed decisions from being made; and

>    v.    Such misrepresentations were made without a written comparison of policies, factually disclosing relevant features and benefits for which the policy or policies were issued, and by which an informed decision could be made (despite the fact that Defendants were put on notice that such steps would prevent deception or misunderstanding and that people were in fact misunderstanding the policy or policies).

f.    Proliferating false information and advertising, generally, by:

    i.   Making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in a newspaper, magazine, or other publication, or in the form of a notice, circular, pamphlet, letter, or poster, or over any radio or television station, or in any other way, an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance, or with respect to any person in the conduct of his or her insurance business, which is untrue, deceptive, or misleading;

       1.   This was done by communicating all of the misrepresentations previously mentioned.

       2.   By disseminating advertisements that portrayed the Defendants as advocates instead of as adversarial in nature.

g.  Defendants engaged in unfair claim settlement practices: Committing or performing, either in willful violation of Colorado Unfair Claims–Deceptive Practices Act, § 10-3-1101 *et seq.*, C.R.S. or with such frequency as to indicate a tendency to engage in a general business practice, the following:

    i.   Misrepresenting pertinent facts or insurance policy provisions relating to the coverage at issue;

    ii.  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

iii.   Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

iv.   Refusing to pay claims without conducting a reasonable investigation based upon all available information;

v.   Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed, by, among other things, having a schedule for delay and a goal to prevent unpaid claims;

vi.   Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

vii.   Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

viii. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

ix.   Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured;

x.   Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement;

xi.   Failure to maintain complaint handling procedures; and

xii.   Failing of any insurer to maintain a complete record of all the complaints, which it has received since the date of its last examination.

h.   Misrepresentations in insurance applications were made by the Defendants communicated, omitted or engineered, to keep the insured from seeing the omitted material terms and features of the contract.

i.   Making false or fraudulent statements or representations on or relative to any application for an insurance policy, for the purpose of obtaining a fee, commission, money, or other benefit from *any* person;

ii.   Failing to promptly make a full refund or credit of all unearned premiums to the person entitled thereto upon termination of insurance coverage;

iii.   Unfair compensation practices:

iv.   Basing the compensation of claims employees or contracted claims personnel, including compensation in the form of performance bonuses or incentives, on any of the following:

1.   The number of policies canceled;

2.   The number of times coverage is denied;

3.   The use of a quota limiting or restricting the number or volume of claims; or

4.   The use of an arbitrary quota or cap limiting or restricting the amount of claims payments without due consideration of the merits of the claim, as Defendants have, among the other ways mentioned, done with percentages;

i. Knowingly made a false representation as to the characteristics, ingredients, uses, *benefits*, alterations, or *quantities* of goods, services, or property;

j.Represented that goods, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;

k.   Advertised goods, services, or property with intent not to sell them as advertised;

l.   Failed to deliver to the customer at the time of an installment sale of goods or services a written order, contract, or receipt setting forth the name and address of the seller, the name and address of the organization which he represents, and *all* of the terms and conditions of the sale, including a description of the goods or services, stated in readable, clear, and unambiguous language;

m.   Employed "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

    i.   Refusal to show the goods or property advertised or to offer the services advertised;

    ii.   Showing or demonstrating defective goods, property, or services which are unusable or impractical for the purposes set forth in the advertisement;

    iii.   Failure to make deliveries of the goods, property, or services within a reasonable time or to make a refund therefore;

n.   Failed to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure

to disclose such information was intended to induce the consumer to enter into a transaction;

o.   Violated Section 6-1-717, C.R.S. in that Defendants engaged in a deceptive trade practice when, in the course of Defendants' business, vocation, or occupation, the person:

i.   Knowingly submitted a false or misleading appraisal in connection with a dwelling offered as security for repayment of a mortgage loan;

ii.   Directly or indirectly compensated, coerced, or intimidated an appraiser and/or appraisers, or attempted, directly or indirectly, to compensate, coerce, or intimidate an appraiser, for the purpose of influencing the independent judgment of the appraiser with respect to the value of a dwelling offered as security for repayment of a mortgage loan.

1192.   Defendants engaged in deceptive trade practices prohibited by § 6-1-105, C.R.S. when Defendants knowingly made misleading representations, intending to induce consumers to enter into a transaction in ways mentioned in the body of this Complaint, and referenced herein, and by other deceptive trade practices, or unfair trade practices, to be revealed in discovery.

1193.   The deceptive trade practices, or unfair trade practices, described in this Complaint occurred in the course of Defendants' business, vocation or occupation.

1194.   The deceptive trade practices, or unfair trade practices, of the Defendants, as described in more detail this Complaint, *supra*, significantly impact the public as actual and potential consumers of the goods, services, or property sold by Defendant.

1195.   Defendants engaged in these deceptive trade practices, or unfair trade practices, in bad faith as defined in C.R.S. § 6-1-113(2.3) in that Defendant's conduct was fraudulent, willful, knowing, and/or intentional conduct that caused injury.

1196.   As a proximate result of the willful and malicious conduct of Defendants described in this Complaint, Plaintiffs suffered, and continue to suffer, irreparable harm and actual damages and loss for which it is entitled to recover in amounts to be proved at trial to a legally protected interest.

1197.   As there is clear and convincing evidence that Defendants engaged in bad faith conduct, Plaintiffs also pray to the Court for treble damages.

1198.   As a result of the willful and malicious conduct of Defendants described in this Complaint, Plaintiffs have also sustained and will continue to sustain damages, which may also be impossible to quantify, and it will suffer irreparable injury that can only be prevented by injunctive relief.

1199.   Equity and the principles of justice require that the Defendants be enjoined from engaging in the conduct described above.

1200.   For all injury described in this Complaint that is referenced where the Plaintiff seeks equitable relief, Plaintiff has no plain, speedy and adequate remedy at law for these particular harms.

### SEVENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Permanent Injunctions and Temporary Restraining Orders)

1201.   As supporting factual allegations, Plaintiffs once more incorporate the allegations included in the Complaint, *supra*, by reference, as though alleged herein.

1202.  As more fully described, *supra*, Defendants developed and implemented the improper and unlawful policies, practices, and procedures (such as the "best practices," deceptive underwriting practices, standard forms excluding material terms, a framework and network set to orchestrate the underpayment and non-payment of claims, institutionalized bad faith, and a zero-sum business model that is inherently unfair and deceptive, particularly given the Defendants' advertising, which was also a part of the deceptive practices in question), which were designed to delay, deny, dictate, withhold and/or restrict legally protected interests of the Plaintiffs in violation of Colorado law, as well as in breach of the duty of good faith and fair dealing Defendants owe to Plaintiffs and the Plaintiff Class members.

1203.  By engaging in such conduct, Defendants unlawfully and improperly attempted to circumvent the statutory and regulatory procedures for determining the value of property and the good faith and quasi-fiduciary obligations owed to Plaintiffs and Plaintiff Class.

1204.  Defendants refuse to comply with Colorado law and/or the duty of good faith and fair dealing they owe to Plaintiffs and the Plaintiff Class members.

1205.  Defendants hold no legal or equitable right to continue such violations of Colorado law and/or to breach the duty of good faith and fair dealing owed to Plaintiffs and the Plaintiff Class members.

1206.  If not enjoined, Defendants will continue to violate Colorado law, Defendants will continue to breach the duty of good faith owed to Plaintiffs and the Class members, and Defendants will continue to cause harm to Plaintiffs and the Plaintiff Class members.

1207.  RICO Section 1964(a) authorizes this Court to enjoin Defendants' conduct in violation of §1962 and to impose reasonable restrictions on Defendants' future conduct. 18 U.S.C. §1964(a).

a.   Plaintiffs have plead a corresponding Claim for Relief on their behalf and on behalf of all others similarly situated, alleging such misconduct on the part of Defendants.

1208.   The Sherman Antitrust Act, 15 U.S.C. § 4 states that Plaintiffs may — by way of petition — setting forth the case, pray that a violation of the Act be enjoined or otherwise prohibited, and further, that when the parties complained of shall have been duly notified of such petition, the Court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, that the Court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

a.   Plaintiffs have pleaded a corresponding Claim for Relief on their behalf and on behalf of all others similarly situated, alleging such misconduct on the part of Defendants.

1209.   COCCA Section 18-17-106 authorizes the Court to, among other things, enjoin Defendants' conduct which is found to be in violation of COCCA Section 18-17-104 and to impose reasonable restrictions on Defendants' future conduct. §18-17-106, C.R.S.

a.   Plaintiffs have pleaded a corresponding Claim for Relief on their behalf and on behalf of all others similarly situated, alleging such misconduct on the part of Defendants.

1210.   The Colorado Antitrust Act of 1992, § 6-4-113, C.R.S., authorizes any person injured in its business or property by reason of any violation of the Act, as Plaintiffs have alleged, herein, to file an action to prevent or restrain any such violation.

a.   Plaintiffs have pleaded a corresponding Claim for Relief on their behalf and on behalf of all others similarly situated, alleging such misconduct on the part of

Defendants.

1211.   The Colorado Consumer Protection Act § 6-1-110, C.R.S., authorizes the court to enjoin Defendants from continuing, engaging in, or doing any act in furtherance of any trade practices, which violate the CCPA. §§6-1-110(1), 6-1-113(1), C.R.S.

a.   Plaintiffs have plead a corresponding Claim for Relief on their behalf and on behalf of all others similarly situated, alleging such misconduct on the part of Defendants.

1212.   Therefore, Plaintiffs and the Plaintiff Class members seek a permanent injunction enjoining Defendants from continuing the complained-of behavior, referenced in more detail, *supra*, including, but not limited to Defendants implementing the improper and unlawful policies, practices, and procedures, such as: (1) the use of the "best practices" and deceptive underwriting practices, (2) the use of standard forms excluding material terms; (3) the use of a framework and network set to orchestrate the underpayment and non-payment of claims; (4) the continued use of institutionalized bad faith; (5) the continued use of the zero-sum business model, or any patently unfair evolution thereof; (6) the use of any advertising, which was developed as a part of the deceptive practices in question; (7) the use of any measurement, estimator or criteria that is calculated to pay less that the known value, including measurements made to pay out less, as a matter of course, than the loss ratio.

### EIGHTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
#### (Civil Conspiracy)

1213.   As supporting factual allegations, Plaintiffs incorporate by reference the allegations set forth in paragraphs of this Complaint stated, *supra*, as set forth herein.

1214.   As stated with more particularity in the BACKGROUND OF THE CASE

section of this Complaint, *supra*, Defendants entered into an unlawful plan and agreement to violate all of the rules of law giving rise to the causes of action alleged herein, by the facts alleged, *supra*, including, a conspiracy to violate the Colorado Consumer Protection Act and the Unfair Claims − Deceptive Practices Act, both of which are plead with more particularity, *supra*. Among the many manifestations of the unlawful plan and agreement were the following: (1) documents of "best practices" presented in enterprise forums and detailing deceptive practices; (2) records of meetings indicating conspiratorial motive and plan; (3) membership agreements; (4) implementation of common schemes that were supposedly "trade secrets"; (5) a pattern of conduct occurring with such frequency as to indicate a common business practice; and (6) concerted action on measures against consumer interest; while (7) opposing reasonable measures that would have the consequence of thwarting the apparent ends of the conspiracy.

1215.  As a result of the overt actions and predicate offenses of the Defendants in carrying out their conspiracy, alleged with more particularity in the Fist Claim for Relief, Second Claim for Relief, Third Claim for Relief, and Fourth Claim for Relief, and acting in furtherance of it, Plaintiffs have been harmed by the acts referenced, *supra*, as predicate acts, and Plaintiffs were also harmed in forfeiture of claims amounts that would have been paid but for the conspiracy of the Defendants to assure that traps and other defects of procedure and nature worked into every part of the insurance product.  Foreseeable damages also include the loss of opportunity to properly insure, as well as the physical deterioration of health, deep anguish, economic harms and loss of property, and harms to the market including overcharging for said defective and fraudulent insurance.

1216.  The aforementioned agreement and compact was furthered by one or more unlawful, overt acts intentionally performed by the conspirators, including: (1) fraud; (2) deceit;

(3) intentional endangerment; (4) violation of the aforementioned laws, and all those cited in this Complaint; (5) undue influence of government; (4) false accusations; (5) abuse of process; and (6) false imprisonment.

1217.  Plaintiffs' injuries and/or those of the Plaintiff Class have resulted in the aforementioned economic damages and losses, including, without limitation: (1) The difference between Actual Cash Value and the Replacement Cost they would have received absent the schemes if insured properly; (2) the loss of opportunity to insure properly; (3) being overcharged for insurance; (4) loss of earnings and earnings capacity; (5) medical bills related to foreseeable harms the Plaintiffs and/or Plaintiff Class have also suffered: (1) mental pain and suffering; (2) depression; (3) emotional distress; (4) outrage; (5) the impairment of quality of life; (6) stress-related nerve damage and associated physical deterioration leading to diabetes and other worsened health conditions, with past and future needs for medical assistance and associated costs, including hospitalization, medical, therapy and rehabilitation expenses; (7) loss of earnings and earnings capacity; (8) injury to reputation; (9) false imprisonment; and (10) damage to career.

1218.  Plaintiffs suffered the above-described injured and damages as a proximate result of the Defendants' conspiracy and unlawful actions; these injuries were caused by acts of the conspirators who undertook to accomplish and complete the unlawful purposes of the agreement they had made.

1219.  All of the aforementioned damage, *supra*, are foreseeable, especially to a reasonable insurer with experience, standing in the place of Defendants.

1220.  Defendants also have experience where they have seen these results to their actions and omissions.

1221.  Plaintiffs therefore pray to the Court for compensation of all foreseeable harms associated with the commission of the act and omissions, and for all relief that may be granted under law for the willful, intentional and knowing acts in furtherance of the conspiracy, as well as for the conspiracy itself.

## NINTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Fraud)

1222.  As supporting factual allegations, Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs of this Complaint, *supra*, as if repeated here.

1223.  In the ways and at the times mentioned, *supra*, the Defendants misrepresented and/or failed to disclose to the Plaintiffs the aforementioned facts about Actual Cash Value, and their business practices surrounding it.  Defendants concealed and/or failed to disclose to Plaintiffs the nature of their business practices in regard to Actual Cash Value, as described in the body of the Complaint, and the many other features, escape clauses, deceptive underwriting methods, bad faith intentions, and orchestrating mechanisms that were intended, and would be used latter to harm Plaintiffs.

1224.  The undisclosed facts were material to the transaction and continued relationship between Plaintiffs and Defendants.

1225.  Defendants knew that disclosures concerning the concealed or undisclosed facts should be made to Plaintiffs, and that not disclosing those facts would create in Plaintiff a false impression.

1226.  Defendants concealed or failed to disclose these material facts with intent of creating a false impression of actual facts in the mind of Plaintiffs, even aiding and abetting said purpose and aim.

1227. Defendants further concealed the fraud through misleading half-truth, doublespeak and the orchestration of circumstances outside of Plaintiffs' control or knowledge, do to the previously-mentioned omissions of Defendants.

1228. Defendants acted with malice and/or in wanton and willful conduct.

1229. Defendants concealed or failed to disclose these material facts with the intent that Plaintiffs would rely and act upon, or otherwise forsake acting, upon the concealment or failure to disclose, by taking a course of action that Plaintiffs would not have taken, or, under the preponderance of the evidence, would not have reasonably taken if knowing the actual facts.

1230. A reasonable consumer would only purchase the defective insurance marketed and offered by Defendants if purportedly not containing hidden traps, which the Defendants also work to orchestrate against the purchaser – facts which required reliance on Defendants' uniform deceptive claims to be appealing.

1231. Plaintiffs justifiably relied to their detriment on Defendants' concealment or failure to disclose such material facts and/or were caused harm by said nondisclosure.

1232. From the inception of the Policy until the loss thereafter, Plaintiffs acted to their detriment based on Defendants' concealment or nondisclosure.

1233. Had Defendants disclosed the material facts to Plaintiffs during contract negotiations, or at the very onset of business dealings, or even at any time before the loss, Plaintiffs would have sought different insurance and thereby avoided the damages alleged above – and thereby also avoided the harms alleged of in this Complaint, caused by Defendants.

1234. WHEREFORE, Plaintiffs, individually, and as a putative representatives of the other members of the putative Plaintiff Class, pray judgment on this Ninth Claim for Relief for actual damages, the costs of this litigation, mental suffering, and for such further relief as the

Court may deem proper and just at the time of trial, including emotional and mental distress, all foreseeable damages, merited punitive damages, and including without limitation, all equitable relief set forth, *infra*.

### TENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Constructive Fraud)

1235.   As supporting factual allegations, Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs of this Complaint, *supra*, as if repeated here.

1236.   In the ways and at the times mentioned, *supra*, the Defendants misrepresented and/or failed to disclose to the Plaintiffs the aforementioned facts that were material, and furthermore deceptively included defects into insurance products as to hide their tendency to bring about forfeiture of replacement cost, and further orchestrated mechanisms to bring about economic harm and overpayment to Plaintiffs.

1237.   During the aforementioned pertinent times, the Defendants specifically knew, or knew to a calculated likelihood (or were aware that they did not know whether what they said was true or false), and that disclosures concerning the insurance product and associated agreements should therefore be made to Plaintiffs to prevent Plaintiffs from misunderstanding and relying on Defendants' representations and omissions.

1238.   Plaintiffs justifiably relied to their detriment on Defendants' misrepresentations and/or failures to disclose such material facts.  During all of the life of the Policy, Plaintiffs paid on the Policy, and at the time of claim suffered a loss that could have been avoided otherwise if the material withheld had been disclosed, or if Defendants would have accurately described their products and associated practices.

1239.   Had Defendants disclosed the material facts to Plaintiffs at contract negotiations or onset of business dealings or at any other pertinent time before the fire, Plaintiffs would have positioned themselves otherwise, as controlled risk was the subject of the agreement, and thereby avoided the losses alleged above.

1240.   By virtue of Defendants' misrepresentations and/or failures to disclose material facts, Defendants afforded themselves the means by which to take undue advantage of Plaintiffs, and otherwise intended that Plaintiffs rely on their representation.

1241.   Defendants' actions and omissions tended to deceive, violate confidence, and injure the public interest, and were further done with malice, and were inspired by malice.

1242.   As a result of the tendency of Defendants' actions and omissions to deceive, violate confidence, and injure public interests, and caused Plaintiffs to justifiably rely on Defendants, wherein Plaintiffs have been damaged in an amount to be proved at trial.

1243.   WHEREFORE, Plaintiffs, individually, and as a putative representatives of the other members of the putative Plaintiff Class, pray judgment on this Tenth Claim for Relief for actual damages, the costs of this litigation, mental suffering, and for such further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

## ELEVENTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Negligent Misrepresentation)

1244.   As supporting factual allegations, Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs of this Complaint, *supra*, as if repeated here.

1245.   In particular, the representations of Defendants, alleged in the body of the Complaint, *supra*, as to the nature of their insurance product, and among other things, the

nature of Actual Cash Value as the Defendants intended to use and/or apply the term, were known to Defendants to have a great likelihood on not being understood by the public.

1246.  In light of the above-stated facts, Defendants gave false or misleading information to Plaintiffs in the course of transactions, and in which the Defendants had a financial interest.

1247.  Defendants gave the aforementioned information to the Plaintiffs for Plaintiffs' use in the business transactions between them.

1248.  As stated above, and as incorporated herein, Defendants were negligent in obtaining or communicating the information to Plaintiffs.

1249.  Defendants gave the information with the intent or knowledge that Plaintiffs would act in reliance on the information.

1250.  Plaintiffs reasonably relied on the information supplied by Defendants.

1251.  In reasonable reliance upon the words and conduct of Defendants, Plaintiffs entered or remained in a contract that could not meet the reasonably-expected needs of the Plaintiffs.

1252.  Plaintiffs relied on the words and conduct of Defendants to their detriment.  As a result of Defendants' words, conduct, and omissions, the Plaintiffs suffered the aforementioned and pleaded harms.

1253.  WHEREFORE, Plaintiffs, individually, and as a putative representatives of the other members of the putative Plaintiff Class, pray judgment on this Eleventh Claim for Relief for actual damages, the costs of this litigation, and such further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

**TWELFTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**(Breach of Contract – Ambiguity Created by Multiple Standard Processes:**
**the Meeting of the Minds at the Time of Application, Creating an Agreement)**

1254.  As supporting factual allegations, Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs of this Complaint, *supra*, as if repeated here.

1255.  Enterprise participants have referred to their contracts as standard, and there are standards that are accepted throughout the enterprise that ACORD participates in.

1256.  Due to standard enterprise processes and procedures, there are many features that lead to differ points of ambiguity in the standard contracts, and which, as part of the aforementioned conspiracy, are used to different ends as a kind of dragnet to catch all possibilities of "efficiency" and "unpaid claims."

1257.  Rather than paying Plaintiffs their stated amount, which had been correlated at the time of the agreement to the actual cash value and market value of the property by the standard application forms and standard sales practices, Defendants informed Plaintiffs at the time of claim that the actual cash value of the property was the true value of their property – determined by material mechanisms not fully disclosed in either the standard policies applications – and that such is all they would be paid unless they rebuilt the property (in the Case of Replacement Cost policies), or as final payment (in Actual Cash Value policies) such that the loss was purported by Defendants to be a total loss of the property and Plaintiffs were entitled to receive only the Actual Cash Value, less the value of the land, and less the deductible, despite having charged Plaintiff Class premiums based upon a stated amount, which is more.

1258.   In another standard contract policy of the enterprise, using enterprise terms and drafted to function ACORD standards, the limits of the policy were paid to the policyholder on loss, and the policyholder received a percentage increase, or "bump," as a standard, 25 percent, if the policyholder was able to rebuild.

1259.   As a standard, the aforementioned features were considered by agents in determining what company to insure a client with, and what amount of coverage would satisfy enterprise underwriters in light of the price of insurance offered to the client.   As an enterprise standard, this information was not shared with the insured.

1260.   By application of the above terms, underinsured policyholders were generally unable to rebuild a property of equal value to that insured on the amounts paid by the enterprise participant insurer.

1261.   The aforementioned terms were introduced as a mechanism of fraud, as more particularly stated, *supra*, and were also introduced after an agreement and meeting of the minds was reached in the application process (as witnessed by the application).   In the standard form applications of the enterprise, and in the standards of the enterprise sales process, terms introduced later in the policy – a legal document that is complex and admitted by the enterprise to be unlikely understood by consumers – were either not provided or undefined.

1262.   Due to the allegations in the preceding paragraph, and the circumstances governing the standard sale of insurance and standard meeting of the minds reached thereon: (1) the terms of the policy that were undisclosed and did not govern the agreement reached at the application process; (2) the contract, particularly the policy, is voidable.

1263.   In reference to the preceding paragraph, if terms provided for the first time in the policy that was mailed after an agreement was reached by the acceptance of the application

where to have a materially different meaning than anything disclosed in the application, then such terms would materially alter the agreement reached in the accepted application for insurance that had no such material term, and such policy language, sent after the fact, would constitute a bait-and-switch deceptive practice if altering the bargain materially by either providing material definitions or different terms.

1264.   In regard to the allegations of the preceding three paragraphs, there are many such terms that would not be a part of the agreement reached in the application – given the standard facts surrounding the formation of enterprise Defendant agreements through the application agreement:

a.   The removal of the value of the land from any contractual agreement as to what would be paid in the event of loss for the property;

b.   Undisclosed terms that one must rebuild first to receive reimbursement a replacement cost, as reimbursement and stated times to rebuild are never mentioned in the standards at the time of agreement;

c.   Terms limiting replacement cost to the policy limit when the policy limit was, as a standard, equated to market value and actual cash value, and where, as a standard, policyholders were told that they were getting an undisclosed "something more" than Actual Cash Value if purchasing a Replacement Cost policy, and that they were thus adequately covered for Replacement Cost (a something simply described in enterprise standards as Replacement Cost or "we will pay to rebuild your home");

d.   All exclusions of coverage not communicated at the time of the application agreement.

1265.   By incorporating vague and ambiguous terminology that was reasonably capable of two or more meanings, without defining such terms at the point of sale, or otherwise disclosing to Plaintiff and Plaintiff Class members how that term would be defined in the event of a "total loss," Defendants created an ambiguities in the contract – each of which, being a standard, leads to a subclass.

1266.   Furthermore, as Defendants had a scheme and conspiracy to defraud, such facts are also to form the circumstantial context used in determining ambiguity and latent ambiguity in regard to the meaning of ambiguous terms.

1267.   In this context, there are many features the enterprise has, as a standard used, to illicit control over the application process.   By principles of estoppel, enterprise participants should not be allowed to impute to applicants elements of the process that were in enterprise control.

1268.   In this context, the insurance application also clearly indicates, by requiring Plaintiffs, through an agent, to declare a Stated Amount for the property to be covered by the agreement reached, under the policy, and reveals an intention on the part of Defendants to value the risk and loss.

1269.   In this context, Defendants form a binding agreement by acceptance of the application prior to mailing a policy.

1270.   Because such term was used in the insuring contracts to define what Defendants will pay for loss to Plaintiffs and/or Plaintiff Class members' insured as final payment on Actual Cash Value policies, the term was material (if the policy, sent after the reaching of an agreement, were, in the alternative, not seen as voidable).

1271.   The enterprise standards also clearly indicate, by requiring applicants to declare

a "Stated Amount" for each the property insured – or in the form, which the agent fills out for residential properties, and as a standard, not provided to the applicant: (1) replacement value; (2) under the policy, an intention on the part of Defendant to value the risk and loss.

1272.  As result, and in this factual context of the enterprise standards, the insurance application agreement is, by the points to which it is a meeting of the minds through the application document being an accepted writing, a stated value policy by contract in regard to Actual Cash Value or policy limit, and simply a contract to replace or pay for replacement in regard to Replacement Cost policies.

1273.  As demonstrated by the disputes between the parties to the agreements, and by the differing use that Defendants give the term Actual Cash Value in their writings and practices, the term is ambiguous and should be interpreted strictly against Defendants.

1274.  Defendant accordingly is estopped to deny that the properties insured under the policy for a Stated Amount, or policy limit, were worth the Stated Amount on the date the policy was issued.

1275.  Because such term was selected for use in the form created by or on behalf of the Defendants, by operation of law the terms should be defined in the way most favorable to Plaintiffs and Plaintiff Class members who were not responsible for drafting the adhesive insuring contract form.

1276.  In the same way, all other terms and/or exclusions, material yet not communicated in the application, create an ambiguity, including the terms stated, *supra*.

1277.  Furthermore, some such terms were not stated, and did not appear in the insurance application, negating any meeting of the minds thereon, such as: any provision

stating that Defendants would only cover to the limits of coverage on Replacement Cost policies, flood exclusions not communicated, etc.

1278.   Rather than apply the meaning most favorable to Plaintiffs and Plaintiff Class members, the Defendants applied unstated meanings, which were unascertainable by Plaintiffs and Plaintiff Class members at the time their contracts were entered into.

1279.   Defendants breached their obligations under the policy by valuing the properties for loss adjustment purposes by a methodology or methodologies independent of and without regard for the Stated Amount, and other representations calculated to give a particular impression to the applicant, and for which the properties were insured.

1280.   By means of such methods, Defendants breached the contractual terms of good faith and fair dealing operating in the contracts as a matter of law.

1281.   As a direct and proximate result of said breaches of contract, Plaintiffs and the other members of the Plaintiff Class were damaged.

1282.   Defendants thereby breached their contract with Plaintiffs and other members of the Plaintiff Class who have sustained total losses of their insured properties.

1283.   As a direct and proximate result of said breach of contract, Plaintiffs and the other members of the Plaintiff Class were damaged.

1284.   WHEREFORE, Plaintiffs, individually, and as putative representatives of the other members of the putative Plaintiff Class, pray judgment on this Twelfth Claim for Relief of this Class Action Complaint for contractual damages owed on the application agreements, the costs of this litigation, and such further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

**THIRTEENTH CLAIM FOR RELIEF**
**AND SUPPORTING FACTUAL ALLEGATIONS**
**(Breach of Contract – Contract of Adhesion / Reasonable Expectations)**

1285.   Plaintiffs, individually and on behalf of the Plaintiff Class members hereby, incorporate by reference all paragraphs of the Complaint, *supra*, as though fully set forth herein.

1286.   The policies of insurance issued by Defendants to Plaintiffs and the Plaintiff Class members are contracts of adhesion.

1287.   Under Colorado law, contracts of adhesion are interpreted so as to protect and enforce the reasonable expectations of the parties to the contract.

1288.   Under the totality of circumstances surrounding the purchase of the insurance, and Defendants' methods of sale, a reasonable person in the position of Plaintiffs at that time, and the members of the Plaintiff Class, would reasonably have expected that they were insuring their properties for the Stated Amount set forth in the policy, if an Actual Cash Value policy, and that they would get something more, the rebuilding of the home and that they would receive the Stated Amount from Defendants in the event of a total loss of the insured property.

1289.   All other conditions, terms or exclusions not communicated at the time of application, are also latently ambiguous, given the totality of the circumstance, and should have no effect, as the are terms of adhesion.

1290.   Defendants breached its obligations under the policy by valuing the properties for loss adjustment purposes by a methodology or methodologies independent of and without regard for the Stated Amount for which the properties were insured, and by not providing for the Replacement Cost of policies.

1291.   As a direct and proximate result of said breach of contract, Plaintiffs and the other members of the Plaintiff Class were damaged.

1292.   WHEREFORE, Plaintiffs, individually, and as a representative of the other members of the putative class of Plaintiffs, pray judgment on this Thirteenth Claim for Relief for contractual damages, actual damages and consequential damages, the costs of this litigation, and for such further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

### FOURTEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
#### (Bad Faith Breach of an Insurance Contract)

1293.   Plaintiffs, individually and on behalf of Plaintiff Class members hereby, incorporate by reference all paragraphs of the Complaint, *supra*, as though fully set forth herein.

1294.   The common law imposes upon Defendants, as a contracting party, the duty of good faith and fair dealing that prohibits a contracting party from exercising a judgment conferred by the express terms of the contract in such a way as to evade the spirit of the transaction and deprive the other party of the expected benefit of the contract.

1295.   By applying a methodology for determining actual cash value that is unrelated to and fails to take into account the Stated Amount for which a property is insured, Defendants breached and are breaching their duty of good faith and fair dealing to Plaintiffs and the Plaintiff Class members.

1296.   In failing to disclose material terms, and in using standards to work defects, traps, ambiguity, and mechanisms to bring about forfeiture, into the sales process agreement, the sending of a materially different policy thereafter, and into the very nature of the insurance product, defendants breached their duty of good faith and fair dealing, and acted unreasonably as to the intent of the contract implicit by legal operation.

1297.   At all times pertinent, a subclass of Defendants who were insurers under the aforementioned insurance policies for Plaintiffs, as for claims arising out of their damages listed.

1298.   Plaintiffs thereafter made a claim.

1299.   Plaintiffs also otherwise complied with the terms and conditions of the relevant insurance policies.

1300.   Defendants failed to act fairly and reasonably in its handling the claim and as to the insurance process in particular by employing terms and devices that it knew, or had reason to know, were deceptive and would lead to the confusion of insureds, and as more particularly treated in the BACKGROUND OF THE CASE allegations, *supra*.

1301.   Defendants, through their agents and attorneys, knew that the Plaintiffs were suffering from emotional distress as they acknowledge that the claims process is typically trying, and as the facts listed in the body of the Complaint indicate that Defendants, as a standard, take, and took, steps known to make the claims process more difficult, painful, trying, and to otherwise cause the insureds to be at an unreasonable disadvantage.

1302.   Defendants acted unreasonably in, among other acts and omissions referenced in the foregoing Complaint, and herein: standing by the previously-mentioned flawed estimates of value, set as traps for Plaintiffs; failing to disclose material terms; using material terms in an inconsistent manner as part of their trade practice; and requiring Plaintiffs to file this suit to obtain judgment for its insurance benefits.

1303.   Defendants knew that their conduct and position on the claim were unreasonable.

1304.   Defendants recklessly disregarded the fact that their conduct and positions on the claims were unreasonable.

1305.   Defendants' unreasonable conduct and position on the claims caused, and proximately caused, Plaintiffs damages in an amount to be proved at trial.

1306.   By the acts listed in the body of the Complaint, above, and which are incorporated herein, as well as facts that will arise in discovery, Defendants violated the duties of good faith and fair dealing in numerous and distinct ways, and other duties also, committing multiple counts of bad faith breach of an insurance contract.

1307.   By the above acts, and other acts that will arise in discovery and at trail, evidence exists, and will be found, that Defendants acted knowingly, intentionally, maliciously, and with conscious or reckless disregard for the rights of Plaintiffs and insureds at large, and a request is made for all damages that at time of trial may be warranted, including punitive damages, actual damages, foreseeable damages and consequential damages, and for such further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

### FIFTEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
#### (Willful and Wanton Breach of Contract,
#### Pursuant to § 13-21-102.5(6)(a), C.R.S.)

1308.   Plaintiffs incorporate by reference all of the allegations stated, *supra*, as if repeated herein.

1309.   Defendants intended to breach the aforementioned contracts;

1310.   Defendants breached the contracts without any reasonable justification, as previously states; and

1311.   The contract, being an insurance contract and insuring against calamity, which if not indemnified would knowingly lead to foreseen noneconomic harm, and the Defendants taking actions in the writing of the Contract that were intended to inflict noneconomic loss and injury, placed the matter within the contemplation and expectation of the parties to the agreement that there would be noneconomic harm if full performance were not tendered.

1312.   By the above acts, and other acts that will arise in discovery and at trail, evidence exists, and will be found, that the Defendants acted knowingly, intentionally, maliciously, and with conscious or reckless disregard for the rights of the Plaintiffs and insureds at large when they intentionally breached contracts contemplating, by their nature, emotional distress and outrage, and a request is made for all damages that at time of trial may be warranted, actual damages, foreseeable damages and consequential damages, including emotional distress, and for such other and further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

### SIXTEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Interference with the Performance of a Contract)

1313.   Plaintiffs incorporate by reference all of the allegations, *supra*, as if repeated here.

1314.   Defendants and Plaintiffs were parties to a valid property and casualty insurance contract.

1315.   Under the contract, Defendants owed Plaintiffs all of the contractual duties heretofore stated, particularly in the contract and contract-related Claims for Relief, *supra*.

1316.   In the ways mentioned, *supra*, Defendants entered into, and thus knew that they were a party to a valid insurance contract with Plaintiffs, respectively.  They thus knew of the existence of a valid contractual interest that Plaintiff held in said contract.

1317.  Defendants thereafter, and with aforethought, intentionally and improperly interfered with the contract they had with Plaintiffs by means of the "best practices" and deceitful mechanisms stated with more particularity, *supra*, and by acts the Defendants induced Plaintiff to commit (through the aforesaid traps and devices, such as purposefully underinsuring Plaintiffs, and deceptive inducements to unknowingly assume risk), or others to commit by aiding and abetting Defendants' aforementioned schemes, to frustrate the ability of Plaintiff to perform its obligations under the contract – intentional interference with Plaintiffs' performance of its own contract, either by preventing performance or making it more expensive and burdensome to perform.

1318.  The acts were perpetrated against Plaintiffs as, among other things, stated in the predicate act relating to Plaintiffs in particular.

1319.  As a result of the aforementioned breaches, which breaches were induced by Defendants' intentional and improper interference, Plaintiffs suffered the following damages: (1) economic losses, (2) lost profits; (3) emotional distress, and harm and all other harms more specifically stated elsewhere in this Complaint in factual allegation, or in Claim for Relief.

1320.  By the above acts, and other acts that will arise in discovery and at trail, evidence exists, and will be found, that the Defendants acted knowingly, intentionally, maliciously, and with conscious or reckless disregard for the rights of the Plaintiffs and insureds at large, and a request is made for all damages that at time of trial may be warranted, including any warranted punitive damages, actual damages, foreseeable damages and consequential damages, and for such further relief as the Court may deem proper and just, including without limitation, all equitable relief set forth, *infra*.

## SEVENTEENTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Negligent Hiring and Retention)

1321.  Plaintiffs incorporate by reference all of the allegations stated, *supra*, as if repeated herein.

1322.  As per enterprise standards, and upon information and belief, Plaintiffs alleges that Defendants hired and retained individuals they had previously tested for dispositions that would enable them to serve Defendants' ends, and were then trained to perform work, and provide for Defendants' benefit, unpaid claims through institutionalized bad faith and a culture of bad faith, tortious conduct, dishonesty and racketeering, which was fostered and standardized, and where negligence of aspects of a policyholders claim, or willful blindness, was encouraged or overlooked.

1323.  Defendants owed a legal duty to Plaintiffs to take the care that a prudent person would take in hiring an employee to perform work and provide the services advertised in regard to insurance claims.

1324.  Defendants breached their duty to Plaintiffs by failing to exercise reasonable care in hiring and retaining their employees to perform this work.

1325.  As a standard, when Defendants hired and retained their employees, and motivated them through contingent compensation, and at all other relevant times herein, Defendant knew or reasonably should have known that their would act in the negligent and otherwise harmful and tortious ways mentioned with more particularity in the body of this Complaint, *supra*, and that, as a direct and proximate result of Defendants' employees actions, Plaintiffs would suffer the complained-of harms, as alleged in more particularity, *supra*.

1326.   As a direct and proximate result of Defendants' negligent hiring and retention of their employees, Plaintiffs suffered and continue to suffer the aforementioned damages listed in the body of this Complaint and the Claims for relief, stated, *supra*, and due to such employee's wrongful acts, also performed in furtherance of Defendants' aims, Plaintiffs are entitled to damages in amounts to be proven at trial.

1327.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) compensatory and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; (4) pre-judgment and post-judgment interest on any award of damages to the extent permitted by law; and (5) for such other and further relief as this Court deems just and proper.

### EIGHTEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
#### (Outrageous Conduct)

1328.   Plaintiffs, individually and on behalf of Plaintiff Class members hereby, incorporate by reference all paragraphs of the Complaint, *supra*, as though fully set forth herein.

1329.   The above-described actions of the Defendants were extreme and outrageous.

1330.   The actions of these Defendants were performed recklessly and with the intent of causing Plaintiffs' severe emotional distress, and with malice.

1331.   The actions of these Defendants did cause Plaintiff severe emotional distress, including but not limited to: stress, fear, anger, shock, mental anguish, and pain and suffering.

1332.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs

of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

### NINETEENTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Complaint for Unreasonable Denial and Delay
### Pursuant to the Unfair Claims – Deceptive Practices Act,
### C.R.S. §§ 10-3-1115 & 10-3-1116)

1333.  Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs of this Complaint, *supra*, as if repeated here.

1334.  By the actions listed above, particularly bad faith breach of the duties referenced in the statutes, and violations of the Colorado Consumer Protection Act and the Unfair Claims – Deceptive practices act, Defendants acted unreasonably in denying Plaintiffs' claims.

1335.  Plaintiffs therefore were harmed, and experience unreasonable delay and denial of their insurance claims.

1336.  Plaintiffs are due statutory damages as allowed by this provision of law.

1337.  In this regard, by the acts listed in the body of the Complaint, *supra*, and which are incorporated herein, as well as facts that will arise in discovery, Defendants violated the duties of good faith and fair dealing in numerous and distinct ways, and other duties also, committing multiple counts of bad faith breach of an insurance contract, thereby unreasonably delaying or denying the claims of the insured Plaintiffs.

1338.  WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) actual, statutory, noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

### TWENTIETH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
#### (Strict Product Liability – Design Defect)

1339.  Plaintiffs hereby incorporate the paragraphs stated, *supra*, as if each paragraph was set forth herein in its entirety.

1340.  Defendants are product manufacturers and sellers within the meaning of the Colorado Product Liability Act, C.R.S. §13-21-401 *et seq.*

1341.  Plaintiffs purchased and used the insurance product in a manner reasonably foreseeable to Defendants, and Defendants' insurance product contains design defects, which involve a substantial danger that would not be readily recognized by the ordinary user of the product.

1342.  Defendants created and developed, through research and development, and otherwise manufactured, distributed and/or sold the insurance products that were the source of the Plaintiffs' previously complained-of injuries, damages, and losses. Defendants engineered methods of forfeiture and loss of benefits, and such were included in the insurance products, and, as a standard, were the source of Plaintiffs' injuries, damages, and losses.

1343.  Such insurance products were also a product or good, within a product within the meaning of the Act.

1344.  The insurance product that was the source of Plaintiffs' injuries, damages and losses, was defective, and was unreasonably dangerous to the consumer, as it was contaminated and designed to be defective, purposefully underwritten and designed, at every stage of the insurance policy lifecycle operating off the ACORD standards and framework, known to produce loss to Plaintiffs.

1345.   Due to enterprise controls and standards, the insurance product created, manufactured and distributed by Defendants reached the Plaintiffs without substantial change in the condition in which it was sold.

1346.   Defendants' defective insurance product proximately caused the Plaintiffs' aforementioned numerous harms.

1347.   Defendants, respectively, were the sellers of the defective insurance product that caused the Plaintiffs' damages.

1348.   Defendants were in the business of creating insurance products and distributing them.

1349.   Because Defendants created and sold the defective insurance products that were the source of the Plaintiffs' injuries, damages and losses, which were defective and not reasonably safe due to the designed defects previously mentioned, *supra*, Defendants are strictly liable to the Plaintiffs for the harm proximately caused by their sale of a defective insurance product.

1350.   The insurance product was inherently defective and it was that the defect in the product caused the injury or damage.

1351.   A product has a design defect when its design or configuration is what makes it unreasonably dangerous.

1352.   Safe product design must take into account the intended use of the product, as well as its reasonably foreseeable uses and misuses.

1353.   At the time of the creation of the product, a safer alternative design existed.

1354.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) actual, statutory,

noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

### TWENTY-FIRST CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
#### (Strict Product Liability – Failure to Warn)

1355.   Plaintiffs hereby incorporate the paragraphs stated, *supra*, as if each paragraph was set forth herein in its entirety, particularly all statements made in the Twentieth Claim for Relief, *supra*.

1356.   The aforementioned insurance product was made unsafe or dangerous by the manufacturer's failure to provide sufficient warnings, instructions, or labels with regard the product, and, in the aforementioned ways, supra, Defendants were negligent of this danger, of which they should have known.

1357.   The aforementioned conduct of the Defendants at the time of marketing should have made them realize the danger they were placing consumers, and the Plaintiffs in, without adequate warnings.

1358.   Defendants knew, or should have known of, the given risk or danger, and were negligent therein.

1359.   Defendants are assumed to possess the knowledge possessed by every other insurer as to the nature of their product and its sales and, as a result, knowledge by one is considered knowledge to all Defendants.

1360.   Therefore, a duty to warn existed, as the danger of an unreasonable risk or danger was known and/or reasonably knowable to Defendants.

1361.   Defendants are therefore liable for the aforementioned Damages caused by an inherent danger in their insurance products, as there was a failure to provide adequate (1) adequate warning of the danger and (2) adequate instructions as to how to avoid the danger.

1362.   The danger was reasonably foreseeable to Defendants or discoverable through reasonable inspection or analysis.

1363.   The adequate warnings needed would have reduced the risk of danger and would have been inexpensive to produce.

1364.   The expense in creating the forms needed to adequately warn Plaintiffs, so as to avert the aforementioned resulting damages, were outweighed by the great economic and foreseeable harm caused to Plaintiffs and Plaintiff Class.

1365.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) actual, statutory, noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

### TWENTY-SECOND CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (Breach of Warranties)

1366.   Plaintiffs hereby incorporate the paragraphs stated, *supra*, as if each paragraph was set forth herein in its entirety, particularly all statements made in the Twentieth Claim for Relief and Twenty-First Claim for Relief, *supra*.

1367.   Defendants owed a duty to the decedent to manufacture and sell an insurance product that conformed to their express and implied warranties, including, but not limited to, the implied warranty of merchantability and the implied warranty of fitness for a particular use

or purpose.

1368.   The insurance products created by Defendants, and produced and sold by Defendants, which caused Plaintiffs' aforementioned foreseeable and proximate damages, were contaminated with hidden traps and defects known to create loss to an insured.

1369.   Such insurance products would not pass without exception in the trade, and the sale of such products was thus in breach of the implied warranty of merchantability.

1370.   The insurance products created and sold by Defendants, which caused the Plaintiffs' aforementioned foreseeable and proximate damages, were contaminated with hidden traps and defects known to create loss to an insured, and were therefore not fit for the uses and purposes intended by either the Plaintiffs or the Defendants, *i.e.*, insuring against loss with a quasi-fiduciary duty, accurately allocating risk prior to loss, and restoring an insured to their prior position after a loss.   The sale was thus a breach of the implied warranty of fitness for its intended use.

1371.   Because Defendants manufactured and sold the insurance products in question, the condition of which breached their express and implied warranties, Defendants are liable to Plaintiffs for the harm proximately caused by their sale of insurance products sold with design defects.

1372.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) contractual, quasi-contractual, actual, statutory, noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

## TWENTY-THIRD CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Common Law Negligence)

1373.   Plaintiffs incorporate by reference the allegations, *supra*, as if repeated here.

1374.   Defendants owed Plaintiffs a duty to not violate the quasi-fiduciary obligations they owed to said Plaintiffs and to other insureds; to not cause said Plaintiffs unreasonable foreseeable harm; to not violate common law duties of care known to all and exemplified in the statutes referenced above (and using the aforementioned statutes therefore as evidence of an existent common law duty), as negligence *per se*; and the Defendants owed Plaintiffs common law duties that are evident in the very nature of the interactions and what was foreseeable to Defendants on the face of the interactions.

1375.   Negligence is also alleged by *res ipsa loquitur*, as the acts and omissions complained of herein are by their very nature of the sort that would not happen absent a breach of a duty owed to the Plaintiffs.

1376.   A jury could find, from the facts alleged above, numerous inferences and other indicating facts surrounding the acts and omissions referenced herein, which would indicated both duties and violation of said duties causing harm.

1377.   Negligence, as alleged, is also seen on the face of the breaches referenced herein, and such breaches are demonstrated on the face of the facts, which will be determined at trial as *prima facie* negligence.

1378.   Defendants violated the various duties owed by means of the acts and omissions alleged herein, and by facts that are now hidden and associated to said acts and omissions, which will, upon information and belief, come to light in discovery and allow a jury considering them, and their inferences, to find negligence on the facts before it.

1379.   The violations caused Plaintiffs foreseeable damage, as alleged above.

1380.   By their actions and omissions, referenced above and herein, Defendants were the proximate cause of the damage to Plaintiffs.

1381.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) actual, statutory, noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

### TWENTY-FOURTH CLAIM FOR RELIEF
### AND SUPPORTING FACTUAL ALLEGATIONS
### (*Quantum Meruit* and Unjust Enrichment)

1382.   Plaintiffs incorporate by reference the allegations, *supra*, as if repeated here.

1383.   Plaintiffs and Plaintiff Class conferred a benefit on the respective Defendants by paying premiums.

1384.   As alleged otherwise in this Complaint, *supra*, Defendants either requested the benefit or knowingly and voluntarily accepted it.

1385.   As pleaded above, *supra*, circumstances surrounding the transaction were such that it would be unjust for Defendants to retain the benefit without compensating Plaintiffs reasonably.

1386.   Defendants were enriched by their improper acts alleged above and incorporated by reference.

1387.   Defendants' aforementioned enrichment was achieved by means that deviated from the Parties' mutual purpose.

1388.   Plaintiff was impoverished by the above-mentioned enrichment of Defendant, and was not compensated for the impoverishment.

1389.   There was no justification for the aforementioned enrichment of the Defendants, and the aforementioned enrichment runs contrary to justice.

1390.   Accordingly, equitable principles dictate that Plaintiffs should be returned the monies that Defendants are holding by means of its previously mentioned unjust enrichment.

1391.   A cause of action for *quantum meruit* arises when one person confers a benefit on another under circumstances that would cause a reasonable person to believe he would be compensated by the other. The Latin phrase means literally, "for so much as the thing is worth."

1392.   As stated in more particularity, *supra*, Defendants charged Plaintiffs on stated amounts, and engineered unpaid claims of monies that would otherwise be paid absent such misconduct.

1393.   Plaintiffs and Plaintiff Class where harmed by such misconduct, as all who have been paying overpaying for insurance, being thus overcharged, are due a refund, as they purchased, and have been heretofore covered, by inferior coverage, having been at risk the entire time, as they made payments.

1394.   All Plaintiffs who suffered a loss and were denied what they paid for, are thus owed the denied monies and what they should have received under principles of *quantum meruit*, as Defendants received the benefit of paid premiums.

1395.   If, in the alternative to the other Claims for Relief alleged in this Complaint, the Court should find that Plaintiffs have no plain, speedy and adequate remedy at law to

compensate them, or for remedying the unjust enrichment complained of, then, in that case, this Claim for Relief is prayed for as a supplement and alternative.

1396.  As a result of Defendants' unjust enrichment, a subclass of Plaintiffs have, and will continue to suffer a loss, absent equitable relief granted by this Court.

1397.  WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and in equity award all appropriate Plaintiffs quasi-contractual relief in equity on the facts of this case (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

## TWENTY-FIFTH CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
### (Estoppel)

1398.  Plaintiffs incorporate by reference the allegations, *supra*, as if repeated here.

1399.  As Defendants by admission, and by admissions contained in the very mechanisms they have used, which presuppose both causation and the prediction of the results endeavored.

1400.  Under equity, it therefore prayed of this Court that Defendants be estopped from asserting that causation must be proven beyond the point of their admissions, or by some other means to its exclusion as to the Plaintiff Class and subclasses affected, and achieved result of such aims.

1401.  Defendants were thus the cause of the aforementioned harms to Plaintiffs, such harms, which were thus foreseeable.

1402.  This is prayed by Plaintiffs in regard to all matters pleaded, *supra*, requiring causation as an element.

1403.   WHEREFORE, Plaintiffs respectively request that this Court enter a judgment in Plaintiffs' favor and against Defendants, and award to Plaintiffs: (1) actual, equitable, noneconomic, foreseeable, proximate and consequential damages, in an amount to be proven at trial; (2) costs of this action; (3) reasonable attorney fees; and (4) for such other and further relief as this Court deems just and proper.

## JURY DEMAND

1404.   Plaintiffs demanded a jury trial as to all issues so triable, particularly on all issues of fact referenced in this Complaint.

## REQUEST FOR RELIEF

1405.   WHEREFORE, Plaintiffs pray, for themselves and all other members of the class:

a.   That the rights of the class members with regard to all the previously stated Claims for Relief, stated, *supra*, be adjudicated, tried and declared;

b.   That Defendants be permanently restrained and enjoined in all of the ways mentioned with more particularity, *supra*, in the aforementioned Claims for Relief;

c.   That Plaintiffs be awarded attorneys' fees in accordance with all previously-pled statutes authorizing the payment of such fees;

d.   That Plaintiff Class be awarded all available damages incident to the relief requested, whether in equity, tort, contract, or statute, and whether actual, consequential, exemplary, treble or punitive, and that such be paid in a sum to be determined at trial; and

e.   That Plaintiffs have such other relief as to the Court may seem appropriate, including costs, expenses, and appropriate pre-judgment and post-judgment interest for all applicable.

Dated: June 21, 2014.

Respectfully submitted,

By:     s/ Ed Dougherty, Esq.
        **Ed Dougherty, Esq.**
        DOUGHERTY & HOLLOWAY, LLC
        7200 N.W. 86th Street – Suite D
        Kansas City, Missouri 64153
        Telephone: (816) 891-9990
        FAX: (816) 891-9905
        E-mail: edougherty@dh-law.com

        ATTORNEYS FOR PLAINTIFFS
        AND THE PUTATIVE CLASS